UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| RAFAEL E. PEREZ, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>TARGET CORPORATION, BRIAN C. CORNELL, MICHAEL J. FIDDELKE, AND A. CHRISTINA HENNINGTON,<br><br>               Defendants. | CIVIL CASE NO. _____<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Rafael E. Perez ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of public statements issued by Target Corporation ("Target" or the "Company"), including press releases and filings with the United States Securities and Exchange Commission ("SEC"), as well as securities analyst reports and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Target common stock between August 18, 2021, and May 17, 2022, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against Target and certain of Target's executive officers and directors.

2.      Prior to the Class Period, Target experienced unprecedented double-digit growth in 2020 as consumers increased spending with funds provided from stimulus checks and shifted their spending away from services in favor of goods. In its 2Q 2021 earnings call, Target attributed its success to its "durable, flexible" business strategy, which it stated allowed the Company to stay nimble and quickly respond to its customers' rapidly shifting preferences. Target touted its "balanced multi-category assortment" as a "key driver of flexibility" and a unique advantage that allowed the Company to "serve our guests, even when their wants and needs are changing rapidly." To ensure that its assortment stayed in balance in a volatile environment, Target reviewed the data that it gathered from its 100+ million-member loyalty program, Target Circle, as well as other sources, on a weekly basis to gain insights and inform its merchandising decisions. Because these preferences were often changing "week by week," these insights were essential to allow Target to "optimize [its] assortment."

3.      However, despite Target's runaway success in 2020, the Company's revenue was constrained by Target's inability to keep its shelves fully stocked. In the first half of 2021, though inventory had meaningfully improved compared to the prior year, Target was still experiencing some headwinds which prevented the Company from maintaining optimal inventory. On August 18, 2021, during a Company earnings call where Defendants discussed second quarter 2021 results, Target attributed its inventory struggles to two pandemic-related factors: (1) unexpectedly greater demand due to changing consumer behavior; and (2) vendor constraints resulting in less product for Target to replenish. To mitigate the risk that replenishment of in-demand goods could take longer than usual going into the second half of 2021, Target announced during that earnings call that it had been ordering larger upfront quantities in advance of season to ensure that shelves were stocked with products consumers wanted, when they wanted them.

4.      At the same time Target announced its early purchasing strategy, Defendants stated during the August 18, 2021, earnings call that consumer shopping preferences continued to shift. For example, while demand for home and hardline products—two of Target's core product categories—skyrocketed in 2020, the Company was now noticing a softening in demand for those products. Nevertheless, Target falsely assured investors that its "unique multi-category assortment" enabled the Company "to flex between patterns in consumer behavior changes," and that its inventory "perfectly positioned [Target] to serve our guests' evolving wants and needs."

5.      As recently as March 1, 2022, Defendants continued to boast about Target's "balanced" assortment and how the Company was "leveraging guest insights to enhance our assortment" and adapt to the rapidly changing consumer trends.

6.      However, contrary to Defendants' statements touting the flexibility of Target's purported "durable" business model and "balanced assortment," Defendants were aware that the Target's strategy of buying early had resulted in the Company over-purchasing goods that were no longer in demand.  As early as August 2021, Target's "multi-category" inventory became out-of-balance and overweight in home and hardline products — "bigger, bulkier products like furniture, TVs, and more" — due to waning demand. Target's assortment problem only continued to grow throughout the Class Period as consumers began to "refocus[] their spending" away from home and hardline goods and into experiences.

7.      By May 18, 2022, Defendants would admit when reporting on results for the first quarter of 2022 that contrary to their public statements, Target's "durable, flexible strategy" was thwarted by its practice of ordering inventory before it was needed, resulting in overstocked, unsellable inventory taking up valuable store shelf space and leaving Target unable to quickly pivot to meet changing consumer preferences as represented. This resulted in Target's inventory

increasing by nearly $1.1 billion over the previous quarter and overweight in "bigger, bulkier" hardline and home products that the Company was now forced to markdown to "make room for fast-growing categories." As a result, Target's revenue and gross margin declined nearly 19% and 4.3%, respectively, for the quarter, and Defendants stated they expected the excess inventory to negatively affect earnings into the next quarter.

