## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RAFAEL E. PEREZ, individually and on behalf of all others similarly situated,<br><br>                                Plaintiff,<br><br>v.<br><br>TARGET CORPORATION, BRIAN C. CORNELL, MICHAEL J. FIDDELKE, A. CHRISTINA HENNINGTON, AND JOHN J. MULLIGAN,<br><br>                                Defendants. | Case No. 0:23-cv-00769-PJS-TNL<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ......................................................................... 2

II.    JURISDICTION AND VENUE ...................................................................... 5

III.   PARTIES ........................................................................................................ 5

     A.    Plaintiffs ............................................................................................. 5

     B.    Defendants ......................................................................................... 6

     C.    Relevant Non-Parties ........................................................................ 7

IV.   FACTUAL ALLEGATIONS .......................................................................... 8

     A.    Background ......................................................................................... 8

     B.    Target Purports to Leverage Customer Data and Insights to Inform its Inventory Purchasing Decisions According To Consumer Demand ..................... 9

     C.    According to Former Target Employees, Target Began its 2021 Holiday Season "Earlier than Ever" by Over-Ordering Large Quantities of Inventory Without Regard to Guest Insights or Customer Demand ..................... 12

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 25

     A.    False and Misleading Statements on November 17, 2021 ..................... 25

     B.    False and Misleading Statements on November 24, 2021 ..................... 32

     C.    False and Misleading Statements on March 1, 2022 ............................ 41

     D.    False and Misleading Statements on March 9, 2022 ............................ 53

VI.   THE TRUTH IS REVEALED ........................................................................ 63

VII.  ADDITIONAL SCIENTER ALLEGATIONS ................................................ 67

     A.    Defendants Admit That They Had Access To Multiple Types of Inventory Data, in "Real-time," that Target Could Use in Making Inventory Purchasing Decisions, Which Was Corroborated by Confidential Witnesses ........... 67

     B.    Defendants Admit That They Had Access To, and Constantly Monitored, Multiple Types of Customer Data and Insights, Which Would Have Informed Them That Customers Were Not Purchasing Hardlines and Furniture ........... 69

C.     Defendants Were Aware of, or Recklessly Disregarded Target's Excessive Inventory Levels Through Their Site Visits to Distribution Centers ................... 70

D.     Inventory Is Key to Target's Core Operations ...................................... 71

E.     Defendants' Attribution of the Majority of Target's Gross Margin Decline to Impairments and Markdowns Further Supports an Inference of Scienter ....... 72

F.     Defendants' Suspicious Insider Trading ................................................ 73

VIII.   LOSS CAUSATION ................................................................................... 75

IX.     APPLICATION OF PRESUMPTION OF RELIANCE ................................... 77

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................... 78

XI.     CLASS ACTIONS ALLEGATIONS ......................................................... 78

XII.    CLAIMS FOR RELIEF ............................................................................ 80

XIII.   PRAYER FOR RELIEF ........................................................................... 84

XIV.    JURY DEMAND ..................................................................................... 84

Court-appointed Lead Plaintiff Terry and Diane Van Der Tuuk Living Trust ("Lead Plaintiff") and Additional Plaintiffs Chester Zoll and John Zlatic (with Lead Plaintiff, "Plaintiffs") bring this action against Target Corporation ("Target" or the "Company"), its Chief Executive Officer ("CEO") and Chairman of its Board of Directors, Brian C. Cornell ("Cornell"), its Executive Vice President and Chief Financial Officer ("CFO"), Michael J. Fiddelke ("Fiddelke"), its Executive Vice President and Chief Growth Officer ("CGO"), A. Christina Hennington ("Hennington"), and its Executive Vice President and Chief Operating Officer ("COO"), John J. Mulligan ("Mulligan"), (collectively, with Cornell, Fiddelke, and Hennington, the "Individual Defendants," and collectively with Target, the "Defendants"), pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of themselves and all other persons similarly situated who purchased or otherwise acquired Target common stock between November 17, 2021 and May 17, 2022, inclusive (the "Class Period"), and were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of its undersigned counsel ("Lead Counsel"), which included, among other things, review and analysis of: (i) Target's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Target's other public statements, including press releases and investor conference calls; (iii) interviews with confidential witnesses who are former Target employees possessing firsthand knowledge of Target's operations; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Target and the retail industry; and (v) other information readily available on the internet or other public sources.

Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.      Target is a U.S.-based retail corporation that operates a chain of department stores across the United States. As Target states in its filings with the SEC, "merchandise sales represent the vast majority" of the Company's revenues. According to Target's SEC filings, Defendants Cornell and Hennington, and Cara Sylvester, Target's Chief Guest Experience Officer, Target uses customer insight data obtained through multiple sources such as rewards programs, ongoing check-in discussions, surveys, search insights and more to gain real-time insight into consumer buying preferences and demand. Target then uses this information to purchase the merchandise that consumers want at a quantity that would satisfy demand but which would not result in bloated inventory that would eventually become obsolete.

2.      In 2020, prior to the Class Period, Target experienced unusual growth due in large part to the COVID-19 pandemic because, unlike other retail stores, Target carried essential items such as groceries and pharmacy items, which allowed Target to remain open as an essential business while other businesses were closed. Target also benefitted from consumers' increased purchasing of items within Target's "hardlines" (*e.g.*, televisions) and home furnishings and décor merchandise categories as consumers spent most of their time at home during lockdowns, as well as increased spending capacity due to federal stimulus payments. As such, Target experienced "double-digit sales comparable sales growth" (*i.e.*, compared to the prior-year periods) in all of its core merchandise categories during the pandemic.

3.       Despite Target's success in 2020, the Company's revenue in late 2020 was constrained by supply chain issues which prevented Target from keeping its shelves fully stocked. However, in early to mid-2021, product availability increased dramatically as COVID restrictions were lifted, resulting in consumers shifting their shopping habits away from bulkier goods like home furnishings and hardlines to services, experiences and smaller items, as well as more competition from other stores reopening.

4.      Nonetheless, unbeknownst to investors, by at least June 2021, Defendants had abandoned Target's inventory management procedures that required Target to purchase inventory

based on customer preferences, and embarked on a massive inventory buying spree in which they pre-ordered large quantities of inventory, irrespective of consumer preferences or demand, to make sure store shelves were stocked with merchandise, even if it was not the products consumers wanted. In particular, Defendants were purchasing excessive quantities of home furnishings and hardline category goods that had sold well during the lockdown, but which consumers were no longer buying as COVID-era restrictions ended and consumers no longer needed another television or sofa.

5.      Despite abandoning Target's inventory processes and procedures, throughout the Class Period, Defendants touted Target's purported "balanced multi-category assortment" of product inventory as being a "key driver of flexibility" and claimed that the Company continuously collected data on, and spoke with, customers to generate "guest insights," which were purportedly used to inform Target's merchandise purchasing decisions to "optimize [its] assortment" of inventory. Indeed, as Target entered the 2021 Holiday Season[1] for shopping, Defendants reassured investors that "[w]e continuously evaluate our guests' mindset, which serves as a North Star for all our strategies and decisions," including those related to inventory purchasing, and that their paramount focus was to get "the right inventory," and "the right amount of inventory," "to the right place at the right time." Accordingly, Target claimed it was "able to be responsive" to "whatever the changing demands were of the consumer," and that the Company was purportedly entering the 2021 Holiday Season "with a very healthy inventory position overall."

6.      Contrary to Defendants' statements, they were pre-buying large quantities of product irrespective of consumer preferences or demand, resulting in the Company significantly over-purchasing goods that were woefully out of sync with customer demand. Indeed, according to former Target employees, as early as September 2021, Target's multi-category inventory became greatly out-of-balance and overweight in home and hardline products—bigger, bulkier products like furniture, sofas and TVs—due to waning consumer demand for such products.

---

[1] Consistent with Target's practice as described below, Target's "2021 Holiday Season" is referred to herein as the period beginning October 10, 2021 and ended approximately January 2, 2022.

Former employees reported that Target's inventory assortment problem only grew more acute throughout the Class Period as consumers began to refocus their spending away from home and hardline goods, and into other types of goods or services, leaving such inventory to accumulate and clog the aisles at major Target distribution centers and stores.

7.     Defendants were aware that Target's inventory was bloated and far in excess of the Company's internal policy of keeping distribution centers at 80% capacity from their personal visits to Target's distribution centers in which inventory could be seen piled up in "stash aisles," as well as through their access to Target's Greenfield and Apollo inventory reporting systems which showed, in real-time, bloated inventory and strained capacity across Target's warehouses and stores.

8.     By May 18, 2022, Defendants finally admitted that, contrary to their prior claims of an "agile," "flexible strategy" of carefully "curating" inventory based on "real-time" insights on, and visibility into, customer purchasing, Target's quarterly results were adversely impacted by the Company's practice of over-ordering inventory on a massive scale, with little regard to current customer insights or demand, resulting in overstocked, unsellable inventory taking up valuable store shelf space and leaving Target unable to quickly pivot to meet changing consumer preferences, as represented. Target's massive over-ordering, fueled by a departure from guest insight-driven practices to merely amassing items in stock, resulted in Target's inventory increasing dramatically over the previous quarter and the prior year's comparable quarter. With "too much inventory" in "bigger, bulkier" hardline and home furnishings and décor products that customers didn't want "like furniture [and] TVs," the Company was forced in early 2022 to mark inventory down to "make room for fast-growing categories." As a result, Target's net profit and gross margin for its second quarter 2022 declined 52% and 4.3%, respectively, for the quarter. A majority of the gross margin decline (three percentage points of the 4.3 points) was from merchandising "actions to reduce excess inventory", *i.e.*, impairments and markdowns taken on inventory that had amassed and sat unsold for many months. Defendants stated they expected the excess inventory to negatively affect earnings into the next quarter and beyond.

4

9.      Upon the news, Target's stock price declined $53.67 per share, or nearly 25%, from a closing price of $215.28 per share on May 17, 2022, to a closing price of $161.61 per share on May 18, 2022.

## II.   JURISDICTION AND VENUE

10.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

12.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Target is headquartered in this District.

## III.   PARTIES

### A.   Plaintiffs

14.     Lead Plaintiff Terry and Diane Van Der Tuuk Living Trust purchased Target common stock during the Class Period as set forth herein, and in its PSLRA certification filed with the Court on May 30, 2023 (ECF No. 24-1), and was damaged thereby.

15.     Additional Plaintiff John Zlatic purchased Target common stock during the Class Period as set forth herein, and in his PSLRA certification filed with the Court on May 30, 2023 (ECF No. 37-3), and was damaged thereby.

16.     Additional Plaintiff Chester Zoll purchased Target common stock during the Class Period as set forth herein, and in his PSLRA certification filed with the Court on May 30, 2023 (ECF No. 37-4), and was damaged thereby.

B.      **Defendants**

17.      Defendant Target is a corporation existing under the laws of the State of Minnesota with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "TGT".

18.      Defendant Brian C. Cornell has served as Target's Chairman of the Board and CEO since August 12, 2014, including at all relevant times during the Class Period.

19.      Defendant Michael J. Fiddelke has served as Target's Executive Vice President and CFO since November 1, 2019, including at all relevant times during the Class Period.

20.      Defendant A. Christina Hennington has served as Target's Executive Vice President and CGO since February 16, 2021, including at all relevant times during the Class Period. As CGO, Ms. Hennington oversees Target's merchandising, product design, and sourcing, as well as strategy, insights, and growth.

21.      Defendant John J. Mulligan has served as Target's Executive Vice President and COO during all relevant times. As COO, Mulligan is responsible for Target's stores, global supply chain, enterprise operations, properties, and flight services.

22.      Cornell, Fiddelke, Hennington, and Mulligan are collectively referred to herein as the "Individual Defendants."

23.      Target and the Individual Defendants are collectively referred to herein as "Defendants."

24.      By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants participated in the drafting of and/or possessed the power and authority to control, the contents of Target's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with

6

the Company, and their access to material, non-public information, including inventory data and/or summaries thereof, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

> ### C.      Relevant Non-Parties

25.     Cara Sylvester ("Sylvester") has served as Target's Executive Vice President ("EVP") and Chief Marketing & Digital Officer starting prior to the Class Period until May 5, 2022, at which point she assumed the role of Executive Vice President and Chief Guest Experience Officer. As Chief Marketing & Digital Officer through much of the Class Period, Sylvester was responsible for driving customer affinity for the Target brand, Target's Circle loyalty program, and Target's in-house media company, Roundel. As Chief Guest Experience Officer, Sylvester is responsible for driving Target customer engagement in collaboration with Target's digital, marketing, and technology teams.

26.     CW-1 was a Warehouse Associate in Target's Regional Distribution Center ("RDC") facility in Albany, Oregon, which services Target operations in Alaska, Washington, Oregon, western Idaho, and parts of northern California, from October 2018 until September 2023. As part of a team of Warehouse Associates, CW-1 was tasked with multiple aspects of moving inventory in and out of the Albany RDC, including unloading and sorting inventory coming from Target's vendors and picking inventory to be sent to both Target stores for replenishment. Due to the nature of this witness' role, CW-1 had visibility into Target's inventory position in the greater Pacific Northwest region across the 2018 to 2022 holiday seasons, including leading up to and following Target's 2021 Holiday Season. CW-1 reported to Duane Garcia, Senior Operations Manager, who in turn reported to the Senior Director of Distribution, Grant Cyrus, who reported to Target headquarters.

