**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

RAFAEL E. PEREZ, individually and on
behalf of all others similarly situated,

            *Plaintiffs*,

v.

TARGET CORPORATION, BRIAN C.
CORNELL, MICHAEL J. FIDDELKE, A.
CHRISTINA HENNINGTON, and JOHN
J. MULLIGAN,

            *Defendants*.

Case No. 0:23-cv-00769-JMB-DTS

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

    A.    As Target Has Repeatedly Warned, Its Success Depends on Its Ability To Balance Supply and Demand, Which Varies Constantly. ...................... 4

    B.    The Pandemic Created Unprecedented Volatility and Uncertainty, Which Target Warned Further Reduced the Accuracy of Predictions. ......... 4

    C.    Target Disclosed That It Was Increasing Inventory, Given Supply-Chain Disruption and Record Demand Increases—Including for HHGs. ......................................................................................................... 5

    D.    Contrary to Plaintiffs' Contention That Demand for HHGs Waned in 2021, Demand *Increased*, While Supply-Chain Disruptions Persisted. ................................................................................................................ 6

    E.    Target Repeatedly Cautioned That Demand Could Rapidly and Unpredictably Shift, Making Its Predictions Unreliable. .............................. 7

    F.    In Late March, HHGs Demand Plummeted Unexpectedly, Resulting in Significant Markdowns, as Target Repeatedly Warned Could Happen. ............................................................................................................. 8

    G.    The Six Categories of Alleged Misstatements Are Not False/Misleading. ...................................................................................... 9

ARGUMENT ...................................................................................................... 10

I.    PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED ................ 10

    A.    Plaintiffs Impermissibly Plead Fraud-by-Hindsight. .................................. 11

    B.    Plaintiffs Fail To Plead Material Misstatements or Omissions. ................... 12

        1.    Plaintiffs Regurgitate the Same Falsity Allegations for Each Alleged Misstatement, Which All Fail for the Same Reasons. ........ 13

        2.    Plaintiffs Fail To Plead Falsity of the Demand Warnings. .............. 20

        3.    Plaintiffs Fail To Plead Falsity of the Insight Statements. ............... 25

        4.    Plaintiffs Fail To Plead Falsity of the Investment Statements. ........ 27

5.      Plaintiffs Fail To Plead Falsity of the Flow Statements...................31

6.      Plaintiffs Fail To Plead Falsity of the Historic Statements.............33

7.      Plaintiffs Fail To Plead Falsity of the Markdown Projections.........35

C.      Plaintiffs Fail To Plead Scienter.................................................................37

1.      Plaintiffs Fail To Allege That Defendants Knew or Had Information That Contradicted Their Statements. ..........................38

2.      Plaintiffs Fail To Establish That Defendants Recklessly Disregarded Inventory Levels Based on Unspecified Visits to Two Warehouses. ............................................................................43

3.      Alleging That Inventory Management Is Part of Target's "Core Operations" Does Not Remedy Plaintiffs' Failure To Establish Contrary Facts Known Within the Company at the Time. .............45

4.      Defendants' Trading Activity Does Not Support Scienter. .............47

5.      The More Compelling Inference Is That Defendants Increased Inventory To Meet Demand Given Ongoing Supply-Chain Issues. ................................................................................................49

II.     PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED.................50

CONCLUSION ...........................................................................................................50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 2007 Novastar Financial, Inc., Securities Litigation*,
2008 WL 2354367 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th
Cir. 2009) ................................................................................................................. 4

*In re 2007 Novastar Financial, Inc. Securities Litigation*,
579 F.3d 878 (8th Cir. 2009) ................................................................................. 12

*In re 3M Company Securities Litigation*,
2021 WL 4482987 (D. Minn. Sept. 30, 2021) ................................................ 27, 28, 46

*In re AMDOCS Ltd. Securities Litigation*,
390 F.3d 542 (8th Cir. 2004) ................................................................................. 24

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013) ................................................................................................. 10

*In re AppHarvest Securities Litigation*,
2023 WL 4866233 (S.D.N.Y. July 31, 2023) ........................................................ 45

*Arkansas Public Employees' Retirement System v. Bristol-Myers Squibb*, 28
F.4th 343 (2d Cir. 2022) ........................................................................................ 29

*Ashland Inc. v. Morgan Stanley & Co., Inc.*,
652 F.3d 333 (2d Cir. 2011) ................................................................................... 24

*In re Best Buy Co., Inc. Securities Litigation*,
2005 WL 839099 (D. Minn. Apr. 12, 2005) ..................................................... 26, 33

*In re Biogen Inc. Securities Litigation*,
857 F.3d 34 (1st Cir. 2017) .................................................................................... 15

*Bondali v. YumA Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ..................................................................... 20, 23

*Boykin v. K12 Inc.*,
54 F.4th 175 (4th Cir. 2022) ............................................................................. 30, 32

*California Public Employees' Retirement System v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ................................................................................... 15

*Campo v. Sears Holdings Co.*,
    371 F. App'x 212 (2d Cir. 2010) ................................................................. 41

*Castaneda v. Amazon.com, Inc.*,
    2023 WL 4181275 (N.D. Ill. June 26, 2023) ............................................. 13

*In re Cerner Corp. Securities Litigation*,
    425 F.3d 1079 (8th Cir. 2005) .................................................................... 12

*In re Champion Enterprises, Inc., Securities Litigation*,
    144 F. Supp. 2d 848 (E.D. Mich. 2001), *aff'd*, 346 F.3d 660 (6th Cir.
    2003) ................................................................................................... 30, 33

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)....................................................................... 15

*City of Plantation Police Officers Pension Fund v. Meredith Corp.*,
    16 F.4th 553 (8th Cir. 2021) ................................................................ 41, 42

*City of Warren Police & Fire Retirement System v. Foot Locker, Inc.*
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ....................................... 25, 26, 31, 47

*In re Duane Reade Inc. Securities Litigation*,
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)........................................... 34

*In re Eastman Kodak Co. Securities Litigation*,
    632 F. Supp. 3d 169 (W.D.N.Y. 2022) ...................................................... 29

*In re ECOtality Securities Litigation*,
    2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ........................................... 32

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ..............................................................*passim*

*Furlong v. Appiant Techs., Inc.*,
    2005 WL 1213939 (E.D. Mo. Apr. 14, 2005)....................................... 15, 16

*Gammel v. Hewlett-Packard Co.*,
    905 F. Supp. 2d 1052 (C.D. Cal. 2012) ............................................... 18, 32

*Garcia v. J2 Glob., Inc.*,
    2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)............................................. 13

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)........................................................ 37

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................ 43

*Guangyi Xu v. ChinaCache Int'l Hldg's, Ltd.*,
    2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ................................................... 26

*Hassan v. Boston Beer Co., Inc.*,
    2023 WL 8110940 (2d Cir. Nov. 22, 2023).......................................... 6, 16

*Henningsen v. ADT Corp*,
    161 F. Supp. 3d 1161 (S.D. Fla. 2015) ....................................................... 42

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ................................................. 38, 41, 43, 49

*In re Hutchinson Tech. Inc. Securities Litigation*,
    502 F. Supp. 2d 884 (D. Minn. 2007), *aff'd*, 536 F.3d 952 (8th Cir.
    2008) ................................................................................................... 14, 17

*In re Hutchinson Tech., Inc. Securities Litigation*,
    536 F.3d 952 (8th Cir. 2008) ............................................................*passim*

*IBEW Local 595 Pension and Money Purchase Pension Plan v. ADT Corp.*,
    660 Fed.App.850 (11th Cir. 2016) ............................................................. 30

*Indiana Public Retirement System v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ........................................................... 21, 24

*In re Intel Corp. Securities Litigation*,
    2023 WL 2767779 (N.D. Cal. Mar. 31, 2023)............................................. 19

*In re iRobot Corp. Securities Litigation*,
    527 F. Supp. 3d 124 (D. Mass. 2021) ........................................................ 43

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)..................................................................................... 12

*In re Jones Soda Co. Securities Litigation*,
    393 F. App'x 507 (9th Cir. 2021) ............................................................... 28

*Julianello v. K-V Pharm. Co.*,
    791 F.3d 915 (8th Cir. 2015) ................................................... 20, 26, 35, 37

*In re K-tel International, Inc. Securities Litigation*,
    300 F.3d at 896 (8th Cir. 2002)......................................................27, 47, 48

*Karth v. Keryx Biopharm., Inc.*,
　6 F.4th 123 (1st Cir. 2021) ............................................................. 21, 22, 24

*In re Key Energy Servs., Inc. Securities Litigation*,
　166 F. Supp. 3d 822 (S.D. Tex. 2016) ........................................................ 44

*Kusnier v. Virgin Galactic Holdings, Inc.*,
　639 F. Supp. 3d 350 (E.D.N.Y.) ................................................................. 26

*In re Leapfrog Enterprise, Inc. Securities Litigation*,
　200 F. Supp. 3d 987 (N.D. Cal. 2016) ....................................................... 36

*Little Gem Life Sciences LLC v. Orphan Med., Inc.*,
　2007 WL 541677 (D. Minn. Feb. 16, 2007) .............................................. 33

*In re Livent, Inc. Noteholders Securities Litigation*,
　151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................ 16

*In re Lululemon Securities Litigation*,
　14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62
　(2d Cir. 2015) .............................................................................................. 47

*In re Marion Merrell Dow Inc., Securities Litigation II*,
　1994 WL 396187 (W.D. Mo. July 18, 1994) ......................................... 33, 34

*In re Marriott International, Inc., Customer Data Security Breach
　Litigation*, 543 F. Supp. 3d 96 (D. Md. 2021), *aff'd*, 31 F.4th 898 (4th
　Cir. 2022) .................................................................................................... 20

*In re Medtronic Inc., Securities Litigation*,
　618 F. Supp. 2d 1016 (D. Minn. 2009), *aff'd*, 621 F.3d 800 (8th Cir.
　2010) ...................................................................................................*passim*

*Metzler Asset Mgmt. GmbH v. Kingsley*,
　928 F.3d 151 (1st Cir. 2019) ...................................................................... 45

*Milavetz, Gallop, Milavetz, P.A. v. Wells Fargo Bank, N.A.*,
　2012 WL 4058065 (D. Minn. Aug. 22, 2012) ........................................... 42

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
　641 F.3d 1023 (8th Cir. 2011) ........................................................ 13, 14, 49

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
　537 F.3d 35 (1st Cir. 2007) ........................................................................ 19

*In re Navarre Corp. Securities Litigation,*
299 F.3d 735 (8th Cir. 2002) ................................................................. *passim*

*In re Neustar Securities Litigation,*
83 F. Supp. 3d 671 (E.D. Va. 2015) ............................................................. 18

*In re New Oriental Educ. & Tech. Group Securities Litigation,*
293 F.R.D. 483 (S.D.N.Y. 2013) ................................................................. 1

*In re NVE Corp. Securities Litigation,*
551 F. Supp. 2d 871 (D. Minn. 2007) ..................................................... 14, 26

*Omnicare Inc. v. Laborers District Council Construction Industry Pension
Fund,* 575 U.S. 175 (2015) ....................................................................... 28

*Ortiz v. Canopy Growth Corp.,*
537 F. Supp. 3d 621 (D.N.J. 2021) ............................................................ 30

*In re Piedmont Lithium Inc. Securities Litigation,*
2024 WL 197751 (E.D.N.Y. Jan. 18, 2024) ............................................... 46

*Podraza v. Whiting,*
790 F.3d 828 (8th Cir. 2015) .................................................................... 4

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.,*
759 F.3d 1051 (9th Cir. 2014) ............................................................ 30, 42

*Pound v. Stereotaxis, Inc.,*
8 F. Supp. 3d 1157 (E.D. Mo. 2014) ....................................................... *passim*

*Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends
v. Peloton Interactive, Inc.,*
665 F. Supp. 3d 522 (S.D.N.Y. 2023) .......................................... 15, 16, 30, 36