8.       The price of Target's common stock had been artificially inflated by Defendants' misrepresentations about the Company's "balanced multi-category assortment," insight into consumer behavior, and ability to respond to shifting trends throughout the Class Period. Upon the news that Target's sales growth was lower than expected and that Target was unable to sustain the more moderate growth the Company had anticipated just a few weeks earlier, the price of Target's common stock plummeted as the artificial inflation was removed from the price.

9.       On this news, Target's stock price declined $53.67 per share, or nearly 25%, from a closing price of $215.28 per share on May 17, 2022, to a closing price of $161.61 per share on May 18, 2022.

## II.    JURISDICTION AND VENUE

10.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

12.      This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Target is headquartered in this District, with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403.

## III.     PARTIES

14.     Plaintiff Rafael E. Perez purchased Target common stock during the Class Period as set forth herein, and in his certification filed herewith.

15.     Defendant Target is a corporation existing under the laws of the State of Minnesota with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "TGT".

16.     Defendant Brian C. Cornell has served as Target's Chairman of the Board and Chief Executive Officer ("CEO") since August 12, 2014.

17.     Defendant Michael J. Fiddelke has served as Target's Executive Vice President and Chief Financial Officer ("CFO") since November 1, 2019.

18.     Defendant A. Christina Hennington has served as Target's Executive Vice President and Chief Growth Officer ("CGO") since February 16, 2021. As CGO, Ms. Hennington oversees Target's merchandising, product design, and sourcing, as well as strategy, insights, and growth.

19.     Cornell, Fiddelke, and Hennington are collectively referred to herein as the "Individual Defendants."

20.    Target and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    CONTROL PERSON ALLEGATIONS

21.    By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Target's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## V.    SUBSTANTIVE ALLEGATIONS

### A.  Background

22.    Target, incorporated in 1902 and headquartered in Minneapolis, Minnesota, is a major retailer of five "core" product categories—apparel, food and beverage, essentials and beauty, home, and hardlines. These categories encompass a wide range of merchandise, such as school supplies, furniture, sporting equipment, and televisions. About one third of the products sold by Target are exclusive to the Company through private labels or owned brands.

23.    After experiencing record growth in 2020 from increased spending due to government stimulus payments and a shift in spending to goods and away from services, Target

emerged from the pandemic with what Defendants described as "a massive influx of insights" of customer preferences from new and returning customers and an ability to "listen[] to the ever-changing wants and needs of our guests" to ensure that the Company can "optimize" its product assortment. Noting that a big headwind in 2020 was Target's ability to keep its store shelves stocked, Defendants announced in August 2021 that it had been pre-buying more product earlier in the season to ensure that the Company could keep up with demand.

24.     Using its purported "durable, flexible" business model and advanced ordering of inventory, Target claimed that it could "adapt to any environment" and "stay[] three steps ahead with our guests in these rapidly changing times." According to Target, the Company's "balanced, multi-category assortment" was key to that model, and leveraging guest insights to inform merchandising decisions was key to keeping the "multi-category assortment" in balance in the face of rapidly changing consumer trends.