27.     CW-2 was an Operations Manager in Target's Flow Center facility in Logan Township from June 2021 through January 2023. As an Operations Manager, CW-2 was in a

managerial position overseeing a team of approximately 150 employees tasked with warehousing and inbound inventory management. As such, CW-2 directly observed Target's inventory position going into, throughout, and following the 2021 Holiday season. CW-2 reported to a Senior Operations Manager—originally Sharene Thomas, then after her promotion, to Blake Helmke—who in turn reported to an Operations Director. The Operations Director reported to the Site Director, who in turn interacted with management at Target headquarters.

28.     CW-3 was an Executive Team Lead—Target's term for an assistant store manager—at Target from September 2019 until March 2022, primarily at a store in New York from December 2019 through the end of CW-3's tenure. As an Executive Team Lead of General Merchandise, CW-3 was tasked with managing a majority (roughly 70%) of the store and the employees therein, including unloading inventory from trucks, managing the stockroom, getting inventory onto the sales floor, and fulfilling customer orders. CW-3 reported to a Store Director, who in turn reported to a District Store Director who oversaw eight stores, who in turn reported to the Regional Store Director.

## IV.   FACTUAL ALLEGATIONS

### A.   Background

29.     Target is a major retailer and operator of department stores nationwide. Target states that "[g]eneral merchandise sales represent the vast majority of our revenues", which the Company breaks down into five "core" product categories: (i) "Apparel and accessories"; (ii) "Beauty and household essentials"; (iii) "Food and beverage";  (iv) "Hardlines," which includes "electronics… toys, entertainment, sporting goods, and luggage"; and (v) "Home furnishings and décor," which includes "furniture, lighting, storage, kitchenware, small appliances, home décor, bed and bath, home improvement, school/office supplies, greeting cards and party supplies, and other seasonal merchandise." Going into the Company's fiscal year 2021, hardlines and home furnishings and décor each constituted roughly one fifth of Target's sales (18% and 20%, respectively).

30.     In 2020, Target reported record growth across all five of its core product categories as the Company was buoyed by shopping trends during the COVID-19 pandemic. Indeed, Target's sales in 2020 represented an increase of $15.3 billion, or 19.8 percent, from the prior year. Going into its fiscal year 2021, Target described that "[w]hile our business was materially affected by the COVID-19 pandemic," the Company had in fact benefited from "significantly higher sales and profits in 2020," and that "the pandemic highlighted the importance of our multi-category portfolio and our decision to put our stores at the center of our strategy."

**B.     Target Purports to Leverage Customer Data and Insights to Inform its Inventory Purchasing Decisions According To Consumer Demand**

31.     As Target entered fiscal year 2021 beginning January 30, 2021, the Company emphasized its continuing success was dependent on continued investment in, *inter alia*, inventory "[c]uration at [s]cale" to best serve its customers, whom Target refers to as "guests." Target claimed it emerged from the pandemic with what Defendants described as "a massive influx of insights" of customer preferences from new and returning customers and an ability to "listen[] to the ever-changing wants and needs of our guests" to ensure that the Company can "optimize" or "curate" its product assortment. Noting that a big headwind in 2020 was Target's ability to keep its store shelves stocked with products that were in demand, Defendants stated in August 2021 that Target had been pre-buying large quantities of product earlier in the year to ensure that the Company could keep up with demand.

32.     Target emphasized during the Class Period that, using its purported "durable, flexible" business model and real-time customer data-driven ordering of inventory, it could "adapt to any environment" and "stay[] three steps ahead with our guests in these rapidly changing times." According to Target, the Company's "balanced multi-category assortment" was a "key driver of flexibility and resiliency within [Target's] business model", and, in turn "leveraging guest insights" to inform merchandising decisions allowed it to keep the multi-category inventory assortment in balance in the face of rapidly-changing consumer trends.

33.     Given Target's position as one of the largest retailers in the United States, the Company has a vast assortment of customer data. In addition to having store sales and inventory data like many retailers, Target operates Target.com and the Target smartphone application, which allows the Company to track what customers are searching for, and saving for potential future purchase. Target also has Target Circle, the Company's proprietary loyalty program, which collects purchase data from over 100 million customer-members. Moreover, Target offers Target-branded debit and credit card programs ("RedCard") which are used in over one fifth of customer purchases at Target, and provide Target further data and insights into customers. Target also offers wedding and baby registry services that give the Company added insights into the products customers want, and collects customer feedback at its stores through a program called Medallion, that prompts customers to provide responses through surveys after their purchases.

34.     Target also owns and operates Roundel, a media and marketing business that works with brands to develop advertising on Target.com and elsewhere, including on Google, YouTube, Instagram, Facebook, and other social media and advertising networks. The Company claims that Target, through Roundel, has an "unparalleled understanding of the Target guest," which is built on "data from 165M+ Target guests." Target's Roundel team regularly demonstrates its purportedly extensive knowledge of Target shopper insights by publishing "insight reports." Roundel's insight reports indicate that Target leverages multiple sources of customer data, including but not limited to, surveys of thousands of Target customers conducted by Roundel, "Consumer Insights" reports, "Target Holiday Quantitative" reports, insights into customer searches on Target.com and in the Target app, and, generally, "Target Internal Data" reports. Defendant Cornell has explained that Target's insights come straight from "…the consumer that we talk to on a regular basis…".

35.     Target has repeatedly touted to investors its ability to "collect[] and use … accurate and relevant guest data" as being "important to our ability to differentiate from other retailers." During the Class Period, Defendant Cornell emphasized that "we're listening very closely to the consumer," and EVP Cara Sylvester elaborated that "our insights team talks with guests …

10

[t]hrough… ongoing check-ins," giving "every area of our enterprise … a view of holistic human experience lived by our guests." Target has told investors that it regularly speaks to and surveys customers to generate "guest insights," which the Company told investors it is "leveraging… to enhance our assortment" of inventory. As a result of the foregoing, Defendants have claimed that "we have a really strong command of our guests, and understand our guests," which enables Target to "quickly and seamlessly serve our guests, even when their wants and needs are changing rapidly."

36.     In a March 1, 2022 earnings call, Cara Sylvester, then Target's EVP and Chief Marketing and Digital Officer, gave investors an additional overview of Target's capabilities in understanding the consumer in order to accurately forecast inventory:

> Target can bring together insights across an omnichannel journey, from RedCard and registry, to digital and in-store, to our call centers and every step in between, which means we're getting a 360-degree view of the kind of guests that are driving so much growth.

37.     Sylvester proceeded to explain how guest search terms on Target's digital channels are purportedly reviewed on a weekly basis, and how those insights are fed to the merchandising team to find the "right mix" of inventory to put in front of consumers at the right time:

> I think our search terms and what the guest is looking for changes seasonally all the time, always seasonal products, always newness and always the hot items that are out there. And so we see a really close look at our search really on a weekly basis and work with our merchant partners to share back those insights. What I would tell you is over the years, the search insights, of course, are going to impact. And we're going to feed those over to the merchandising team for them as they're constantly looking for the right mix of our owned brand products and our national brand products. And so we'll continue to make sure we're feeding those over.

38.     Similarly, in a November 17, 2021 interview, Defendant Hennington described that when external factors such as inflation are weighing on consumer buying habits, especially during the holiday shopping season which she referred to as the "Super Bowl of retail," Target "constantly" assesses customer data and insights to adjust the Company's inventory position:

> [W]ith the environment being as dynamic as it is, it's one that we're constantly reevaluating, make sure that we are as well positioned as we can be as consumers'

11

demands continue to change with this external factors [*sic*] that we're dealing with. Hennington added that, using Target's various customer insight resources including Roundel, "we … make sure that we are creating relevancy for our consumers" by "putting product and experiences in front of consumers' eyeballs that care about them" and by the "curation of our assortment that we put so much time into…".

39.     However, and unbeknownst to investors, Target had abandoned its customer-focused purchasing strategy leading into and during its 2021 Holiday Season. Rather than purchasing the goods customers wanted, Target began indiscriminately buying large quantities of inventory focused on stocking up on any inventory it could get its hands on, without regard for guest insights and other customer data indicating what customers wanted. Defendants' reckless inventory buying spree led to a massive overstock in many discretionary items—especially in the hardlines and home furnishing categories that customers no longer wanted and that Target could only sell at a significant discount.

**C.      According to Former Target Employees, Target Began its 2021 Holiday Season "Earlier than Ever" by Over-Ordering Large Quantities of Inventory Without Regard to Guest Insights or Customer Demand**

40.     Target's fourth fiscal quarter (typically November 1st through the end of January) is perennially the retailer's biggest sales quarter, given that the holiday season largely falls within that quarter. While the "holiday season" in the United States has popularly been known as the period beginning around Thanksgiving through New Years' Eve, Target begins its holiday season much earlier than Thanksgiving. Indeed, Target kicked off its holiday season "earlier than ever" on October 10, 2021,[2] during the Company's third fiscal quarter. Target has declared that "Black Friday", the shopping day immediately after Thanksgiving, "is no longer the start of holiday shopping."

---

[2] Target Press Release, *Target Helps Guests Prepare for the Holidays with Return of Target Deal Days and New, Industry-Leading Holiday Price Match Guarantee,* (Sept. 29, 2021), https://corporate.target.com/press/release/2021/09/target-helps-guests-prepare-for-the-holidays-with

41.     To encourage shoppers to start holiday shopping earlier, on October 10, 2021, Target initiated a "Target Deal Days" sales event, consisting of three days of "deep discounts" across Target's 1,900+ stores and Target.com, "kicking off the holiday season."

42.     Target's preparation for the 2021 Holiday Season began much earlier than October 2021. Despite Defendants' representations to investors that the Company had been leveraging customer insights to inform inventory purchasing, according to CW-3, starting no later than June 2021, Defendants began indiscriminately pre-ordering inventory for the holiday season, rather than according to current customer insights or demand, going on a massive inventory spree that soon overwhelmed Target's distribution centers.   But, with COVID-era lockdowns over, customer demands had changed, even as supply chains improved inventory delivery.

43.     Thus, Target went into its 2021 Holiday Season with grossly overstocked inventory, mainly consisting of larger and bulkier hardlines and home furnishing product categories. The hardlines and home furnishing categories, largely comprised of "discretionary" products, became alarmingly overstocked in Target's warehouses and stores by July or August 2021 as demand for these products had softened, such that Target was unable to move it off the store shelves fast enough to make room for the deluge of incoming inventory, or to adapt to changes in customer preferences.

44.     While Defendants told investors that they were regularly listening to customers to gauge their changing behaviors in the face of rising inflation and the tail end of the COVID-19 pandemic, in reality Target was buying immense quantities of discretionary products that were discordant with those changing customer behaviors. Thus, Target massively overstocked its inventory by buying huge amounts of product that customers did not want.

45.     As a result, Target's warehouses quickly surpassed operating capacity for inventory heading into fall 2021 and, faced with a lack of demand from Target.com sales and lack of replenishment demand from Target's stores, Target was forced to store excess inventory in trailers in its warehouse parking lots and in overflow off-site locations. As a result, beginning in Winter 2021 and continuing through Spring 2022, Target began heavily discounting the prices of its

overstocked hardline and home inventory to make room for the products consumers actually wanted so the Company would not miss out on sales of those demanded products, while its less desirable, slower-moving "hardline" and "home" inventory slowly made its way off the shelves.

46.     CW-1 was a Warehouse Associate at Target's RDC warehouse in Albany, Oregon from October 2018 to September 2023. As a Warehouse Associate at the Albany RDC, which replenished inventory for stores in Alaska, Washington, Oregon, western Idaho, and parts of northern California, CW-1 witnessed first-hand Target's unprecedented overstock of inventory in the 2021 Holiday Season.

47.     CW-1 was tasked with multiple rotating functions at the Albany RDC, including: working "inbound," in which CW-1 unloaded trucks of inventory from manufacturers and vendors and sorting the merchandise into expansive storage racks; "picking" inventory, in which CW-1 was instructed which items were needed to be sent to Target stores to replenish their stock; and consolidating inventory of similar types into the same storage spaces within the RDC. CW-1 explained that individual boxes or units of merchandise were labeled with barcodes, which CW-1 would scan with a handheld "stock picker" barcode reading device to track inventory movement in, around, and out of the Albany RDC. According to CW-1, the overwhelming majority of inventory sold in Target stores flows from vendors through Target's RDCs, save for "very few" products that go straight to stores. Thus, the Albany RDC had high visibility into Target's inventory position for the greater Pacific Northwest region. Through daily meetings with management at the Albany RDC, CW-1 was instructed on daily goals and the state of the inventory position at the RDC.

48.     CW-1 described that inventory levels at the Albany RDC grew at "alarming" and "strange" levels as early as July or August 2021 and continued growing through the end of the Class Period.  Although 2021 was CW-1's fourth holiday season working at Target, CW-1 stated that the Albany RDC has many warehouse workers that had worked there up to 25 years, who remarked that inventory conditions leading up to and through the 2021 Holiday Season were

"unique and unprecedented" compared to years prior, even during the height of the COVID-19 pandemic. "Everybody was talking about it, like 'this is crazy,'" recounted CW-1.

49.     Specifically, CW-1 explained that Target's policy was to keep inventory levels at its warehouse facilities at less than 80% capacity at all times. CW-1 remarked that it would have been "almost unfathomable" for the Albany RDC to surpass 80% capacity in prior years, such as 2019 or 2020. Going into the 2021 Holiday Season was a different story, however: CW-1 recalled learning in one of the warehouse's daily shift meetings in October 2021, held to discuss the state of the RDC and ongoing tasks, that the inventory at the Albany RDC had surpassed the goal of 80% capacity and kept growing into the 2021 Holiday Season. According to CW-1, the daily shift meetings occurred throughout CW-1's tenure.