*Rochester Laborers Pension Fund v. Monsanto Co.,*
883 F. Supp. 2d 835 (E.D. Mo. 2012) ................................................... 29, 30

*In re Royal Caribbean Cruises, Ltd. Securities Litigation,*
2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ............................................. 44

*Scott v. General Motors Co.,*
46 F. Supp. 3d 387 (S.D.N.Y 2014) ......................................................... 34

*SEB Investment Management AB v. Align Tech., Inc.,*
485 F. Supp. 3d 1113 (N.D. Cal. 2020), *aff'd,* 806 F. App'x 603 (9th
Cir. 2020) ............................................................................................ 28

*Shoemaker v. Cardiovascular System, Inc.*,
   300 F. Supp. 3d 1046 (D. Minn. 2018) ........................................................................ 13

*Smallen v. The Western Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) ................................................................................. 42

*Steamfitters Local 449 Pension & Retirement Securities Funds v. Sleep
   Number Corp.*,
   2023 WL 4421688 (D. Minn. July 10, 2023) ..................................................... *passim*

*Steamfitters Local 449 Pension Plan v. Skechers USA, Inc.*,
   412 F. Supp 3d 353 (S.D.N.Y. 2019), *aff'd*, 826 F. App'x 111 (2d Cir.
   2020) ................................................................................................................. *passim*

*Steamship Trade Association of Baltimore v. Olo, Inc.*,
   2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023) ........................................................... 21

*In re Stratasys Ltd. Shareholder Securities Litigation*,
   864 F.3d 879 (8th Cir. 2017) ................................................................... 12, 25, 26

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ........................................................................................ 40

*In re Target Corp. Securities Litigation*,
   275 F. Supp. 3d 1063 (D. Minn. 2017), *aff'd*, 955 F.3d 738     (8th Cir.
   2008) ................................................................................................................. *passim*

*In re Target Corp. Securities Litigation*,
   955 F.3d 738 (8th Cir. 2020) ............................................................................. 29, 37

*Teamsters Local 445 Freight Div. Pension Fund v. Dyneyz Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008).............................................................................. 40, 41

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).................................................................................... 3, 37, 49

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
   325 F. Supp. 3d 728 (N.D. Tex. 2018), *aff'd*, 935 F.3d 424     (5th Cir.
   2019) ............................................................................................................ 23, 46, 49

*Turquoise Hill Res. Ltd. Securities Litigation*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................................ 44

*U.S. Bank National Association v. PHL Variable Insurance Co.*,
   2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) .............................................................. 32

*Waswick v. Torrid Holdings, Inc.*,
   2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ............................................................ 30

*Williams v. Globus Medical, Inc.*,
   869 F.3d 235 (3d Cir. 2017) ........................................................................................ 22

*In re XM Satellite Radio Holdings Securities Litigation*,
   479 F. Supp. 2d 165 (D.D.C. 2007) ............................................................................ 30

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...................................................................................... 19

**Statutes**

17 C.F.R. § 229.105 .......................................................................................................... 20

15 U.S.C. §78u-4 ................................................................................................................ 1

15 U.S.C. §78u-5 ........................................................................................................ 20, 35

**Rules**

Federal Rule of Civil Procedure 9(b) .............................................................................. 11

## INTRODUCTION[1]

In their Amended Complaint ("AC"), Plaintiffs[2] attempt to manufacture securities fraud claims from Defendants' inability to accurately predict the timing and extent of swings in supply and demand during the COVID-19 pandemic.[3] But failing to make accurate predictions is not securities fraud. Because the securities laws do not require companies to be clairvoyant, claims of fraud-by-hindsight can never meet the high bar for stating a securities claim.

From the beginning of COVID in 2020, Target experienced record growth in demand, particularly for hardlines (merchandise like sporting goods, electronics, and appliances) and home goods ("HHGs"). But supply constraints impeded Target's ability to meet growing demand, meaning it was missing out on sales. So, Target stocked up, particularly in advance of the 2021 holiday season—Target's busiest period. Target told investors both about this buying strategy and rising inventory levels.

Even when the crystal ball is cloudy, retailers need to make predictions about demand. Predicting future demand is always challenging, but COVID created extreme uncertainty from unknown and unexpected variables, making retail predictions

---

[1] References to "¶" are to the AC.

[2] The AC purports to name John Zlatic and Chester Zoll as "Additional Plaintiffs" (¶¶15-16) despite this Court's Order denying their application to serve as "Co-Lead Plaintiffs." (Dkt. 54 at 5.) Likewise, although not appointed as counsel (Dkt. 65 at 7), Pomerantz LLP and Portnoy Law Firm purport to represent Additional Plaintiffs. Would-be plaintiffs (or counsel) may not designate themselves without court approval. *See* 15 U.S.C. §78u-4(3); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 293 F.R.D. 483, 486 (S.D.N.Y. 2013).

[3] Defendants are Target Corporation ("Target"), Brian C. Cornell, Michael J. Fiddelke, A. Christina Hennington, and John J. Mulligan.

significantly less reliable. Defendants told investors this too and explained that if Target's predictions turned out to be inaccurate, it may need to mark down inventory, which could reduce profits. As anyone who lived through COVID can understand, Defendants had no control over—or ability to predict—the evolution of COVID variants; the duration of lockdowns; the evolving governmental responses; and the degree and direction of changes to consumer behavior along the way.

After Target issued its 2021 Annual Report on March 9, 2022, demand shifted abruptly and unpredictably away from HHGs. Target adapted by making various changes, including by incurring greater-than-expected markdowns. In May 2022, Target announced reduced profit guidance for the year. Plaintiffs contend that Target's revised guidance revealed that Defendants had previously lied to investors about its inventory risks. (¶¶84-85.)

To curb such fraud-by-hindsight claims, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which subjects securities claims to the most stringent pleading standards in American civil law. To plead falsity, plaintiffs must identify specific statements and allege particularized *facts*—not just advance speculative theories—showing how each alleged misstatement was materially misleading. And to plead scienter, they must identify specific *facts* generating a strong inference of fraudulent intent. Plaintiffs do not come close.

**Falsity**. Plaintiffs say 20 statements were misleading because Target failed to disclose it had been buying unwanted inventory. But Plaintiffs' allegations are debunked by Target's audited financial statements, which show demand growth at the time each

statement was made. Because Plaintiffs cannot dispute this data, they ignore it and instead offer the speculation of three low-level employees—one of whom worked in one of Target's 1,926 stores and two of whom each worked in one of Target's 47 warehouses. All CWs admit they had zero involvement in ordering inventory. In any event, the alleged misstatements are inactionable for multiple independent reasons.

**Scienter**. Plaintiffs say that Defendants *intentionally* made false statements because Defendants allegedly had access to information about demand and saw inventory increasing, and thus somehow knew that Target was buying unwanted inventory. Stepping back, it makes no sense that Target would systematically buy inventory it had no expectation of selling. Plaintiffs stretch for a motive by pointing to Defendants' stock sales, but these were all prescheduled under 10b5-1 plans and in-line with Defendants' customary sales patterns. Again, the audited sales data contradicts Plaintiffs' claim of dwindling demand, and stocking up is exactly what Target told investors it was doing. Plaintiffs fail to put forth a plausible inference of scienter, much less a *strong* one, as required by the securities laws.

The AC should be dismissed in full with prejudice for each of these reasons.

## BACKGROUND[4]

Under the PSLRA, courts must consider the complaint in its entirety, as well as "documents incorporated into the complaint by reference, and matters" subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). In securities

---

[4] References to "Ex." are to the exhibits to the declaration of Alexander J. Rodney. Unless otherwise indicated, emphasis is added.

cases, courts may take judicial notice of public SEC filings, stock price history, and industry trends. *In re 2007 Novastar Fin., Inc., Sec. Litig.*, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009). The exhibits cited consist of SEC filings, evidence on which Plaintiffs rely, and matters subject to judicial notice. *Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015).

### A. As Target Has Repeatedly Warned, Its Success Depends on Its Ability To Balance Supply and Demand, Which Varies Constantly.

As Target has warned investors, supply and demand imbalances can negatively affect its business. (*See* Ex. A.5-10; Ex. B.7-12.) Demand depends on factors outside Target's control that can (and do) rapidly change, making predictions difficult. (Ex. C.8; Ex. A.6.) And Target's inventory flows through a complex supply chain, which is prone to disruptions with cascading effects. (Ex. C.4, 8, 10-11.) HHGs[5] are particularly susceptible to disruption as they are bulkier and primarily imported from overseas with longer lead times. (*See* Ex. D.6; Ex. E.6.) Due to the ever-changing balance of supply and demand, Target, like all retailers, marks down merchandise (i.e., reduces its price) in the ordinary course of business to make way for new inventory. (*See* Ex. A.27.)

### B. The Pandemic Created Unprecedented Volatility and Uncertainty, Which Target Warned Further Reduced the Accuracy of Predictions.

In March 2020, the United States declared COVID a nationwide emergency (the "Pandemic"). (Ex. A.18.) Federal, state, local, and international governments responded

---

[5] Hardlines include electronics, video game hardware and software, toys, entertainment, sporting goods, and luggage. Home goods include furniture, lighting, storage, kitchenware, small appliances, home décor, and bed and bath. (*See* Ex. A.41.)

with a patchwork of measures that varied regionally and over time, including directions to leave residences only when necessary and shutdowns to all but essential businesses ("Lockdowns").  (Ex. C.20; Ex. A.18.)

The Pandemic caused a drastic imbalance in supply and demand across the world: labor shortages and border closings caused massive supply-chain disruption, while rapid shifts in consumers' everyday lifestyle, Lockdowns, and fears of scarcity caused unprecedented demand shifts.  (Ex. A.8-9.)

The Pandemic affected every aspect of Target's business—supply, demand, fulfillment, and competition—and did so in unpredictable ways.  (*See id.*)  Target told investors that while some of the demand changes "may be temporary, others could become long-lasting."  (*Id.* at 8.)  Target further warned that the Pandemic's ultimate impact on Target's business and performance was unpredictable and rested on factors outside its control.  (*Id.*)

### C. Target Disclosed That It Was Increasing Inventory, Given Supply-Chain Disruption and Record Demand Increases—Including for HHGs.

While many retailers were forced to close, Target was deemed an "essential" business, which boosted its sales.  (Ex. F; ¶2.)  Because people were confined to their homes, sales of HHGs grew significantly.  (Ex. E.4.)  By Q3 2020, Target saw sales growth of hardlines and home goods in the mid-20%-30% range, respectively.  (*Id.*)

Target also experienced soaring demand for online ordering for same-day delivery and in-store pickup (Ex. G.3), which in turn increased inventory needs (Ex. H.7).

Target's unprecedented increase in sales, however, would have been higher but for inventory shortfalls. (Ex. I.6-7.) Supply-chain disruptions—coupled with unexpected demand explosion—caused "persistent inventory shortfalls," particularly in long-lead categories like HHGs. (Ex. E.6; *see also* ¶141.) Target told investors that to mitigate these shortfalls and meet demand, it was increasing its overall inventory, including by ordering merchandise earlier. (*See* Ex. J.7, 22; Ex. H.8.)

### D. Contrary to Plaintiffs' Contention That Demand for HHGs Waned in 2021, Demand *Increased*, While Supply-Chain Disruptions Persisted.