25.     Cara Sylvester, Target's Chief Marketing and Digital Officer, gave investor's an overview of Target's capabilities of understanding the consumer in order to accurately forecast inventory:

> Today, Target has 40 million guests in counting shopping across channels. And as you've heard us share before, omnichannel guests spend 4x as much as stores-only guests and even more compared to digital-only guests. *Target can bring together insights across an omnichannel journey, from RedCard and registry, to digital and in-store, to our call centers and every step in between, which means we're getting a 360-degree view of the kind of guests that are driving so much growth.*

26.     Sylvester continued, explaining how guest search terms are purportedly reviewed on a weekly basis and how those insights are fed to the merchandising team to find the "right mix":

> *I think our search terms and what the guest is looking for changes seasonally all the time*, always seasonal products, always newness and always the hot items that are out there. *And so we see a really close look at our search really on a weekly basis and work with our merchant partners to share back those insights. What I would tell you is over the years, the search insights, of course, are going to impact.*

*And we're going to feed those over to the merchandising team for them as they're constantly looking for the right mix of our owned brand products and our national brand products. And so we'll continue to make sure we're feeding those over.*

27.     However, unbeknownst to investors, Target had grossly overstocked inventory for its larger and bulkier "hardline" and home product categories (*e.g.*, furniture and televisions), as demand for these products were softening such that Target was unable to move it off the store shelves fast enough to adapt to changes in customer preferences. Thus, the Company was faced with the choice of discounting and writing down the value of its overstocked hardline and home inventory to make room for the products consumers wanted, or missing out on sales of those products while its less desirable, slower moving hardline and home inventory slowly made its way off the shelves.

28.     Despite Target's inability to sell its overstocked hardline and home inventory and accurately and timely predict consumer purchasing preferences, throughout the Class Period, Defendants made a series of false and misleading statements to investors misrepresenting the flexibility of the Company's purported "durable" business model, its ability to leverage its multi-category product assortment to meet unexpected changes in its guest's wants and needs, and its ability to leverage its guest insight data to predict those changing wants and needs. As a result, as early as August 2021, Target's multi-category assortment became out-of-balance and overweight in "bulky" hardline and home products. Target's overstocked inventory problem worsened throughout the Class Period.

**B.  Defendants' Material Misrepresentation and Omissions**

29.     The Class Period begins on August 18, 2021, when Defendants reported Target's financial results for the second quarter ending July 31, 2021, in an earnings call with analysts (the "Q2 2021 Earnings Call"). During the Q2 2021 Earnings Call, Defendant CEO Brian Cornell

boasted that Target has a "durable model that's in place today, one that puts our guests first and *leverages all of our assets and capabilities to serve their evolving wants and needs*."

30.     Defendant Cornell touted that "[b]eyond our fulfillment options, *we continue to benefit from our unique multi-category assortment, which is perfectly positioned to serve our guest's evolving wants and needs*. As a result, comp sales in all 5 of our core categories expanded in the second quarter on top of strong growth a year ago."

31.     During that same earnings call, Defendant Christina Hennington, Target's Chief Growth Officer, provided more details on the purported flexibility of Target's "durable model", again emphasizing how the Company's "multi-category assortment" was an essential part of Target's business model that uniquely allows the Company to respond to rapid changes in consumer behavior:

> Target's second quarter performance also demonstrates the strength and durability of our business model. *Our unique, multi-category assortment offers the right balance of what our guests want and need even as they change, sometimes rapidly.* As a result, despite record-setting growth last year, all 5 of our core merchandising categories grew again this year, proving that there's still plenty of runway ahead.

32.     In responding to an analyst question about how consumer behavior had changed over the past 90 days and how Target expects consumer traffic to unfold over the next couple of quarters, Defendant Hennington claimed that the changes were happening at the "more at the micro level", which the Company was well-prepared to respond to:

> Traffic has been very consistent, and it's been consistently strong. And we're very excited about the early momentum in back-to-school and back-to-college as well. *What I would tell you is that the strength of our portfolio allows us to flex between patterns in consumer behavior changes that are more at the micro level, not at the aggregate level*. The aggregate has been consistent and healthy.

33.     On November 17, 2021, Target issued a press release announcing its third quarter financial results for the quarter-ended September 30, 2021 (the "Q3 2021 Earnings Release"). In

the Q3 2021 Earnings Release, Defendants boasted about Target's strong growth, with comparable sales up 12.7%, and that *"[a]ll five core merchandise categories delivered double-digit comparable sales growth*."