50.     CW-1 later recalled learning in one of the warehouse's daily shift meetings in early November 2021 that the Albany RDC reached 95 or 96% capacity at that time. CW-1 was informed by the RDC's Senior Director of Distribution and headquarters liaison, Grant Cyrus, that this level of inventory "generated a lot of flashing lights" at Target's headquarters. Although CW-1 never officially heard that Albany reached 100% capacity during 2021, CW-1's first-hand observations indicated that the facility outgrew capacity by overstocking on hardlines and home furnishing items that customers were not buying, and what CW-1 saw by early 2022 manifestly *exceeded* 100% capacity.

51.     CW-1 depicted a chaotic overstock of inventory at the Albany RDC leading into and during 2021 Holiday Season. CW-1 explained that, after an initial buildup of cleaning and paper products in the early days of the COVID pandemic in 2020, overall inventory levels began to drop at the facility, only to begin rising again in August 2021.  As inventory built up at the Albany RDC and passed goal capacity before October 2021, CW-1 was more frequently tasked with inventory consolidation in order to free up what space could be used. CW-1 commented that back in 2018, consolidation was merely seen as a "placeholder" task, meaning it was typically low priority, to be completed when other tasks were complete. However, according to CW-1,

consolidation work "exploded" in workload over 2021 and into 2022 as the Albany RDC would constantly need to free up space for the inventory overload.

52.     After the Albany RDC surpassed its goal of 80% capacity by October 2021, trucks full of merchandise still kept arriving. CW-1 explained that storage at the Albany RDC consists of aisles of racks that pallets of products can be placed on, and that there is also a "bulk storage" section for larger products or for pallets to be stacked. As inventory continued to amass at the Albany RDC during September, October, and November 2021, the RDC reached a state where there was no space on warehouse racks or in bulk storage. CW-1 and colleagues began having to make "stash aisles," placing inventory into aisles and travel lanes where warehouse workers are supposed to be able to walk, because there was no other place to put it. "You never want to have those," CW-1 remarked, because they are a safety hazard to employees. Indeed, CW-1 recounted that colleagues frequently brought up safety concerns (*e.g.*, tripping over products in stash aisles, fire safety) as a result of the inventory reaching capacity.

53.     According to CW-1, the inventory overstock issues also caused warehouse worker unhappiness because of the level of mandatory overtime required to process it. CW-1 explained that Target often required its warehouse teams to work mandatory overtime during peak seasons, but this would abate thereafter. In 2021, however, "because of the volume" of inventory, CW-1 and other workers at the Albany RDC were required to work overtime throughout the entirety of the year.  Yet despite the constant influx of inventory, certain products were "not selling."  Notably, CW-1 observed throughout the 2021 Holiday Season that large quantities of televisions, furniture, toys, and home goods, mostly "bulky" items, were not flowing out of the RDC because Target customers were not buying them.

54.     Even as the Albany RDC had, according to CW-1, "numerous and full" stash aisles throughout the 2021 Holiday season, which were "entire aisles front to back," Target's inventory purchases of these products kept arriving throughout the 2021 Holiday Season. Towards the end of Target's 2021 Holiday Season, the Albany RDC exceeded 100% capacity, as it was forced to create additional capacity in the parking lot.  As CW-1 explained, by November 2021, employees

at the RDC "started stuffing trailers and leaving them in the yard," referring to the parking lot of the RDC. CW-1 estimated that the Albany RDC had 50 to 100 tractor trailer loads of excess, unsold inventory "just sitting there" in the lot. CW-1 also recalled that Target had a team tasked with moving some of this inventory to a secondary off-site warehouse in Riverside, California. CW-1 stated that the "havoc" caused by Target's inventory overbuying in 2021 became so bad that, in 2022, the Company created a new position at the RDC called a Capacity Lead.

55.     CW-1 confirmed that the Albany RDC's inventory overstock was tracked and could be viewed in an inventory management system developed in-house by Target. CW-1 and colleagues scanned "everything" into the warehouse's system, such that management—including the Albany RDC Building Director, Grant Cyrus—could see the date and time of when an item was scanned into the system, picked to be sent to stores, and shipped. Moreover, CW-1 recalled that Target executives would visit in Target's corporate jet, on "jet visits," to check in on the RDC, and that the jet visits increased from once to twice annually in 2021 and 2022. CW-1 recalled that executives visited while stash aisles were being used—a visual indicator of the overstock issue— at least one or two times. Thus, through regular visits to the Albany RDC in addition to access to detailed warehouse inventory data, the Individual Defendants had multiple touchpoints to observe the inventory overstock that was not moving because customers were not purchasing those products.

56.     CW-2 also witnessed first-hand the growth of Target's inventory overstock, which was the result of the Company's extraordinary buying spree that was contrary to changing customer behaviors. CW-2 was an Operations Manager at Target's Flow Center warehouse in Logan Township, New Jersey (the "Logan Flow Center"), a massive, 2 million square foot facility, from June 2021 through January 2023. According to CW-2, the Logan Flow Center was a first of its kind facility for Target, a purportedly "state-of-the-art" warehouse that not only replenished store inventories like Target's RDCs, but also fulfilled e-commerce orders made on Target.com— a role previously relegated to delivery warehouses operated by Target's Direct-to-Consumer ("DTC") team. CW-2 recalled that the Logan Flow Center serviced stores and online orders for a

large bulk of the East Coast, including stores in New Jersey, New York, Pennsylvania, and the Carolinas.

57.     As an Operations Manager at the Logan Flow Center, CW-2 managed a team of roughly 150 employees who worked to meet goals set by Production Planners, individuals who would receive inventory replenishment demands from Target stores and interact with Target headquarters to determine the appropriate flow of inventory. The Logan Flow Center was comprised of several departments, including: i) Inbound, which unloaded trucks into the Center; ii) Warehousing, which picked and sent inventory to the Outbound and "Re-bin" teams; iii) Outbound, which sent products to Target stores for replenishment; and iv) Re-bin, which fulfilled digital orders and shipped product to customers. According to CW-2, each department had key performance indicators ("KPIs"), metric goals which the Production Planners set in conjunction with Target stores and headquarters. CW-2 was originally employed in the Warehousing department, and eventually moved to the Inbound department.

58.     CW-2 started working at the Logan Flow Center in June 2021. CW-2 recalled being told by Blake Helmke, Senior Operations Director and CW-2's direct supervisor, that Target's goal was to operate the Logan Flow Center at peak (holiday) season at 80% inventory capacity. According to CW-2, the Logan Center reached the 80% "intended capacity" well before Thanksgiving, surpassing 90% capacity and "in the mid-90s" by "mid-November" 2021. In fact, by mid-November 2021, CW-2 observed that employees at the Logan Flow Center began having to put inventory on the floors of this 2 million square foot warehouse as the storage racks became full—similar to the stash aisles described by CW-1 at the Albany RDC. CW-2 recalled that the Logan Flow Center hit 100% capacity, and exceeded it around February or March 2022, with some of the inventory overflow ending up in trailers outside the building as had occurred at the Albany RDC facility and inventory "piling up in every nook and cranny that we could put stuff into."

59.     For example, CW-2 recalled the Logan Flow Center had "probably 1,000 televisions that sat in the building collecting dust" because customers were not buying them. CW-2 knew from both personal observations and from store fulfillment demands that much of the

inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods (*i.e.*, products whose bulk made them incompatible with conveyor belt systems) such as "televisions and patio furniture," which are products that fall into Target's hardlines and home furnishings and décor categories.

60.     To CW-2 and colleagues, it appeared that the inventory had been over-ordered in a scattershot approach, divorced from actual customer purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.  In this regard, CW-2 stated that, "[w]hen capacity gets into the 90s" as it did by November 2021, "you really need a plan to deal with it" and reduce inventory quantities, but "we had no valve to shut it off," referring to the overwhelming of outgoing inventory by incoming inventory.

61.     Exacerbating the inventory overstock was the fact that Target headquarters, not the Logan Flow Center, managed inventory reporting. CW-2 explained that the Flow Center used a custom-built warehouse management system called Apollo ("Apollo"), but management at the Flow Center could not generate inventory reports from the Apollo software. CW-2 articulated that inventory reports came from Target headquarters rather than from the Flow Center, from the top down rather than from the bottom up.

62.     According to CW-2, Target headquarters knew which products were not moving through access to Apollo data and directed the Flow Center where to move products by sending reports. Many of headquarters' directives, CW-2 stated, were recorded in Microsoft Excel spreadsheets. CW-2 recalled that headquarters was giving CW-2's team direction on what to do about the inventory based on their observations from Apollo.  Inventory status was discussed at the Flow Center at a minimum during daily pre-shift and post-shift meetings, during which time directives from headquarters were communicated, as well as at regular Flow Center management meetings held every Wednesday throughout CW-2's employment.

63.     Corroborating CW-1's account, CW-2 indicated that Company management at the Minneapolis headquarters was aware of the inventory overstock at the Logan Flow Center for the additional reason that Target executives would regularly conduct jet visits every couple of months.

CW-2 recalled that these visitors included C-suite and Senior Vice President-level executives, and specifically that Defendant Cornell and Arthur Valdez, Target's Executive Vice President and Chief Supply Chain and Logistics Officer, each attended at least one of the jet visits.

64.     CW-3 also observed Target's inventory overstock issues caused by the Company's scattershot purchasing decisions. CW-3 served as an Executive Team Lead ("ETL"), or assistant store manager, of the General Merchandise department at a major Target store in New York state from 2019 until departing the Company in March 2022. As CW-3 explained, the General Merchandise team is responsible for 70% of the store, including receiving and unloading incoming inventory, managing the back stockroom, getting inventory onto the sales floor, and fulfilling customer orders.

65.     CW-3 described that there was a "huge spike" in accumulated inventory as far back as May 2021 at CW-3's Target store, particularly in the home furnishings and apparel categories, which got worse over the rest of 2021. "Everything" was stacking up, CW-3 said, but apparel and "bulky" furniture—*i.e.,* the furniture and home goods category—in particular were moving extremely slowly because customers were not buying them at anywhere near the levels they had during the 2020 COVID lockdowns. However, Target headquarters continued to buy those categories and quantities of products.

66.     CW-3 attributed the changing consumer buying habits to a handful of factors that Target's procurement team had, from CW-3's observation, apparently disregarded. For example, CW-3 explained that while Target, as a department store, had been an "essential" business during COVID and thus was "the only game in town" in 2020, by mid-2021 many other retailers had reopened and were taking back market share as consumers had more buying choices. Yet Target continued to stock at 2020 demand levels. CW-3 stated that procurement teams at Target clearly projected based off 2020 demand and, as a result, inventory on most apparel and home goods far exceeded demand. CW-3 recalled that inventory overstock issues continued throughout all of 2021 and into 2022 through March 2022, when CW-3 left the Company. Management at CW-3's store

20

did not have a say in which products and quantities arrived at the store, CW-3 said, because those decisions were made "top down" from Target headquarters in Minneapolis.

67.     CW-3 also described that, by June 2021 through the end of the year into 2022, the inventory selection and quantities that Target management at headquarters sent to stores departed from Target's practices in 2019 and 2020 in that Target would manually override the figures in the Company's inventory software to push excess inventory onto stores. In earlier years like 2019 and 2020, CW-3 explained, Target's inventory management data system, Greenfield, would automate to "1:1" inventory ordering for the stores, meaning that as one unit of a product was sold, the Greenfield system would record the sale and automatically request that one replacement unit be sent to the store from one of Target's distribution centers. Products would typically turn and need to be replenished every two weeks. Starting in April 2021, however, CW-3 recalled that management at Target headquarters began emailing CW-3 that the distribution centers were out of space, and that the stores had to accept the excess inventory regardless of what products were selling. CW-3 stated that CW-3's store would get an email saying the warehouse needed more space so CW-3's store had to take 20 weeks' worth of furniture. This was how CW-3 learned that, by April 2021, the Target distribution center in Amsterdam, Pennsylvania that serviced the witness' store was out of storage capacity. Such emails continued from April 2021 through the end of CW-3's tenure in March 2022, and massive quantities of inventory that was not selling were pushed onto CW-3's store from June 2021 onward.

68.     CW-3 observed directly which products were not selling because CW-3 had access to multiple sources of information, including Greenfield, which showed inventory levels that adjusted in real-time as items were sold at the registers and received into the store by freight. Moreover, CW-3 stated that through the Greenfield system, CW-3 and other store personnel could see what inventory the DC had in real-time and could plug in any Target store number and observe inventory quantities and capacity.

69.     Through management of CW-3's Target store's fulfillment operations, including monitoring the Greenfield reporting, CW-3 saw the exact products that customers were buying.

CW-3 observed that many of the product types that had sold well during the pandemic in 2020, such as home furnishings products, were now clogging the store in May 2021 because consumers no longer wanted them. Moreover, CW-3's team was tasked with managing the store's stockroom, which gave the witness insight into which products were accumulating unsold.

70.     CW-3 also confirmed that the inventory overstock issues were not limited to the witness' store. CW-3 observed starting in June 2021, they were widespread at other stores in CW-3's store's region. CW-3 explained that it is Target's practice to send staff from one store temporarily to another to help deal with time-sensitive issues such as inventory backlogs. Thus, CW-3 and other ETL's stayed in touch with each other about the situations at their respective stores. CW-3 recalled, however, that stores in CW-3's region were unable to help each other (*e.g.*, by transferring inventory) starting in mid-2021 because every store was dealing with the same inventory overstock issues. Through such store-to-store calls and emails to other ETLs, CW-3 learned that overstock permeated stores in the entire region. CW-3 also confirmed this through conversations with the District Store Director, who visited stores weekly or bi-weekly and observed and discussed overstock on the sales floor and in the stockroom with ETLs, including CW-3.