While Plaintiffs allege that demand for HHGs waned in 2021 (*see, e.g.*, ¶¶4, 39, 45, 83), the Court need not accept that allegation because Target's publicly available financial results reflected the opposite.[6] (*See* Ex. K.) On November 17, 2021, Target announced that its sales had exceed expectations: in Q3 alone, hardline sales increased nearly 14% from the previous year and home goods increased approximately 10% year-over-year. (Ex. L.9.) For the nine months ended October 31, 2021, hardline sales grew 17% year-over-year and home goods grew 14% year-over-year. (*Id.*)

As the 2021 holiday season approached, Target's COO, John Mulligan, reiterated that Target was purchasing inventory earlier to mitigate delays, given continuing record demand and supply-chain issues. (Ex. M.7; *see also* ¶31.) Mulligan further disclosed that inventory increased more than $2 billion year-over-year and that a sizable amount would flow to stores in the coming weeks. (Ex. M.7.) To support growing inventory, Mulligan

---

[6] *See infra* §I.B.1.c (citing *Hassan v. Boston Beer Co., Inc.*, 2023 WL 8110940, at *3 (2d Cir. Nov. 22, 2023) (rejecting plaintiff's factual assertion of declining growth because publicly available data showed the opposite)).

explained that Target was adding permanent and temporary storage to its stores and warehouses.  (*Id.* at 8.)

During the 2021 holiday season, demand was high across all merchandise categories, including HHGs, both relative to the previous year and the previous quarter. Hardline sales in Q4 2021 increased 4.3% year-over-year and 81% quarter-over-quarter. And home goods sales increased 4.6% year-over-year and 22% quarter-over-quarter.  (*See* Ex. K.)

### E. Target Repeatedly Cautioned That Demand Could Rapidly and Unpredictably Shift, Making Its Predictions Unreliable.

Despite surging sales, Target repeatedly warned investors throughout 2021 that there was a "high level of uncertainty" in its projections, emphasizing that detailed guidance "would be an exercise in false precision."  (Ex. H.14-15.)  Target's CFO, Michael Fiddelke, cautioned that trends in each category could change and that the timing and extent of such changes "is hard to predict and could be offset by permanent changes in consumer habits."  (*Id.* at 15.)  He added: "our crystal ball is not nearly clear enough to predict this year's category mix with any precision."  (*Id.*)

Target reiterated those warnings going into 2022, cautioning that due to COVID, as well as geopolitics and market conditions (including record inflation and the Ukraine war), consumer trends may change.  (Ex. B.7-10, 20.)  On March 1, 2022, Target told investors that it expected "quarterly profit performance [to] be choppy" and predicted "a small increase in markdown rates in 2022."  (Ex. N.20.)  Target further cautioned that it was "still facing multiple challenges and uncertainties" (*id.* at 19) and stated in its 2021 Annual

Report (issued March 9, 2022) that the "fluidity" of the ongoing Pandemic and other external risks limited its ability to predict financial performance (Ex. B.11).

### F. In Late March, HHGs Demand Plummeted Unexpectedly, Resulting in Significant Markdowns, as Target Repeatedly Warned Could Happen.

In late March 2022, demand for HHGs drastically dropped, decreasing for the first time since the Pandemic began. (Ex. O.3.) On May 18, 2022, Target issued a press release disclosing lower-than-expected results for Q1 2022, "driven primarily by gross margin pressure reflecting actions to reduce excess inventory as well as higher freight and transportation costs." (Ex. P.1.) Hardline revenue for Q1 2022 fell roughly 6% year-over-year and home goods fell 3%. (Ex. Q.9.)

Target's CEO, Brian Cornell, explained that the lower-than-expected results "reflect[ed] a combination of factors that prove to be very different than expected, driven by a rapidly shifting macro backdrop and changing consumer behavior." (Ex. O.3.) Indeed, Target saw a "rapid slowdown in the year-over-year sales trends" beginning in late March that was unanticipated in magnitude and left it overstocked in HHGs. (*Id.* at 3, 6.) Target told investors that it had made the difficult decision to take incremental markdowns to "make room for fast-growing categories." (*Id.*)

An analyst questioned the change in trend forecasting from March 1, 2022. Cornell responded that things "changed rapidly" *after* Target's March statements, stating:

> ***As we [stood] in front of you and others in March, we did not anticipate the rapid shifts we've seen over the last 60 days.*** We did not anticipate the transportation and freight costs would soar the way they have as fuel prices have risen to all-time highs. While we were certainly anticipating the impact of overlapping stimulus and consumer and guest returning to more normal

activities, ***we did not expect to see the dramatic shift in many categories that we've talked about, the shift from categories like TVs to luggage***[.]

(*Id.* at 13.)[7]

Following the release, Target's stock price dropped.  (¶155.)  Plaintiffs allege this drop revealed that Defendants had intentionally misled investors regarding Target's inventory levels.  (¶¶150-52.)

### G. The Six Categories of Alleged Misstatements Are Not False/Misleading.

Plaintiffs allege that between November 17, 2021 and May 17, 2022 (the "Class Period"), Defendants made 20 alleged misstatements.  Defendants have grouped the statements into six categories[8]:

- **Demand Warnings**: Risk warnings contained in Target's 2020 Annual Report (incorporated into Target's Q3 2021 Report) and 2021 Annual Report cautioning investors that if Target is unable to quickly respond to changes in consumer trends and effectively manage its inventory, it may suffer material financial harm, including through material markdowns.  (¶¶94, 114.)

- **Insight Statements**: Statements by Target's Chief Growth Officer, Christina Hennington in November 2021 and March 2022, that Target evaluates consumer preferences.  (¶¶81, 98.)

---

[7] The same analyst noted that the day before, May 17, 2022, Target's competitor, Walmart, announced that it, too, had lower-than-expected results due in large part to markdowns from rapidly changing demand.  (*Id.*)  Indeed, Walmart reported a decrease in gross profits "***primarily driven by higher markdowns***."  (Ex. R.21.)  On May 17, 2022, Walmart executives stated that, while they knew that general merchandise (i.e., hardline) sales would likely decrease, that decrease was larger than expected and resulted in overstock.  (Ex. S.4.)  Walmart's stock price dropped from $49.79 to $43.78 and continued to drop in the following days to a low of $39.69 on May 19, 2022.  (Ex. T.)

[8] Defendants have listed each alleged misstatement by category in Annex A for ease of the Court's review.  Paragraph 81 of the AC quotes a full paragraph emphasizing three portions.  Defendants have categorized and addressed each emphasized portion in the category with which it most aligns.

- **<u>Investment Statements</u>**: Statements by Hennington, Mulligan, and Fiddelke in November 2021 expressing optimism about Target's increased inventory levels heading into the 2021 holiday season, given supply-chain constraints (¶¶81, 84, 86); a similar statement made by Fiddelke in a March 2022 interview stating he "fe[lt] really good" about Target's inventory investments given supply-chain issues (¶105); and one statement in Target's 2021 Annual Report (issued on March 9, 2022) that Target plans inventory levels to minimize markdowns (¶108).

- **<u>Flow Statements</u>**: Statements by Hennington and Mulligan in November 2021 describing Target's efforts to move inventory to the right location at the right time (¶¶81-82) and a statement by Mulligan in March 2022, noting that inventory flows through Target's larger stores at a comparatively higher pace (¶103).

- **<u>Historic Statements</u>**: Statements in Target's Q3 2021 Report (issued November 24, 2021), Q4 2021 Press Release (issued March 1, 2022), and 2021 Annual Report (issued March 9, 2022), describing historical data, events, and actions regarding Target's inventory levels and gross margin rate. (¶¶88, 90, 92, 96, 110, 112.)

- **<u>Markdown Projections</u>**: Statements made by Fiddelke on March 1, 2022, that Target expected some markdowns in the 2022 fiscal year. (¶¶100-01.)

For each category, Plaintiffs' falsity allegations hinge on Plaintiffs' contention that, as of June 2021, Target stopped taking into consideration consumer preferences when purchasing inventory. (*See, e.g.*, ¶¶83, 87, 91, 104, 115.) Plaintiffs base their allegations on the anecdotal accounts of three low-level former employees who claim that—contrary to the sales data set forth above—HHGs demand decreased from June 2021. (*See, e.g.*, ¶¶66, 83-85.)

## ARGUMENT

## I.     PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED

To allege securities fraud under Section 10(b), Plaintiffs must plead, among other things, a material misstatement or omission that is made with scienter. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013).

Claims for securities fraud are governed by the PSLRA, which was adopted to curb abuses of securities fraud litigation and put an end to pleading "fraud by hindsight." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741-42 (8th Cir. 2002). The PSLRA heightens the pleading standard for fraud under Federal Rule of Civil Procedure 9(b), *id.*, imposing two additional "[e]xacting pleading requirements" on securities plaintiffs. *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 958 (8th Cir. 2008). First, plaintiffs "must specify each false statement or misleading omission and explain why that omission is misleading." *Id.* Second, they must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* Failure to meet this heightened standard requires dismissal. *Id.*

## A. Plaintiffs Impermissibly Plead Fraud-by-Hindsight.

Plaintiffs cannot demonstrate falsity or scienter because they impermissibly plead fraud-by-hindsight. A complaint pleads "fraud-by-hindsight" if, rather than specifying facts about why a statement was false when made and how defendants knew so, it instead alleges that a statement was false, and defendants must have known so because that statement later turned out to be wrong. *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1070 (D. Minn. 2017), *aff'd*, 955 F.3d 738 (8th Cir. 2020). The Eighth Circuit has repeatedly held that the PSLRA's heightened pleading standard "put an end to the practice of pleading fraud by hindsight." *Navarre*, 299 F.3d at 742. Instead, Plaintiffs must specify "contemporaneous reports, witness statements, or any information that had actually been provided to defendants" establishing that defendants knowingly made false statements at the time they made those statements. *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008).

11

Plaintiffs' theory of fraud boils down to the contention that, because Target ultimately marked down HHGs in May 2022, Defendants' optimistic statements from November 2021 to March 2022 about its inventory were false/misleading and Defendants must have known so.  (*See, e.g.*, ¶¶95-97, 101, 106, 109-115, 126, 143.)  But nothing in the AC establishes either that the statements were false when made (*infra* §I.B) or that Defendants had knowledge of their falsity (*infra* §I.C).  *See In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 883 (8th Cir. 2017) (dismissing case because plaintiffs fail to provide "particular details about *when*" defendants knew about product issues).  Plaintiffs' claims are classic fraud-by-hindsight and thus fail out of the gate.

### B.  Plaintiffs Fail To Plead Material Misstatements or Omissions.[9]

Plaintiffs must plead falsity with specificity, setting forth with particularity the "who, what, when, where and how of the misleading statements or omissions."  *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009) (internal quotations omitted).  Factual allegations "must necessarily show that the defendants' statements were misleading."  *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005).  Plaintiffs may not rest on mere allegations that fraud has occurred; instead, they "must indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made."  *Hutchinson*, 536 F.3d at 958-59.  They cannot plead fraud-by-hindsight.  *Navarre*, 299 F.3d at 742.

---

[9] Twelve of the alleged misstatements were made by individual Defendants.  (*See* Annex A.)  To the extent a Defendant did not make or have ultimate authority over the alleged misstatement, they cannot be held liable.  *See Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011).

Plaintiffs take issue with 20 statements Defendants made between November 2021 and March 2022.  Plaintiffs regurgitate the same falsity allegations for all 20 statements, which all fail for the same reasons.  In addition, Plaintiffs fail to plead falsity for independent reasons that vary depending on the category of statement.

### 1. Plaintiffs Regurgitate the Same Falsity Allegations for Each Alleged Misstatement, Which All Fail for the Same Reasons.