34.     During an earnings call that same day (the "Q3 2021 Earnings Call"), Defendants once again touted the flexibility of Target's "durable" business model and the Company's purported ability to respond to rapidly changing consumer behavior, stating that the strong third quarter growth was a "vivid demonstration" of that flexibility.

35.     For example, Defendant Cornell stated:

> Since the third quarter of 2019, prior to the pandemic, Q3 store sales have expanded by $3.8 billion, while digital sales have increased another $3.1 billion. *This provides a vivid demonstration of the flexibility of our operating model to serve our guests no matter how they choose to shop. All of these results reflect the level of guest engagement far beyond what many would have imagined a few years ago, when we started making huge investments throughout our business, in our stores, new brands, same-day services, supply chain*, and importantly, our team.

36.     Defendant Cornell continued, again emphasizing how Target's "multi-category assortment" allows the company to be nimble and responsive to evolving consumer wants and needs:

> Beyond fulfillment capabilities, *our balanced multi-category assortment is another key driver of flexibility and resiliency within our business model. The breadth of our assortment, both within and across our core categories, allows our team to quickly and seamlessly serve our guests, even when their wants and needs are changing rapidly.*

37.     Defendant Hennington, building on the CEO's statements about Target's flexibility and nimbleness, explained how Target uses its insight into customer's wants and needs to inform its business decisions:

> *We continuously evaluate our guests' mindset, which serves as a North Star for all our strategies and decisions*. We remain laser-focused on their experiences with us and expectations of us. *And we strive to build flexibility and agility into our*

***plans*** to ensure we show up at our best for them during the holidays and all year round.

38.     On March 1, 2022, Target announced its fourth quarter earnings for the fiscal year 2021 and hosted an earnings call with analysts (the "Q4 2021 Earnings Call"). In the Q4 Earnings Call, Defendant Cornell boasted that Target had "19 consecutive quarters of comp growth" with fourth quarter comparative sales up nearly 9%. Defendant Cornell attributed the continued growth to Target's ability to meet "the explosive demands that materialized with the pandemic," emphasizing that the Company's insights into consumer behavior enabled Target to move forward "***with speed, with efficiency and with relevance, with care.***" Cornell continued:

> Guest engagement is impressive. We see the scale of opportunities as being even more impressive. ***We'll show you how we translated a massive influx of insights from new guests and loyal guests who are engaging even more.*** You'll see how we're accelerating our capabilities in personalization, creating an always-on, inspiring guest experience and driving unparalleled value to our partners with a fast-growing revenue stream for our business through Roundel.

39.     Hennington continued, emphasizing the purported advantages of Target's durable business model and the Company's ability to understand its customer's wants and needs:

> We have created momentum through unique and innovative strategies, many of which began long before the onset of the pandemic. ***And because of our durable, flexible business model, we have proven we can adapt to any environment. We'll continue to play offense and accelerate these strategies while listening to the ever-changing wants and needs of our guests to ensure our playbook is a direct reflection of what they have come to expect from Target.***

40.     In responding to an analyst question about what Target believes is the "***right assortment***" of inventory, Defendant Hennington emphasized how Target's insights into the consumer ensures that the Company can "craft" the right balance:

> First and foremost, our point of view on assortment is all about curation. ***It's making sure that we understand the consumer and that we can craft an assortment that starts with a balance of really well-designed, high-quality and value owned brands, coupled with the leading national brands that consumers would expect to find***. By having a curated assortment, it fuels the stores-as-hubs

11

model because there isn't this long extension that we have to fulfill from other parts of the network. We're using the inventory base of the stores, which creates efficiencies, which creates speed, which creates lower costs.