71.     CW-3 confirmed that the Greenfield inventory management system was used and accessed by employees at Target's headquarters in Minneapolis to provide visibility into where specific inventory products were at all times, and that anyone at the management level at Target headquarters could access and view detailed inventory data in Greenfield at any Target facility, including stores and distribution centers.

72.     Moreover, CW-3 indicated that Target corporate headquarters knew which products were overstocked at stores because, in June 2021, employees from headquarters began directing markdowns, discounts, and liquidations of those same products. As CW-3 recalled, Target headquarters began mandating discounting and marking down items in June 2021 in response to the inventory buildup in stores and continued to do so through 2021 into 2022. CW-3 stated that the rate at which Target marked down goods drastically increased starting in June 2021.

CW-3 stated that while during 2019 and 2020 Target changed prices on an average of 700-900 different items per week, in 2021, this ballooned to apply discounted price changes on 5,000–6,000 items per week.

73.     CW-3 added that one of the ways Target collected guest insights at stores was through the "Medallion" survey system, which prompted customers to provide feedback to Target. Through both Greenfield and the Medallion systems, Target headquarters and management had access to a continuous stream of inventory and customer data.

74.     CW-1, CW-2 and CW-3's accounts are corroborated by, *inter alia*, posts and comments on certain internet forums where Target employees discuss their work, which indicate that, by October 2021, Target's overstock inventory overstock problems were readily apparent at multiple facilities throughout Target's supply chain. For example, the Target "subreddit" internet forum, which has over 185,000 members, is described as "a place where Team Members"— Target's term for employees—"can get together to share and discuss all things related to Target."[3]

75.     On October 10, 2021, a Target employee posted a photo of the back storage room of a Target store captioned "please stop sending us TVs."[4] The photo depicts TVs and other electronics crowding storage racks intended to be storage space for Sporting Goods and Bikes products, indicating that this Target employee's store was so overstocked with hardlines products that they were forced to cannibalize storage space intended for other product categories.

76.     The post was "upvoted" by hundreds of users, an indication that the post received a high level of engagement. Several Target employees commented on the October 10, 2021 post as well. On the discussion thread for the post, one Target employee commented "[r]eal talk! Keep those damn things at the DC," to which a third employee identifying himself as Distribution Center worker replied "[n]o. I'm drowning I'm [sic] TVs here. Racks 4 high everywhere." Yet a fourth employee, also self-labeled as from a Distribution Center, commented "[f]rom the DC… NO" –

---

[3] Reddit, */r/Target*, http://www.reddit.com/r/target (last accessed Dec. 12, 2023).

[4] Reddit, *Please stop sending us TVs,* https://www.reddit.com/r/Target/comments/q52a73/please_stop_sending_us_tvs/ (Oct. 10, 2022).

again indicating that Distribution Centers had no place to store such inventory either. Collectively, this post and the comments thereto indicate that Target stores and distribution centers were facing unusually large inventory buildup more than a month before the Class Period, supporting the accounts given by CW-1, CW-2, and CW-3.

77.     Other forum threads on the Target subreddit forum and other similar websites indicated that Target's inventory buildup continued causing capacity issues at Target stores in February 2022, weeks before Target's Q4 2021 Earnings Call on March 1, 2022. On The Break Room, an internet forum described as "by team members, for team members," a user identifying themself as a Distribution Center employee posted on February 2, 2022 that "[w]e've been taking in so much freight we have nowhere to put it."[5] The user indicated that their distribution center had to make stash aisles for excess bulky inventory: "[t]hey even made up bulk locations in the shipping wing and we still can't store it all."  In response, another employee commented that there were "inventory concerns in our dc. Seems like you guys aren't the only one. We are still trying to recover from 4th quarter…". A third employee added "[w]e are having same issue of more coming in than going out."  In another Target subreddit thread on February 16, 2022, a user posted a photo of an overstocked store back room with the caption "[i]s anyone overwhelmed with the amount of shipments coming through this week? … Space is tight!!"[6] This prompted dozens of comments within 48 hours confirming the issue was widespread at other stores and warehouses, describing their facilities as "absolutely slammed," "extremely overwhelmed," "packed so solid," "full of stuff no one's buying", and "f***ked in every department." One user identified as a "Closing Team Lead"—*i.e.*, assistant store manager—added that "[i]t is because they don't have room in the warehouse so they are sending it all to out to the stores, who also have no room."

---

[5]  The Break Room, *We've been taking in so much freight we have nowhere to put it*, https://www.thebreakroom.org/threads/weve-been-taking-in-so-much-freight-we-have-nowhere-to-put-it.27916/ (Feb. 2, 2022).

[6]  Reddit, *Is anyone overwhelmed with the amount of shipments coming through this week? My store is definitely behind on literally everything and everyone at the store is trying to catch up with pushing loads onto the sales floor. I work in the back doing Super Sort break out. Space is tight!!*, https://www.reddit.com/r/Target/comments/sucm9c/is_anyone_overwhelmed_with_the_amount_of/ (Feb. 16, 2022).

78.     Another employee gave a supply chain perspective, commenting "[t]ruck driver for you guys here: We are overwhelmed too. Most stores are getting two and three trailers a day from our dc. Stores aren't finishing trailers on time because they don't have room for everything. It sucks."[7] Target stores continued to be inundated with overbought inventory that customers were not buying prior to the Q4 2021 Earnings Call wherein Defendants reassured investors that the Company got "the right assortment" of inventory by "listening to the ever-changing wants and needs of our guests."

79.     Nonetheless, despite the massive overstock of inventory, Defendants told investors throughout the Class Period that Target had a "durable, flexible" business model and inventory purchasing and management strategy that centered around leveraging its multi-category product assortment and abundance of "real-time" inventory data and guest insights to get "the right amount" and "the right inventory to the right place at the right time," to "align" it with the "ever-changing wants and needs of our guests," and had a "very healthy inventory position," when Defendants knew that the Company clearly and verifiably did not.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS[8]

### A.   False and Misleading Statements on November 17, 2021

80.     The Class Period begins on November 17, 2021, when Target held an earnings call announcing its third quarter financial results for the quarter ended September 30, 2021 (the "Q3 2021 Earnings Call").

81.     During the Q3 2021 Earnings Call, Defendant Hennington falsely claimed that Target was using consumer insights to inform its inventory purchasing decisions:

> ***We continuously evaluate our guests' mindset, which serves as a North Star for all our strategies and decisions.*** We remain laser-focused on their experiences with us and expectations of us. And we strive to build flexibility and agility into our

---

[7] The comment has since been deleted because the employee deleted their Reddit account. A copy of the comment is archived by the Internet Archive Wayback Machine, https://web.archive.org/web/20220217172345/https://www.reddit.com/r/Target/comments/sucm9c/is_anyone_overwhelmed_with_the_amount_of/ (archived as of Feb. 17, 2022).

[8] The statements Plaintiffs allege are false and misleading are bolded and italicized. All other statements are provided for context.

plans to ensure we show up at our best for them during the holidays and all year round.

* * *

As John will outline in more detail, ***our teams are working diligently to get the right inventory to the right place at the right time***. Doing so has driven some near-term gross margin pressure, appropriate long-term investment in the relationship with our guests. ***Bottom line, based on the incredible efforts of our team, we feel good about our inventory levels heading into the holiday season***.

82.     Similarly during the Q3 2021 Earnings Call, Defendant Mulligan told investors that Target was focused on moving appropriate levels of inventory, particularly during the prime holiday shopping season, and repeated a mantra that Target used in discussing inventory with investors at this time, that "[o]n our supply chain team, ***the focus is on moving the right amount of inventory to the right place at the right time***."

83.     The above statements were materially false and misleading when made, because by at least June 2021 and through the Class Period, Target did not take customers' shifting buying habits into account to buy the "right inventory" in the "right amount" and instead engaged in a scattershot buying spree where Target was pre-ordering large quantities of inventory, particularly in the hardlines and home furnishing and décor categories, for which demand had waned, as evidenced by the following:

        a.      CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of

26

CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

c.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," prior to the Q3 2021 Earnings Call, which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

d.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual

27

purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

     e.    Target employees from various locations had been complaining on internet discussion forums as early as October 10, 2021 about stores and distribution centers being overloaded with hardlines such as TVs that were not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities.

84.    Later during the same Q3 2021 Earnings Call, Defendant Mulligan reiterated that "while we continue to see some periodic outages across different items and categories, ***we're entering the holidays with a very healthy inventory position overall***."

85.    The above statement was materially false and misleading when made, because going into the 2021 Holiday Season, Target was massively overstocked in hardlines and home furnishings and décor products, bulk goods that consumers did not want and which would have to be heavily discounted and/or marked down in order to move them, such that Target was clearly entering the holidays with a very *un*-healthy inventory position overall, as evidenced by the following:

     a.    CW-3 confirmed that by May 2021 through the end of 2021, including before the Q3 2021 Earnings Call, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state, other Target stores in the district, and at the Amsterdam, PA distribution center that replenished them due to Target's massive overbuying in those categories. It was evident during this time to CW-3 from fulfilling customer orders, as well as Target's Greenfield inventory system, that such products were not selling in 2021 in the quantities they had been in 2020 because customer mindsets had changed. Thus, management at Target headquarters forced stores to accept massive levels of overstock to relieve pressure on Target's distribution centers that themselves had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, such as making stores take 20 weeks' worth of product, starting in June 2021 through the end of CW-3's tenure in March

2022, including through the 2021 Holiday Season. CW-3 confirmed that other stores in the region were facing the same overstock issues, which was evident from the Greenfield system and from regular discussions with the District Store Director and management from other Target stores, all of whom were deluged with excess inventory.

b.    CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest became "alarming[ly]" overstocked with an "unprecedented" level of inventory in the hardlines and home furnishings and décor categories, particularly televisions, furniture, and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% goal for a healthy capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to increase thereafter; and, throughout the Class Period, the Albany RDC was overstocked with excessive quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles due to lack of rack space, and the RDC began stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive, and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate excess storage capacity.

c.    According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," and prior to the Q3 2021 Earnings Call, with massive overstocking that necessitated storing excess inventory, in the aisles of the warehouse and eventually in trailers outside the building, as 100% capacity was exceeded because customers were not interested in buying the product. Meanwhile, Target management "knew which products weren't moving" through the warehouse's Apollo data system.

d.    CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Logan Flow Center leading up to the 2021 Holiday Season consisted of larger, non-conveyable goods such as "televisions and patio

furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach. CW-2 confirmed that inventory was coming in far faster than the warehouses could contain it.

e.  Target employees from various locations had been complaining on internet discussion forums as early as October 10, 2021 about stores and distribution centers being overloaded with hardlines such as TVs that were not selling, demonstrating that the imbalanced inventory was a widespread issue for the Company by at least the very start of its 2021 Holiday Season.

86.  Following Defendants' prepared statements, the Q3 2021 Earnings Call turned to Q&A with securities analysts. In response to an analyst query about how inventory levels were affecting the Company's gross margin, Defendant Fiddelke again emphasized Target's ability to purchase and position inventory based on guest expectations:

> Thanks for the question, Michael. As you know, we don't guide margins specifically out into future quarters. But I will say and reiterate what I said in my remarks. *I think you're seeing in the third quarter, the result of some very specific investments we made. And the biggest of those investments is an investment to make sure we've got a great inventory position heading into the fourth quarter. And pulling all the levers within the system to ensure we're there for the guest has been our priority*. And some of those levers, think of expediting product to come at a cost, and you saw some of that in the third quarter.

> But I feel really good about the payoff from an investment decision like that. *We've got inventory of $2 billion north of last year, up almost 20% on a year-over-year basis. And that's fueling the continued top line growth that we see. So I feel really good about the set of investments that we're making and how they have us positioned for the back part of the year*.

87.  The above statements were materially false and misleading when made because Defendants failed to disclose that Target's inventory investments had been neither "specific" nor "appropriate" in that Defendants had departed from Target's internal policy of using customer data and insights to purchase products people wanted to buy, and instead Target was buying excess inventory in a scattershot approach. Therefore Defendants had no basis upon which to claim that Target's inventory was "well-positioned," as evidenced by the following:

a.      CW-1 confirmed that by July or August 2021, the inventory position at the Albany RDC which serviced stores and online orders in the Pacific Northwest, was overstocked to "alarming" and "unprecedented" levels particularly in the hardlines and home furnishings and décor categories, including televisions, furniture, and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Thus, throughout the Class Period, Target was highly overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisle floors due to lack of rack space, and by November 2021, the RDC was "stuffing" 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory, leaving product "just sitting there" in the RDC parking lot or to be shipped to off-site locations to generate extra storage capacity.

b.      According to CW-2, the inventory at the Logan Flow Center in New Jersey surpassed the 80% intended capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory the Company had over-ordered (namely larger, bulkier items) in the aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying those products. CW-2 confirmed that Target management "knew which products weren't moving" by way of the warehouse's Apollo data system and therefore knew that this statement was false and misleading when made.

c.      CW-2 knew from both personal observations and from fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that Target over-ordered inventory in a scattershot approach, divorced from actual customer purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it by the beginning of the Class Period.