The backbone of Plaintiffs' case is that, between November 2021 and May 2022, Target concealed that it had "abandoned its customer-focused purchasing strategy." (¶39.) Specifically, Plaintiffs contend that Target was "indiscriminately buying large quantities of inventory" that consumers did not want, particularly HHGs.  (*Id*.)  They base these allegations on statements imputed to three low-level former employees ("CWs").  The CWs allegedly observed that inventory increased in three locations, which caused them to speculate that demand for HHGs had decreased companywide, and further speculate that Target must have purchased HHGs without considering what customers wanted.  (*See* ¶¶46-73.)[10]

In securities actions, courts are not required to accept as true statements from confidential witnesses.  *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1055 (D. Minn. 2018) (citing *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec.*

---

[10] Plaintiffs also allege that Internet posts and comments from unspecified Target employees "corroborate" the CWs' allegations (¶¶74-78), but anonymous and unsubstantiated user comments "badly flunk[]" pleading fraud. *Castaneda v. Amazon.com, Inc.*, 2023 WL 4181275, at *8 (N.D. Ill. June 26, 2023); *see also Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *15 (C.D. Cal. Mar. 5, 2021) ("unsupported opinion" cannot substitute for specific factual allegations).  In any event, the posts merely discuss increasing inventory, which is consistent with Target's public statements.  (*Supra* §§C-D.)

*Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011)).  Rather, the court must examine "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia" to determine whether the allegations satisfy the particularity pleading requirement.  *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008).  The CWs flunk this test.

      a.  Plaintiffs Fail To Allege Any Basis To Draw Companywide Conclusions from Three Low-Level CWs' Anecdotes and Speculation.

None of the CWs are alleged to have any basis for speculating about companywide HHGs demand or Target's inventory-purchasing strategy.  Rather, their purported "knowledge" is limited to anecdotal observations at one facility each.  CW-1 and CW-2 each worked at one of Target's 47 warehouses, and their primary responsibilities were to receive and unload inventory.  (¶¶46, 57.)  CW-3 was an assistant manager of the team responsible for moving inventory at one of Target's 1,926 stores.  (¶64.)  Plaintiffs do not allege how employees at this level would have knowledge of inventory levels across Target's nationwide warehouses and stores, much less Target's overall purchasing patterns. Their falsity allegations must be rejected for this reason alone.  *See In re Hutchinson Tech. Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 895 (D. Minn. 2007) (disregarding CW allegations where complaint failed to allege how manufacturing supervisor at single plant would have companywide knowledge), *aff'd*, 536 F.3d 952 (8th Cir. 2008); *Pound v. Stereotaxis, Inc.*,

8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014) (same where complaint failed to allege CWs had foundation, such as by analyzing financial reports).

> b. Alleged Observations of Inventory Increases Are *Consistent* with Target's Public Statements That It Was Increasing Inventory.

In any event, CW allegations that are consistent with a company's statements cannot support falsity. *See Cal. Pub. Emp.s' Ret. Sys. v. Chubb*, 394 F.3d at 126, 157 (3d Cir. 2004) (no falsity when CW statements were "completely consistent" with defendants' public statements); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 42 (1st Cir. 2017) (similar).

Here, the CWs allegedly observed that inventory levels grew to higher-than-average levels throughout Q2 of 2021, but those observations are *consistent with* Target's statements that it was pre-ordering merchandise and investing in increased inventory. (*See supra* §§C-D; ¶¶141, 51, 58, 65.) *See also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014) (rejecting falsity claim where "pleading demonstrate[d] the accuracy of defendants' statement").

> c. Contrary to CWs' Contentions of Falling Demand, Target's Audited Financial Statements Show That HHGs Demand Consistently *Increased*.

CW allegations cannot support falsity when they are contradicted by public disclosures that are not alleged to be fraudulent. *See Furlong v. Appiant Techs., Inc.*, 2005 WL 1213939, at *6-7 (E.D. Mo. Apr. 14, 2005) (falsity belied by defendants' disclosures that were not alleged to be false); *Robeco Capital Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 541 (S.D.N.Y. 2023) (same where falsity contradicted by public data). Further, courts must reject allegations belied by documentary evidence incorporated into the complaint or subject to judicial

notice.  *See Furlong*, 2005 WL 1213939, at \*6-7 (rejecting falsity where allegations were belied by documents incorporated into complaint); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (same).

Here, Plaintiffs allege that, by July or August 2021, Target was buying HHGs that consumers "no longer wanted." (*See, e.g.*, ¶¶4, 39, 42-45, 50, 83-87.)  But those allegations are contradicted by sales data Target disclosed: rather than decreasing, HHGs sales *increased* throughout 2021, *on top of* record increases in 2020.   (*Supra* §§C-D.) Specifically, hardline sales in 2021 increased 48% from 2019 and 12% from 2020, and home goods increased 40% from 2019 and 11% from 2020.  (*See* Ex. K.)  As shown below, HHGs sales increased each quarter for *eight consecutive quarters*.  Plaintiffs do not (and cannot) dispute this sales data, which was independently audited.  *See Hassan*, 2023 WL 8110940, at \*3 (rejecting plaintiff's factual assertion of declining growth because publicly available data showed the opposite); *Peloton*, 665 F. Supp. 3d at 541 (statement that sales were "strong" was not false where public sales data showed same).

| Target's Audited HHGs Quarterly Sales | | | | | |
|---|---|---|---|---|---|
| **Hardline Goods** | | | | | |
| | Q1 | Q2 | Q3 | Q4 | Full Year |
| **FY 2019** | $2.385 | $2.503 | $2.460 | $5.247 | $12.595 |
| **FY 2020** | $2.974 | $3.608 | $3.377 | $6.667 | $16.626 |
| **FY 2021** | $3.946 | $3.867 | $3.841 | $6.960 | $18.614 |
| **Home Goods** | | | | | |
| | Q1 | Q2 | Q3 | Q4 | Full Year |
| **FY 2019** | $3.001 | $3.457 | $3.527 | $4.445 | $14.430 |
| **FY 2020** | $3.264 | $4.625 | $4.506 | $5.836 | $18.231 |
| **FY 2021** | $4.410 | $4.748 | $4.989 | $6.108 | $20.255 |

(Ex. K.)[11]

Plaintiffs attempt to circumvent this rise in HHGs demand by leaning on unsupported contrary observations from three of Target's nearly 450,000 employees—none of whom are alleged to have any involvement in analyzing Target's companywide sales or demand. For instance, CW-1 and CW-2 allege that throughout the 2021 holiday season, certain "bulky" items were not leaving the warehouse because "customers were not buying them." (¶¶53, 59.) But Plaintiffs do not explain how either had knowledge of customer purchasing patterns across Target's business, let alone what merchandise Target was purchasing and when. *See Hutchinson*, 502 F. Supp. 2d at 895 (CW's observation that

---

[11] Figures in billions.

returns had increased did not support allegation that *company's* return allowances were inadequate).

Similarly, CW-3 allegedly had access to data showing real-time inventory levels, which purportedly showed what "consumers no longer wanted." (¶69.) But, even if CW-3 had access to certain inventory data, Plaintiffs fail to explain how that gave her insight into *demand*, much less *across the company*. Nor do Plaintiffs allege when CW-3 accessed such data, how often, its content, its scope, or how it was analyzed to predict demand. *See Pound*, 8 F. Supp. 3d at 1166.

And CW-3's conclusory allegation that "overstock permeated stores in the entire region" (¶70)—which is based solely on conversations with unnamed individuals at unidentified stores—similarly fails to establish falling demand. *See In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 686 (E.D. Va. 2015) (rejecting hearsay evidence where CW had no personal knowledge); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012) ("[R]eliance [on hearsay] may indicate that particular statements are not sufficiently reliable, plausible, or coherent.").

> d.  CW Speculation That Target Ignored Demand Must Be Rejected.

Finally, the CWs speculate that, as of June 2021, Target stopped considering consumer preferences. (¶60.) But speculation without foundation cannot support a claim under the PSLRA. *Target*, 275 F. Supp. 3d at 1081-82.

For example, CW-2 alleges that "inventory had been over-ordered in a scattershot approach, divorced from actual customer purchasing patterns." (¶60.) But Plaintiffs provide no basis for this speculation. CW-2 is not alleged to have had access to customer

data or any knowledge of, or involvement in, Target's inventory ordering.  *See Pound*, 8 F. Supp. 3d at 1166.

CW-2's only purported basis for his allegations is that, at some unspecified time, his warehouse had "probably 1,000 televisions." (¶59.)  But CW-2 fails to allege *when* that was, nor do Plaintiffs explain how that indicates inventory purchasing was divorced from demand.  *See Hutchinson*, 536 F.3d at 959 (rejecting CW observations where complaint failed to explain how they were outside "normal business fluctuations"); *see also In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *23 (N.D. Cal. Mar. 31, 2023) (rejecting CW allegations that fail to specify timing of observation); *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 52 (1st Cir. 2007) (same).  Indeed, CW-2 only began working at Target in June 2021 (¶58) and, therefore, had no personal knowledge about Target's inventory levels in prior seasons.[12]

Similarly, CW-3 alleges that Target's procurement team "disregarded" changing consumer buying habits and "clearly projected [demand] based off 2020 demand." (¶¶65-66.)  But CW-3's allegations are speculation built on extrapolation:  even if true, the claim that certain inventory in her store was moving more slowly than it had earlier in the Pandemic does not say anything about the process for ordering inventory companywide. (¶66.)  That is especially true here as CW-3 is not alleged to have had any involvement in

---

[12] The only alleged basis for CW-2's contentions regarding Target's ordinary inventory levels is an alleged conversation with his warehouse supervisor. (¶58.)  Plaintiffs fail to allege when this conversation took place, the contents of that conversation, or the supervisor's source of knowledge regarding ordinary inventory levels.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) (rejecting CW allegation based on hearsay).

procurement, contact with the procurement team, or knowledge of factors relevant to the procurement team's decision-making.  *See Pound*, 8 F. Supp. 3d at 1166.  In fact, Plaintiffs *admit* that store management had no say in purchasing or stocking decisions.  (¶66.)

***

None of Plaintiffs' allegations show that the alleged misstatements were false when made.  On top of these universal defects, Plaintiffs fail to plead facts establishing the falsity of each category of alleged misstatements.

### 2.  **Plaintiffs Fail To Plead Falsity of the Demand Warnings**.

Starting with the Demand Warnings, Plaintiffs fail to show they were made with actual knowledge that the warned-of risk was virtually certain to occur.

SEC rules mandate that public companies disclose "material factors" that make an investment "risky."  17 C.F.R. § 229.105.  But such risk warnings are "rarely" actionable under Section 10(b).  *In re Marriott Int'l, Inc., Customer Data Sec. Breach. Litig.*, 543 F. Supp. 3d 96, 128 (D. Md. 2021), *aff'd*, 31 F.4th 898 (4th Cir. 2022).  This is because they are "inherently *prospective*," warning of "harms [that] may come."  *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015).  Thus, they are forward-looking statements protected under the PSLRA's safe harbor ("Safe Harbor"), which renders forward-looking statements inactionable in three disjunctive circumstances—where they are (i) accompanied by adequate cautionary language; (ii) immaterial; *or* (iii) made without actual knowledge of falsity.  15 U.S.C. §78u-5(c); *see also Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920-21 (8th Cir. 2015).  Because companies are not "omniscient," they

20

cannot commit fraud for failing to "predict[] whatever harm befell [them]." *Karth v. Keryx Biopharm., Inc.*, 6 F.4th 123, 138 (1st Cir. 2021).

Consistent with the Safe Harbor, risk warnings are actionable only where defendants had actual knowledge that the warned-of risk had "already materialized" or was "virtually certain to occur" at the time the risk warnings were issued. *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1255 (10th Cir. 2022); *Steamship Trade Ass'n of Balt. v. Olo, Inc.*, 2023 WL 8287681, at *2 (S.D.N.Y. Nov. 30, 2023) (losing a few customers did not mean "risk of losing customers had meaningfully materialized"). It is not enough to allege that the company has suffered some harm; rather, plaintiffs must allege that the defendants *knew* the warned-of risk had a "near certainty of causing financial disaster." *Karth*, 6 F.4th at 137-38.