41.     Defendant Fiddelke, Target's Chief Financial Officer, assured investors that, as a result of the explosive growth in customers during the pandemic and accompanying gains in insight into consumer behavior, Target was well-positioned to maintain sustained mid- to high-single-digit growth in 2023 and beyond:

> ***Our confidence in Target's ability to continue growing is based on all of the initiatives you've heard about today***, which are designed to drive engagement, traffic and market share gains, ***including***: new stores; remodels; national brand partnerships and owned brand innovations; expansion of our same-day services; growth of new and emerging revenue sources; further rollout of sortation centers; continued investments in value and affordability; ***leveraging guest insights to enhance our assortment*** and promotions while personalizing the guest experience; elevating guest service through investments in the team, training and technology, all while investing in Target Forward, to enhance the long-term sustainability of the business and the planet.

42.     The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to Target's business, operations, and prospects: (i) Target's strategy for mitigating supply-chain constraints by over-ordering inventory had severely limited the Company's ability to timely respond to evolving consumer behavior; (ii) as a result, the purported "massive influx of insights" gained from the extraordinary heightened demand during the pandemic could not be leveraged by Target to react to rapidly changing trends; and (iii) as a result of Target's inability to timely react to changes in consumer trends, Target's sales declined and the Company was left with an overabundance of inventory, forcing Target to take large markdowns, and severely impacting the Company's financial results. As a result of the foregoing, Target's public statements were materially false and misleading at all relevant times.

### C.  The Truth is Revealed

43.     On the morning of May 18, 2022, Target filed a Form 8-K with the SEC attaching a press release containing the Company's financial and operating results for the first quarter ended April 30, 2022 (the "Q1 2022 Earnings Release"). The Q1 2022 Earnings Release revealed that Target had missed profit estimates widely, with cost of goods sold increasing 10% year over year and operating income declining to $1.3 billion from $2.4 billion in the prior year. In the filing, Target also revealed that its operating margin was "well below expectations, driven primarily by gross margin pressure reflecting actions to reduce excess inventory…." Target further explained that the "gross margin rate reflected higher markdown rates, driven largely by inventory impairments and actions to address lower-than-expected sales in discretionary categories…."

44.     On an earnings call for investors held before trading on that same day, Defendant Fiddelke noted that Target's gross margin for the quarter was down nearly 4.3%, with approximately 3% of the 4.3% decline due to "the combined impact of impairments, markdowns, and other actions taken to rightsize our inventory position in categories that were too heavy…."

45.     Defendant Cornell attributed the excess inventory to Target's inability to anticipate the pace at which consumers "continue[d] refocusing their spending away from goods and into services[.]" Cornell further noted that much of the excess was in bulky categories, such as kitchen appliances, TVs, and outdoor furniture, "which put additional strain on an already stretched supply chain."

46.     Defendant Hennington further explained:

As Brian mentioned, first quarter gross margin performance was well below our expectations. This was driven by a number of factors, *the most impactful of which was softer than expected sales in several categories, resulting in too much inventory in those areas.* As we developed our plans for the quarter, our task was to anticipate how spending would change under circumstances no one had ever seen before given that we were about to compare over 2 years of historically high federal stimulus payments. As such, we relied on numerous forecasts and estimate, both

13

internal and external, to help determine our view for the quarter. Despite this careful approach, the mix of actual demand materialized differently than we had anticipated.

In addition, as supply grew and demand shifted away from bigger, bulkier products like furniture, TVs and more, we needed to make difficult trade-off decisions. We could keep this product knowing it would sell over time or we can make room for fast-growing categories like Food & Beverage, Beauty, and personal care and Household Essentials. To preserve the quality of on-shelf presentations and support the guest experience, we chose the latter, leading to incremental markdowns that reduced our gross margin.

47.     John J. Mulligan, Executive Vice President and Chief Operating Officer, added:

As Brian and Christina mentioned, this quarter, we ended up carrying too much inventory in several categories where the slowdown in sales was more pronounced than expected, including home, electronics, sporting goods and apparel. In addition, capacity pressures were compounded by the fact that in several of these categories, including kitchen appliances, furniture and outdoor living, items are bulkier than average and require higher-than-average amounts of storage capacity.