31

d.     CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories were extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overinvestment in those categories, and it was evident throughout CW-3's tenure from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer demand had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (*i.e.*, ten times normal quantities), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

e.     Target employees in various locations had been complaining on certain internet discussion forums as early as October 10, 2021, the start of Target's 2021 Holiday Season, about stores and distribution centers being overloaded with hardlines such as TVs that were not selling, indicating that Target's acute inventory problems were widespread and known internally.

**B.     False and Misleading Statements on November 24, 2021**

88.     On November 24, 2021, one week after the Q3 2021 Earnings Call, Target filed a Form 10-Q reporting its financial and operating results for its third quarter (the "Q3 2021 Form 10-Q"), signed by defendant Fiddelke. In the Q3 2021 Form 10-Q, Target claimed that it had been purportedly purchasing "certain" inventory in core categories in advance to offset supply chain pressures:

> Since the onset of the COVID-19 pandemic, we have experienced strong comparable sales growth and significant volatility in our sales category and channel mix, including same-day fulfillment options. Note 4 presents sales by category. *We have taken various actions, including accelerating purchases of certain*

*merchandise in our core categories* and, early in the pandemic, slowing or canceling purchase orders, primarily for Apparel and Accessories. As a result, during the quarter ended May 2, 2020, we recorded $216 million of purchase order cancellation fees in Cost of Sales.

89.     The statements above were materially false and misleading when made, because Defendants failed to disclose that, in accelerating purchases of merchandise in the Company's core hardlines and home furnishings and décor categories, Target abandoned using customer data and insights that indicated customer buying habits were shifting for those products to make inventory purchasing decisions, as evidenced by the following:

        a.     According to CW-3, starting as early as May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories were heavily overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer buying habits were changing.  Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no more space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making them take 20 weeks' sales worth of product (ten times normal quantities), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that other stores in their region were facing the same overstock issues as evident from the Greenfield system and through regular discussions with the District Store Director and leadership at the other stores.

        b.     CW-1 stated that inventory levels at the Albany RDC grew at "alarming" levels starting in July or August 2021 and continued to increase through the 2021 Holiday Season such that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021, and exceeded 100% capacity by early 2022. Thus, throughout the Class Period, Target was overstocked with large quantities of televisions, furniture, and home goods, mostly

"bulky" items, which were not flowing out of the RDC because Target customers were not buying them as described above. Starting by at least November 2021, CW-1 and colleagues were forced to store excess inventory in the aisle floors due to lack of rack space, and the RDC began "stuffing" dozens of shipping trailers, 50 to 100 full trailers by CW-1's estimate, with excessively overbought inventory, leaving product "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

      c.    According to CW-2, due to Target's advanced purchasing of products that were not selling, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory, namely larger, bulkier items from the problem categories (*e.g.*, furniture and "1,000" televisions) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded,  Meanwhile, Target management "knew which products weren't moving" through the warehouse's Apollo data system.

      d.    CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory accumulating at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

      e.    Target employees from various locations had been complaining on internet discussion forums as early as October 10, 2021 about stores and distribution centers being overloaded with hardlines such as TVs that were not selling, demonstrating that Target's acute inventory problems were widespread and known internally.

      90.    The Q3 2021 Form 10-Q also discussed Target's gross margin rate for the quarter, and painted a false picture that the Company's inventory position was in fact a positive driver of the gross margin rate when compared to negative drivers such as supply chain issues:

For the three months ended October 30, 2021, our gross margin rate was 28.0 percent compared with 30.6 percent in the comparable prior-year period. This decrease reflected the net impact of[:]
• pressure from higher merchandise and freight costs and higher inventory shrink, *partially offset by the benefit of historically low promotional and clearance markdown rates*;
• supply chain pressure related to increased compensation and headcount in our distribution centers; and
• favorable mix in the relative growth rates of higher and lower margin categories.

91.     The above statement was materially false and misleading when made, because Defendants failed to disclose that Target's scattershot inventory buying was making the Company overweight on hardline and home furnishings and décor goods, which created an immense overstock that would need to be marked down and discounted to get rid of it, as evidenced by the following:

a.     CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer buying habits had changed. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal quantities), starting in June 2021 through at least the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.     CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest became "alarming[ly]" overstocked with

an "unprecedented" level of inventory in the hardlines and home furnishings and décor categories, particularly televisions, furniture, toys, and home goods that customers were not buying. The Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021 and exceeded 100% by early 2022. Thus, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisle floors due to lack of rack space, and the RDC began "stuffing" 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory, leaving product "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

        c.     According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory, namely larger, bulkier items from the problem categories including furniture and "1,000" televisions in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying the product. Target management "knew which products weren't moving" through the warehouse's Apollo data system.

        d.     CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

        e.     Target employees in various locations had been complaining on certain internet discussion forums as early as October 10, 2021 about stores and distribution centers being overloaded with hardlines such as TVs that were not selling, demonstrating that Target's acute

imbalanced inventory problems were widespread and known internally, corroborating the accounts of the CWs.

92.     Target's Q3 2021 Form 10-Q also falsely informed investors that the Company's inventory position was built with customer sales trends in mind:

> Inventory was $15.0 billion as of October 30, 2021, compared with $10.7 billion and $12.7 billion at January 30, 2021, and October 31, 2020, respectively. ***The increase over the balance as of October 31, 2020, reflects efforts to align inventory with sales trends***.

93.     The above statements were materially false and misleading when made, because Target's inventory balance increase was not due to Defendants' efforts to align inventory with sales trends that inventory and customer data and insights indicated. Rather, unbeknownst to investors, Target was pre-ordering massive quantities of any inventory it could get its hands on, including massive quantities of hardlines, furniture and bulk goods that consumers did not want, as evidenced by the following:

        a.     CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it— due to Target's massive overbuying in those categories, and it was evident to CW-3 from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had been in 2020 because customer buying habits were changing.  Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal quantities), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident from the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest became "alarming[ly]" overstocked with an "unprecedented" level of inventory in the hardlines and home furnishings and décor categories, particularly televisions, furniture, and home goods that customers were not buying. The Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021 and exceeded 100% capacity by early 2021.  Thus, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisle floors due to lack of rack space, and the RDC began "stuffing" 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory, leaving product "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

c.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which necessitated storing excess inventory, namely larger, bulkier items from the problem categories including furniture and "1,000" televisions in aisles of the 2 million square foot warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying the product. Target management "knew which products weren't moving" through the warehouse's Apollo data system.

d.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns.  The inventory was coming in far faster than the warehouses could contain it.

e.      Target employees in various locations had been complaining on certain internet discussion forums as early as October 10, 2021 about stores and distribution centers being

overloaded with hardlines such as TVs that were not selling, demonstrating that Target's acute imbalanced inventory problems were widespread and known internally, and corroborating the accounts of the CWs.

94.     The Q3 2021 Form 10-Q also incorporated by reference statements as to purported risk factors, which had been outlined in Target's Form 10-K filed with the SEC on March 10, 2021. Through these statements, Target purported to warn investors of the purported risk that Target's business could be materially impacted if Defendants failed accurate manage its inventory according to consumer demand and preferences:

> *If we do not anticipate and respond quickly to changing consumer preferences, our sales and profitability could suffer. A large part of our business is dependent on our ability to make trend-right decisions and effectively manage our inventory in a broad range of merchandise categories, including apparel, accessories, home décor, electronics, toys, seasonal offerings, food, and others. If we do not obtain accurate and relevant data on guest preferences, predict and quickly respond to changing consumer tastes, preferences, spending patterns and other lifestyle decisions, emphasize the correct categories, implement competitive and effective pricing and promotion strategies, or personalize our offerings to our guests, we may experience lost sales, spoilage, and increased inventory markdowns, which could adversely affect our results of operations.*

95.     The purported risk disclosure statements above 94were materially false and misleading when incorporated by reference in the Q3 2021 Form 10-Q because the risk being warned of had already materialized when, back in July 2021, Defendants abandoned any effort to purchase inventory based on consumer preferences and demand and instead engaged in a scattershot pre-ordering bulk buying spree, as evidenced by the following:

a.     CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it— due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer buying habits were changing.  Thus, management at Target headquarters forced stores to accept massive

shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal quantities), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident from the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-1 confirmed that by July or August 2021 and continuing throughout CW-1's tenure, the Albany RDC which serviced stores and online orders in the Pacific Northwest became "alarming[ly]" overstocked with an "unprecedented" level of inventory in the hardlines and home furnishings and décor categories, particularly televisions, furniture, and home goods that customers were not buying. The Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021 and exceeded 100% by early 2022.  Thus, throughout the Class Period, Target was highly overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisle floors due to lack of rack space, and the RDC began "stuffing" 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory, leaving product "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

c.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which necessitated storing excess inventory, namely larger, bulkier items from the problem categories including furniture and "1,000" televisions in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying the product.  Target management "knew which products weren't moving" through the warehouse's Apollo data system.

d.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns.  The inventory was coming in far faster than the warehouses could contain it.

e.      Target employees in various locations had been complaining on certain internet discussion forums as early as October 10, 2021 about stores and distribution centers being overloaded with hardlines such as TVs that were not selling, demonstrating that Target's acute imbalanced inventory problems were a widespread and known internally, and corroborating the accounts of the CWs.

**C.      False and Misleading Statements on March 1, 2022**

96.      On March 1, 2022, Target announced its fourth quarter earnings for the fiscal year 2021 via both a press release (the "March 1, 2022 Press Release"), which was filed as an exhibit to a Form 8-K filed with the SEC that day, and an earnings call with investment analysts (the "Q4 2021 Earnings Call"). In the March 1, 2022 Press Release, Defendants falsely claimed that Target's gross margin rate for 2021 had purportedly benefitted from a "***favorable category mix***" of inventory and ***"lower markdowns*,"** stating that "[f]ull-year gross margin rate was 28.3 percent, in line with 28.4 percent in 2020, reflecting pressure from increased supply chain, merchandise, and freight costs ***largely offset by favorable category mix and lower markdowns***."

97.      The above statements were materially false and misleading when made, because they gave the false impression that Target was not overstocked in inventory, such that the Company would not need to take markdowns and thereby have a higher gross margin when, in fact, Defendants knew Target had massively over-ordered hardlines and home furnishings and décor, two of Target's core product categories representing roughly 40% of the Company's sales, and that such inventory had not been selling for months and would necessitate significant markdowns and write-offs the immediately following quarter, as evidenced by the following:

41

a.      CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending in March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted.  Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels) starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-3 also confirmed that inventory overstock led management at Target headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns in 2021 through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per just one week in 2021 as Target had to work through the overstock.

c.      CW-1 confirmed that by July or August 2021, the Albany RDC that serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying. CW-1 further confirmed that the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as

described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

d.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded in advance of the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

e.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

f.      Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

98.      On the Q4 2021 Earnings Call, Defendant Hennington emphasized purported advantages of Target's durable business model and the Company's ability to understand its customer's wants and needs:

We have created momentum through unique and innovative strategies, many of which began long before the onset of the pandemic. And ***because of our durable, flexible business model, we have proven we can adapt to any environment. We'll continue to play offense and accelerate these strategies while listening to the ever-changing wants and needs of our guests*** to ensure our playbook is a direct reflection of what they have come to expect from Target.

99.     The above statements were materially false and misleading when made, because Defendants failed to disclose that Target had abandoned its purported "durable, flexible business model" as it related to inventory management and, instead, by June 2021 began pre-ordering large quantities of whatever inventory Target could get its hands on without listening or adapting to changing customer wants or need for product, as evidenced by the following:

a.     CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted.  Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.     CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so

overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

c.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded before the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

d.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and his/her colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

e.      Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

100.    Defendant Fiddelke also discussed Target's plans for markdowns in the Company's fiscal year 2022, telling investors on the Q4 2021 Earnings Call that "***we're planning for a small increase in markdown rates in 2022*** as we move past the dramatically low rates we've seen over the last couple of years."

101.    Following prepared remarks, the Q4 2021 Earnings Call turned to a question-and-answer portion with stock analysts. In response to an analyst question about Target's efficiency in promotional markdowns, Defendant Fiddelke falsely represented that the Company would only be implementing "***a few more … markdowns***," when, in fact, Defendants knew or recklessly disregarded that Target would have to employ massive markdowns well beyond merely "a few" in order to sell the overstocked quantity of inventory the Company had accumulated:

> The shape of profit for the year will be like we described, where you could expect it to build over the course of the year. ***When it comes to markdowns specifically, there's some markdowns that we've been rooting for returning. To be better in stock with stronger inventory levels means a few more clearance markdowns, and we're planning for that outcome in the upcoming year***.

102.    The above statements were materially false and misleading when made, because they gave the false impression that Target was not overstocked in inventory such that the Company would not need to take major markdowns and thereby have a higher gross margin when, in fact, Defendants knew Target had massively over-ordered hardlines and home furnishings and décor, two of Target's core product categories representing roughly 40% of the Company's sales, and that such inventory had not been selling for months and would necessitate significant markdowns and write-offs the immediately following quarter, as evidenced by the following:

a.    CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020

because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-3 also confirmed that inventory overstock led management at Target headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns in 2021 through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per just one week in 2021 as Target had to work through the overstock.

c.      CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

d.     According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded leading up to the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

e.     CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

f.     Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

*103.*     Analysts on the Q4 2021 Earnings Call continued to question Defendants about the capacity Target's stores had to store inventory, with one analyst specifically asking how much inventory "headroom" Target stores had left to be productive. In response, Defendant Mulligan falsely described inventory as "constantly moving through" stores:

> I think the other thing I'd add on is as inventory turns increase with scale, you just push things through faster. ***Speed and flow of inventory is the key to the whole game***, like we were just talking about with Robby. ***And as that happens, we see it in our largest stores, they just move inventory. It's constantly moving through***. It shows up at night. It's out the store the next day. That's capacity. ***You're just moving inventory. So a lot of headroom for growth from that perspective***.