Plaintiffs challenge certain risk factors in Target's 2020 and 2021 Annual Reports, which warned that if Target is unable to quickly respond to changing consumer preferences, it could experience "lost sales, spoilage and increased inventory markdowns" that could have a *material* adverse effect on Target's financial results (the "Demand Warnings"). (¶¶94, 114; Ex. A.6; Ex. B.8.) Plaintiffs contend that the Demand Warnings were false/misleading because, they allege, the warned-of harm already existed at the time they were made (¶¶95, 115), but they fail to allege any facts demonstrating so.

**Q3 2021 Report**. Plaintiffs first allege that the Demand Warnings incorporated in the Q3 2021 Report, issued on November 24, 2021, were false/misleading because "the risk being warned of had already materialized when, back in July 2021, Defendants abandoned any effort to purchase [HHGs] inventory based on consumer preferences and

demand." (¶95.)  But the purported failure to align Target's purchasing behavior and inventory selection with demand is not the "risk" that the Demand Warnings warned of. Rather, the warned-of "risk" is *material harm* to Target's results of operations through lost sales, spoilation, or increased inventory markdowns resulting from the failure to quickly respond to consumer preferences.  *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) (rejecting contention that risk had materialized where warned-of risk is "adverse effects on sales—not simply the loss of independent distributors").

Plaintiffs do not allege that, as of November 24, 2021, Target had suffered (or was virtually certain to suffer) material financial harm, or even that it had experienced lost sales, spoilation, or increased inventory markdowns in HHGs due to a failure to quickly respond to changes in consumer preferences.  *Id.* at 242-43 (warned-of risk only materialized if company was materially adversely affected at the time of risk disclosures); *Karth*, 6 F.4th at 137-38 (same).  Nor can they: Target's audited financial statements show consistent sales growth.  (*Supra* §I.B.1.c.)

Instead, Plaintiffs speculate—based on CW anecdotes—that Target was overstocked in HHGs, implying that the Court should infer that markdowns were inevitable.  (¶95.)  But Plaintiffs fail to plead that companywide HHGs inventory levels were misaligned with anticipated demand, which is not surprising as demand had been— and was still—rising.  (*See* Ex. K); *see also Steamfitters Local 449 Pension & Ret. Sec. Funds v. Sleep Number Corp.*, 2023 WL 4421688, at *8 n.5 (D. Minn. July 10, 2023) (low-level employee's understanding that weather would cause delays is "a far cry" from establishing severe disruption causing material harm to company).  And even if they had,

Plaintiffs further fail to plead that Defendants *knew* that it was virtually certain that Target would suffer material financial harm because of any such purported mismatch. *See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 747 (N.D. Tex. 2018) (allegations that overstock represented "a ticking time bomb of aging inventory and markdown risk" insufficient to establish defendants knew "significant immediate risk for markdown"), *aff'd*, 935 F.3d 424 (5th Cir. 2019).

**2021 Annual Report**.  Plaintiffs make similar allegations regarding the 2021 Annual Report (issued on March 9, 2022).  Specifically, they contend that the warned-of risk already existed because, as of at least June 2021, Target had "massively overspent" on pre-ordered HHGs inventory without regard to demand and had already begun to mark down inventory.  (¶115.)  But, again, overspending on pre-ordered HHGs or even marking down inventory—which is a routine practice in retail (*supra* §A)—is not the warned-of risk.  Rather, the warned-of risk is inventory markdowns of such a magnitude that they cause *material* harm to the company.  Plaintiffs have not alleged (and cannot allege) that, as of March 9, 2022 (when the 2021 Annual Report was issued), Target had experienced material harm due to any of the warned-of risks or that any such harm was a virtual certainty.  *See Bondali*, 620 F. App'x at 491 (rejecting materialization of warned-of risk where plaintiffs failed to allege extent of food-safety issues would necessarily result in financial loss).  Plaintiffs cannot make this allegation because, again, Target's 2021 Annual Report showed that Target was continuing to experience increased sales in HHGs for the eighth consecutive quarter.  (*See* Ex. K.)

Nor have Plaintiffs alleged that Defendants knew, as of March 9, 2022, that it was virtually certain that Target would take increased inventory markdowns that would materially impact Target's results of operations.  To be sure, Target warned that it would take some inventory markdowns (*supra* §E)—but that does not mean that Target knew that several months later it would need to take markdowns of such a magnitude that would cause material harm to its business.  *See, e.g.*, *Karth*, 6 F.4th at 139; *Pluralsight*, 45 F.4th at 1256-57 (despite allegations that company was "months" behind its sales goals, complaint did not support inference that defendants knew they were so far behind in sales goals that harm to business was virtually certain); *Sleep Number*, 2023 WL 4421688, at *3-4 (mere fact that storm affected company's suppliers did not mean that warned-of risk of material adverse effect on business from weather had materialized).  In fact, as Defendants stated in the earnings call on May 18, 2022, announcing the material markdowns, Target (and its competitors) did not experience a significant change in demand for HHGs—or the need to take material markdowns—until *after* the release of the 2021 Annual Report.  (*Supra* §F.)

Far from keeping investors in the dark about risks that had yet to materialize, Target warned that consumer preferences could change quickly and that the Pandemic and market conditions caused "significant volatility" in demand, which materially limited its ability to make predictions.  (*Supra* §§A-B, E; Ex. A.8-9.)  *See In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir. 2004); *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 338 (2d Cir. 2011) (no securities fraud when company disclosed the "very risks about which [a plaintiff] claim[s] to have been misled").

**3.  Plaintiffs Fail To Plead Falsity of the Insight Statements**.

Plaintiffs allege that two statements Hennington made—one on November 17, 2021, and another on March 1, 2022—that Target "continuously evaluates [its] guests' mindset" (¶81) and "listen[s] to the[ir] everchanging wants and needs" (¶98) were false/misleading. This fails for at least three reasons.

> a.  Plaintiffs Fail To Plead Facts Showing That Target Did Not Consider Consumer Insights When Purchasing Inventory.

Plaintiffs contend that the Insight Statements are false/misleading because, they allege, as of June 2021, Target did not consider customers' shifting buying habits when ordering inventory.  (*See* ¶¶83, 99.)  As explained above, however, Plaintiffs' factual allegations fail to support this, and are contradicted by the undisputed sales data.  (*Supra* §I.B.1.c.)  *See City of Warren Police & Fire Ret. Sys. v. Foot Locker*, 412 F. Supp. 3d 206, 222 (E.D.N.Y. 2019) (inventory observations did not render company's statements regarding consumer insight and market position false/misleading).

> b.  The Insight Statements Are Immaterial Puffery.

Further, statements that are "so vague and such obvious hyperbole that no reasonable investor would rely upon" them are immaterial puffery.  *Stratasys*, 864 F.3d at 882.  Such statements are devoid of substantive information and are incapable of disproof.  *Id.*

The Insight Statements—that consumer insights are Target's "North Star" and that Target "evaluate[s] [its] guests' mindset" (¶81)—are classic puffery: they are hyperbolic, vague, and incapable of disproof.  *See, e.g.*, *Foot Locker*, 412 F. Supp. 3d at 221 (statement

that company understood what customers wanted was immaterial puffery); *NVE*, 551 F.

Supp. 2d at 895 (same for statement describing product as "Holy Grail" of memory); *see*

*also Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y.) (same

for "uncompromising commitment" to customers); *Guangyi Xu v. ChinaCache Int'l*

*Holdings, Ltd.*, 2017 WL 114401, at *12 (C.D. Cal. Jan. 9, 2017) (same for "enhanced

customer satisfaction").

Similarly, Hennington's statement that Target has a "'durable, flexible' business

model" that "can adapt to any environment" (¶98) is a promotional phrase devoid of

substantive information. *See Stratasys*, 864 F.3d at 882; *In re Medtronic Inc., Sec. Litig.*,

618 F. Supp. 2d 1016, 1030 (D. Minn. 2009) (statement that product was "durable and

reliable" was mere puffery), *aff'd*, 621 F.3d 800 (8th Cir. 2010).

c.   The Insight Statements Fall Within the Safe Harbor.

The Insight Statements are forward-looking, as they concern Target's future

objectives and ongoing evaluation of consumers, and thus qualify for the Safe Harbor.

(¶¶81, 94.)  *See In re Best Buy Co., Inc. Sec. Litig.*, 2005 WL 839099, at *3 (D. Minn.

Apr. 12, 2005) (statements regarding "management's plans or objectives" are forward-

looking).

The Insight Statements are inactionable under the Safe Harbor for three independent

reasons. *First*, as set forth above, forward-looking statements are not actionable if they are

accompanied by "meaningful cautionary language."   *Julianello*, 791 F.3d at 922.

"Meaningful" cautionary language is a "realistic description of the risks applicable to the

particular circumstances." *Id.*  Defendants' cautionary language was spot on:  Defendants

warned that if Target failed to "make trend-right decisions" or "predict…changing consumer tastes [and] preferences," it may "experience inventory markdowns." (*See* Ex. M.2; Ex. N.32; *supra* §I.B.2.)

*Second*, they were immaterial. (*Supra* §I.B.3.b.) And *third*, Plaintiffs fail to allege that Defendants had actual knowledge of falsity. (*Infra* §I.C.)

### 4. Plaintiffs Fail To Plead Falsity of the Investment Statements.

Plaintiffs take issue with four statements made by Fiddelke and Mulligan—three in a November 2021 earnings call (¶¶82, 84, 86) and one in a Bloomberg interview on March 1, 2022 (¶105)—expressing generic optimism regarding Target's inventory position. Fiddelke and Mulligan described Target's inventory as "healthy," "well-positioned," and stated that they "fe[lt] good" about it. (¶¶81, 84, 87, 105.) Plaintiffs also cite a statement in the 2021 Annual Report describing how Target carefully plans seasonal inventory levels to "achieve effective inventory management." (¶108.) Plaintiffs allege these statements were false because Target had stopped taking customers' shifting demand into account when ordering inventory and had become overstocked. (¶¶83, 85, 87, 106, 109.) Thus, Plaintiffs contend that Target had no basis to view its inventory position positively. (¶106.) This contention fails for similar reasons.

### a. Plaintiffs Mischaracterize the Investment Statements, Which Expressed Optimism About Inventory Investments To Address Supply Constraints.

Statements must be read in context to discern their true meaning. *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 887 (8th Cir. 2002); *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *13 (D. Minn. Sept. 30, 2021). Plaintiffs mischaracterize the Investment

27

Statements; each conveyed optimistic feelings and beliefs regarding Target's inventory investments to meet demand, given ongoing supply-chain constraints.

For instance, Plaintiffs quote that Target had a "very healthy inventory position overall." (¶129.) But they selectively omit the very next sentence, which makes clear that the "health" of the inventory was relative to persistent inventory shortages. (*See* Ex. M.7.) Plaintiffs admit both that Target (1) experienced inventory shortages and (2) made corresponding investments in inventory. (*See* ¶¶3, 42.). Plaintiffs cannot manufacture falsity through cherry-picking. *See In re Jones Soda Co. Sec. Litig.*, 393 F. App'x 507, 509 (9th Cir. 2021) (no falsity where plaintiffs "mischaracterize[d]" statement); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) (same), *aff'd*, 806 F. App'x 603 (9th Cir. 2020).

### b. The Investment Statements Are Nonactionable Opinions.

In any event, the Investment Statements are nonactionable opinion statements. Statements of opinion are actionable only where (1) the speaker did not hold the stated belief; (2) the statement "contain[s] embedded statements of facts" that are untrue; or (3) the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion." *See Omnicare Inc. v. Laborers Dist. Couns. Constr. Indus. Pension Fund*, 575 U.S. 175, 184-89 (2015); *accord 3M*, 2021 WL 4482987, at *14. Meeting this standard is "no small task" given that plaintiffs must plead particularized facts demonstrating falsity. *Id.*

Almost all of the Investment Statements are expressly framed as feelings. (Ex. M.5 ("we feel good about our inventory levels"), 7 ("we're entering the holidays with a very

healthy inventory position overall"), 12 ("we've got a great inventory position"; "I feel really good about the [investments]"); Bloomberg Surveillance[13] ("I feel good about our inventory position today"); Ex. B.6 (Target "achieve[s] effective inventory management" through "carefully planning inventory levels").)  These are textbook opinion statements. *See Steamfitters Loc. 449 Pension Plan v. Skechers USA, Inc.*, 412 F. Supp. 3d 353, 365 (S.D.N.Y. 2019) (statement that inventory levels were "appropriate" was nonactionable opinion), *aff'd*, 826 F. App'x 111 (2d Cir. 2020); *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 185 (W.D.N.Y. 2022) (same for "[w]e feel very comfortable"); *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343, 354-55 (2d Cir. 2022) (same for description of medical trials as designed with "great care" and "strong").