As our team collaborated with Christina's team to work through this excess inventory, we made decisions with an eye on preserving the guest experience. Rather than jamming store sales floors with excess product, which would have made them more difficult to shop, our team secured temporary storage capacity instead. And as Christina mentioned, rather than carrying items beyond their relevant season, her team made the tougher call and marked items down to clear them and keep our presentations fresh and inspiring.

48.     Defendant Fiddelke, responding to an analyst question regarding inventory, attributed the increase in inventory relative to sales, in part, to Target's supply-chain mitigation strategy of ordering larger quantities earlier in season:

**Edward Joseph Kelly**
*Wells Fargo Securities, LLC, Research Division*

Okay. And then just a follow-up. Inventory per store is up a lot over 2019 before, pre-pandemic. And a lot has obviously changed, and your sales are a lot higher. But can you talk about where this should be? Maybe quantify the amount of excess that's still sitting in inventory today and where the most work needs to be done. And then what are you doing going forward to adjust things like cancellations? Or is it just really sort of adjusting ordering going forward?

**Michael J. Fiddelke**
*Executive VP & CFO*

Yes, Ed. The -- it's a good question. There's a few things going on if you look at the level of inventory on our balance sheet. One is we've got some categories where we need to work through some inventories. We've already talked about that piece. There's a little bit of product cost inflation sitting in that number, too. But I will say, given our desire to make sure we're landing some product earlier and protect against supply chain volatility, for the near term here, you should expect kind of that new normal of sales growth to inventory growth to include some working capital investments as we land some of that product sooner to make sure we've got it for the guest.

And so those are the 3 big factors that we're watching. Obviously, the first of those factors, we'll work to make some progress on here in the second quarter to get us in line with what we expect sales trends to look like for the back part of the year. But old normal might not be the current run rate in the near term as we work to secure product, land it early and avoid some of the disruptions that have caused out of stocks over the last year.

49.     On this news, Target's stock price declined $53.67 per share, or nearly 25%, from a close of $215.28 per share on May 17, 2022, to a close of $161.61 on May 18, 2022.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Target were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Target, their control over, and/or receipt and/or modification of Target's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Target, participated in the fraudulent scheme alleged herein.

15

51.     In particular, as alleged above, Defendants admitted that they had access to data that they reviewed on a weekly basis which gave them insights into changing consumer trends. Defendants admitted that, based on a review of this data, they were aware that trends were changing rapidly, "week by week." As a result, Defendants were aware that demand for hardline and home products that it had already pre-ordered was softening and that Target's assortment was, thus, overweight in these categories such that markdowns would be inevitable to make room for in-demand goods.

52.     Additionally, many of the Defendants sold stock during the Class Period.

53.     On December 2, 2021, Defendant Cornell sold 30,000 shares of Target common stock, while Cornell was in possession of material non-public information. On March 16, 2022, Defendant Cornell sold another 30,000 shares of Target common stock while in possession of material non-public information.

54.     On April 4, 2022, Defendant Fiddelke sold 5,000 shares of Target common stock—just days after the Company announced results for the 2021 fiscal year—while Fiddelke was in possession of material non-public information.

55.     At the time of their stock sales, Defendants were aware of the true nature of the Company's rising, off-balance inventory and lower sales of pre-ordered product categories that consumers were no buying but that were taking up valuable store shelf space. As insiders with specific knowledge of the facts that would cause the price of the Company's stock to decline when the truth was revealed on May 18, 2022, the Defendants sale of stock prior to the May 18, 2022 corrective disclosure that informed the market of the true nature of the Company's inventory problems and declining sales raises an inference that the Company's management acted knowingly

and recklessly when issuing the false and misleading statements concerning the Company's supply chain issues detailed in this complaint.