104.    The above statements were materially false and misleading when made because they gave the misleading impression that at that time inventory was constantly moving and not building up, and that Target stores had plenty of inventory capacity. Contrary to Defendants' statements, Target was not purchasing inventory according to customer demand and preferences; rather, Defendants consciously decided to pre-order large quantities of inventory starting by at least June 2021 without regard to customer preferences or demand, which caused a major overstock of inventory that clogged Target warehouses and stores past the 2021 Holiday Season and into 2022, *i.e.*, massive amounts of inventory were ***not*** moving, as evidenced by the following:

g.    The inventory levels that CW-1 saw by early 2022 manifestly exceeded 100% capacity at the Albany RDC. CW-1 confirmed that by July or August 2021 and continuing into 2022, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout and following the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products that were not moving because Target customers were not buying them. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

h.    According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," well before the Q4 2022 Earnings Call, which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying these products, and

that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

       i.     CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

       j.     CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

       k.     Target employees from various Company locations had been complaining on internet discussion forums in 2022 as early as October 10, 2021 and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling which corroborated the accounts of the CWs, demonstrating that Target was buying the wrong

inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

105.    In addition to speaking to Yahoo! Finance on March 1, 2022, Defendant Fiddelke gave a similar interview on Bloomberg's "Bloomberg Surveillance" television program. As with the Yahoo! Finance interview, Bloomberg questioned Fiddelke on how Target was navigating supply chain disruptions and inflation:

> Well, as you might expect, it's a situation we monitor really closely and I'll start by just saying our hearts go out to everyone impacted by the situation in Ukraine. I know it weighs heavily on my mind, our Target team and our guests. We're fortunate. We've got the benefit of a really sophisticated supply chain that's navigated a lot of challenges over the last two years. Incredibly well. ***I feel really good about our inventory position today, up 30% to last year. That's a testament to us working through some of those supply chain challenges. So we should be well positioned to start the year.***

106.    The above statements were materially false and misleading when made because Defendants had no basis to view Target's inventory increase as positive or its inventory status as "well positioned"; Defendants failed to disclose that Defendants consciously decided to pre-order large quantities of inventory starting by at least June 2021 without regard to customer preferences or demand, resulting in Target having massively overbought its hardline and furniture categories of inventory that consumers were not buying into 2022 and, thus, Target would be forced to mark them down or write off large quantities of product the immediately following quarter, as evidenced by the following:

a.    The inventory levels that CW-1 saw by early 2022 manifestly exceeded 100% capacity at the Albany RDC. CW-1 confirmed that by July or August 2021 and continuing into 2022, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such

that, throughout and following the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products that were not moving because Target customers were not buying them. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

b.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," well before the Q4 2022 Earnings Call, which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

c.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

d.      CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it— due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted.  Thus, management at Target headquarters forced stores to accept massive shipments

of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

e.     Target employees from various Company locations had been complaining on internet discussion forums in 2022 as early as October 10, 2021 and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling which corroborated the accounts of the CWs, demonstrating that Target from its fourth quarter into the first quarter was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

**D.     False and Misleading Statements on March 9, 2022**

107.     Following the March 1, 2022 earnings call, on March 9, 2022, Target filed its Form 10-K with the SEC, signed by Defendants Cornell and Fiddelke, which reported the Company's financial and operational results for its fourth quarter and fiscal year ended January 29, 2022 (the "2021 Form 10-K").

108.     In the 2021 Form 10-K, Defendants told investors that Target had "effective inventory management" by purportedly "carefully planning inventory levels," which was "key" to the Company's success in being able to "minimize markdowns":

> Effective inventory management is key to our ongoing success, and we use various techniques including demand forecasting and planning and various forms of replenishment management. ***We achieve effective inventory management by*** staying in-stock in core product offerings, maintaining positive vendor relationships, ***and carefully planning inventory levels for seasonal and apparel items to minimize markdowns.***

109.     The above statements were materially false and misleading when made because Defendants were not carefully planning inventory levels nor achieving effective inventory

management at all. On the contrary, Defendants consciously decided to pre-order large quantities of inventory starting by at least June 2021 without regard to customer preferences or demand, resulting in Target having massively overspent on its hardline and furniture categories of inventory that consumers were not buying and, thus, inventory in these categories had piled up massively in Target's distribution centers and stores for months, and compelling Target to mark down such items, which it had begun and would continue to do, as evidenced by the following:

a.      CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending in March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-3 also confirmed that inventory overstock led management at Target headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns in 2021 through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per just one week during 2021 and early 2022 as Target had to work through the overstocks.

c.       CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.  Thus, rather than "effective" inventory management, CW-1 stated that inventory management at Target prior to and throughout the Class Period was pure "havoc."

d.       According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded in advance of the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

e.       CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual

purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

        f.    Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

      110.    The 2021 Form 10-K also discussed Target's gross margin rate. In doing so, Target told investors that the Company's inventory position had been a boon for gross margin:

> Our gross margin rate was 28.3 percent in 2021 and 28.4 percent in 2020. This decrease reflected the net impact of[:]
> • supply chain pressure related to increased compensation and headcount in our distribution centers, partially offset by the small net benefit of a higher percentage of digital sales fulfilled through our lower-cost same-day fulfillment options;
> • higher merchandise and freight costs partially ***offset by historically low promotional and clearance markdown rates***; and
> • ***favorable mix in the relative growth rates of higher and lower margin categories***.

      111.    The above statements were materially false and misleading when made, because Defendants failed to disclose that they consciously decided to pre-order large quantities of inventory starting by at least June 2021 without regard to customer preferences or demand, resulting in Target having massively overspent on its hardline and furniture categories of inventory that consumers were not buying and, thus, Target had been and would be compelled to mark them down, requiring write-offs, and, thus, did not have a "favorable mix," as evidenced by the following:

        a.    CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending in March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield

inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

b.      CW-3 also confirmed that inventory overstock led management at Target headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns in 2021 through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per just one week during 2021 and early 2022 as Target had to work through the overstock.

c.      CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that

continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

d.     According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded in advance of the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

e.     CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

f.     Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

112.   Defendants also represented in the 2021 Form 10-K that Target's year-end 2021 inventory was $13.9 billion, compared with $10.7 billion in 2020, noting "*[t]he increase in inventory levels reflect our efforts to align inventory with sales trends*, and elevated in-transit inventory related to import supply chain delays."

113.   The above statement was materially false and misleading when made because Defendants were not aligning inventory with sales trends. Rather, Defendants consciously decided to pre-order large quantities of inventory starting by at least June 2021 without regard to customer

preferences or demand, resulting in Target having massively overspent on its hardline and furniture categories of inventory that consumers were not buying and, thus, Target would be marking them down or writing them off that quarter, as evidenced by the following:

f.      CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending in March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020 because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

g.      CW-3 also confirmed that inventory overstock led management at Target headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns in 2021 through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per in just one week during 2021 and early 2022 as Target had begun working through the overstock.

h.      CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so

overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

i.       According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded in advance of the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

j.       CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

k.       Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

114.   The 2021 Form 10-K also purported to warn investors of the risk that Target's business could be negatively impacted if the Company failed to adapt to changing consumer buying behaviors:

> *If we do not anticipate and respond quickly to changing consumer preferences, our sales and profitability could suffer*. A large part of our business is dependent on our ability to make trend-right decisions and effectively manage our inventory in a broad range of merchandise categories, including apparel, accessories, home décor, electronics, toys, seasonal offerings, food and beverage, and others. *If we do not obtain accurate and relevant data on guest preferences, predict and quickly respond to changing consumer preferences, spending patterns, and other lifestyle decisions, emphasize the correct categories, implement competitive and effective pricing and promotion strategies*, or personalize our offerings to our guests, *we may experience lost sales, spoilage, and increased inventory markdowns, which could adversely affect our results of operations*. During the COVID-19 pandemic, many guests significantly reduced their spending on dining, travel, lodging, and other leisure activities outside their homes, which may have contributed to our increased sales, particularly for essential items and merchandise associated with guests spending more time at home. *If we are unable to effectively adapt if or when guests increase spending on other categories, it could lead to lower sales and adversely affect our results of operations*."

115.   The purported risk disclosure statements above were themselves materially false and misleading when made because the purported risk being warned of had already materialized, since Defendants had pre-ordered large quantities of inventory starting by at least June 2021 without regard to customer preferences or demand, resulting in Target having massively overspent on its hardline and furniture categories of inventory that consumers were not buying, and thus, Target had begun marking them down and would be required to write them off, as evidenced by the following:

l.   CW-3 confirmed that by May 2021 and continuing throughout CW-3's tenure ending in March 2022, the home furnishings and apparel categories became extremely overstocked at CW-3's Target store in New York state—and the Amsterdam, PA distribution center that replenished it—due to Target's massive overbuying in those categories, and it was evident to CW-3 during this time from fulfilling customer orders as well as Target's Greenfield inventory system that such products were not selling in 2021 in the quantities they had in 2020

because customer mindsets had shifted. Thus, management at Target headquarters forced stores to accept massive shipments of overstock because the distribution centers had no space for them. Moreover, CW-3 recalled that Target headquarters, which monitored inventory at warehouses and stores through Greenfield, regularly pushed far more product to stores than customers were buying, making stores take 20 weeks' sales worth of product (ten times normal levels), starting in June 2021 through the end of CW-3's tenure in March 2022. CW-3 confirmed that every store in their region was facing the same overstock issues, which was evident through the Greenfield system and from regular discussions with the District Store Director and leadership at other stores.

        m.      CW-3 also confirmed that inventory overstock led management at Target headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns in 2021 through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per in just one week during 2021 and early 2022 as Target had begun working through the overstock.

        n.      CW-1 confirmed that by July or August 2021, the Albany RDC which serviced stores and online orders in the Pacific Northwest region became "alarming[ly]" overstocked with an "unprecedented" level of inventory, particularly with respect to televisions, furniture and home goods that customers were not buying, and the Albany facility was so overstocked that the RDC surpassed Target's 80% target capacity level to reach 95% or 96% capacity by October 2021. Capacity continued to grow past 100% by early 2022, such that, throughout the Class Period, Target was overstocked with large quantities of hardlines and home furnishings and décor category products because Target customers were not buying them as described above. By November 2021, CW-1 and colleagues were forced to store excess inventory in the aisles ("stash aisles") due to lack of rack space, and by November 2021 the RDC was stuffing 50 to 100 shipping trailers, by CW-1's estimate, with excessively overbought inventory that continued to arrive and leaving them "just sitting there" in the RDC parking lot or shipping them to off-site locations to generate extra storage capacity.

o.      According to CW-2, the Logan Flow Center in New Jersey surpassed the 80% intended inventory capacity to reach "mid-90s" percent capacity by "mid-November 2021," which also necessitated storing excess inventory (namely larger, bulkier items) in aisles of the warehouse and eventually in trailers outside the building as 100% capacity was exceeded in advance of the Q4 2021 Earnings Call because customers were not interested in buying these products, and that Target management "knew which products weren't moving" through the warehouse's Apollo data system.

p.      CW-2 knew from both personal observations and from store fulfillment demands that much of the inventory being accumulated at the Flow Center consisted of larger, non-conveyable goods such as "televisions and patio furniture," leading CW-2 and colleagues to conclude that inventory had been over-ordered in a scattershot approach, divorced from actual purchasing patterns, and the inventory was coming in far faster than the warehouses could contain it.

q.      Target employees from various locations had been complaining on internet discussion forums in 2022 as early as October 10, and on February 2 and February 10, 2022, about stores and distribution centers being overloaded with inventory that was not selling, demonstrating that Target was buying the wrong inventory quantities and forcing them into its facilities, which would necessitate heavy discounting and markdowns to get rid of.

## VI.   THE TRUTH IS REVEALED

116.    Before market opened on the morning of May 18, 2022, Target filed a Form 8-K with the SEC attaching a press release containing the Company's financial and operating results for the first quarter ended April 30, 2022 (the "Q1 2022 Earnings Release"). The Q1 2022 Earnings Release revealed that Target had missed profit estimates widely, with cost of goods sold increasing 10% year over year, operating income declining by nearly half to $1.3 billion from $2.4 billion in the prior year, and net profit down 52%. In the filing, Target also revealed that its operating margin was "well below expectations, driven primarily by gross margin pressure reflecting actions to

reduce *excess inventory*…".[9] Target further explained that its first quarter 2022 "gross margin rate" had dropped to 25.7%, compared to 30.0% in the first quarter of 2021, which "reflected higher markdown rates" in inventory, "driven largely by inventory impairments and actions taken to address lower-than-expected sales in discretionary categories…".

117.    On an earnings call for investors held before markets opened for trading on that same day (the "Q1 2022 Earnings Call"), Defendant Fiddelke explained that Target's gross margin rate for the quarter was down nearly 4.3%, with approximately 3 percentage points of the 4.3 points—due to "merchandising actions", *i.e.* "the combined impact of impairments, markdowns and other actions taken to right-size our inventory position in categories that were too heavy…".