Plaintiffs neither claim that Defendants did not hold those opinions, nor that Defendants lied about Target's inventory investments, which is fatal to their claims.  (¶41.)

c.  The Investment Statements Are Immaterial Puffery.

Moreover, the Investment Statements are puffery, and thus immaterial as a matter of law.  Courts routinely hold that characterizations of assets and businesses as "healthy" and "well-positioned," as Target said of its inventory (¶¶84, 87), are legally immaterial. *See, e.g.*, *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 n.2 (8th Cir. 2020) ("feel really good about where we are today" was puffery); *Hutchinson*, 536 F.3d at 960 (same for "well-positioned"); *Medtronic*, 618 F. Supp. 2d at 1031 (same); *Rochester Laborers*

---

[13]*Bloomberg Surveillance Simulcast Full Show*, Bloomberg Surveillance (Mar. 1, 2022), https://www.bloomberg.com/news/videos/2022-03-01/-bloomberg-surveillance-simulcast-full-show-3-01-2022-video, at 1:25:47-1:26:38.

*Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 869 (E.D. Mo. 2012) (same);

*Skechers*, 412 F. Supp. 3d at 363 (same); *Police Ret. Sys. of St. Louis v. Intuitive Surgical,*

*Inc.*, 759 F.3d 1051 (9th Cir. 2014) (same).  The same is true for Target's statement that it

achieves "effective inventory management" by "carefully planning inventory levels."

(¶108.)  *See, e.g.*, *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *3-4 (C.D. Cal.

Dec. 1, 2023) ("effective in-season inventory management" was puffery); *In re XM*

*Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179 (D.D.C. 2007) (same for

"cost effective growth strategy"); *IBEW Local 595 Pension and Money Purchase Pension*

*Plan v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) (same for "effective" business

strategy).

> d.  The Investment Statements Fall Within the Safe Harbor.

In any event, the Investment Statements are forward-looking.  *See Peloton*, 665 F.

Supp. 3d at 538; *see also Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 647 (D.N.J.

2021) (statement that defendant "fe[lt] very happy with [its] inventory level today" was

forward-looking because it concerned future expectations regarding demand and

inventory); *In re Champion Enters., Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 865 (E.D. Mich.

2001) (same for statement that company was "watching and managing inventory to

improve turn"), *aff'd*, 346 F.3d 660 (6th Cir. 2003); *Boykin v. K12 Inc.*, 54 F.4th 175, 184

(4th Cir. 2022) (same for statements of "future prospects").  Accordingly, the Investment

Statements are inactionable under each prong of the Safe Harbor: they are immaterial

puffery (*supra* §I.B.4.c); they were accompanied by adequate cautionary language (*supra*

§I.B.2); and Plaintiffs have not shown that they were false (*supra* §I.B.4.a), much less actual knowledge of falsity (*infra* §I.C).

## 5. Plaintiffs Fail To Plead Falsity of the Flow Statements.

Plaintiffs next take issue with three statements—two made on November 17, 2021, by Hennington and Mulligan (¶¶81-82), and one on March 1, 2022, by Mulligan (¶103)—concerning Target's inventory flow. The November 2021 statements each describe Target's efforts to move the "right inventory to the right place at the right time." (¶¶81-82.) And the March 2022 statement describes how "[s]peed and flow of inventory is the key to the whole game," and that in Target's "largest stores," inventory is "constantly moving through[; i]t shows up at night [and is] out the store the next day." (¶103.) Plaintiffs insist these statements were false when made because Target's store and warehouses were overstocked. But this fails as well.

### a. Plaintiffs Fail To Plead Facts Showing the Flow Statements Were False.

The mere allegation that Target bought merchandise that Plaintiffs allege was unwanted does not undercut Target's statement that it was attempting to get appropriate inventory to its stores at the appropriate time. *See Foot Locker*, 412 F. Supp. 3d at 224 (mere allegation that company bought "undesirable merchandise" did not undercut statement that "it was attempting to get what it thought was the appropriate amount of inventory or endeavoring to get the right product to the right place at the right time"). Nor does it undercut Target's statement that speed and flow of inventory is key, or that inventory is constantly moving through Target's largest stores.

In any event, Plaintiffs' allegation that Target was purchasing unwanted inventory is controverted by the data showing strong HHG sales. (*Supra* §I.B.1.c.)

  b. <u>The Flow Statements Are Immaterial Puffery.</u>

Regardless, the Flow Statements are nonactionable puffery. Proclaiming to focus on moving the "right inventory to the right place at the right time" (¶¶81-82) is generically aspirational. By itself, the term "right" is inherently subjective and incapable of verification. *See Hewlett-Packard*, 905 F. Supp. 2d at 1071 (statement that company had the "right leaders in the right roles" is immaterial puffery). It is even more vague given the term is stacked on top of itself to refer to unspecified inventory, places, and times. Likewise, Mulligan's statement that inventory is "constantly moving" through Target's largest stores (¶103) is ambiguous as to the types and quantity of inventory described, and so obviously incapable of verification that no reasonable investor would rely upon it. *See U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *6 (S.D.N.Y. Mar. 5, 2013) (representation "subject to varying interpretations depending upon varying standards" is puffery).

  c. <u>The Flow Statements Fall Within the Safe Harbor.</u>

Statements must be "read as a whole" to determine whether they are forward-looking, *Boykin*, 54 F.4th at 184; "context is critical." *In re ECOtality Sec. Litig.*, 2014 WL 4634280, at *7 (N.D. Cal. Sept. 16, 2014). When read as a whole, the Flow Statements—which generically concern future inventory plans—are forward-looking.

The statements that Target is "working diligently" and "focus[ing]" on moving the right inventory to the right place at the right time (¶¶81-82) describe generic efforts to

achieve supply-chain goals.  The same is true for the statement that inventory "constantly" moves through Target's largest stores.  (Ex. N.27-28.)  *See Best Buy*, 2005 WL 839099, at *3 (statements involving plans or objectives are forward-looking).  Even if the Flow Statements partially refer to Target's present efforts, they are "mixed statements" that are still entitled to Safe Harbor protection.  *See Little Gem Life Scis. LLC v. Orphan Med., Inc.*, 2007 WL 541677, at *6 (D. Minn. Feb. 16, 2007) ("[M]ixed statements consisting of forward looking and non-forward-looking factors are nonetheless treated by courts as forward looking."); *Champion*, 144 F. Supp. 2d at 865 (statements in "mixed statement" considered forward-looking).

The Flow Statements are inactionable under each Safe Harbor prong because they are immaterial (*supra* §I.B.5.b), accompanied by meaningful cautionary language (*supra* §I.B.2; Ex. M.17; Ex. N.32), and Plaintiffs fail to plead that Defendants had actual knowledge of falsity (*supra* §I.B.5.a; *infra* §I.C).

### 6.  Plaintiffs Fail To Plead Falsity of the Historic Statements.

Plaintiffs point to six statements—three in the Q3 2021 Report (¶¶88, 90, 92), one in the Q4 2021 Earnings Press Release (¶96), and two in the 2021 Annual Report (¶¶110, 112)—reporting historic inventory data, gross margin rate, and certain company actions.

Plaintiffs allege the Historic Statements were false because, Plaintiffs contend, they misled investors as to the likelihood of future markdowns.  (¶¶91, 97, 111.)  This fails as a matter of law.  "[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy."  *In re Marion Merrell Dow Inc., Sec. Litig. II*, 1994 WL 396187, at *3-4 (W.D. Mo. July 18, 1994);

*accord In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (same), *aff'd*, 107 F. App'x 250 (2d Cir. 2004).[14]

Plaintiffs fail to allege that any of the actions, events, or financial information described in the Historic Statements was false. For instance, Target stated that it was "accelerating purchases of certain merchandise in [its] core categories" (¶88), which Plaintiffs *admit* occurred (¶¶97, 109, 113). *See Sleep Number*, 2023 WL 4421688, at *8 (statement that company "expedit[ed] components" not false/misleading where no facts alleged to the contrary). Similarly, Target stated that it experienced lower markdowns in 2021 (¶¶96, 110), but Plaintiffs do not—and cannot—allege facts to the contrary. *See Medtronic*, 618 F. Supp. 2d at 1031 (accurate statements of historic data inactionable).

Plaintiffs also try to challenge Target's statement that its increased inventory levels reflected its efforts to align with sales trends. *First*, they say that Target was not purchasing merchandise in line with demand (¶¶89, 93), but, as set forth above, that is contradicted by the sales data (*supra* §I.B.1.c). *Second*, Plaintiffs allege that Defendants did not succeed in "aligning inventory with sales trends." (¶113.) But Plaintiffs cannot demonstrate that Target was not exerting "effort" by claiming—in hindsight—that Target failed to succeed in its efforts. *See Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 395 (S.D.N.Y. 2014) (allegation that company failed to meet certain inventory levels insufficient to show falsity

---

[14] In any event, Plaintiffs fail to demonstrate that—at the time the Historic Statements were made—Target's future performance outlook was less optimistic than its past performance. (*Supra* §I.C.1.)

of statement that company "sought to improve inventory management"), *aff'd*, 605 F. App'x 52 (2d Cir. 2015).[15]

### 7. Plaintiffs Fail To Plead Falsity of the Markdown Projections.

Finally, Plaintiffs challenge three statements—two made by Fiddelke on March 1, 2022 (¶¶100-01) and one contained in the 2021 Annual Report issued on March 9, 2022 (¶108)—concerning Defendants' projections for a "small increase in markdown[s]" (¶101). Plaintiffs say that prediction was fraudulent because, they contend, Defendants "knew" that HHGs inventory "would necessitate significant markdowns and write-offs the immediately following quarter," yet understated their extent. (¶102.) This claim, likewise, fails.

#### a. Plaintiffs Fail To Plead Facts Showing Defendants Knew There Would Be Further Markdowns Materially Impacting Target's Business.

Defendants' Markdown Projections are estimates regarding expectations of markdowns in the future—paradigmatic "forward-looking" statements. 15 U.S.C. §78u-5(i)(1)(B) (defining, as forward-looking, statements on a company's "plans and objectives" for "future operations" and "projections"). These statements are thus nonactionable under the Safe Harbor unless Plaintiffs can show that *at the time the Markdown Projections were made*, Defendants had "actual knowledge" that markdowns would be materially greater in the future. *Julianello*, 791 F.3d at 920-21. Since Defendants are no soothsayers, this is a

---

[15] While the Historic Statements are not forward-looking, insofar as Plaintiffs interpret them to be, they are nonactionable under the Safe Harbor because Plaintiffs fail to allege actual knowledge of falsity (*supra* §I.B.6; *infra* §I.C) and the statements were accompanied by adequate cautionary language (*supra* §I.B.2).

difficult burden to meet.  Merely pleading that Target's projections later turned out to be wrong does not demonstrate falsity.  *Id.* at 921; *see also Target*, 275 F. Supp. 3d at 1071 (D. Minn. 2017) (fact that Target did not meet sales projections did not mean projections were false when made); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016) (fact that inventory did not move as quickly as defendants projected did not mean projections were false when made).