## VII.   LOSS CAUSATION

56.   During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Target's common stock and operated as a fraud or deceit on Class Period purchasers of Target common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Target's common stock fell precipitously. As a result of their purchases of Target common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## VIII.   APPLICATION OF PRESUMPTION OF RELIANCE

57.   At all relevant times, the market for Target's common stock was an efficient market for the following reasons, among others:

a)   Target common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)   Target filed periodic public reports with the SEC and the NYSE; and

c)   Target regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

58.   As a result of the foregoing, the market for Target's common stock promptly digested current information regarding Target from all publicly available sources and reflected

such information in the prices of the common stock. Under these circumstances, all purchasers of Target common stock during the Class Period suffered similar injury through their purchase of Target common stock at artificially inflated prices and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

59.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Target who knew that the statement was false when made.

## X.    CLASS ACTIONS ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Target common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

61.     The members of the Class are so numerous that joinder of all members is impracticable since Target has more than a million shares of stock outstanding and because the Company's shares were actively traded on the NYSE. As of March 3, 2022, Target had 462,418,075 shares outstanding.

62.     While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

63.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)      whether the price of Target common stock was artificially inflated during the Class

Period as a result of the material nondisclosures and/or misrepresentations complained of herein;

and

(g)      whether the members of the Class have sustained damages as a result of the decline

in value of Target's stock when the truth was revealed, and if so, what is the appropriate measure

of damages.

64.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

sustained damages from Defendants' wrongful conduct in a substantially identical manner.

65.      Plaintiff will adequately protect the interests of the Class and has retained counsel

who are experienced in class action securities litigation. Plaintiff has no interests which conflict

with those of the Class.

66.      A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

## XI.    CLAIMS FOR RELIEF

**COUNT I**
**Violation of Section 10(b) of**
**the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

67.      Plaintiff incorporates by reference each and every preceding paragraph as though

fully set forth herein.

68.      This Count is asserted by Plaintiff on behalf of herself and the Class against all the

Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

69.      During the Class Period, Defendants carried out a plan, scheme, and course of

conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

20

including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Target's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Target's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

70.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Target's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

71.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

72.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

73.    As a result of Defendants' fraudulent activity, the market price of Target stock was artificially inflated during the Class Period.

74.    In ignorance of the true financial condition of Target, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Target containing the misleading information, purchased or otherwise acquired Target's common stock at artificially inflated prices during the Class Period.

75.    Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Target's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Target's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Target's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Target.

76.    Throughout the Class Period, Defendants were aware of material non-public information concerning Target fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

77.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Target common stock during the Class Period.

### COUNT II
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

78.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

79.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

80.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with

copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

81.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Target's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Target's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

82.     The Individual Defendants acted as controlling persons of Target within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Target to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Target and all of its employees. As alleged above, Target is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Levi & Korsinsky, LLP as Class counsel;

(B)     Awarding Plaintiff and the members of the Class damages, including interest;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demand a jury trial of all issues involved, now, or in the future, in this action.


DATED: March 29, 2023            By:  */s/ Garrett D. Blanchfield*
                                 **REINHARDT WENDORF & BLANCHFIELD**
                                 Garrett D. Blanchfield (#209855)
                                 Roberta A. Yard (#322295)
                                 332 Minnesota Street, Suite W1050
                                 St. Paul, MN 55101
                                 Tel: (651) 287-2100
                                 Email: g.blanchfield@rwblawfirm.com

                                 **LEVI & KORSINSKY, LLP**
                                 Shannon L. Hopkins
                                 Gregory M. Potrepka
                                 1111 Summer Street, Suite 403
                                 Stamford, CT 06905
                                 Tel: (203) 992-4523
                                 Email: shopkins@zlk.com
                                 Email: gpotrepka@zlk.com

                                 *Attorneys for Plaintiff*