118.    Defendant Cornell attributed Target's excess inventory to the Company's purported inability to anticipate the pace at which consumers "continue[d] refocusing their spending away from goods and into services[.]" Cornell further stated that much of the excess inventory was in "bulky" categories, such as "kitchen appliances, TVs and outdoor furniture"—products within Target's hardlines and home furnishings and décor categories—"which put additional strain on an already stretched supply chain."

119.    Also on the Q1 2022 Earnings Call, the Individual Defendants described that Target had incurred higher costs to store the superfluous inventory they had ordered. Defendant Cornell described that Target had had "very little slack capacity" to handle the excess hardlines and home furnishings products and stated that "we faced elevated cost to store" the surplus product. In that vein, Defendant Mulligan remarked that "capacity pressures" at Target's facilities "were compounded by the fact that in several of those categories, including kitchen appliances, furniture and outdoor living, items are bulkier than average and require higher-than-average amounts of storage capacity." Mulligan added that his team had "collaborated" with Defendant Hennington's team to "work through this excess inventory," which included securing "temporary storage capacity" outside of Target's warehouses.

---

[9] Italics in this section are added for emphasis only.

120.    On the Q1 2022 Earnings Call, Defendant Hennington elaborated on Target's inventory problems:

> As Brian mentioned, first quarter gross margin performance was well below our expectations. This was driven by a number of factors, *the most impactful of which was softer than expected sales in several categories, resulting in too much inventory in those areas.* As we developed our plans for the quarter, our task was to anticipate how spending would change under circumstances no one had ever seen before given that we were about to compare over 2 years of historically high federal stimulus payments. As such, we relied on numerous forecasts and estimate, both internal and external, to help determine our view for the quarter. Despite this careful approach, the mix of actual demand materialized differently than we had anticipated.
>
> In addition, as *supply grew and demand shifted away from bigger, bulkier products like furniture, TVs and more*, we needed to make difficult trade-off decisions. We could keep this product knowing it would sell over time or we can make room for fast-growing categories like Food & Beverage, Beauty, and personal care and Household Essentials. To preserve the quality of on-shelf presentations and support the guest experience, we chose the latter, leading to incremental markdowns that reduced our gross margin.

121.    John J. Mulligan, Executive Vice President and Chief Operating Officer, added on the call:

> As Brian and Christina mentioned, this quarter, we ended up carrying too much inventory in several categories where the slowdown in sales was more pronounced than expected, including home, electronics, sporting goods and apparel.
>
> * * *
>
> And as Christina mentioned, rather than carrying items beyond their relevant season, her team made the tougher call and marked items down to clear them and keep our presentations fresh and inspiring.

122.    Notably, however, the fact that 3 percentage points of the 4.3 point gross margin decline was attributed by Target itself to its "merchandising actions"—or impairments and markdowns—undercuts Defendants' explanation that they were surprising by a shift in customer spending patterns during Q1, because impairments and markdowns are typically taken on inventory that has sat unsold for a significant period of time, for which there is little remaining

hope of recouping full retail value. Thus, the bulk of gross margin decline would have been from impairments and markdowns taken on inventory that had amassed and sat unsold for many months.

123.    Defendant Fiddelke, responding to an analyst question regarding Target's excess inventory, admitted that throughout the Class Period, Target abandoned its inventory management policies of closely evaluating customer insights and ordering according to customer demand and, instead, had been pre-ordering larger quantities earlier in season:

**Edward Joseph Kelly**
Wells Fargo Securities, LLC, Research Division

Okay. And then just a follow-up. Inventory per store is up a lot over 2019 before, pre-pandemic. And a lot has obviously changed, and your sales are a lot higher. But can you talk about where this should be? Maybe quantify the amount of excess that's still sitting in inventory today and where the most work needs to be done. And then what are you doing going forward to adjust things like cancellations? Or is it just really sort of adjusting ordering going forward?

**Michael J. Fiddelke**

Yes, Ed. The -- it's a good question. There's a few things going on if you look at the level of inventory on our balance sheet. One is we've got some categories where we need to work through some inventories. We've already talked about that piece. There's a little bit of product cost inflation sitting in that number, too. But I will say, given our desire to make sure we're landing some product earlier and protect against supply chain volatility, for the near term here, you should expect kind of that new normal of sales growth to inventory growth to include some working capital investments as we land some of that product sooner to make sure we've got it for the guest.

And so those are the 3 big factors that we're watching. Obviously, the first of those factors, we'll work to make some progress on here in the second quarter to get us in line with what we expect sales trends to look like for the back part of the year. But old normal might not be the current run rate in the near term as we work to secure product, land it early and avoid some of the disruptions that have caused out of stocks over the last year.

124.    On this news, Target's stock price declined $53.67 per share, or nearly 25%, from a closing price of $215.28 per share on May 17, 2022, to close at $161.61 per share on May 18, 2022.

125.    While Defendants' disclosures on May 18, 2022 were carefully couched and defensive, as more time elapsed after the Class Period, Defendants eventually admitted that Target had sidelined consideration of changing consumer spending habits in favor of overzealous and indiscriminate inventory purchasing.  On November 2, 2023, Defendant Cornell was interviewed by *CNBC* about the state of Target's operations. Looking back at 2021 into 2022, Cornell recognized that Target "had several years where we were just chasing demand." Moreover, Cornell conceded that Target's comparable sales growth at the time, "up ten, fifteen, twenty percent" was "driven by Americans who were buying all of those discretionary items because they were at home, and they were entertaining their families and they were they were decorating their homes" admitting that "we knew that wasn't going to go on forever."

## VII. <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

126.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Target were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As detailed elsewhere herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Target, their control over, and/or receipt and/or modification of Target's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Target, participated in the fraudulent scheme alleged herein.

### A.    Defendants Admit That They Had Access To Multiple Types of Inventory Data, in "Real-time," that Target Could Use in Making Inventory Purchasing Decisions, Which Was Corroborated by Confidential Witnesses

127.    In their public statements, the Individual Defendants admitted that they accessed real-time customer insights and inventory data to make inventory purchase and management decisions.

128.    According to Defendant Mulligan during the Q3 2021 Earnings Call, Defendants monitored Target's inventory levels and locations in "real-time":

> I also want to pause and emphasize the ongoing collaboration that's been happening between our supply chain, merchandising and marketing teams. These teams have worked together to develop promotional and marketing plans that are much more fluid and nimble than in the past, ***enabling the incorporation of real-time data on inventory availability and location within our holiday plans,*** in order to maximize their impact to the benefit of both our guests and operations.

129.    CW-3 corroborated that the Greenfield inventory data system provided up-to-date capacity and inventory information across Target's distribution centers and stores, with management at Target headquarters down to store managers able to track the location of each piece of inventory in real-time, including individually, by product type, and in total amounts. Given that multiple teams within Target—including the marketing team, headed by non-party and C-suite executive Cara Sylvester, and the supply chain team, headed by non-party and C-suite executive Arthur Valdez—had access to and incorporated real-time inventory data, they were informed that, by June 2021, consumers were not purchasing the hardline and home products they had bought during COVID lockdown.  Accordingly, they knew that their Class Period claims of entering the 2021 Holiday Season "with a very healthy inventory position overall" were false and highly misleading when made, as they had intentionally or recklessly over-ordered massive quantities of hardline and home goods that consumers were no longer buying, as described above.

130.    CW-1, CW-2 and CW-3 confirmed that Defendants, by virtue of their positions at Target headquarters, had access to Target's inventory data from the Company's warehouses, and that such inventory data at was accessible through, *inter alia*, the Greenfield and Apollo software. Given Defendants' detailed knowledge of Target's bloated inventory position in "real-time," Defendants had no basis upon which to believe Target's inventory levels were healthy throughout the Class Period; rather, they knew the opposite was true.

68

**B.    Defendants Admit That They Had Access To, and Constantly Monitored, Multiple Types of Customer Data and Insights, Which Would Have Informed Them That Customers Were Not Purchasing Hardlines and Furniture**

131.    The Individual Defendants admit that they had access to customer data that they reviewed on a weekly basis which gave them insights into changing consumer trends, and that they placed special focus on collecting and monitoring such data and insights in purportedly determining which and how many products to buy. Target's "incredible data and guest insights," as described by Defendant Hennington, would have enabled the Company to order products its customers actually wanted, had Target not eschewed relying on that data and, instead, pre-ordered inventory without regard to customer preferences and demand. Defendant Hennington emphasized the importance of curating and stocking inventory that customers actually demand, stating that "obviously, how we go to market is make sure that we are creating relevancy for our consumers. And so putting product and experiences in front of consumers' eyeballs that care about them is always going to be relevant in generating demand."

132.    At the start of the Class Period, Defendant Hennington reassured investors on the Q3 2021 Earnings Call that "[w]e continuously evaluate our guests' mindset" and that "[w]e remain laser-focused on their experiences with us and expectations of us." In a November 17, 2021 interview with Chain Drug Review, Hennington stated that Target was "constantly reevaluating" as consumer demand shifted during the critical 2021 Holiday Season, indicating that Target had a finger on the pulse of consumer shopping habits to better position the Company's inventory:

> [W]ith the environment being as dynamic as it is, it's one that we're constantly reevaluating, make sure that we are as well positioned as we can be as consumers' demands continue to change with this external factors [*sic*] that we're dealing with.

133.    Defendant Hennington thus stated that, based on reviews of search data from Target.com, Defendants were constantly aware of rapidly-changing customer trends, as frequently as "week by week." Fellow C-suite member Cara Sylvester likewise stated that these "search insights, of course, are going to impact" Target's inventory strategy, explaining that Target's practice is to "feed those [search insights] over to the merchandising team…". As a result, Defendants were aware when they made their Class Period statements that demand for hardline

and home products that Target had already pre-ordered had evaporated and that Target's assortment was, thus, highly overweight in these categories, such that markdowns were inevitable to make room for in-demand goods.

134.    Moreover, Defendant Cornell admitted that Target knew its customers' purchasing patterns during the early stages of the COVID would soon end and thus monitored for this, stating that Target's sales growth during the height of COVID lockdowns was "driven by Americans who were buying all of those discretionary items because they were at home, and they were entertaining their families and they were they were decorating their homes" and admitting that "we knew that wasn't going to go on forever."

### C.    Defendants Were Aware of, or Recklessly Disregarded Target's Excessive Inventory Levels Through Their Site Visits to Distribution Centers

135.    Prior to, throughout, and following the Class Period, Defendants and other key Target executives made jet visits to Target warehouses, wherein excess inventory was being stored in stash aisles and in trailers due to overcapacity issues. CW-1 confirmed that during 2021 and 2022, executives visited the Albany RDC by jet twice annually, including at least twice while stash aisles were actively being used.

136.    CW-2 recalled that Target executives also visited the Logan Flow Center once every couple of months during CW-2's tenure. CW-2 specifically recalled that Defendant Cornell visited the Logan facility on one such jet visit, and that Arthur Valdez, Target's Executive Vice President and Chief Supply Chain and Logistics Officer, visited the Logan Flow Center in October 2021. Due to Valdez' executive position, and in light of the high importance placed on inventory levels by Target's top management prior to and during the Class Period as Cornell acknowledged, Valdez's fellow senior executives (including the Individual Defendants) would have been made aware of the inventory buildup at Target's warehouses.

137.    Through their jet visits, the Individual Defendants and other Target senior executives would have directly observed the stash aisles and trailers of excess inventory building at the Company's warehouses and would have therefore known that Target had bought enormous

amounts of excess product—particularly bulky hardlines and home furnishings category products—that customers were not buying.

### D.      Inventory Is Key to Target's Core Operations

138.    As one of the largest retailers in the country, Target's entire business depended on proper inventory management. According to Defendant Mulligan, "[s]peed and flow of inventory is the key to the whole game" and Target's "focus is on moving the right amount of inventory to the right place, at the right time." Defendants also admitted in the Company's SEC filings that "[a] large part of our business is dependent on our ability to make trend-right decisions and effectively manage our inventory in a broad range of merchandise categories...If we do not…we may experience lost sales, spoilage, and increased inventory markdowns, which could adversely affect our results of operations."

139.    It was particularly critical for Target to have the proper amounts of inventory during the 2021 Holiday Season to retain its customer base and capitalize on sales during the busiest shopping period of the year. Indeed, Defendants stressed during the Q3 2021 Earnings Call that Target "took specific actions to ensure we have a healthy inventory position going into the holidays" and self-congratulated themselves stating that Target was "off to a very good start," which Defendants claimed was "going to continue throughout the holiday season" because Target had purportedly made "appropriate investments in inventory." Defendants also emphasized that it was critical for Target to use "real-time data on inventory availability and location within our holiday plans in order to maximize their impact to the benefit of both our guests and operations."

140.    The importance of proper inventory levels was reiterated during every quarterly investor conference call. *See, e.g.*, Target's earnings call on August 18, 2021 ("…our inventory is in a much better position…"); Q3 2021 Earnings Call ("Bottom line, based on the incredible efforts of our team, we feel good about our inventory levels heading into the holiday season"); Q4 2021 Earnings Call ("stronger inventory levels means a few more clearance markdowns").

141.    Moreover, Defendants were particularly focused on Target's inventory in FY 2021 due to ongoing supply chain issues resulting from COVID, which had previously prevented Target

from having sufficient inventory in FY 2020. Determined not to let that happen again, Target admittedly began in 2021 "ordering merchandise earlier," but, according to CWs 1–3 Target was following a headquarters policy to buy-buy-buy any and all inventory that the Company could get its hands on, without regard to consumer demand or preferences, and Defendant Cornell later acknowledged that "we were just chasing demand."