Plaintiffs try to plead falsity by alleging that Target knew it had "massively over-ordered" HHGs at the time the statements were made, and thus must have known significant markdowns were inevitable.  (¶102.)  But, as of March 1 and 9, 2022, Target's limited projected markdowns were *consistent* with its financial results, which had shown for ***eight consecutive quarters increasing*** HHGs demand.  (*Supra* §I.B.1.c); *see Peloton*, 665 F. Supp. 3d at 541 (rejecting allegation that defendants knew sales were declining when public disclosures showed otherwise).  Plaintiffs plead *zero* facts showing that at the time the Markdown Projections were made, Target *knew* that demand would rapidly change in the upcoming quarter.  *See Skechers*, 412 F. Supp. 3d at 367 (conclusory allegation that defendants "knew" revenue would decline insufficient).  As Target told investors on May 19, 2022—two-and-a-half months after the Markdown Projections were made—HHGs demand plummeted unexpectedly in late March, which led to decreased HHGs sales in Q1 2022 for the first time in two years.  (*Supra* §F.)[16]

---

[16] As analysts noted in the Q1 2022 Call, Walmart, one of Target's top competitors, reported drastic decreases in similar categories in the first quarter of 2022 that also led to unanticipated markdowns.  (*Supra* n.6.)

To be sure, Defendants projected there would be *some* markdowns—which is what they disclosed. (*See* Ex. N.23.) But just because Defendants projected in early March 2022 that there would be *some* markdowns in the coming year, does not mean that they had "laser-like precision necessary to forecast" that markdowns, in May, would be significantly more than anticipated. *See Gissin v. Endres*, 739 F. Supp. 2d 488, 501-02 (S.D.N.Y. 2010); *Skechers*, 412 F. Supp. 3d at 366.

  b. The Markdown Projections Were Accompanied by Meaningful Cautionary Language Regarding Risk of Changing Consumer Preferences.

In any event, forward-looking statements are inactionable if they are accompanied by "meaningful cautionary language." *Julianello*, 791 F.3d at 922. As set forth above, Defendants' cautionary language concerning markdowns was spot on. (*See* Ex. N.32; *supra* §I.B.3.c.)

**C. Plaintiffs Fail To Plead Scienter**.

Plaintiffs' claim also fails for the separate and independent reason that they have not adequately pled scienter. The Court can dismiss on this basis alone. *See Target*, 955 F.3d at 742.

Plaintiffs must allege particularized facts supporting a "strong inference" that Defendants intentionally or recklessly made the alleged misstatements. *Navarre*, 299 F.3d at 746. This is a high bar: an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiffs must allege facts demonstrating (1) a mental state embracing an intent to deceive, manipulate or defraud; (2) conduct which rises to the level of severe recklessness; or

(3) motive and opportunity.  *Elam*, 544 F.3d at 928.  Critically, Plaintiffs must "raise a strong inference of scienter for *each* defendant and with respect to *each* alleged misrepresentation."  *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009).  And since corporations cannot act alone, courts determine corporate scienter by "look[ing] to the scienter of individual corporate officers."  *Medtronic*, 618 F. Supp. 2d at 1035.

Plaintiffs allege that Defendants acted fraudulently or severely recklessly because (a) they had access to information showing that their public statements were inaccurate (¶¶127-34); (b) they were aware of—or recklessly disregarded—Target's increased inventory levels through warehouse visits (¶¶135-37); and (c) inventory management is part of Target's "core operations" (¶¶138-43).  Plaintiffs further allege that because three Defendants sold stock during the Class Period, they had motive to misrepresent demand. (¶¶144-49.)  None meets the high bar of a clear and cogent inference of scienter—either individually or collectively.

### 1. Plaintiffs Fail To Allege That Defendants Knew or Had Information That Contradicted Their Statements.

Plaintiffs allege that Defendants knew or had access to real-time data that showed (i) inventory dramatically increased (¶¶127-30), while (ii) demand had dramatically decreased (¶¶131-34).  Such allegations are insufficient.

To establish scienter based on knowledge or access to contradictory facts, Plaintiffs must do more than merely assert that Defendants "must have known" about conflicting information.  *Elam*, 544 F.3d at 930.  Rather, they must allege "particular facts

demonstrating how the defendants knew" what the information showed and "why" it proves falsity of the alleged misstatements. *Medtronic*, 618 F. Supp. 2d at 1033-34. Bare allegations of "data monitoring" are insufficient to support scienter. *Id.* at 1034. Plaintiffs fail to meet this burden.

### a. Defendants Did Not Admit They Had Information Showing Target Was Purchasing Inventory for Which There Was No Demand.

Plaintiffs allege that Defendants "admit that they had access to customer data that they reviewed on a weekly basis" (¶131), and thus, Plaintiffs speculate, Defendants must have known that "customers were not purchasing" HHGs (Compl. §VII.B). This allegation fails for lack of specificity: Plaintiffs fail to plead *what* the data Defendants allegedly reviewed stated, much less that it showed decreased HHGs demand companywide—nor can they, as HHGs sales *were increasing.* (*Supra* §I.B.1.c.) *Medtronic*, 618 F. Supp. 2d at 1034.

In any event, Plaintiffs mischaracterize the so-called admissions. *First*, Plaintiffs point to statements Hennington made in an earnings call and interview in November 2021 that Target "continuously evaluate[s]" its guests' mindsets. (¶132.) But Hennington did not say she accessed inventory data. Instead, she referred generically to Target's strategy of offering a shopping experience that meets customers' "wants and needs." (Ex. M.5.)[17]

*Second*, Plaintiffs contend that Cornell admitted he "monitored" "purchasing patterns," by noting retrospectively that increased demand during the Pandemic "wasn't

---

[17] *See also* Jeffrey Woldt, *Video Forum: Christina Hennington, Target*, Chain Drug Review (Nov. 22, 2021), https://www.chaindrugreview.com/video-forum-christina-hennington-target/, at 0:50-1:52.

going to go on forever." (¶134.)  But Cornell—who made this statement on November 2, 2023, one-and-a-half years after the Class Period ended—was speaking about decreased demand across all "discretionary items" over the "past seven quarters": i.e., *after* the last alleged misstatement was made.  He did not imply that he knew *when* demand would decrease, much less that it would during the Class Period.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (rejecting scienter where complaint was "silent about *when* employees realized that the more pessimistic assessments of the market were likely to come to fruition").[18]

        None of these statements suggest that any Defendant reviewed HHGs demand data on a weekly basis, much less that they reviewed data revealing a precipitous drop in demand.  *See Medtronic*, 618 F. Supp. 2d at 1034 (dismissing complaint where plaintiffs failed to allege defendant reviewed "sales and data" or explain what the "data would convey").

        b.  CW Speculation That "Headquarters" Could Access Reports Fails To Show Defendants Had Contradictory Information.

        Plaintiffs claim the CWs "confirmed" that Defendants, "by virtue of their position at Target's headquarters," had access to "real time" data contradicting Defendants' statements.  (¶130.)  But merely pointing to unspecified "data" does not raise an inference of scienter.  *Teamsters Loc. 445 Freight Div. Pension Fund v. Dyneyz Cap. Inc.*, 531 F.3d

---

[18] Plaintiffs also allege that Target's Chief Marketing & Digital Officer, Cara Sylvester, stated that "search insights" impact Target's inventory strategy. (¶133.)  But this statement fails to establish corporate scienter because Plaintiffs do not allege that these "search insights" showed decreased HHGs demand or otherwise contradicted Target's public statements in any way.  *Medtronic*, 618 F. Supp. 2d at 1034.

190, 196 (2d Cir. 2008).  Plaintiffs "must specifically identify the reports or statements containing" contradictory information.  *Id.*  They fail to do so.

*First*, Plaintiffs allege that Defendants had access to inventory and demand data and that "headquarters" reviewed inventory reports.  (¶¶50, 62, 67.)  For instance, both CW-2 and CW-3 contend that employees at "headquarters" used various inventory management systems (¶¶61-62) but neither allege *who* at "headquarters" used those systems, much less that Defendants used them.  CW-1 alleges that inventory was "scanned" and could be viewed in an inventory management system but only claims that "management" (an apparent reference to warehouse management) could see that data.[19]  (¶55.)  But allegations that an executive "*could* obtain access to" company information are insufficient where the witness has "no knowledge of whether [the executive] actually accessed or reviewed the reports."  *Campo v. Sears Holdings Co.*, 371 F. App'x 212, 217 (2d Cir. 2010).

That some unspecified person or persons at Target's "headquarters" or at individual warehouses allegedly reviewed data and had knowledge of its contents cannot be imputed to Defendants.  *See Horizon*, 580 F.3d at 762 ("That [the vice president] at times reported directly to [the CEO], also does not provide a basis to infer that [the CEO] knew everything that the [vice president] did.").  Nor are Plaintiffs' bare-bones allegations that unidentified

---

[19] CW-1 claims that he heard second hand from a warehouse director that the inventory levels "generated a lot of flashing lights" at "headquarters."  (¶50.)  But not only do Plaintiffs fail to say what those "flashing lights" were, they also fail to allege the contents of that conversation, when it took place, the basis of the warehouse director's knowledge, or who at "headquarters" held that opinion or otherwise had knowledge regarding companywide inventory levels.  *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) (discounting CW's allegations where nothing suggested that he or his sources had insight into defendants' knowledge).

managers reviewed unspecified data sufficient to show the scienter of Target's officers, which is necessary to establish corporate scienter. *Milavetz, Gallop, Milavetz, P.A. v. Wells Fargo Bank, N.A.*, 2012 WL 4058065, at *4 (D. Minn. Aug. 22, 2012), *report and recommendation adopted*, 2012 WL 4056715 (D. Minn. Sept. 14, 2012); *see also Smallen v. The Western Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020) (only scienter of senior corporate officials, acting with apparent authority, can establish corporate scienter).

*Second*, the CWs do not even allege *what* the data showed and why it conflicted with Defendants' public statements.  For instance, CW-1 alleges that he "scanned" inventory into a system but does not specify what the system showed, much less whether it showed companywide information.  This is insufficient.  *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557-58 (8th Cir. 2021) (dismissing complaint because nothing suggests CWs had "insight into what, if anything, [defendant] knew"); *see also Henningsen v. ADT Corp*, 161 F. Supp. 3d 1161, 1198 (S.D. Fla. 2015) (CWs' allegations of isolated customer service problems were insufficient to infer "company-wide problem"), *aff'd*, 660 F. App'x 850 (11th Cir. 2016).  And CW-2 *admits* that he did not have access to the data, thus he could not have possibly known what it said. (*Compare* ¶62 ("According to CW-2, Target headquarters knew which products were not moving through access to the Apollo data.") *with* ¶61 ("management at [the warehouse] could not generate inventory reports from the Apollo software").)  *See Intuitive Surgical*, 759 F.3d at 1063 (CW scienter allegations inadequate where CWs did not have first-hand knowledge).

Likewise, CW-3 alleges that, through an inventory management system, she

"observed that many of the product types that had sold well during the pandemic in 2020, such as home furnishings products, were now clogging the store." (¶69.)  But CW-3 does not specify how the data showed this and *when* it did so, nor does she explain how observing unspecified data for one store told her anything about sales patterns companywide.  *Medtronic*, 618 F. Supp. 2d at 1034 (allegations of "data monitoring" and "access to data" insufficient); *see also In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 134 (D. Mass. 2021) (CW's allegation that defendants had reports demonstrating company's market-share loss insufficient where complaint failed to identify any "specific or quantifiable facts" regarding company's "inventory, shelf space, [or] demand").

In sum, none of the CWs allege that the data showed demand was decreasing companywide, which is unsurprising, given that demand *increased* in all four quarters of 2021.  (*Supra* §I.B.1.c); *see Horizon*, 580 F.3d at 764 (inference of scienter weakened when CW makes inaccurate allegations).

### 2. Plaintiffs Fail To Establish That Defendants Recklessly Disregarded Inventory Levels Based on Unspecified Visits to Two Warehouses.