142.    Further, as discussed in Section VII.A, *supra*, Defendants admit to closely monitoring inventory levels in "real-time" and CWs 1 and 2 confirmed that executives such as Defendants, including Defendant Cornell personally visited the inventory warehouses to check on inventory levels during the Class Period, and CW-3 stated that Target headquarters used the Greenfield system to monitory inventory which showed them where each piece of inventory was at any time.  Given the critical importance of inventory management to Target's business and operations, there is a strong inference Defendants were closely monitoring inventory levels and were, thus, aware that Target had purchased well over its 80% target levels.

### E.    Defendants' Attribution of the Majority of Target's Gross Margin Decline to Impairments and Markdowns Further Supports an Inference of Scienter

143.    As alleged above, during Target's May 18, 2022 Q1 2022 Earnings Call, Defendant Fiddelke stated that Target's gross margin rate for the quarter was down nearly 4.3%, with approximately 3 percentage points of the 4.3% decline due to "the combined impact of impairments, markdowns, and other actions taken to right-size our inventory position in categories that were too heavy…."   Target also acknowledged that the decline in earnings was "driven primarily by gross margin pressure reflecting actions to reduce excess inventory…" While Defendants sought to attribute some of the decline to a recent change in consumer demand in Q1 (January 30 to April 30, 2022), impairments and markdowns are typically taken on inventory that has sat unsold for a significant period of time, for which there is little remaining hope of recouping full retail value.  Thus, the bulk of gross margin decline would have been from impairments and markdowns taken on inventory (*e.g.*, indoor and patio furniture) that had amassed and sat unsold for many months. Inventory had sat clogging up Target's warehouses and stores so long that

Defendants had to be aware of these issues well in advance, especially given that Target's 2021 Form 10-K filed with the SEC indicated that "inventory typically turns in less than three months." Thus, Defendants, particularly with their self-described "real-time," high visibility into inventory and customer behavior, clearly would have known that such "bulk" products they had ordered many months before were not selling.

F.    **Defendants' Suspicious Insider Trading**

144.   During the Class Period, Defendants profited from selling their personal shares of Target stock at suspicious times, while in possession of material, non-public information about Target's inventory overstock that was not disclosed to investors, and during which time the price of Target's common stock was artificially inflated due to Defendants' false and misleading statements.

145.   As set forth above, CW-1 described that Target's inventory levels at the Albany, Oregon RDC—a critical warehouse for the greater Pacific Northwest—reached "alarming" and "unique and unprecedented" levels as early as July or August 2021, and that the Albany RDC surpassed the goal of 80% inventory capacity as early as October 2021. Similarly, CW-2 described the inventory at the Logan Township, New Jersey Flow Center as surpassing 80% capacity well before Thanksgiving 2021, specifically "in the mid 90s" percent capacity by "mid-November" 2021. CW-3 described that the huge inventory overstock of home furnishing items at CW-3's store began in May 2021 and worsened throughout 2021 and into 2022, with Target headquarters emailing CW-3's and other stores in Spring 2021 telling them they had to take inventory they had no space for because the distribution centers were out of space, and that he could also observe the overstocking throughout Target via the Greenfield system which Target headquarters also used. Through their access to extensive customer and inventory data and systems, as well as through jet visits to Target's various regional distribution centers and flow centers, Defendants were able to observe and become aware of Target's growing inventory overstock that was out of sync with customer demand prior to the November 17, 2021 Q3 Earnings Call, and thereby were in possession of material non-public information prior to and during the Class Period. As the

Individual Defendants engaged in the stock sales detailed herein, they were aware that Target had abandoned its customer insight and data-driven inventory purchasing strategies in favor of scattershot over-purchasing, which had caused the Company to become substantially overweight in products, particularly hardlines and home furnishings and décor products—that customers did not want to buy and which were clogging Target's warehouses and stores.

146.    At the same time Defendants were aware of this material, non-public information, on December 2, 2021, Defendant Cornell sold 30,000 shares of Target common stock, constituting approximately 13.6% of his holdings. On March 16, 2022, just two months before the truth was revealed, Defendant Cornell sold another 30,000 shares of Target common stock, or roughly 14.3% of his holdings, while in possession of material non-public information. Each of these trades constituted higher volumes of stock and greater portions of Cornell's holdings than any stock sale Cornell had made in the six months leading up to the Class Period beginning November 17, 2021.

147.    Therefore, the timing of Cornell's Class Period stock sales are suspicious and indicative that he sold stock while Target's stock price was artificially inflated due to Defendants' false and misleading representations—thereby maximizing his sale proceeds—and before the disclosure of material information on the Company's inventory overstock on May 18, 2022.

148.    Defendant Cornell was not alone in executing suspicious stock sales while Target's stock price was artificially inflated due to Defendants' misleading statements and omissions. On April 4, 2022, just over one month before the truth was revealed that Target would widely miss its gross margin and earnings targets due to undisclosed write-offs and extreme inventory discounts, Defendant Fiddelke sold 5,000 shares of Target common stock, constituting roughly 13.8% of his holdings at the time.

149.    Defendant Hennington also engaged in stock sales at a suspicious time when she was in possession of material, non-public information about Target's overbuying of inventory. On November 19, 2021, Hennington sold 4,173 shares while Target's stock price was artificially inflated. This sale, which represented approximately 17.5% of Hennington's holdings in the Company at the time, was additionally suspicious because it was the largest portion of her holdings

74

she had sold at any point to that point. In 2021 in particular, Defendant Hennington's April 9, 2021 and March 19, 2021 stock sales had constituted roughly just 7.7% and 6.8% of her holdings, respectively. As insiders with specific knowledge of the facts that would cause the price of the Company's stock to decline when the truth was revealed on May 18, 2022, the Defendants sale of stock prior to the May 18, 2022 corrective disclosure that informed the market of the true nature of the Company's inventory problems and declining sales raises an inference that the Company's management acted knowingly and recklessly when issuing the false and misleading statements concerning the Company's supply chain issues detailed in this complaint.

## VIII. LOSS CAUSATION

150.    During the Class Period, as detailed herein, Defendants materially misled the investing public by publicly issuing untrue statements of material fact and omitting material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, thereby inflating the price of Target common stock. The specific statements and omissions enumerated herein at Section V, *supra*, were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Target's business, operations, and prospects.

151.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

152.    By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of Target's business, risks, and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent

to the market, the price of Target's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock.

153.    On the morning of May 18, 2022, Target filed the Q1 2022 Earnings Release with the SEC revealing that Target had missed earnings estimates by a wide margin, with operating income declining from $2.4 billion to $1.3 billion year over year and net profit falling by 52%. In the Q1 2022 Earnings Release, Target also revealed that the decline in earnings was "driven primarily by gross margin pressure reflecting actions to reduce excess inventory…". Target further explained that its first quarter 2022 gross margin rate had dropped to 25.7%, compared to 30.0% in 2021, which "reflected higher markdown rates" in inventory, "driven largely by inventory impairments and actions taken to address lower-than-expected sales in discretionary categories…."

154.    During an earnings call for investors held before markets opened that same day, Defendant Fiddelke noted that Target's gross margin rate for the quarter was down nearly 4.3%, with approximately 3 percentage points out of the 4.3 percentage point decline due to "the combined impact of impairments, markdowns, and other actions taken to right-size our inventory position in categories that were too heavy…"

155.    On this news, Target's stock price declined $53.67 per share, or nearly 25%, from a close of $215.28 per share on May 17, 2022, to a close of $161.61 on May 18, 2022 on heavy trading volume, its worst one-day decline since the Black Monday market crash of 1987.

156.    During the subsequent earnings call that day, analysts were laser-focused on Target's inventory issues. For example, analyst Edward Kell from Wells Fargo Securities, LLC expressed concerns about Target's excess inventory and asked Defendants to quantify it and explain Target's plans for reducing excess inventory going forward, which Defendants refused to directly answer. Defendant Fiddelke, however, intimated that a further write-down would likely be forthcoming as "we've got some categories where we need to work through some inventories":

> Yes, Ed. The -- it's a good question. There's a few things going on if you look at the level of inventory on our balance sheet. One is we've got some categories where we need to work through some inventories.
>                                                   * * *

Obviously, the first of those factors, we'll work to make some progress on here in the second quarter to get us in line with what we expect sales trends to look like for the back part of the year.

* * *

But old normal might not be the current run rate in the near term….

157.    Defendant Fiddelke likewise stated on the earnings call that "We still got some inventory to work through. And so you saw some of that pain in Q1. And our gross margin guidance of Q2 of operating -- or sorry, our operating margin guidance of a 5.3%, give or take, a wide range around that, contemplates the work we still think we have to do on the inventory side in the second quarter."  Fiddelke added that, "[W]e now believe our full year operating margin rate will be well below our prior guidance of 8% or higher. More specifically, … we see a range of potential outcomes, centered around a 6% operating margin rate for the full year."

158.    Analyst reports issued after the earnings announcement focused on Target's excess inventory. For example, the first item listed in a May 18, 2022 DA Davidson report discussing "Incremental takes for Target from the earnings call" was labeled "Inventory is the big issue." Therein, the author noted that "the bulk of the margin decline" happened because Target "went heavy on inventory," which "necessitated inventory impairment and markdowns to work down the 43% increase in inventory" accounting "for the bulk of the 430 bps gross margin decline."

159.    A May 18, 2022 Raymond James report similarly reported that "TGT's F1Q22 reslts were disappointing driven by a large GM% [gross margin percentage] miss on markdowns and inventory impairments on discretionary items."

## IX.  APPLICATION OF PRESUMPTION OF RELIANCE

160.    At all relevant times, the market for Target's common stock was an efficient market for the following reasons, among others:

a)      Target common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)      Target filed periodic public reports with the SEC and the NYSE; and

c)      Target regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

161.    As a result of the foregoing, the market for Target's common stock promptly digested current information regarding Target from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Target common stock during the Class Period suffered similar injury through their purchase of Target common stock at artificially inflated prices, and a presumption of reliance applies.

## X.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

162.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Target who knew that the statement was false when made.

## XI.  CLASS ACTIONS ALLEGATIONS

163.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Target common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their

families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

164.   The members of the Class are so numerous that joinder of all members is impracticable since Target has more than 400 million shares of stock outstanding and because the Company's shares were actively traded on the NYSE. As of March 3, 2022, Target had 462,418,075 shares outstanding.

165.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class and that they are geographically dispersed.

166.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)   whether the Exchange Act was violated by Defendants;

(b)   whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)   whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)   whether the price of Target common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)  whether the members of the Class have sustained damages as a result of the decline in value of Target's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

167.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

168.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

169.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.  CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

170.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

171.    This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

172.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Target's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Target's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

173.    Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Target's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

174.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

175.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

176.    As a result of Defendants' fraudulent activity, the market price of Target stock was artificially inflated during the Class Period.

177.    In ignorance of the true financial condition of Target, Plaintiffs and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Target containing the misleading information, purchased or otherwise acquired Target's common stock at artificially inflated prices during the Class Period.

178.    Plaintiffs' and the Class's losses were proximately caused by Defendants' active and primary participation in Target's scheme to defraud the investing public by, among other

things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased Target's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Target's common stock through their misconduct as described herein. Plaintiffs' and the Class' losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Target.

179.    Throughout the Class Period, Defendants were aware of material non-public information concerning Target fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiffs' and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

180.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of Target common stock during the Class Period.

### COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

181.    Plaintiffs incorporates by reference and realleges each and every allegation above as though fully set forth herein.

182.    During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing

public. Plaintiffs and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

183.   The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

184.   The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Target's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Target's corporate releases detailed herein and are therefore responsible and liable for the misrepresentations contained herein.

185.   The Individual Defendants acted as controlling persons of Target within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Target to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Target and all of its

employees. As alleged above, Target is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

## XIII. **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class and Levi & Korsinsky, LLP as Class counsel;

(B)     Awarding Plaintiffs and the members of the Class damages, including interest;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV. **JURY DEMAND**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: December 15, 2023            By:  */s/ Carl V. Malmstrom*
                                    Carl V. Malmstrom (#0391908)
                                    **WOLF HALDENSTEIN ADLER**
                                    **FREEMAN & HERZ LLC**
                                    111 West Jackson Blvd.,Suite 1700
                                    Chicago, IL 60604
                                    Tel.: (312) 984-0000
                                    malmstrom@whafh.com

                                    *Local Counsel*

                                    **LEVI & KORSINSKY, LLP**
                                    Shannon L. Hopkins (admitted *pro hac vice*)
                                    (State of Connecticut Juris No. 435545)
                                    Gregory M. Potrepka (admitted *pro hac vice*)
                                    (State of Connecticut Juris No. 437326)
                                    1111 Summer Street, Suite 403
                                    Stamford, CT 06905

Tel.: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

*Attorneys for Lead Plaintiff Terry and Diane Van
Der Tuuk Living Trust and Lead Counsel*

**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice forthcoming)
(State of New York Registration No. 4161352)
Jonathan D. Park (pro hac vice forthcoming)
(State of New York Registration No. 5371059)
600 Third Avenue
New York, New York 10016
Tel: (212) 661-1100
jlieberman@pomlaw.com
jpark@pomlaw.com

*Counsel for Additional Plaintiffs Chester Zoll and
John W. Zlatic*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
(State of New York Registration No. 4832903)
1800 Century Park East, Suite 600
Los Angeles, California 90067
Tel: (310) 692-8883
lesley@portnoylaw.com

*Counsel for Additional Plaintiffs Chester Zoll and
John W. Zlatic*