Plaintiffs allege, solely based on CW statements, that Defendants "would have been made aware of" inventory buildup, because executives who visited two warehouses "would have directly observed" inventory levels.  (¶¶136-37.)  This sort of hypothetical, "would have" allegation fails to support a strong inference of scienter.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590-91 (S.D.N.Y. 2011).

The only Defendant specifically identified as having visited a warehouse is Cornell, whom CW-2 alleges visited one time.  (¶63.)  But Plaintiffs do not specify *when* Cornell

visited, much less that he visited during the Class Period.  (*Id.*)  CW-1 and CW-2 allege that other unspecified executives visited their respective warehouses once or twice a year.  (¶¶55, 63.)  But again, Plaintiffs fail to allege *when* they visited—save for one visit from an executive in October 2021, *before* the Class Period (or even that any of the unspecified executives made any alleged misstatements).  (¶136.)  And without an allegation of *when*, it is impossible for Plaintiffs to allege that Defendants possessed knowledge of information that made their statements intentionally or recklessly false.  *See Sleep Number*, 2023 WL 4421688, at *7 (CW's lack of specificity as to timing rendered allegation insufficient).

Even if Plaintiffs had adequately alleged that executives visited two warehouses, they fail to explain why executives' observations of inventory levels at those warehouses imputes Defendants with actual knowledge that Target had nationwide "excess" inventory levels that posed a significant markdown risk.

*First*, Plaintiffs fail to explain why three low-level former employees would have any basis for opining that companywide inventory levels were "excessive."  That determination requires an understanding of future demand, which they had no insight into. *See In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 862 (S.D. Tex. 2016) (CWs' opinions that internal controls were inadequate "add nothing to [the] scienter analysis"); *In re Royal Caribbean Cruises, Ltd. Sec. Litig.*, 2013 WL 3295951, at *18 (S.D. Fla. Apr. 19, 2013) (disregarding CWs' opinions that strategy was "risky").

*Second*, Plaintiffs fail to explain how stockpiling of inventory in two warehouses would have given executives knowledge that that stockpiling was excessive relative to future demand.  *See, e.g., Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 238

(S.D.N.Y. 2022) (executive's site visits insufficient for scienter of issues regarding development delays, which "would not necessarily have been plainly visible"), *aff'd*, 935 F.3d 424 (5th Cir. 2019); *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *21 (S.D.N.Y. July 31, 2023) (CW allegations that CEO visited processing plant every day and observed product waste insufficient to establish scienter of a problem because they did not establish "when [CEO] would have been aware that the product waste" abnormal).

*Third*, such a small sample size cannot establish knowledge of enterprise-level risk. *See Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 165 (1st Cir. 2019) (affirming dismissal where court rejected CW statement about single sales region, which did "not indicate that [the CW] knew that [defendants'] generalized assessments of the magnitude of the change in [sales decline] nationally for the company were untrue"); *see also Sleep Number*, 2023 WL 4421688, at *8 n.5 (low-level employee's understanding that there would be some delay is a "far cry" from establishing company had severe disruption causing material harm).

### 3. Alleging That Inventory Management Is Part of Target's "Core Operations" Does Not Remedy Plaintiffs' Failure To Establish Contrary Facts Known Within the Company at the Time.

Nor can Plaintiffs' "Core Operations" allegations salvage their scienter theory. (¶¶138-42.) Before the PSLRA was enacted, plaintiffs used the core operations doctrine to infer that, where facts critical to a company's core operations are known within the company, they must be also known by the company's key corporate officers. *See Elam*, 544 F.3d at 929. The Eighth Circuit has never recognized this theory, and several other circuits have found it insufficient to establish scienter under the PSLRA's heightened

pleading standard, which requires that plaintiffs plead particularized facts as to each defendant. *Elam*, 544 F.3d at 929; *see In re Piedmont Lithium Inc. Sec. Litig.*, 2024 WL 197751, at *14 (E.D.N.Y. Jan. 18, 2024). The Court should not recognize it here.

In any event, the core operations doctrine does not help Plaintiffs' theory. Under the core operations doctrine, Plaintiffs must still establish that facts contradicting Defendants' statements were "*known within the company at that time*" they were made (i.e., that it was known within the company at the time of the alleged misstatements that Target was purchasing too much inventory relative to demand). *Elam*, 544 F. 3d at 929. Plaintiffs try to allege such knowledge by asserting that Target purchased more inventory than before. (*See* ¶142.) Setting aside that Plaintiffs allege no basis for that companywide assertion (as set forth above), knowledge of heightened inventory levels is *consistent* with Target's disclosures, so cannot demonstrate scienter. *See 3M*, 2021 WL 4482987, at *21 (even if defendants were aware of "key facts," the complaint fails to allege that such knowledge contradicted public statements). Further, Plaintiffs fail to explain why heightened inventory levels demonstrate "knowledge within the company" that inventory levels were *too* high relative to demand. Rather, it suggests the opposite: Defendants increased inventory because they believed there was continued demand for it. *See Pier 1*, 325 F. Supp. 3d at 724 (rejecting claim that defendants knew inventory was obsolete yet continued to order more).

### 4.  Defendants' Trading Activity Does Not Support Scienter.

Plaintiffs' allegations that Fiddelke, Cornell, and Hennington had motive to mislead investors because they sold Target stock during the Class Period (¶¶144-49) fail for several reasons.

*First*, as was publicly disclosed, each Defendant sold pursuant to prescheduled 10b5-1 trading plans (Ex. U), which supports the "inference that the sales were prescheduled and not suspicious."  *Elam*, 544 F.3d at 928.  Cornell's and Hennington's 10b5-1 plans were entered into *before* the Class Period, which "undermines any inference of fraudulent intent."  *Foot Locker*, 412 F. Supp. 3d at 226.  Although Fiddelke entered his plan during the Class Period, Plaintiffs plead no facts suggesting it was done "strategically" to "capitalize on insider knowledge" and therefore does not support scienter either.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

*Second*, Fiddelke's, Hennington's, and Cornell's stock ownership increased during the Class Period.  According to Plaintiffs' theory, those Defendants acquired shares at a price allegedly "inflated" by their alleged fraud, which undermines any inference of scienter.  (Exs. V, W, X); *Medtronic*, 618 F. Supp. 2d at 1037 ("When insiders increase their stock holdings during the Class Period, it weakens the allegations of suspicious insider trading.").

*Third*, executives' stock sales only support scienter "when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Navarre*, 299 F.3d at 747.  The

sales were in-line with historic trading patterns and none of them are suspicious. Plaintiffs allege that Fiddelke sold 13.8% of his holdings in April 2022. (¶148.) Notably, however, they fail to allege his prior sales history, which is fatal to their claim that *this* sale was "unusual." *K-tel*, 300 F.3d at 896. That is not surprising: Fiddelke sold approximately the same percentage of holdings in the six months preceding the Class Period. (Ex. V.)[20]

Likewise, Plaintiffs allege that Cornell sold 13.6% and 14.3% of his direct holdings in December 2021 and March 2022, which they allege were larger than any stock sale he made "*in the six months*" preceding the Class Period. (¶146.) Plaintiffs likely cabin their allegations to "six months" because Cornell sold 41.7% of his direct holdings a mere eight months before the Class Period. (Ex. X.) If anything, Cornell's sales during the Class Period were below average.

Finally, Plaintiffs insist that Hennington's sale of 17.5% of her holdings was suspicious because it allegedly "was the largest portion of her holdings she had sold at any point to that point." (¶149.) But Plaintiffs *concede* that she sold a combined 14.5% of her holdings in the seven months before the Class Period. (*Id.*) And she sold 16.1% the prior year, making her Class Period sales in line with her prior trading history. (Ex. W.)

---

[20] Contrary to Plaintiffs' insinuation, it is not unusual for Target's named executive officers to trade Target stock as they receive the majority of their compensation in stock or stock equivalents. (*See* Ex. Y.29.) For the 2021 fiscal year, Target stock and stock equivalents comprised 92% of Cornell's and 83% of Fiddelke's and Mulligan's. (*Id.* at 37.) (Hennington did not become a named executive officer until the 2022 fiscal year.)

Thus, none of the trades warrant a strong inference of scienter.  *See Navarre*, 299 F.3d at 747 (sale of 32% of holding, standing alone, does not support a strong inference of scienter); *Medtronic*, 618 F. Supp. 2d at 1037 (same for 14%).

### 5. The More Compelling Inference Is That Defendants Increased Inventory To Meet Demand Given Ongoing Supply-Chain Issues.

Plaintiffs' theory that Defendants knowingly ignored consumer preferences to "embark[] on a massive inventory buying spree" (¶4) is not just less compelling than non-fraudulent inferences—it is implausible.  *See MEMC*, 641 F.3d at 1030 (dismissing case where "more innocent, simpler inference" was more compelling).  Defendants would have no reason to increase inventory despite knowing it would ultimately be marked down and harm Target's profitability.  *See Target*, 275 F. Supp. 3d at 1075 (finding it "facially implausible that leadership willfully or knowingly engaged in an ill-advised strategy"); *Pier 1*, 325 F. Supp. 3d at 748 (rejecting allegation that defendant knew inventory was obsolete yet continued to order more).  That's even more true for the Individual Defendants, whose compensation was 83%-91% performance-based.  (Ex. Z.37.)

Moreover, Defendants repeatedly warned that the Pandemic "may have contributed to increased sales" and that as conditions returned to normal, Target may experience "lower sales than [it] experienced during the COVID-19 pandemic."  (Ex. A.9.)  Such risk warnings undermine any inference of scienter.  *See MEMC*, 641 F.3d at 1030.  And Defendants repeatedly disclosed rising inventory levels, further undercutting scienter.  *Horizon*, 580 F.3d at 764 (no scienter where defendants disclosed alleged problems).

The far more compelling, nonfraudulent inference is that, as they told investors, Defendants accelerated inventory purchases to mitigate "persistent inventory shortfalls." (*Supra* §C); *see Tellabs*, 551 U.S. at 314.  Plaintiffs *admit* that much is true.  (*See* ¶141 ("Defendants were particularly focused on Target's inventory in FY 2021 due to ongoing supply-chain issues resulting from COVID, which had previously prevented Target from having sufficient inventory in FY 2020.  Determined not to let that happen again, Target admittedly began in 2021 'ordering merchandise earlier'[.]"); *see also* ¶139 ("It was particularly critical for Target to have the proper amounts of inventory during the 2021 Holiday Season to retain its customer base and capitalize on sales during the busiest shopping period of the year.").)  That strategy aligned with Target's sales numbers, which showed *increased* demand for eight consecutive quarters.  (*Supra* §I.B.1.c.)  Far from ignoring customer preferences, Target ordered more inventory to meet them, while also warning that it could experience increased markdowns if its predictions were wrong. (*Supra* §E; Ex. A.6.)  In hindsight, Target's forecasts may have eventually been inaccurate, but the fact that Target's crystal ball was cloudy (as it told investors) does not amount to securities fraud.

## II.    PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED

Because Plaintiffs fail to state a claim for a primary violation of Section 10(b), their Section 20(a) claim fails as well.  *Hutchinson*, 536 F.3d at 961-62.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the AC with prejudice.

Date:  March 8, 2024

Respectfully submitted,

/s/ Sandra C. Goldstein

Jeffrey P. Justman
MN Bar No. 0390413
FAEGRE DRINKER BIDDLE &
REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
jeff.justman@faegredrinker.com

Sandra Grannum (*pro hac vice*)
FAEGRE DRINKER BIDDLE &
REATH LLP
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
sandra.grannum@faegredrinker.com

*Attorneys for Defendants*

Sandra C. Goldstein, P.C. (*pro hac vice*)
Alexander J. Rodney (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4779
sandra.goldstein@kirkland.com
alexander.rodney@kirkland.com