# EXHIBIT EE

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended August 1, 2020

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 1-6049

# TARGET CORPORATION

(Exact name of registrant as specified in its charter)

| **Minnesota** | **41-0215170** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1000 Nicollet Mall, Minneapolis, Minnesota** | **55403** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: 612/304-6073

Former name, former address and former fiscal year, if changed since last report: N/A

Securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common stock, par value $0.0833 per share** | **TGT** | **New York Stock Exchange** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company (as defined in Rule 12b-2 of the Exchange Act).

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ |
|---|---|---|
| Smaller reporting company ☐ | Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of registrant's classes of common stock, as of the latest practicable date. Total shares of common stock, par value $0.0833, outstanding at August 21, 2020 were 500,617,844.

Table of Contents
Index to Notes

**TARGET CORPORATION**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements (unaudited) | |
| | Consolidated Statements of Operations | 1 |
| | Consolidated Statements of Comprehensive Income | 2 |
| | Consolidated Statements of Financial Position | 3 |
| | Consolidated Statements of Cash Flows | 4 |
| | Consolidated Statements of Shareholders' Investment | 5 |
| | Notes to Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 4. | Controls and Procedures | 24 |
| **PART II** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 25 |
| Item 1A. | Risk Factors | 25 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 25 |
| Item 3. | Defaults Upon Senior Securities | 25 |
| Item 4. | Mine Safety Disclosures | 25 |
| Item 5. | Other Information | 25 |
| Item 6. | Exhibits | 26 |
| Signature | | 27 |

Table of Contents
Index to Notes

## PART I. FINANCIAL INFORMATION

**Item 1. Financial Statements**

**Consolidated Statements of Operations**

| (millions, except per share data) (unaudited) | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Sales | $ 22,696 | $ 18,183 | $ 42,067 | $ 35,584 |
| Other revenue | 279 | 239 | 523 | 465 |
| Total revenue | 22,975 | 18,422 | 42,590 | 36,049 |
| Cost of sales | 15,673 | 12,625 | 30,183 | 24,874 |
| Selling, general and administrative expenses | 4,460 | 3,912 | 8,520 | 7,575 |
| Depreciation and amortization (exclusive of depreciation included in cost of sales) | 542 | 561 | 1,119 | 1,142 |
| Operating income | 2,300 | 1,324 | 2,768 | 2,458 |
| Net interest expense | 122 | 120 | 239 | 246 |
| Net other (income) / expense | (11) | (13) | 11 | (27) |
| Earnings from continuing operations before income taxes | 2,189 | 1,217 | 2,518 | 2,239 |
| Provision for income taxes | 499 | 279 | 544 | 509 |
| **Net earnings from continuing operations** | 1,690 | 938 | 1,974 | 1,730 |
| Discontinued operations, net of tax | - | - | - | 3 |
| **Net earnings** | $ 1,690 | $ 938 | $ 1,974 | $ 1,733 |
| **Basic earnings per share** | | | | |
| Continuing operations | $ 3.38 | $ 1.83 | $ 3.94 | $ 3.37 |
| Discontinued operations | - | - | - | 0.01 |
| Net earnings per share | $ 3.38 | $ 1.83 | $ 3.94 | $ 3.37 |
| **Diluted earnings per share** | | | | |
| Continuing operations | $ 3.35 | $ 1.82 | $ 3.91 | $ 3.34 |
| Discontinued operations | - | - | - | 0.01 |
| Net earnings per share | $ 3.35 | $ 1.82 | $ 3.91 | $ 3.35 |
| Weighted average common shares outstanding | | | | |
| Basic | 500.1 | 512.1 | 500.6 | 513.9 |
| Diluted | 504.4 | 516.1 | 505.1 | 517.8 |
| Antidilutive shares | - | - | - | - |

Note: Per share amounts may not foot due to rounding.

See accompanying Notes to Consolidated Financial Statements.

 

Table of Contents
Index to Notes

**Consolidated Statements of Comprehensive Income**

| (millions) (unaudited) | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Net earnings | $ 1,690 | $ 938 | $ 1,974 | $ 1,733 |
| Other comprehensive income | | | | |
| Pension, net of tax | 22 | 10 | 44 | 20 |
| Currency translation adjustment and cash flow hedges, net of tax | (1) | - | (9) | 3 |
| Other comprehensive income | 21 | 10 | 35 | 23 |
| **Comprehensive income** | $ 1,711 | $ 948 | $ 2,009 | $ 1,756 |

See accompanying Notes to Consolidated Financial Statements.

TARGET CORPORATION    Q2 2020 Form 10-Q                                  2

Table of Contents
Index to Notes

## Consolidated Statements of Financial Position

| (millions, except footnotes) (unaudited) | | August 1, 2020 | | February 1, 2020 | | August 3, 2019 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | $ | 7,284 | $ | 2,577 | $ | 1,656 |
| Inventory | | 8,876 | | 8,992 | | 9,122 |
| Other current assets | | 1,463 | | 1,333 | | 1,341 |
| Total current assets | | 17,623 | | 12,902 | | 12,119 |
| Property and equipment | | | | | | |
| Land | | 6,027 | | 6,036 | | 6,054 |
| Buildings and improvements | | 30,946 | | 30,603 | | 29,908 |
| Fixtures and equipment | | 5,665 | | 6,083 | | 5,622 |
| Computer hardware and software | | 2,631 | | 2,692 | | 2,627 |
| Construction-in-progress | | 811 | | 533 | | 667 |
| Accumulated depreciation | | (19,341) | | (19,664) | | (18,866) |
| Property and equipment, net | | 26,739 | | 26,283 | | 26,012 |
| Operating lease assets | | 2,233 | | 2,236 | | 2,062 |
| Other noncurrent assets | | 1,405 | | 1,358 | | 1,373 |
| **Total assets** | $ | 48,000 | $ | 42,779 | $ | 41,566 |
| **Liabilities and shareholders' investment** | | | | | | |
| Accounts payable | $ | 10,726 | $ | 9,920 | $ | 9,152 |
| Accrued and other current liabilities | | 5,057 | | 4,406 | | 4,059 |
| Current portion of long-term debt and other borrowings | | 109 | | 161 | | 1,153 |
| Total current liabilities | | 15,892 | | 14,487 | | 14,364 |
| Long-term debt and other borrowings | | 14,188 | | 11,338 | | 10,365 |
| Noncurrent operating lease liabilities | | 2,241 | | 2,275 | | 2,111 |
| Deferred income taxes | | 1,121 | | 1,122 | | 1,082 |
| Other noncurrent liabilities | | 1,980 | | 1,724 | | 1,808 |
| Total noncurrent liabilities | | 19,530 | | 16,459 | | 15,366 |
| Shareholders' investment | | | | | | |
| Common stock | | 42 | | 42 | | 43 |
| Additional paid-in capital | | 6,248 | | 6,226 | | 6,114 |
| Retained earnings | | 7,121 | | 6,433 | | 6,461 |
| Accumulated other comprehensive loss | | (833) | | (868) | | (782) |
| Total shareholders' investment | | 12,578 | | 11,833 | | 11,836 |
| **Total liabilities and shareholders' investment** | $ | 48,000 | $ | 42,779 | $ | 41,566 |

**Common Stock** Authorized 6,000,000,000 shares, $0.0833 par value; 500,252,831, 504,198,962 and 511,335,375 shares issued and outstanding at August 1, 2020, February 1, 2020, and August 3, 2019, respectively.

**Preferred Stock** Authorized 5,000,000 shares, $0.01 par value; no shares were issued or outstanding during any period presented.

See accompanying Notes to Consolidated Financial Statements.

TARGET CORPORATION  Q2 2020 Form 10-Q

3

**FINANCIAL STATEMENTS**

Table of Contents
Index to Notes

### Consolidated Statements of Cash Flows

| (millions) (unaudited) | | Six Months Ended | | |
|---|---|---|---|---|
| | | August 1, 2020 | | August 3, 2019 |
| **Operating activities** | | | | |
| Net earnings | $ | 1,974 | $ | 1,733 |
| Earnings from discontinued operations, net of tax | | - | | 3 |
| Net earnings from continuing operations | | 1,974 | | 1,730 |
| Adjustments to reconcile net earnings to cash provided by operations | | | | |
| Depreciation and amortization | | 1,245 | | 1,267 |
| Share-based compensation expense | | 104 | | 86 |
| Deferred income taxes | | (12) | | 104 |
| Noncash losses / (gains) and other, net | | 86 | | 42 |
| Changes in operating accounts | | | | |
| Inventory | | 116 | | 375 |
| Other assets | | (14) | | 64 |
| Accounts payable | | 795 | | (731) |
| Accrued and other liabilities | | 822 | | (127) |
| Cash provided by operating activities-continuing operations | | 5,116 | | 2,810 |
| Cash provided by operating activities-discontinued operations | | - | | 2 |
| Cash provided by operations | | 5,116 | | 2,812 |
| **Investing activities** | | | | |
| Expenditures for property and equipment | | (1,414) | | (1,394) |
| Proceeds from disposal of property and equipment | | 10 | | 10 |
| Other investments | | 2 | | - |
| Cash required for investing activities | | (1,402) | | (1,384) |
| **Financing activities** | | | | |
| Additions to long-term debt | | 2,480 | | 994 |
| Reductions of long-term debt | | (126) | | (1,026) |
| Dividends paid | | (662) | | (658) |
| Repurchase of stock | | (706) | | (662) |
| Stock option exercises | | 7 | | 24 |
| Cash provided by / (required for) financing activities | | 993 | | (1,328) |
| Net increase in cash and cash equivalents | | 4,707 | | 100 |
| Cash and cash equivalents at beginning of period | | 2,577 | | 1,556 |
| **Cash and cash equivalents at end of period** | $ | 7,284 | $ | 1,656 |
| **Supplemental information** | | | | |
| Leased assets obtained in exchange for new finance lease liabilities | $ | 246 | $ | 156 |
| Leased assets obtained in exchange for new operating lease liabilities | | 142 | | 195 |

See accompanying Notes to Consolidated Financial Statements.

TARGET CORPORATION  Q2 2020 Form 10-Q                                    4

Table of Contents
Index to Notes

**Consolidated Statements of Shareholders' Investment**

| (millions) (unaudited) | Common Stock Shares | | Stock Par Value | | Additional Paid-in Capital | | Retained Earnings | | Accumulated Other Comprehensive (Loss)/Income | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| February 2, 2019 | 517.8 | $ | 43 | $ | 6,042 | $ | 6,017 | $ | (805) | $ | 11,297 |
| Net earnings | - | | - | | - | | 795 | | - | | 795 |
| Other comprehensive income | - | | - | | - | | - | | 13 | | 13 |
| Dividends declared | - | | - | | - | | (330) | | - | | (330) |
| Repurchase of stock | (3.6) | | - | | - | | (277) | | - | | (277) |
| Accelerated share repurchase pending final settlement | (3.0) | | - | | (153) | | (247) | | - | | (400) |
| Stock options and awards | 1.1 | | - | | 19 | | - | | - | | 19 |
| May 4, 2019 | 512.3 | $ | 43 | $ | 5,908 | $ | 5,958 | $ | (792) | $ | 11,117 |
| Net earnings | - | | - | | - | | 938 | | - | | 938 |
| Other comprehensive income | - | | - | | - | | - | | 10 | | 10 |
| Dividends declared | - | | - | | - | | (341) | | - | | (341) |
| Repurchase of stock | (1.3) | | - | | 153 | | (94) | | - | | 59 |
| Stock options and awards | 0.3 | | - | | 53 | | - | | - | | 53 |
| August 3, 2019 | 511.3 | $ | 43 | $ | 6,114 | $ | 6,461 | $ | (782) | $ | 11,836 |
| Net earnings | - | | - | | - | | 714 | | - | | 714 |
| Other comprehensive income | - | | - | | - | | - | | 9 | | 9 |
| Dividends declared | - | | - | | - | | (338) | | - | | (338) |
| Repurchase of stock | (3.0) | | (1) | | - | | (295) | | - | | (296) |
| Accelerated share repurchase pending final settlement | (2.5) | | - | | (178) | | (272) | | - | | (450) |
| Stock options and awards | 0.9 | | - | | 70 | | - | | - | | 70 |
| November 2, 2019 | 506.7 | $ | 42 | $ | 6,006 | $ | 6,270 | $ | (773) | $ | 11,545 |
| Net earnings | - | | - | | - | | 834 | | - | | 834 |
| Other comprehensive loss | - | | - | | - | | - | | (95) | | (95) |
| Dividends declared | - | | - | | - | | (336) | | - | | (336) |
| Repurchase of stock | (2.6) | | - | | 178 | | (335) | | - | | (157) |
| Stock options and awards | 0.1 | | - | | 42 | | - | | - | | 42 |
| February 1, 2020 | 504.2 | $ | 42 | $ | 6,226 | $ | 6,433 | $ | (868) | $ | 11,833 |

 

Table of Contents
Index to Notes

**Consolidated Statements of Shareholders' Investment**

| (millions) (unaudited) | Common Stock Shares | | Stock Par Value | | Additional Paid-in Capital | | Retained Earnings | | Accumulated Other Comprehensive (Loss) / Income | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| February 1, 2020 | 504.2 | $ | 42 | $ | 6,226 | $ | 6,433 | $ | (868) | $ | 11,833 |
| Net earnings | - | | - | | - | | 284 | | - | | 284 |
| Other comprehensive income | - | | - | | - | | - | | 14 | | 14 |
| Dividends declared | - | | - | | - | | (333) | | - | | (333) |
| Repurchase of stock | (5.7) | | - | | - | | (609) | | - | | (609) |
| Stock options and awards | 1.4 | | - | | (20) | | - | | - | | (20) |
| May 2, 2020 | 499.9 | $ | 42 | $ | 6,206 | $ | 5,775 | $ | (854) | $ | 11,169 |
| Net earnings | - | | - | | - | | 1,690 | | - | | 1,690 |
| Other comprehensive income | - | | - | | - | | - | | 21 | | 21 |
| Dividends declared | - | | - | | - | | (344) | | - | | (344) |
| Stock options and awards | 0.4 | | - | | 42 | | - | | - | | 42 |
| August 1, 2020 | 500.3 | $ | 42 | $ | 6,248 | $ | 7,121 | $ | (833) | $ | 12,578 |

We declared $0.68 and $0.66 dividends per share for the three months ended August 1, 2020, and August 3, 2019, respectively, and $2.62 per share for the fiscal year ended February 1, 2020.

See accompanying Notes to Consolidated Financial Statements.

 

## INDEX TO NOTES

| **Notes to Consolidated Financial Statements** | | **8** |
|---|---|---|
| Note 1 | Accounting Policies | 8 |
| Note 2 | Impact of Coronavirus (COVID-19) | 8 |
| Note 3 | Revenues | 9 |
| Note 4 | Fair Value Measurements | 10 |
| Note 5 | Property and Equipment | 10 |
| Note 6 | Commercial Paper and Long-Term Debt | 10 |
| Note 7 | Derivative Financial Instruments | 11 |
| Note 8 | Share Repurchase | 11 |
| Note 9 | Pension Benefits | 12 |
| Note 10 | Accumulated Other Comprehensive Loss | 12 |

Table of Contents

Index to Notes

**Notes to Consolidated Financial Statements (unaudited)**

**1.**
**Accounting Policies**

These unaudited condensed consolidated financial statements are prepared in accordance with the rules and regulations of the Securities and Exchange Commission (SEC) applicable to interim financial statements. While these statements reflect all normal recurring adjustments that are, in the opinion of management, necessary for fair presentation of the results of the interim period, they do not include all of the information and footnotes required by United States (U.S.) generally accepted accounting principles (U.S. GAAP) for complete financial statements. These condensed consolidated financial statements should be read in conjunction with the financial statement disclosures in our 2019 Form 10-K.

We use the same accounting policies in preparing quarterly and annual financial statements. Unless otherwise noted, amounts presented within the Notes to Consolidated Financial Statements refer to our continuing operations.

We operate as a single segment that includes all of our continuing operations, which are designed to enable guests to purchase products seamlessly in stores or through our digital channels. Nearly all of our revenues are generated in the U.S. The vast majority of our long-lived assets are located within the U.S.

Due to the seasonal nature of our business, quarterly revenues, expenses, earnings, and cash flows are not necessarily indicative of the results that may be expected for the full year.

**2.**
**Impact of Coronavirus (COVID-19)**

On March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) a pandemic, and on March 13, 2020, the United States declared a national emergency. States and cities have taken various measures in response to COVID-19, including mandating the closure of certain businesses and encouraging or requiring citizens to avoid large gatherings. To date all of our stores, digital channels, and distribution centers remain open.

Throughout the six months ended August 1, 2020, guest shopping patterns changed significantly and unpredictably in reaction to the COVID-19 pandemic. Four of our
five core merchandise categories have experienced significant sales growth year-to-date; however, sales of Apparel and Accessories declined significantly in the first quarter before rebounding in the second quarter. Note 3 provides sales by category. In response to these changes, we have taken many actions, including accelerating purchases of certain merchandise in our core categories and slowing or canceling certain purchase orders, primarily for Apparel and Accessories. As a result of these actions, during the first quarter of 2020, we recorded $216 million of purchase order cancellation fees in Cost of Sales.

 

Table of Contents
Index to Notes

**3.**
**Revenues**

General merchandise sales represent the vast majority of our revenues. We also earn revenues from a variety of other sources, most notably credit card profit sharing income from our arrangement with TD Bank Group (TD).

| Revenues | | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|---|
| (millions) | | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Apparel and accessories [a] | $ | 4,084 | $ 3,656 | $ 6,703 | $ 6,946 |
| Beauty and household essentials [b] | | 6,158 | 5,076 | 12,069 | 10,047 |
| Food and beverage [c] | | 4,186 | 3,460 | 8,761 | 7,182 |
| Hardlines [d] | | 3,608 | 2,503 | 6,582 | 4,889 |
| Home furnishings and décor [e] | | 4,625 | 3,457 | 7,889 | 6,458 |
| Other | | 35 | 31 | 63 | 62 |
| Sales | | 22,696 | 18,183 | 42,067 | 35,584 |
| Credit card profit sharing | | 158 | 168 | 324 | 328 |
| Other | | 121 | 71 | 199 | 137 |
| Other revenue | | 279 | 239 | 523 | 465 |
| Total revenue | $ | 22,975 | $ 18,422 | $ 42,590 | $ 36,049 |

[a]Includes apparel for women, men, boys, girls, toddlers, infants and newborns, as well as jewelry, accessories, and shoes.
[b]Includes beauty and personal care, baby gear, cleaning, paper products, and pet supplies.
[c]Includes dry grocery, dairy, frozen food, beverages, candy, snacks, deli, bakery, meat, produce, and food service in our stores.
[d]Includes electronics (including video game hardware and software), toys, entertainment, sporting goods, and luggage.
[e]Includes furniture, lighting, storage, kitchenware, small appliances, home décor, bed and bath, home improvement, school/office supplies, greeting cards and party supplies, and other seasonal merchandise.

*Merchandise sales* - We record almost all retail store revenues at the point of sale. Digitally originated sales may include shipping revenue and are recorded upon delivery to the guest or upon guest pickup at the store. Sales are recognized net of expected returns, which we estimate using historical return patterns and our expectation of future returns. As of August 1, 2020, February 1, 2020, and August 3, 2019, the accrual for estimated returns was $
201 million, $117 million, and $131 million, respectively. Other than as described below, we have not historically had notable adjustments to our returns estimates.

From March 26, 2020 to April 26, 2020, we did not accept in-store merchandise returns and exchanges to protect our team members from COVID-19. We lengthened the return period for merchandise affected by this change. Our returns estimate for sales during the suspension period included significant assumptions, including the impact of the lengthened return period, sales mix, and recent changes in guest returns behavior. At May 2, 2020, the returns reserve totaled $398 million. After resuming guest returns, we received fewer returns than originally expected. During the second quarter, we reduced our estimate of sales returns, which increased sales by $146 million and operating income by $110 million.

Revenue from Target gift card sales is recognized upon gift card redemption, which is typically within one year of issuance.

| Gift Card Liability Activity | | | Gift Cards Issued During Current Period But Not Redeemed [b] | Revenue Recognized From Beginning Liability | | |
|---|---|---|---|---|---|---|
| (millions) | | February 1, 2020 | | | | August 1, 2020 |
| Gift card liability [a] | $ | 935 | $ 315 | $ (475) | $ | 775 |

[a]Included in Accrued and Other Current Liabilities.
[b]Net of estimated breakage.

*Credit card profit sharing* - We receive payments under a credit card program agreement with TD. Under the agreement, we receive a percentage of the profits generated by the Target Credit Card and Target MasterCard receivables in exchange for performing account servicing and primary marketing functions. TD underwrites, funds, and owns Target Credit Card and Target MasterCard receivables, controls risk management policies, and oversees regulatory compliance.

Table of Contents
Index to Notes

## 4.
### Fair Value Measurements

Fair value measurements are reported in one of three levels reflecting the valuation techniques used to determine fair value.

| **Fair Value Measurements - Recurring Basis** | | | Fair Value at | | |
|---|---|---|---|---|---|
| (millions) | Classification | Pricing Category | August 1, 2020 | February 1, 2020 | August 3, 2019 |
| **Assets** | | | | | |
| Short-term investments | Cash and Cash Equivalents | Level 1 | $ 6,370 | $ 1,810 | $ 796 |
| Prepaid forward contracts | Other Current Assets | Level 1 | 26 | 23 | 20 |
| Equity securities [a] | Other Current Assets | Level 1 | 27 | 39 | 80 |
| Interest rate swaps | Other Noncurrent Assets | Level 2 | 239 | 137 | 108 |
| **Liabilities** | | | | | |
| Interest rate swaps | Other Noncurrent Liabilities | Level 2 | 12 | - | - |

[a]Represents our investment in Casper Sleep Inc. common stock.

| **Significant Financial Instruments Not Measured at Fair Value** [a] | August 1, 2020 | | February 1, 2020 | | August 3, 2019 | |
|---|---|---|---|---|---|---|
| (millions) | Carrying Amount | Fair Value | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Long-term debt, including current portion [b] | $ 12,384 | $ 15,457 | $ 9,992 | $ 11,864 | $ 10,244 | $ 11,635 |

[a]The carrying amounts of certain other current assets, commercial paper, accounts payable, and certain accrued and other current liabilities approximate fair value due to their short-term nature.
[b]The fair value of debt is generally measured using a discounted cash flow analysis based on current market interest rates for the same or similar types of financial instruments and would be classified as Level 2. These amounts exclude commercial paper, unamortized swap valuation adjustments, and lease liabilities.

## 5.
### Property and Equipment

We review long-lived assets for impairment when store performance expectations, events, or changes in circumstances-such as a decision to relocate or close a store or distribution center, discontinue projects, or make significant software changes-indicate that the asset's carrying value may not be recoverable. We recognized impairment charges of $
25 million and $60 million during the three and six months ended August 1, 2020, respectively. We recognized impairment charges of $10 million and $13 million during the three and six months ended August 3, 2019, respectively. These impairment charges are included in Selling, General and Administrative Expenses (SG&A).

## 6.
### Commercial Paper and Long-Term Debt

In March 2020, we issued unsecured fixed rate debt of $1.5 billion at 2.250 percent that matures in April 2025 and $1.0 billion at 2.650 percent that matures in September 2030.

We obtain short-term financing from time to time under our commercial paper program.
No balances were outstanding at any time during the six months ended August 1, 2020. For the six months ended August 3, 2019, the maximum amount outstanding was $744 million, and the average daily amount outstanding was $74 million at a weighted average annual interest rate of 2.4 percent, with no balance outstanding as of August 3, 2019.

In April 2020, we obtained a committed $900 million 364-day unsecured revolving credit facility that expires in April 2021. This new facility is in addition to our $2.5 billion unsecured revolving credit facility that expires in October 2023. No balances were outstanding under either credit facility at any time during 2020 or 2019.

 

Table of Contents
Index to Notes

**7.**
**Derivative Financial Instruments**

Our derivative instruments consist of interest rate swaps used to mitigate interest rate risk. As a result, we have counterparty credit exposure to large global financial institutions, which we monitor on an ongoing basis. Note 4 to the Consolidated Financial Statements provides the fair value and classification of these instruments.

As of August 1, 2020, and August 3, 2019, we were party to interest rate swaps with notional amounts totaling $ 1.5 billion. We pay a variable rate and receive a fixed rate under each of these agreements. All of the agreements are designated as fair value hedges, and all were perfectly effective during the three and six months ended August 1, 2020, and August 3, 2019.

As of August 1, 2020, we were party to forward-starting interest rate swaps with notional amounts totaling $250 million to hedge the interest rate exposure of anticipated future debt issuances. We designated these derivative financial instruments as cash flow hedges. We assess, both at inception and on an ongoing basis, whether the derivative financial instrument is highly effective in offsetting changes in cash flows of the hedged item and whether it is probable that the hedged forecasted transaction will occur. As of August 1, 2020, a $12 million loss was recorded in Accumulated Other Comprehensive Loss and will be reclassified to Net Interest Expense when the forecasted transaction affects earnings.

**Effect of Hedges on Debt**

| (millions) | | August 1, 2020 | | February 1, 2020 | | August 3, 2019 |
|---|---|---|---|---|---|---|
| Long-term debt and other borrowings | | | | | | |
| Carrying amount of hedged debt | $ | 1,732 | $ | 1,630 | $ | 1,600 |
| Cumulative hedging adjustments, included in carrying amount | | 239 | | 137 | | 108 |

**Effect of Hedges on Net Interest Expense**

| | | Three Months Ended | | | | Six Months Ended | | |
|---|---|---|---|---|---|---|---|---|
| (millions) | | August 1, 2020 | | August 3, 2019 | | August 1, 2020 | | August 3, 2019 |
| Gain (loss) on fair value hedges recognized in Net Interest Expense | | | | | | | | |
| Interest rate swap designated as fair value hedges | $ | 11 | $ | 86 | $ | 102 | $ | 101 |
| Hedged debt | | (11) | | (86) | | (102) | | (101) |
| Total | $ | - | $ | - | $ | - | $ | - |

**8.**
**Share Repurchase**

We periodically repurchase shares of our common stock under a board-authorized repurchase program through a combination of open market transactions, accelerated share repurchase (ASR) arrangements, and other privately negotiated transactions with financial institutions.

| Share Repurchase Activity | | Three Months Ended | | | | Six Months Ended | | |
|---|---|---|---|---|---|---|---|---|
| (millions, except per share data) | | August 1, 2020 | | August 3, 2019 [a] | | August 1, 2020 | | August 3, 2019 [a] |
| Number of shares purchased | | - | | 4.3 | | 5.7 | | 7.9 |
| Average price paid per share | $ | - | $ | 80.02 | $ | 107.58 | $ | 78.63 |
| Total investment | $ | - | $ | 341 | $ | 609 | $ | 618 |

[a]This table includes activity related to the ASR arrangement entered in first quarter 2019 because final settlement occurred in second quarter 2019. Under the ASR arrangement, we repurchased 4.2 million shares for a total cash investment of $340 million. We did not enter into any new ASR arrangements during second quarter 2019.

In March 2020, we suspended share repurchase activity.

 

## 9.
## Pension Benefits

We provide pension plan benefits to eligible team members.

| **Net Pension Benefits Expense** | | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|---|
| (millions) | Classification | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Service cost benefits earned | SG&A Expenses | $ 25 | $ 23 | $ 51 | $ 46 |
| Interest cost on projected benefit obligation | Net Other (Income) / Expense | 29 | 37 | 59 | 74 |
| Expected return on assets | Net Other (Income) / Expense | (60) | (62) | (121) | (124) |
| Amortization of losses | Net Other (Income) / Expense | 32 | 16 | 64 | 31 |
| Amortization of prior service cost | Net Other (Income) / Expense | (3) | (3) | (6) | (5) |
| Total | | $ 23 | $ 11 | $ 47 | $ 22 |

## 10. Accumulated Other Comprehensive Loss

| **Change in Accumulated Other Comprehensive Loss** | Cash Flow Hedges | Currency Translation Adjustment | Pension | Total |
|---|---|---|---|---|
| (millions) | | | | |
| February 1, 2020 | $ (12) | $ (19) | $ (837) | $ (868) |
| Other comprehensive income before reclassifications, net of tax | (9) | - | - | (9) |
| Amounts reclassified from AOCI, net of tax | - | - | 44 | 44 |
| August 1, 2020 | $ (21) | $ (19) | $ (793) | $ (833) |

 

Table of Contents
Index to Notes

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Financial Summary**

Second quarter 2020 includes the following notable items:

•GAAP diluted earnings per share were $3.35.
•Adjusted diluted earnings per share were $3.38.
•Total revenue increased 24.7 percent, driven by an increase in comparable sales.
•Comparable sales increased 24.3 percent, driven by an 18.8 percent increase in average transaction amount.
◦Comparable store sales grew 10.9 percent.
◦Digital channel sales increased 195 percent, contributing 13.4 percentage points to comparable sales growth.
•Operating income of $2.3 billion was 73.8 percent higher than the comparable prior-year period.

Sales were $22.7 billion for the three months ended August 1, 2020, an increase of $4.5 billion, or 24.8 percent, from the same period in the prior year. Operating cash flow provided by continuing operations was $5.1 billion for the six months ended August 1, 2020, an increase of $2.3 billion, or 82.1 percent, from $2.8 billion for the six months ended August 3, 2019.

| Earnings Per Share from Continuing Operations | Three Months Ended | | | Six Months Ended | | |
| --- | --- | --- | --- | --- | --- | --- |
| | August 1, 2020 | August 3, 2019 | Change | August 1, 2020 | August 3, 2019 | Change |
| GAAP diluted earnings per share | $ 3.35 | $ 1.82 | 84.4 % | $ 3.91 | $ 3.34 | 17.0 % |
| Adjustments | 0.03 | - | | 0.06 | - | |
| Adjusted diluted earnings per share | $ 3.38 | $ 1.82 | 85.7 % | $ 3.96 | $ 3.34 | 18.6 % |

Note: Amounts may not foot due to rounding. Adjusted diluted earnings per share from continuing operations (Adjusted EPS), a non-GAAP metric, excludes the impact of certain items. Management believes that Adjusted EPS is useful in providing period-to-period comparisons of the results of our continuing operations. A reconciliation of non-GAAP financial measures to GAAP measures is provided on page 19.

We report after-tax return on invested capital (ROIC) from continuing operations because we believe ROIC provides a meaningful measure of our capital-allocation effectiveness over time. For the trailing twelve months ended August 1, 2020, after-tax ROIC was 17.2 percent, compared with 15.2 percent for the trailing twelve months ended August 3, 2019. The calculation of ROIC is provided on page 21.

**Impact of COVID-19**

On March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) a pandemic, and on March 13, 2020, the United States declared a national emergency. The rapid development and fluidity of this situation limits our ability to predict the ultimate impact of COVID-19 on our business, financial condition and financial performance, which could be material. States and cities have taken various measures in response to COVID-19, including mandating the closure of certain businesses and encouraging or requiring citizens to avoid large gatherings. We have implemented numerous safety measures to protect our guests and team members - such as mandating face masks for all team members and guests in our stores, more rigorous cleaning processes, providing disposable face masks, gloves and thermometers for team members, installing distancing markers, limiting guest levels within our stores, and installing partitions at all stores. We have also reduced store hours to support increased cleaning and replenishment efforts and implemented quantity limits on certain high-demand merchandise. In addition, we have reserved certain store hours for guests with increased vulnerability to COVID-19. To date all of our stores, digital channels, and distribution centers remain open.

As the crisis has evolved, we have experienced unusually strong sales, as guests rely on Target for essential items like food, medicine, cleaning products, and household stock-up items. Underlying this trend, we saw significant volatility in our sales mix, including both category sales mix and the mix of sales in our stores and digital channels, including same-day fulfillment options.

•During the first quarter, comparable sales increased 10.8 percent, reflecting a 0.9 percent increase in store originated comparable sales and a 141 percent increase in digitally originated comparable sales. The quarter began with strength across our multi-category portfolio, followed by a shift to strong comparable sales growth in our Food and Beverage and Beauty and Household Essentials core merchandising categories and significant comparable sales declines in Apparel and Accessories. Comparable sales in Apparel and Accessories recovered notably beginning mid-April.

 

•During the second quarter, comparable sales increased 24.3 percent, reflecting a 10.9 percent increase in store originated comparable sales and a 195 percent increase in digitally originated comparable sales. Comparable sales growth was strong across our multi-category portfolio, with slightly higher growth in lower-margin categories. Monthly variability in comparable sales continued, with comparable sales increases of 32.9 percent in May, 21.4 percent in June, and 19.7 percent in July.

For the six months ended August 1, 2020, gross margin has been negatively impacted by changes in both our category and channel sales mix, as well as actions that we have taken to allow us to better fulfill guest demand for essentials. Additionally, gross margin reflects COVID-19-related investments in pay and benefits for our supply chain team members.

Our SG&A expenses have also been significantly impacted by incremental costs related to investments in pay and benefits for store team members, the spikes in merchandise volume in stores and the supply chain, incremental safety and cleaning supplies, and the impact of additional team member hours dedicated to more rigorous cleaning routines in our facilities.

To support our team and minimize potential disruptions in their work to serve our guests, we have modified our plans for some of our strategic initiatives, including our previously announced remodel program. We have completed approximately 130 remodels in 2020, down from the previous expectation of approximately 300. Similarly, we now expect to open up to 30 new small format stores in 2020, rather than the 36 previously announced.

During the six months ended August 1, 2020, we issued $2.5 billion of 5-year and 10-year notes in an effort to increase our cash on hand. Additionally, we entered into a $900 million 364-day credit facility, increasing our total undrawn committed credit facilities to $3.4 billion. Our dividend policy remains unchanged; however, we have temporarily suspended share repurchase activity due to continued uncertainty in the current environment. The Liquidity and Capital Resources section provides additional information.

### Analysis of Results of Operations

| Summary of Operating Income | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| (dollars in millions) | August 1, 2020 | August 3, 2019 | Change | August 1, 2020 | August 3, 2019 | Change |
| Sales | $ 22,696 | $ 18,183 | 24.8 % | $ 42,067 | $ 35,584 | 18.2 % |
| Other revenue | 279 | 239 | 16.6 | 523 | 465 | 12.3 |
| Total revenue | 22,975 | 18,422 | 24.7 | 42,590 | 36,049 | 18.1 |
| Cost of sales | 15,673 | 12,625 | 24.1 | 30,183 | 24,874 | 21.3 |
| Selling, general and administrative expenses | 4,460 | 3,912 | 14.0 | 8,520 | 7,575 | 12.5 |
| Depreciation and amortization (exclusive of depreciation included in cost of sales) | 542 | 561 | (3.5) | 1,119 | 1,142 | (2.1) |
| Operating income | $ 2,300 | $ 1,324 | 73.8 % | $ 2,768 | $ 2,458 | 12.6 % |

| Rate Analysis | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Gross margin rate | 30.9 % | 30.6 % | 28.3 % | 30.1 % |
| SG&A expense rate | 19.4 | 21.2 | 20.0 | 21.0 |
| Depreciation and amortization (exclusive of depreciation included in cost of sales) expense rate | 2.4 | 3.0 | 2.6 | 3.2 |
| Operating income margin rate | 10.0 | 7.2 | 6.5 | 6.8 |

Note: Gross margin rate is calculated as gross margin (sales less cost of sales) divided by sales. All other rates are calculated by dividing the applicable amount by total revenue.

Table of Contents

Index to Notes

**Sales**

Sales include all merchandise sales, net of expected returns, and our estimate of gift card breakage. We use comparable sales to evaluate the performance of our stores and digital channel sales by measuring the change in sales for a period over the comparable, prior-year period of equivalent length. Comparable sales include all sales, except sales from stores open less than 13 months, digital acquisitions we have owned less than 13 months, stores that have been closed, and digital acquisitions that we no longer operate. Comparable sales measures vary across the retail industry. As a result, our comparable sales calculation is not necessarily comparable to similarly titled measures reported by other companies. Digitally originated sales include all sales initiated through mobile applications and our websites. Our stores fulfill the majority of digitally originated sales, including shipment from stores to guests, store Order Pick Up or Drive Up, and delivery via our wholly owned subsidiary, Shipt. Digitally originated sales may also be fulfilled through our distribution centers, our vendors, or other third parties.

Sales growth - from both comparable sales and new stores - represents an important driver of our long-term profitability. We expect that comparable sales growth will drive the majority of our total sales growth. We believe that our ability to successfully differentiate our guests' shopping experience through a careful combination of merchandise assortment, price, convenience, guest experience, and other factors will over the long-term drive both increasing shopping frequency (traffic) and the amount spent each visit (average transaction amount).

The increase in sales during the three and six months ended August 1, 2020, is due to a comparable sales increase of 24.3 percent and 17.7 percent, respectively, and the contribution from new stores.

| Comparable Sales | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Comparable sales change | 24.3 % | 3.4 % | 17.7 % | 4.1 % |
| Drivers of change in comparable sales | | | | |
| Number of transactions | 4.6 | 2.4 | 1.6 | 3.3 |
| Average transaction amount | 18.8 | 0.9 | 15.8 | 0.7 |

| Contribution to Comparable Sales Change | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Stores originated channel comparable sales change | 10.9 % | 1.5 % | 6.0 % | 2.1 % |
| Contribution from digitally originated sales | 13.4 | 1.8 | 11.7 | 1.9 |
| Total comparable sales change | 24.3 % | 3.4 % | 17.7 % | 4.1 % |

Note: Amounts may not foot due to rounding.

| Sales by Channel | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Stores originated | 82.8 % | 92.7 % | 83.7 % | 92.8 % |
| Digitally originated | 17.2 | 7.3 | 16.3 | 7.2 |
| Total | 100 % | 100 % | 100 % | 100 % |

 

Table of Contents
Index to Notes

| **Sales by Product Category** | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Apparel and accessories | 18 % | 20 % | 16 % | 20 % |
| Beauty and household essentials | 27 | 28 | 29 | 28 |
| Food and beverage | 19 | 19 | 21 | 20 |
| Hardlines | 16 | 14 | 15 | 14 |
| Home furnishings and décor | 20 | 19 | 19 | 18 |
| Total | 100 % | 100 % | 100 % | 100 % |

The collective interaction of a broad array of macroeconomic, competitive, and consumer behavioral factors, as well as sales mix, and transfer of sales to new stores makes further analysis of sales metrics infeasible. As previously discussed, we believe that COVID-19 has had a significant impact on the mix of sales amongst our sales channels and categories.

We monitor the percentage of purchases that are paid for using RedCards (RedCard Penetration) because our internal analysis has indicated that a meaningful portion of the incremental purchases on RedCards are also incremental sales for Target. Guests receive a 5 percent discount on virtually all purchases when they use a RedCard at Target.

| **RedCard Penetration** | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Target Debit Card | 11.8 % | 12.5 % | 12.2 % | 12.8 % |
| Target Credit Cards | 8.7 | 10.7 | 9.2 | 10.6 |
| Total RedCard Penetration | 20.5 % | 23.2 % | 21.4 % | 23.4 % |

Note: Amounts may not foot due to rounding.

**Gross Margin Rate**



For the three months ended August 1, 2020, our gross margin rate was 30.9 percent compared with 30.6 percent in the comparable period last year. This increase reflected the net impact of merchandising strategies, primarily favorability in clearance and promotional markdowns, and the favorable impact of a change in our returns estimate for sales during the temporary returns suspension period in the first quarter of 2020. The increase was partially offset by increased digital fulfillment and supply chain costs (driven by unusually strong growth in digital volume and higher pay and benefit costs classified within Cost of Sales, including incremental pay and benefits due to COVID-19) and unfavorable category sales mix, as sales growth was strongest in lower-margin categories.



For the six months ended August 1, 2020, our gross margin rate was 28.3 percent compared with 30.1 percent in the comparable period last year. This decrease reflected increased digital fulfillment and supply chain costs (driven by unusually strong growth in digital volume and the impact of higher pay and benefit costs classified within Cost of Sales, including incremental pay and benefits due to COVID-19) and unfavorable category sales mix, as sales growth was strongest in lower-margin categories. The decrease was partially offset by the net impact of merchandising strategies, primarily favorability in clearance and promotional markdowns. Sales returns relating to the temporary returns suspension period during the first quarter of 2020 did not notably affect our year-to-date gross margin rate.

**Selling, General, and Administrative Expense Rate**

For the three and six months ended August 1, 2020, our SG&A expense rate was 19.4 percent and 20.0 percent, respectively, compared with 21.2 percent and 21.0 percent, respectively, in the comparable periods last year. Incremental team member pay and benefits and investments to protect the health and safety of guests represented approximately $400 million of the $548 million increase in SG&A expenses for the three months ended August 1, 2020, and approximately $600 million of the $945 million increase for the six months ended August 1, 2020, compared with the prior year periods. From a rate perspective, these increased costs were more than offset by leverage resulting from strong revenue growth.

Table of Contents
Index to Notes

**Store Data**

| Change in Number of Stores | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | August 1, 2020 | August 3, 2019 | August 1, 2020 | August 3, 2019 |
| Beginning store count | 1,871 | 1,851 | 1,868 | 1,844 |
| Opened | - | 4 | 3 | 11 |
| Closed | - | (2) | - | (2) |
| Ending store count | 1,871 | 1,853 | 1,871 | 1,853 |

| Number of Stores and Retail Square Feet | Number of Stores | | | Retail Square Feet [a] | | |
|---|---|---|---|---|---|---|
| | August 1, 2020 | February 1, 2020 | August 3, 2019 | August 1, 2020 | February 1, 2020 | August 3, 2019 |
| 170,000 or more sq. ft. | 272 | 272 | 272 | 48,613 | 48,619 | 48,619 |
| 50,000 to 169,999 sq. ft. | 1,505 | 1,505 | 1,499 | 189,224 | 189,227 | 188,711 |
| 49,999 or less sq. ft. | 94 | 91 | 82 | 2,745 | 2,670 | 2,357 |
| Total | 1,871 | 1,868 | 1,853 | 240,582 | 240,516 | 239,687 |

[a]In thousands, reflects total square feet less office, distribution center, and vacant space.

**Other Performance Factors**

**Provision for Income Taxes**

Our effective income tax rate from continuing operations for the three and six months ended August 1, 2020, was 22.8 percent and 21.6 percent, respectively, compared with 23.0 percent and 22.7 percent, respectively, for the comparable periods last year. The effective tax rate for the six months ended August 1, 2020, reflects a larger rate benefit from discrete items, primarily related to share-based payments, compared with the prior year.

 

Table of Contents

Index to Notes

### Reconciliation of Non-GAAP Financial Measures to GAAP Measures

To provide additional transparency, we have disclosed non-GAAP adjusted diluted earnings per share from continuing operations (Adjusted EPS). This metric excludes certain items presented below. We believe this information is useful in providing period-to-period comparisons of the results of our continuing operations. This measure is not in accordance with, or an alternative to, generally accepted accounting principles in the U.S. (GAAP). The most comparable GAAP measure is diluted earnings per share from continuing operations. Adjusted EPS should not be considered in isolation or as a substitution for analysis of our results as reported in accordance with GAAP. Other companies may calculate Adjusted EPS differently, limiting the usefulness of the measure for comparisons with other companies.

| Reconciliation of Non-GAAP Adjusted EPS | Three Months Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | August 1, 2020 | | | August 3, 2019 | | |
| (millions, except per share data) | Pretax | Net of Tax | Per Share Amounts | Pretax | Net of Tax | Per Share Amounts |
| GAAP diluted earnings per share from continuing operations | | | $  3.35 | | | $  1.82 |
| Adjustments | | | | | | |
| Gain on investment [a] | $  (9) | $  (6) | $  (0.01) | $  - | $  - | $  - |
| Other [b] | 25 | 18 | 0.04 | - | - | - |
| Adjusted diluted earnings per share from continuing operations | | | $  3.38 | | | $  1.82 |

| Reconciliation of Non-GAAP Adjusted EPS | Six Months Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | August 1, 2020 | | | August 3, 2019 | | |
| (millions, except per share data) | Pretax | Net of Tax | Per Share Amounts | Pretax | Net of Tax | Per Share Amounts |
| GAAP diluted earnings per share from continuing operations | | | $  3.91 | | | $  3.34 |
| Adjustments | | | | | | |
| Loss on investment [a] | $  12 | $  9 | $  0.02 | $  - | $  - | $  - |
| Other [b] | 25 | 18 | 0.04 | - | - | - |
| Adjusted diluted earnings per share from continuing operations | | | $  3.96 | | | $  3.34 |

Note: Amounts may not foot due to rounding.
[a]Includes an unrealized (gain) / loss on our investment in Casper Sleep Inc., which is not core to our continuing operations.
[b]Includes store damage and inventory losses related to civil unrest.

 

Earnings from continuing operations before interest expense and income taxes (EBIT) and earnings from continuing operations before interest expense, income taxes, depreciation, and amortization (EBITDA) are non-GAAP financial measures. We believe these measures provide meaningful information about our operational efficiency compared with our competitors by excluding the impact of differences in tax jurisdictions and structures, debt levels, and for EBITDA, capital investment. These measures are not in accordance with, or an alternative to, GAAP. The most comparable GAAP measure is net earnings from continuing operations. EBIT and EBITDA should not be considered in isolation or as a substitution for analysis of our results as reported in accordance with GAAP. Other companies may calculate EBIT and EBITDA differently, limiting the usefulness of the measures for comparisons with other companies.

| **EBIT and EBITDA** | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| (dollars in millions) (unaudited) | August 1, 2020 | August 3, 2019 | Change | August 1, 2020 | August 3, 2019 | Change |
| Net earnings from continuing operations | $ 1,690 | $ 938 | 80.3 % | $ 1,974 | $ 1,730 | 14.1 % |
| + Provision for income taxes | 499 | 279 | 78.3 | 544 | 509 | 7.0 |
| + Net interest expense | 122 | 120 | 1.9 | 239 | 246 | (2.5) |
| EBIT | $ 2,311 | $ 1,337 | 72.8 % | $ 2,757 | $ 2,485 | 11.0 % |
| + Total depreciation and amortization [a] | 604 | 624 | (3.2) | 1,245 | 1,267 | (1.9) |
| EBITDA | $ 2,915 | $ 1,961 | 48.6 % | $ 4,002 | $ 3,752 | 6.7 % |

[a] Represents total depreciation and amortization, including amounts classified within Depreciation and Amortization and within Cost of Sales.

 

We have also disclosed after-tax ROIC, which is a ratio based on GAAP information, with the exception of the add-back of operating lease interest to operating income. We believe this metric is useful in assessing the effectiveness of our capital allocation over time. Other companies may calculate ROIC differently, limiting the usefulness of the measure for comparisons with other companies.

**After-Tax Return on Invested Capital**

(dollars in millions)

|  | | Trailing Twelve Months | | |
| --- | --- | --- | --- | --- |
| *Numerator* | | August 1, 2020 | | August 3, 2019 |
| Operating income | $ | 4,968 | $ | 4,395 |
| + Net other income / (expense) | | (28) | | 42 |
| EBIT | | 4,940 | | 4,437 |
| + Operating lease interest [a] | | 87 | | 85 |
| - Income taxes [b] | | 1,076 | | 937 |
| **Net operating profit after taxes** | $ | **3,951** | $ | **3,585** |

| *Denominator* | | August 1, 2020 | | August 3, 2019 | | August 4, 2018 |
| --- | --- | --- | --- | --- | --- | --- |
| Current portion of long-term debt and other borrowings | $ | 109 | $ | 1,153 | $ | 1,044 |
| + Noncurrent portion of long-term debt | | 14,188 | | 10,365 | | 10,108 |
| + Shareholders' investment | | 12,578 | | 11,836 | | 11,167 |
| + Operating lease liabilities [c] | | 2,448 | | 2,285 | | 2,183 |
| - Cash and cash equivalents | | 7,284 | | 1,656 | | 1,180 |
| Invested capital | $ | 22,039 | $ | 23,983 | $ | 23,322 |
| **Average invested capital** [d] | $ | **23,011** | $ | **23,652** | | |

| After-tax return on invested capital | | **17.2 %** | | **15.2 %** | | |
| --- | --- | --- | --- | --- | --- | --- |

[a]Represents the add-back to operating income driven by the hypothetical interest expense we would incur if the property under our operating leases were owned or accounted for as finance leases. Calculated using the discount rate for each lease and recorded as a component of rent expense within SG&A Expenses. Operating lease interest is added back to operating income in the ROIC calculation to control for differences in capital structure between us and our competitors.

[b]Calculated using the effective tax rates for continuing operations, which were 21.4 percent and 20.7 percent for the trailing twelve months ended August 1, 2020, and August 3, 2019, respectively. For the trailing twelve months ended August 1, 2020, and August 3, 2019, includes tax effect of $1.1 billion and $919 million, respectively, related to EBIT, and $19 million and $18 million, respectively, related to operating lease interest.

[c]Total short-term and long-term operating lease liabilities included within Accrued and Other Current Liabilities and Noncurrent Operating Lease Liabilities.

[d]Average based on the invested capital at the end of the current period and the invested capital at the end of the comparable prior period.

 

Table of Contents

Index to Notes

## Analysis of Financial Condition

### Liquidity and Capital Resources

*Capital Allocation*

We follow a disciplined and balanced approach to capital allocation based on the following priorities, ranked in order of importance: first, we fully invest in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets; second, we maintain a competitive quarterly dividend and seek to grow it annually; and finally, we return any excess cash to shareholders by repurchasing shares within the limits of our credit rating goals.

We believe our sources of liquidity will continue to be adequate to maintain operations, finance anticipated expansion and strategic initiatives, fund debt maturities, and pay dividends. In response to COVID-19, we have suspended our share repurchase program. We continue to anticipate ample access to commercial paper and long-term financing.

Our cash and cash equivalents balance was $7.3 billion, $2.6 billion, and $1.7 billion at August 1, 2020, February 1, 2020, and August 3, 2019, respectively. Our cash and cash equivalents balance includes short-term investments of $6.4 billion, $1.8 billion, and $796 million as of August 1, 2020, February 1, 2020, and August 3, 2019, respectively. Our investment policy is designed to preserve principal and liquidity of our short-term investments. This policy allows investments in large money market funds or in highly rated direct short-term instruments that mature in 60 days or less. We also place dollar limits on our investments in individual funds or instruments.

*Operating Cash Flows*

Operating cash flow provided by continuing operations was $5.1 billion for the six months ended August 1, 2020, compared with $2.8 billion for the six months ended August 3, 2019. The increase reflects stronger operating performance combined with higher payables leverage during the six months ended August 1, 2020, due to increased inventory turnover driven by strong sales, compared with higher net settlement of accounts payable during the six months ended August 3, 2019, resulting from elevated inventory and accounts payable levels as of February 2, 2019. Additionally, operating cash flows for the six months ended August 1, 2020, reflect increased payroll-related liabilities, including the deferral of employer social security tax payments. Also, lower first quarter 2020 pretax earnings resulted in a decrease in year-to-date income tax payments.

*Inventory*

Inventory was $8.9 billion as of August 1, 2020, compared with $9.0 billion and $9.1 billion at February 1, 2020, and August 3, 2019, respectively. The decrease reflects elevated sell-through rates in longer-lead time merchandise categories, partially offset by increases in Food and Beverage and Beauty and Household Essentials inventory to align with sales trends.

*Investing Cash Flows*

Cash flow for investing activities included capital expenditures of $1.4 billion for the six months ended August 1, 2020, and August 3, 2019. During the six months ended August 1, 2020, we completed new store and remodel projects that were in process as the COVID-19 crisis developed. However, in response to COVID-19, we have modified plans for some of our strategic initiatives including store remodels and new store openings. We expect full year 2020 capital expenditures to be at a lower level than in 2019.

*Dividends*

We paid dividends totaling $330 million ($0.66 per share) and $662 million ($1.32 per share) for the three and six months ended August 1, 2020, respectively, and $328 million ($0.64 per share) and $658 million ($1.28 per share) for the three and six months ended August 3, 2019, respectively, a per share increase of 3.1 percent. We declared dividends totaling $344 million ($0.68 per share) during the second quarter of 2020, a per share increase of 3.0 percent over the $341 million ($0.66 per share) of declared dividends during the second quarter of 2019. We have paid dividends every quarter since our 1967 initial public offering, and it is our intent to continue to do so in the future.

 

Table of Contents
Index to Notes

*Share Repurchase*

We returned $609 million to shareholders through share repurchase during the six months ended August 1, 2020. We did not repurchase any shares during the three months ended August 1, 2020. See Part II, Item 2, Unregistered Sales of Equity Securities and Use of Proceeds of this Quarterly Report on Form 10-Q and Note 8 to the Consolidated Financial Statements for more information.

*Financing*

Our financing strategy is to ensure liquidity and access to capital markets, to maintain a balanced spectrum of debt maturities, and to manage our net exposure to floating interest rate volatility. Within these parameters, we seek to minimize our borrowing costs. Our ability to access the long-term debt and commercial paper markets has provided us with ample sources of liquidity. Our continued access to these markets depends on multiple factors, including the condition of debt capital markets, our operating performance, and maintaining strong credit ratings. As of August 1, 2020, our credit ratings were as follows:

| Credit Ratings | Moody's | Standard and Poor's | Fitch |
|---|---|---|---|
| Long-term debt | A2 | A | A- |
| Commercial paper | P-1 | A-1 | F1 |

If our credit ratings were lowered, our ability to access the debt markets, our cost of funds, and other terms for new debt issuances could be adversely impacted. Each of the credit rating agencies reviews its rating periodically and there is no guarantee our current credit ratings will remain the same as described above.

In March 2020, we issued $2.5 billion of debt. Notes 6 and 7 to the Consolidated Financial Statements provide additional information.

We have additional liquidity through a committed $900 million 364-day revolving credit facility obtained through a group of banks in April 2020, which expires in April 2021, and an existing $2.5 billion revolving credit facility obtained through a group of banks, which expires in October 2023. No balances were outstanding under either credit facility at any time during 2020 or 2019.

Most of our long-term debt obligations contain covenants related to secured debt levels. In addition to a secured debt level covenant, our credit facilities also contain a debt leverage covenant. We are, and expect to remain, in compliance with these covenants. Additionally, as of August 1, 2020, no notes or debentures contained provisions requiring acceleration of payment upon a credit rating downgrade, except that certain outstanding notes allow the note holders to put the notes to us if within a matter of months of each other we experience both (i) a change in control and (ii) our long-term credit ratings are either reduced and the resulting rating is non-investment grade, or our long-term credit ratings are placed on watch for possible reduction and those ratings are subsequently reduced and the resulting rating is non-investment grade.

## Contractual Obligations and Commitments

As of the date of this report, other than the new borrowings discussed in Note 6 to the Consolidated Financial Statements, there were no material changes to our contractual obligations and commitments outside the ordinary course of business since February 1, 2020, as reported in our 2019 Form 10-K.

## New Accounting Pronouncements

We do not expect any recently issued accounting pronouncements to have a material effect on our financial statements.

 

## Forward-Looking Statements

This report contains forward-looking statements, which are based on our current assumptions and expectations. These statements are typically accompanied by the words "expect," "may," "could," "believe," "would," "might," "anticipates," or similar words. The principal forward-looking statements in this report include: our financial performance, statements regarding the adequacy of and costs associated with our sources of liquidity, the funding of debt maturities, the continued execution of our share repurchase program, our expected capital expenditures and new lease commitments, the expected compliance with debt covenants, the expected impact of new accounting pronouncements, our intentions regarding future dividends, the expected return on plan assets, the expected outcome of, and adequacy of our reserves for, claims, litigation and the resolution of tax matters, the expected impact of changes in information technology systems, future responses to and effects of the COVID-19 pandemic, and changes in our assumptions and expectations.

All such forward-looking statements are intended to enjoy the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995, as amended. Although we believe there is a reasonable basis for the forward-looking statements, our actual results could be materially different. The most important factors which could cause our actual results to differ from our forward-looking statements are set forth in our description of risk factors included in Part I, Item 1A, Risk Factors of our Form 10-K for the fiscal year ended February 1, 2020 and Part II, Item 1A, Risk Factors of our Form 10-Q for the quarter ended May 2, 2020, which should be read in conjunction with the forward-looking statements in this report. Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update any forward-looking statement.

### Item 3. Quantitative and Qualitative Disclosures About Market Risk

There have been no material changes in our primary risk exposures or management of market risks from those disclosed in Part II, Item 7A, Quantitative and Qualitative Disclosures About Market Risk of our Form 10-K for the fiscal year ended February 1, 2020.

### Item 4. Controls and Procedures

## Changes in Internal Control Over Financial Reporting

During the most recently completed fiscal quarter, the following changes materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:

•We are in the process of a broad multi-year migration of many mainframe-based systems and middleware products to a modern platform, including systems and processes supporting inventory and supply chain-related transactions.
•In March 2020, as a result of COVID-19, we temporarily suspended physical inventory counts at our stores. We resumed physical inventory counts in June 2020 using a statistical sampling method, and we have continued to record estimated losses related to shrink and markdowns based upon historical rates.

During the most recently completed fiscal quarter, no other changes in our internal control over financial reporting materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this quarterly report, we conducted an evaluation, under supervision and with the participation of management, including the chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934, as amended (Exchange Act). Based upon that evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are effective at a reasonable assurance level. Disclosure controls and procedures are defined by Rules 13a-15(e) and 15d-15(e) of the Exchange Act as controls and other procedures that are designed to ensure that information required to be disclosed by us in reports filed with the SEC under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed under the Exchange Act is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

 

Table of Contents
Index to Notes

## PART II. OTHER INFORMATION

### Item 1. Legal Proceedings

The following update to a previously reported proceeding is being reported pursuant to Item 103 of Regulation S-K:

On July 28, 2020, the U.S. Court of Appeals for the Eighth Circuit affirmed the prior decision by the United States District Court for the District of Minnesota (the Court) dismissing the purported Employee Retirement Income Security Act of 1974 (ERISA) class action previously filed in the Court on August 30, 2017 (the Second ERISA Class Action). The Second ERISA Class Action involved claims arising from investments in Target stock by participants in or beneficiaries of the Target Corporation 401(k) Plan and the Target Corporation Ventures 401(k) Plan during Target's expansion of retail operations into Canada and was previously described in Target's annual report on Form 10-K for the fiscal year ended February 1, 2020.

### Item 1A. Risk Factors

Other than as described in Part II, Item 1A, Risk Factors of our Form 10-Q for the quarter ended May 2, 2020, there have been no material changes to the risk factors described in Part I, Item 1A, Risk Factors of our Form 10-K for the fiscal year ended February 1, 2020.

### Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

On September 19, 2019, our Board of Directors authorized a $5 billion share repurchase program with no stated expiration. We began repurchasing shares under the authorization during the first quarter of 2020, prior to suspending share repurchase activity in March 2020. Under the program, we have repurchased 4.6 million shares of common stock at an average price of $105.80, for a total investment of $484 million. As of August 1, 2020, the dollar value of shares that may yet be purchased under the program is $4.5 billion. There were no Target common stock purchases made during the three months ended August 1, 2020, by Target or any "affiliated purchaser" of Target, as defined in Rule 10b-18(a)(3) under the Exchange Act.

### Item 3. Defaults Upon Senior Securities

Not applicable.

### Item 4. Mine Safety Disclosures

Not applicable.

### Item 5. Other Information

Not applicable.

 

**SUPPLEMENTAL INFORMATION**

Table of Contents
Index to Notes

**Item 6. Exhibits**

| | |
|---|---|
| (3)A | Amended and Restated Articles of Incorporation (as amended through June 9, 2010) [1] |
| (3)B | Bylaws (as amended through March 27, 2020) [2] |
| (10)D | Target Corporation 2020 Long-Term Incentive Plan [3] |
| (10)T | Form of Restricted Stock Unit Agreement |
| (10)U | Form of Performance-Based Restricted Stock Unit Agreement |
| (10)V | Form of Performance Share Unit Agreement |
| (10)Y | Form of Non-Employee Director Restricted Stock Unit Agreement |
| (31)A | Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| (31)B | Certification of the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| (32)A | Certification of the Chief Executive Officer As Adopted Pursuant to 18 U.S.C. Section 1350 Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| (32)B | Certification of the Chief Financial Officer As Adopted Pursuant to 18 U.S.C. Section 1350 Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | XBRL Instance Document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

---

[1] *Incorporated by reference to Exhibit (3)A to the Registrant's Form 8-K Report filed June 10, 2010.*
[2] *Incorporated by reference to Exhibit (3)B to the Registrant's Form 8-K Report filed April 2, 2020.*

[3] *Incorporated by reference to Exhibit (10)D to the Registrant's Form 8-K Report filed June 11, 2020.*

 

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

TARGET CORPORATION

Dated: August 28, 2020                                                By:      /s/ Michael J. Fiddelke

Michael J. Fiddelke

Executive Vice President and

Chief Financial Officer

(Duly Authorized Officer and

Principal Financial Officer)


/s/ Robert M. Harrison

Robert M. Harrison

Senior Vice President, Chief Accounting Officer

and Controller

 



Target Corporation 2020 Long-Term Incentive Plan

RESTRICTED STOCK UNIT AGREEMENT
(Officer)

THIS RESTRICTED STOCK UNIT AGREEMENT (the "Agreement") is made in Minneapolis, Minnesota as of the date of grant (the "Grant Date") set forth in the award letter (the "Award Letter") by and between the Company and the person (the "Team Member") identified in the Award Letter. This award (the "Award") of Restricted Stock Units ("RSUs"), provided to you as a Service Provider, is being issued under the Target Corporation 2020 Long-Term Incentive Plan (the "Plan"), subject to the following terms and conditions.

1.<u>Definitions</u>. Except as otherwise provided in this Agreement, the defined terms used in this Agreement shall have the same meaning as in the Plan. The term "Committee" shall also include those persons to whom authority has been delegated under the Plan.

2.<u>Grant of RSUs</u>. Subject to the relevant terms of the Plan and this Agreement, as of the Grant Date, the Company has granted the Team Member the number of RSUs set forth in the Award Letter.

3.<u>Vesting Schedule</u>.

(a)Subject to Section 3(b), one fourth (1/4) of the Shares issuable under the RSUs shall vest on the first anniversary of the Grant Date and on each succeeding anniversary of the Grant Date until all of the Shares have been issued (after the fourth anniversary of the Grant Date).

(b)Notwithstanding Section 3(a), the Shares issuable under the RSUs shall vest on the earlier of: (i) the date that the conditions for an Accelerated Vesting Event set forth in Section 4 are satisfied, in which case, all of the outstanding unvested RSUs shall become vested; or (ii) as specified in Section 5.

(c)Each date of vesting is referred to as a "Vesting Date". All vested RSUs shall be paid out as provided in Section 10, in accordance with and subject to any restrictions set forth in this Agreement, the Plan or any Release Agreement that the Team Member may be required to enter pursuant to Sections 4 or 5. "Release Agreement" means an agreement containing a release of claims, a covenant not to engage in competitive employment, and/or other provisions deemed appropriate by the Committee in its sole discretion.

4.<u>Accelerated Vesting Events</u>. Upon the occurrence of one of the following events (each, an "Accelerated Vesting Event"), the outstanding unvested RSUs subject to this Agreement shall vest as provided below:

(a)<u>Retirement</u>. If the Retirement Conditions are satisfied any outstanding unvested RSUs shall vest in full as of the date the last of the Retirement Conditions is satisfied, as applicable. The "Retirement Conditions" are: (i) the Team Member attaining age 55 and completing at least 5 years of Service (which 5 years need not be continuous) on or prior to the Team Member's voluntary termination of Service, (ii) the Company receiving a valid unrevoked Release Agreement from the Team Member, and (iii) the Team Member must have commenced discussions with the Company's Chief Executive Officer or most senior human resources executive regarding the Team Member's consideration of termination at least six months prior to the Team Member's voluntary termination of Service.

(b)<u>Death</u>. In the case of the Team Member's death prior to the Team Member's termination of Service, any outstanding unvested RSUs shall vest in full as of the date of the Team Member's death.

(c)<u>Disability</u>. In the case of the Team Member's Disability prior to the Team Member's termination of Service, any outstanding unvested RSUs shall vest in full as of the date of the Team Member's Disability.

5.<u>Change in Control</u>. If a Change in Control occurs and the Award is assumed or replaced pursuant to Section 11(b)(1) of the Plan, the Award will continue to be subject to the Vesting Schedule provided in Section 3. Notwithstanding the foregoing, if within two years after a Change in Control and prior to the fourth anniversary of the Grant Date, the Team Member's Service terminates voluntarily by the Team Member for Good Reason or involuntarily without Cause, and provided that the Company has received a valid unrevoked Release Agreement from the Team Member, then any outstanding unvested RSUs subject to this Agreement shall vest in full as of the date of the Team Member's termination of Service.

6.<u>Cause</u>. Notwithstanding any other provisions of this Agreement to the contrary, if the Committee concludes, in its sole discretion, that the Team Member's Service was terminated in whole or in part for Cause, all of the RSUs subject to the Award that have not previously been converted to Shares shall terminate immediately and the Team Member shall have no rights hereunder.

7.<u>Other Termination; Changes of Service</u>. If at any time prior to the fourth anniversary of the Grant Date the Team Member's Service is terminated involuntarily (even if the Team Member has satisfied the Retirement Conditions related to age and service), for Cause, or for any other reason not meeting all the conditions specified in Sections 4(b), 4(c) or 5, all of the outstanding unvested RSUs subject to the Award shall terminate effective as of the date of termination of Service and the Team Member shall have no rights hereunder.  Service shall not be deemed terminated in the case of (a) any approved leave of absence, or (b) transfers among the Company and any Subsidiaries in the same Service Provider capacity; however, a termination of Service shall occur if (i) the relationship the Team Member had with

2.

the Company or a Subsidiary at the Grant Date terminates, even if the Team Member continues in another Service Provider capacity with the Company or a Subsidiary, or (ii) the Team Member experiences a "separation from service" within the meaning of Code Section 409A.

8. <u>Restrictive Covenant</u>. By accepting the Award, the Team Member specifically agrees to the restrictive covenant contained in this Section 8 (the "Restrictive Covenant") and the Team Member agrees that the Restrictive Covenant and the remedies described herein are reasonable and necessary to protect the legitimate interests of the Company.

(a) <u>Non-Solicitation</u>. The Team Member agrees that for the period beginning on the Grant Date and ending on the date that is one year following the Team Member's termination of Service, the Team Member will not recruit for employment directly or indirectly, any employee of the Company with whom the Team Member worked, or about whom the Team Member possesses any Company personnel information.

(b) <u>Remedies.</u> The Team Member agrees that immediate irreparable damage will result to Company if the Team Member breaches the Restrictive Covenant set forth in this Agreement. Therefore, in the event the Team Member breaches this Agreement, whether directly or indirectly, the Team Member consents to specific enforcement of this Agreement through an injunction or restraining order. Injunctive relief shall be awarded in addition to any other remedies or damages available at law or in equity. The Team Member specifically agrees that the Company is entitled to the attorneys' fees and expenses the Company incurs to enforce this Agreement, and that the Team Member is responsible for paying the Company's costs and attorneys' fees incurred as a result of enforcing any provisions of this Agreement.

(c) <u>Recovery.</u> Notwithstanding any other provisions of this Agreement to the contrary, if the Committee concludes, in its sole discretion, that the Team Member has breached the Restrictive Covenant, the Company may take one or more of the following actions with respect to the Award:

(i) immediately terminate all of the RSUs subject to the Award that have not previously been converted to Shares, and the Team Member shall have no rights hereunder; and

(ii) require repayment of all or any portion of the amounts realized or received by the Team Member resulting from the conversion of RSUs to Shares or the sale of Shares related to the Award.

9. <u>Dividend Equivalents</u>. The Team Member shall have the right to receive additional RSUs with a value equal to the regular cash dividend paid on one Share for each RSU held pursuant to this Agreement prior to the conversion of RSUs and issuance of Shares pursuant to Section 10. The number of additional RSUs to be received as dividend equivalents for each RSU held shall be determined by dividing the cash dividend per share by the Fair Market Value of one Share on the dividend payment date; provided, however, that

3.

for purposes of avoiding the issuance of fractional RSUs, on each dividend payment date the additional RSUs issued as dividend equivalents shall be rounded up to the nearest whole number. All such additional RSUs received as dividend equivalents shall be subject to forfeiture in the same manner and to the same extent as the original RSUs granted hereby, and shall be converted into Shares on the basis and at the time set forth in Section 10 hereof.

10. Conversion of RSUs and Issuance of Shares.

(a) Timing. Vested RSUs shall be converted to Shares and shall be issued within 90 days following the earliest to occur of (i) each anniversary of the Grant Date, (ii) the Team Member's "separation from service" as such term is defined for purposes of Code Section 409A, (iii) the Team Member's death, or (iv) the Team Member's Disability (as determined by the Committee in its sole discretion, provided such determination complies with the definition of disability under Code Section 409A).

(b) Limitation for Specified Employees. If any Shares shall be issuable with respect to the RSUs as a result of the Team Member's "separation from service" at such time as the Team Member is a "specified employee" within the meaning of Code Section 409A, then no Shares shall be issued, except as permitted under Code Section 409A, prior to the first business day after the earlier of (i) the date that is six months after the Team Member's "separation from service", or (ii) the Team Member's death.

(c) Unvested RSUs. All of the RSUs subject to the Award that are unvested as of the time the vested RSUs are converted and Shares are issued under Section 10(a)(ii) shall terminate immediately and the Team Member shall have no rights hereunder with respect to those unvested RSUs.

(d) Code Section 409A. The Committee in its sole discretion may accelerate or delay the distribution of any payment under this Agreement to the extent allowed or required under Code Section 409A. Payment of amounts under this Agreement are intended to comply with the requirements of Code Section 409A and this Agreement shall in all respects be administered and construed to give effect to such intent.

11. Taxes. The Team Member acknowledges that (a) the ultimate liability for any and all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items") legally due by him or her is and remains the Team Member's responsibility and may exceed the amount actually withheld by the Company and/or a Subsidiary to which the Team Member is providing Service (the "Service Recipient") and (b) the Company and/or the Service Recipient or a former Service Recipient, as applicable, (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the RSUs, including, but not limited to, the grant, vesting and/or conversion of the RSUs and issuance of Shares; (ii) do not commit and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Team Member's liability for Tax-Related Items; (iii) may be required to withhold or account for Tax-Related Items in more than one jurisdiction if the Team Member has become subject to tax in more than one jurisdiction between the Grant Date and

4.

the date of any relevant taxable event; and (iv) may refuse to deliver the Shares to the Team Member if he or she fails to comply with his or her obligations in connection with the Tax-Related Items as provided in this Section.

The Team Member authorizes and consents to the Company and/or the Service Recipient, or their respective agents, satisfying all applicable Tax-Related Items which the Company reasonably determines are legally payable by him or her by withholding from the Shares that would otherwise be delivered to the Team Member the highest number of whole Shares that the Company determines has a value less than or equal to the aggregate applicable Tax-Related Items. In lieu thereof, the Team Member may elect at the time of conversion of the RSUs such other then-permitted method or combination of methods established by the Company and/or the Service Recipient to satisfy the Team Member's Tax-Related Items.

12. <u>Limitations on Transfer</u>. The Award shall not be sold, assigned, transferred, exchanged or encumbered by the Team Member other than pursuant to the terms of the Plan.

13. <u>Recoupment Provision</u>. In the event of intentional misconduct of the Team Member that causes the Company material financial or material reputational harm, or contributes to a restatement of the Company's consolidated financial statements, the Company may take one or more of the following actions with respect to the Award, as determined by the Human Resources & Compensation Committee of the Board in its sole discretion, and the Team Member shall be bound by such determination:

(a) cancel all or a portion of the RSUs, whether vested or unvested, including any dividend equivalents related to the Award; and

(b) require repayment of all or any portion of the amounts realized or received by the Team Member resulting from the conversion of RSUs to Shares or the sale of Shares related to the Award.

The term "restatement" shall mean the result of revising financial statements previously filed with the Securities and Exchange Commission to reflect the correction of an error. The term "intentional misconduct" shall be limited to conduct that the Human Resources & Compensation Committee or its delegate determines indicates an intentional violation of law, an intentional violation of the Company's Code of Ethics (or any successor or replacement code of conduct for employees), or an intentional violation of a significant ethics or compliance policy of the Company, but shall not include good faith errors in judgment made by the Team Member.

The Team Member agrees that the Company may setoff any amounts it is entitled to recover under this Section against any amounts owed by the Company to the Team Member under any of the Company's deferred compensation plans to the extent permitted under Code Section 409A. This Section 13 shall not apply, and no amounts may be recovered hereunder, following a Change in Control.

5.

14.<u>No Employment Rights</u>. Nothing in this Agreement, the Plan or the Award Letter shall confer upon the Team Member any right to continued Service with the Company or any Subsidiary, as applicable, nor shall it interfere with or limit in any way any right of the Company or any Subsidiary, as applicable, to terminate the Team Member's Service at any time with or without Cause or change the Team Member's compensation, other benefits, job responsibilities or title provided in compliance with applicable local laws and permitted under the terms of the Team Member's service contract, if any.

(a)The Team Member's rights to vest in the RSUs or receive Shares after termination of Service shall be determined pursuant to Sections 3 through 10. Those rights and the Team Member's date of termination of Service will not be extended by any notice period mandated under local law (*e.g.*, active service would not include a period of "garden leave" or similar notice period pursuant to local law).

(b)This Agreement, the Plan and the Award Letter are separate from, and shall not form, any part of the contract of Service of the Team Member, or affect any of the rights and obligations arising from the Service relationship between the Team Member and the Company and/or the Service Recipient.

(c)No Service Provider has a right to participate in the Plan. All decisions with respect to future grants, if any, shall be at the sole discretion of the Company and/or the Service Recipient.

(d)The Team Member will have no claim or right of action in respect of any decision, omission or discretion which may operate to the disadvantage of the Team Member.

15.<u>Nature of Grant</u>. In accepting the grant, the Team Member acknowledges, understands, and agrees that:

(a)the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement, and any such modification, amendment, suspension or termination will not constitute a constructive or wrongful dismissal;

(b)the RSUs are extraordinary items and are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or welfare or retirement benefits or similar payments;

(c)in no event should the RSUs be considered as compensation for, or relating in any way to, past services for the Company or the Service Recipient, nor are the RSUs or the underlying Shares intended to replace any pension rights or compensation;

(d)the future value of the underlying Shares is unknown and cannot be predicted with certainty;

6.

(e)the Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Team Member's participation in the Plan or the RSUs;

(f)no claim or entitlement to compensation or damages shall arise from forfeiture of the RSUs resulting from termination of the Team Member's Service (for any reason whatsoever and whether or not in breach of local labor laws), and in consideration of the grant of the RSUs to which the Team Member is otherwise not entitled, the Team Member irrevocably (i) agrees never to institute any such claim against the Company or the Service Recipient, (ii) waives the Team Member's ability, if any, to bring any such claim, and (iii) releases the Company and the Service Recipient from any such claim. If, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Team Member shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claims;

(g)this Agreement is not a condition of the Team Member's employment or continued employment; and

(h)the Team Member is hereby advised to consult with personal tax, legal and financial advisors regarding participation in the Plan before taking any action related to the RSUs or the Plan.

16.Governing Law; Venue; Jurisdiction; Severability. To the extent that federal laws do not otherwise control, this Agreement, the Award Letter, the Plan and all determinations made and actions taken pursuant to the Plan shall be governed by the laws of the State of Minnesota without regard to its conflicts-of-law principles and shall be construed accordingly. The exclusive forum and venue for any legal action arising out of or related to this Agreement shall be the United States District Court for the District of Minnesota, and the parties submit to the personal jurisdiction of that court. If neither subject matter nor diversity jurisdiction exists in the United States District Court for the District of Minnesota, then the exclusive forum and venue for any such action shall be the courts of the State of Minnesota located in Hennepin County, and the Team Member, as a condition of this Agreement, consents to the personal jurisdiction of that court. If any provision of this Agreement, the Award Letter or the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, the Award Letter or the Plan, and the Agreement, the Award Letter and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

17.Currencies and Dates. Unless otherwise stated, all dollars specified in this Agreement and the Award Letter shall be in U.S. dollars and all dates specified in this Agreement shall be U.S. dates.

18.Survival. The Team Member agrees that the terms of Sections 8 and 13 shall survive the Team Member's termination of Service and any conversion of the Award into Shares.

19. <u>Imposition of Other Requirements</u>. The Company reserves the right to impose other requirements on the Team Member's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan, and to require the Team Member to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

20. <u>Plan and Award Letter Incorporated by Reference; Electronic Delivery</u>. The Plan, as hereafter amended from time to time, and the Award Letter shall be deemed to be incorporated into this Agreement and are integral parts hereof. In the event there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern. This Agreement, the Plan and the Award Letter embody the entire agreement and understanding between the Company and the Team Member pertaining to this grant of RSUs and supersede all prior agreements and understandings (oral or written) between them relating to the subject matter hereof. The Company or a third party designated by the Company may deliver to the Team Member by electronic means any documents related to his or her participation in the Plan. The Team Member acknowledges receipt of a copy of the Plan and the Award Letter.

[End of Agreement]

8.



Target Corporation 2020 Long-Term Incentive Plan

PERFORMANCE-BASED RESTRICTED STOCK UNIT AGREEMENT

THIS PERFORMANCE-BASED RESTRICTED STOCK UNIT AGREEMENT (the "Agreement") is made in Minneapolis, Minnesota as of the date of grant (the "Grant Date") set forth in the award letter (the "Award Letter") by and between the Company and the person (the "Team Member") identified in the Award Letter. This award (the "Award") of Performance-Based Restricted Stock Units ("PBRSUs"), provided to you as a Service Provider, is being issued under the Target Corporation 2020 Long-Term Incentive Plan (the "Plan"), subject to the following terms and conditions.

1.<u>Definitions</u>. Except as otherwise provided in this Agreement, the defined terms used in this Agreement shall have the same meaning as in the Plan. The term "Committee" shall also include those persons to whom authority has been delegated under the Plan.

2.<u>Grant of PBRSUs</u>.

(a)Subject to the relevant terms of the Plan and this Agreement, as of the Grant Date, the Company has granted the Team Member the number of PBRSUs set forth in the Award Letter (the "Goal Payout"). The maximum number of Shares that may be earned is equal to 125% of the Goal Payout (the "Maximum Payout"). The number of Shares actually earned, if any, shall depend on the Company's performance during the period comprised of the Company's three consecutive fiscal years beginning with the first full fiscal year during which the Grant Date occurs (the "Performance Period").

(b)Except as set forth in Section 6, the actual number of Shares earned will be determined by the Committee pursuant to a formula established by the Committee to measure the Company's performance during the Performance Period (the "Payout Formula"). The determination of the actual number of Shares earned, which shall not exceed the Maximum Payout, shall occur as soon as practicable after completion of the Performance Period, but in any event not later than November 30 of the calendar year in which the Performance Period ends (the date the Committee so determines, the "Determination Date"). A description of the Payout Formula and the percentage of Shares to be earned, if any, for the various levels of performance will be communicated to the Team Member. All decisions of the Committee regarding the application of the Payout Formula and the number of Shares earned shall be final and binding on the Team Member. Except as set forth in Section 6, the Award shall be cancelled and the Team Member shall have no rights hereunder if the Determination Date does not occur.

3.Vesting Schedule. The PBRSUs shall vest on the earlier of: (a) the end of the Performance Period, in which case, the number of Shares earned shall be determined by the Committee pursuant to the Payout Formula; (b) the date that the conditions for an Accelerated Vesting Event set forth in Section 4 are satisfied, in which case, the number of Shares earned shall be determined by the Committee pursuant to the Payout Formula; or (c) as specified in Sections 5 or 6. The date of vesting is referred to as the "Vesting Date". All such vested PBRSUs shall be paid out as provided in Section 11, in accordance with and subject to any restrictions set forth in this Agreement, the Plan or any Release Agreement that the Team Member may be required to enter pursuant to Sections 4, 5 or 6. "Release Agreement" means an agreement containing a release of claims, a covenant not to engage in competitive employment, and/or other provisions deemed appropriate by the Committee in its sole discretion.

4.Accelerated Vesting Events. Upon the occurrence of one of the following events (each, an "Accelerated Vesting Event"), the PBRSUs subject to this Agreement shall vest as provided below:

(a)Retirement. If the Retirement Conditions are satisfied the PBRSUs shall vest as of the date the last of the Retirement Conditions is satisfied and be settled in a number of Shares determined by the Committee pursuant to the Payout Formula. The "Retirement Conditions" are: (i) the Team Member attaining age 55 and completing at least 5 years of Service (which 5 years need not be continuous) on or prior to the Team Member's voluntary termination of Service, (ii) the Company receiving a valid unrevoked Release Agreement from the Team Member, and (iii) the Team Member must have commenced discussions with the Company's Chief Team Member Officer or most senior human resources Team Member regarding the Team Member's consideration of termination at least six months prior to the Team Member's voluntary termination of Service.

(b)Death. In the case of the Team Member's death prior to the Team Member's termination of Service, the PBRSUs shall vest as of the date of the Team Member's death and be settled in a number of Shares determined by the Committee pursuant to the Payout Formula.

(c)Disability. In the case of the Team Member's Disability prior to the Team Member's termination of Service, the PBRSUs shall vest as of the date of the Team Member's Disability and be settled in a number of Shares determined by the Committee pursuant to the Payout Formula.

5.Involuntary Service Separation. Notwithstanding any other provisions of this Agreement to the contrary and provided that the Company has received a valid unrevoked Release Agreement from the Team Member, if the Team Member's Service is involuntarily terminated by the Company or a Subsidiary to which the Team Member is providing Service (the "Service Recipient") prior to the end of the Performance Period other than for Cause and under circumstances not covered in Section 6 below (an "Involuntary Service Separation"), then the 50% of the outstanding unvested PBRSUs shall vest as of the date of the Team Member's Involuntary Service Separation and such 50% of the outstanding unvested PBRSUs shall be settled in a number of Shares equal to the amount determined by the Committee

2.

pursuant to the Payout Formula. All remaining PBRSUs shall be cancelled and the Team Member shall have no rights to such cancelled PBRSUs.

6.<u>Change in Control</u>. If a Change in Control occurs prior to the Determination Date and the Award is assumed or replaced pursuant to Section 11(b)(1) of the Plan, the Award will continue to be subject to the Vesting Schedule provided in Section 3, but the total number of Shares earned under the Payout Formula shall be deemed to be equal to the Goal Payout. Notwithstanding the foregoing, if within two years after a Change in Control and prior to the end of the Performance Period, the Team Member's Service terminates voluntarily by the Team Member for Good Reason or involuntarily without Cause, and provided that the Company has received a valid unrevoked Release Agreement from the Team Member, then the PBRSUs shall vest as of the date of the Team Member's termination of Service and be settled in a number of Shares equal to the Goal Payout.

7.<u>Cause</u>. Notwithstanding any other provisions of this Agreement to the contrary, if the Committee concludes, in its sole discretion, that the Team Member's Service was terminated in whole or in part for Cause, all of the PBRSUs subject to the Award shall terminate immediately and the Team Member shall have no rights hereunder.

8.<u>Other Termination; Changes of Service</u>. If the Team Member's termination of Service occurs at any time prior to the end of the Performance Period for any reason not meeting the conditions specified in Sections 4 through 7, all of the PBRSUs subject to the Award shall terminate effective as of the date of termination of Service and the Team Member shall have no rights hereunder. Service shall not be deemed terminated in the case of (a) any approved leave of absence, or (b) transfers among the Company and any Subsidiaries in the same Service Provider capacity; however, a termination of Service shall occur if (i) the relationship the Team Member had with the Company or a Subsidiary at the Grant Date terminates, even if the Team Member continues in another Service Provider capacity with the Company or a Subsidiary, or (ii) the Team Member experiences a "separation from service" within the meaning of Code Section 409A.

9.<u>Restrictive Covenant</u>. By accepting the Award, the Team Member specifically agrees to the restrictive covenant contained in this Section 9 (the "Restrictive Covenant") and the Team Member agrees that the Restrictive Covenant and the remedies described herein are reasonable and necessary to protect the legitimate interests of the Company.

(a)<u>Non-Solicitation</u>. The Team Member agrees that for the period beginning on the Grant Date and ending on the date that is one year following the Team Member's termination of Service, the Team Member will not recruit for employment directly or indirectly, any employee of the Company with whom the Team Member worked, or about whom the Team Member possesses any Company personnel information.

(b)<u>Remedies.</u> The Team Member agrees that immediate irreparable damage will result to Company if the Team Member breaches the Restrictive Covenant set forth in this Agreement. Therefore, in the event the Team Member breaches this Agreement, whether directly or indirectly, the Team Member consents to specific enforcement of this Agreement through an injunction or restraining order. Injunctive relief shall be awarded in

addition to any other remedies or damages available at law or in equity. The Team Member specifically agrees that the Company is entitled to the attorneys' fees and expenses the Company incurs to enforce this Agreement, and that the Team Member is responsible for paying the Company's costs and attorneys' fees incurred as a result of enforcing any provisions of this Agreement.

(c)Recovery. Notwithstanding any other provisions of this Agreement to the contrary, if the Committee concludes, in its sole discretion, that the Team Member has breached the Restrictive Covenant, the Company may take one or more of the following actions with respect to the Award:

(i)immediately terminate all of the PBRSUs subject to the Award that have not previously been converted to Shares, and the Team Member shall have no rights hereunder; and

(ii)require repayment of all or any portion of the amounts realized or received by the Team Member resulting from the conversion of PBRSUs to Shares or the sale of Shares related to the Award.

10.Dividend Equivalents. The Team Member shall have the right to receive additional PBRSUs with a value equal to the regular cash dividend paid on one Share for each PBRSU earned pursuant to this Agreement prior to the conversion of PBRSUs and issuance of Shares pursuant to Section 11. The dividend equivalents will be based on the actual number of PBRSUs earned pursuant to this Agreement. The number of additional PBRSUs to be received as dividend equivalents for each PBRSU held shall be determined by dividing the cash dividend per share by the Fair Market Value of one Share on the dividend payment date; provided, however, that for purposes of avoiding the issuance of fractional PBRSUs, on each dividend payment date the additional PBRSUs issued as dividend equivalents shall be rounded up to the nearest whole number. All such additional PBRSUs received as dividend equivalents shall be subject to forfeiture in the same manner and to the same extent as the original PBRSUs granted hereby, and shall be converted into Shares on the basis and at the time set forth in Section 11 hereof.

11.Conversion of PBRSUs and Issuance of Shares.

(a)Timing. Vested PBRSUs shall be converted to Shares in accordance with the Payout Formula and shall be issued within 90 days following the Determination Date, but in any event not later than December 31 of the calendar year in which the Performance Period ends.  Notwithstanding the foregoing, PBRSUs meeting the conditions specified in Section 6 involving termination of the Team Member's Service voluntarily for Good Reason or involuntarily without Cause, shall be converted to Shares that shall be issued within 90 days following such termination.

(b)Unvested PBRSUs. All of the PBRSUs subject to the Award that are unvested as of the time the vested PBRSUs are converted and Shares are issued under this Section 11 shall terminate immediately and the Team Member shall have no rights hereunder with respect to those unvested PBRSUs.

4.

(c)<u>Code Section 409A</u>. The Committee in its sole discretion may accelerate or delay the distribution of any payment under this Agreement to the extent allowed or required under Code Section 409A. Payment of amounts under this Agreement are intended to comply with the requirements of Code Section 409A and this Agreement shall in all respects be administered and construed to give effect to such intent.

12.<u>Taxes</u>. The Team Member acknowledges that (a) the ultimate liability for any and all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items") legally due by him or her is and remains the Team Member's responsibility and may exceed the amount actually withheld by the Company and/or the Service Recipient and (b) the Company and/or the Service Recipient or a former Service Recipient, as applicable, (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the PBRSUs, including, but not limited to, the grant, vesting and/or conversion of the PBRSUs and issuance of Shares; (ii) do not commit and are under no obligation to structure the terms of the grant or any aspect of the PBRSUs to reduce or eliminate the Team Member's liability for Tax-Related Items; (iii) may be required to withhold or account for Tax-Related Items in more than one jurisdiction if the Team Member has become subject to tax in more than one jurisdiction between the Grant Date and the date of any relevant taxable event; and (iv) may refuse to deliver the Shares to the Team Member if he or she fails to comply with his or her obligations in connection with the Tax-Related Items as provided in this Section.

The Team Member authorizes and consents to the Company and/or the Service Recipient, or their respective agents, satisfying all applicable Tax-Related Items which the Company reasonably determines are legally payable by him or her by withholding from the Shares that would otherwise be delivered to the Team Member the highest number of whole Shares that the Company determines has a value less than or equal to the aggregate applicable Tax-Related Items. In lieu thereof, the Team Member may elect at the time of conversion of the PBRSUs such other then-permitted method or combination of methods established by the Company and/or the Service Recipient to satisfy the Team Member's Tax-Related Items.

13.<u>Limitations on Transfer</u>. The Award shall not be sold, assigned, transferred, exchanged or encumbered by the Team Member other than pursuant to the terms of the Plan.

14.<u>Recoupment Provision</u>. In the event of intentional misconduct of the Team Member that causes the Company material financial or material reputational harm, or contributes to a restatement of the Company's consolidated financial statements, the Company may take one or more of the following actions with respect to the Award, as determined by the Human Resources & Compensation Committee of the Board in its sole discretion, and the Team Member shall be bound by such determination:

(a)cancel all or a portion of the PBRSUs, whether vested or unvested, including any dividend equivalents related to the Award; and

5.

(b)require repayment of all or any portion of the amounts realized or received by the Team Member resulting from the conversion of PBRSUs to Shares or the sale of Shares related to the Award.

The term "restatement" shall mean the result of revising financial statements previously filed with the Securities and Exchange Commission to reflect the correction of an error. The term "intentional misconduct" shall be limited to conduct that the Human Resources & Compensation Committee or its delegate determines indicates an intentional violation of law, an intentional violation of the Company's Code of Ethics (or any successor or replacement code of conduct for employees), or an intentional violation of a significant ethics or compliance policy of the Company, but shall not include good faith errors in judgment made by the Team Member.

The Team Member agrees that the Company may setoff any amounts it is entitled to recover under this Section against any amounts owed by the Company to the Team Member under any of the Company's deferred compensation plans to the extent permitted under Code Section 409A. This Section 14 shall not apply, and no amounts may be recovered hereunder, following a Change in Control.

15.No Employment Rights. Nothing in this Agreement, the Plan or the Award Letter shall confer upon the Team Member any right to continued Service with the Company or any Subsidiary, as applicable, nor shall it interfere with or limit in any way any right of the Company or any Subsidiary, as applicable, to terminate the Team Member's Service at any time with or without Cause or change the Team Member's compensation, other benefits, job responsibilities or title provided in compliance with applicable local laws and permitted under the terms of the Team Member's Service contract, if any.

(a)The Team Member's rights to vest in the PBRSUs or receive Shares after termination of Service shall be determined pursuant to Sections 3 through 11. Those rights and the Team Member's date of termination of Service will not be extended by any notice period mandated under local law (e.g., active service would not include a period of "garden leave" or similar notice period pursuant to local law).

(b)This Agreement, the Plan and the Award Letter are separate from, and shall not form, any part of the contract of Service of the Team Member, or affect any of the rights and obligations arising from the Service relationship between the Team Member and the Company and/or the Service Recipient.

(c)No Service Provider has a right to participate in the Plan. All decisions with respect to future grants, if any, shall be at the sole discretion of the Company and/or the Service Recipient.

(d)The Team Member will have no claim or right of action in respect of any decision, omission or discretion which may operate to the disadvantage of the Team Member.

16.Nature of Grant. In accepting the grant, the Team Member acknowledges, understands, and agrees that:

6.

(a)the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement, and any such modification, amendment, suspension or termination will not constitute a constructive or wrongful dismissal;

(b)the PBRSUs are extraordinary items and are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or welfare or retirement benefits or similar payments;

(c)in no event should the PBRSUs be considered as compensation for, or relating in any way to, past services for the Company or the Service Recipient, nor are the PBRSUs or the underlying Shares intended to replace any pension rights or compensation;

(d)the future value of the underlying Shares is unknown and cannot be predicted with certainty;

(e)the Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Team Member's participation in the Plan or the PBRSUs;

(f)no claim or entitlement to compensation or damages shall arise from forfeiture of the PBRSUs resulting from termination of the Team Member's Service (for any reason whatsoever and whether or not in breach of local labor laws), and in consideration of the grant of the PBRSUs to which the Team Member is otherwise not entitled, the Team Member irrevocably (i) agrees never to institute any such claim against the Company or the Service Recipient, (ii) waives the Team Member's ability, if any, to bring any such claim, and (iii) releases the Company and the Service Recipient from any such claim. If, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Team Member shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claims;

(g)this Agreement is not a condition of the Team Member's employment or continued employment; and

(h)the Team Member is hereby advised to consult with personal tax, legal and financial advisors regarding participation in the Plan before taking any action related to the PBRSUs or the Plan.

17.<u>Governing Law; Venue; Jurisdiction; Severability</u>. To the extent that federal laws do not otherwise control, this Agreement, the Award Letter, the Plan and all determinations made and actions taken pursuant to the Plan shall be governed by the laws of the State of Minnesota without regard to its conflicts-of-law principles and shall be construed accordingly. The exclusive forum and venue for any legal action arising out of or related to this Agreement shall be the United States District Court for the District of Minnesota, and the parties submit to

7.

the personal jurisdiction of that court. If neither subject matter nor diversity jurisdiction exists in the United States District Court for the District of Minnesota, then the exclusive forum and venue for any such action shall be the courts of the State of Minnesota located in Hennepin County, and the Team Member, as a condition of this Agreement, consents to the personal jurisdiction of that court. If any provision of this Agreement, the Award Letter or the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, the Award Letter or the Plan, and the Agreement, the Award Letter and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

18. Currencies and Dates. Unless otherwise stated, all dollars specified in this Agreement and the Award Letter shall be in U.S. dollars and all dates specified in this Agreement shall be U.S. dates.

19. Survival. The Team Member agrees that the terms of Sections 9 and 14 shall survive the Team Member's termination of Service, the end of the Performance Period, and any conversion of the Award into Shares.

20. Imposition of Other Requirements. The Company reserves the right to impose other requirements on the Team Member's participation in the Plan, on the PBRSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan, and to require the Team Member to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

21. Plan and Award Letter Incorporated by Reference; Electronic Delivery. The Plan, as hereafter amended from time to time, and the Award Letter shall be deemed to be incorporated into this Agreement and are integral parts hereof. In the event there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern. This Agreement, the Plan and the Award Letter embody the entire agreement and understanding between the Company and the Team Member pertaining to this grant of PBRSUs and supersede all prior agreements and understandings (oral or written) between them relating to the subject matter hereof. The Company or a third party designated by the Company may deliver to the Team Member by electronic means any documents related to his or her participation in the Plan. The Team Member acknowledges receipt of a copy of the Plan and the Award Letter.

[End of Agreement]

8.

Target Corporation 2020 Long-Term Incentive Plan

PERFORMANCE SHARE UNIT AGREEMENT

THIS PERFORMANCE SHARE UNIT AGREEMENT (the "Agreement") is made in Minneapolis, Minnesota as of the date of grant (the "Grant Date") set forth in the award letter (the "Award Letter") by and between the Company and the person (the "Team Member") identified in the Award Letter. This award (the "Award") of Performance Share Units ("PSUs"), provided to you as a Service Provider, is being issued under the Target Corporation 2020 Long-Term Incentive Plan (the "Plan"), subject to the following terms and conditions.

1.Definitions. Except as otherwise provided in this Agreement, the defined terms used in this Agreement shall have the same meaning as in the Plan. The term "Committee" shall also include those persons to whom authority has been delegated under the Plan.

2.Grant of PSUs. Subject to the relevant terms of the Plan and this Agreement, as of the Grant Date, the Company has granted the Team Member the number of PSUs set forth in the Award Letter (the "Goal Payout"). The maximum number of Shares that may be earned is equal to 200% of the Goal Payout (the "Maximum Payout"). The number of Shares actually earned, if any, shall depend on the Company's performance during the period comprised of the Company's three consecutive fiscal years beginning with the first full fiscal year in which the Grant Date occurs (the "Performance Period").

3.Payout Formula. Except as set forth in Section 5, the actual number of Shares earned will be determined by the Committee pursuant to a formula established by the Committee to measure the Company's performance during the Performance Period (the "Payout Formula"). The determination of the actual number of Shares earned, which shall not exceed the Maximum Payout, shall occur as soon as practicable after completion of the Performance Period, but in any event not later than November 30 of the calendar year in which the Performance Period ends (the date the Committee so determines, the "Determination Date"). A description of the Payout Formula and the percentage of Shares to be earned, if any, for the various levels of performance will be communicated to the Team Member. All decisions of the Committee regarding the application of the Payout Formula and the number of Shares earned shall be final and binding on the Team Member. Except as set forth in Section 5, the Award shall be cancelled and the Team Member shall have no rights hereunder if any of the following occur: (a) the Determination Date does not occur, or (b) the Committee determines on the Determination Date that no Shares have been earned.

4.Continuous Service Requirement. In order to earn any Shares, the Team Member must be continuously providing Service from the Grant Date to the end of the

Performance Period, except as described in this Section and Section 5. Even if the Team Member is not continuously providing Service through the end of the Performance Period, upon the occurrence of one of the events specified in Sections 4(a) through 4(d), the Shares that are earned during the Performance Period, if any, shall vest and be paid out as provided in Section 9, in accordance with and subject to any restrictions set forth in this Agreement, the Plan or any Release Agreement that the Team Member may be required to enter pursuant to this Section or Section 5. "Release Agreement" means an agreement containing a release of claims, a covenant not to engage in competitive employment, and/or other provisions deemed appropriate by the Committee in its sole discretion.

(a)Early Retirement Date. The Team Member's Service terminates on or after the Team Member's Early Retirement Date and the Company receives a valid unrevoked Release Agreement from the Team Member. "Early Retirement Date" is the date that is (i) on or prior to the Team Member's termination of Service, (ii) at or after attaining age 45 and prior to attaining age 55 and completing at least 15 years of Service (which 15 years need not be continuous), (iii) if the Team Member's termination of Service is voluntary, at least six months after the Team Member commenced discussions with the Company's Chief Executive Officer or most senior human resources executive regarding the Team Member's consideration of termination, and (iv) the following additional requirements are satisfied, to the extent applicable: (A) if the Team Member's Early Retirement Date occurs prior to the Team Member's attainment of age 48, the Team Member was providing Service for at least the first 24 months of the Performance Period, (B) if the Team Member's Early Retirement Date occurs prior to the Team Member's attainment of age 52 and on or after attainment of age 48, the Team Member was providing Service for at least the first 18 months of the Performance Period, and (C) if the Team Member's Early Retirement Date occurs prior to the Team Member's attainment of age 55 and on or after attainment of age 52, the Team Member was providing Service for at least the first 12 months of the Performance Period.

(b)Normal Retirement Date. The Team Member's Service terminates on or after the Team Member's Normal Retirement Date and the Company receives a valid unrevoked Release Agreement from the Team Member. "Normal Retirement Date" is the date that is (i) on or prior to the Team Member's termination of Service, (ii) at or after attaining age 55 and completing at least 5 years of Service (which 5 years need not be continuous), and (iii) if the Team Member's termination of Service is voluntary, at least six months after the Team Member commenced discussions with the Company's Chief Executive Officer or most senior human resources executive regarding the Team Member's consideration of termination.

(c)Death. In the event of the Team Member's death prior to the Team Member's termination of Service, the Team Member shall be fully vested in all Shares earned under the Payout Formula.

(d)Disability. In the event of the Team Member's Disability (as determined by the Committee in its sole discretion, provided such determination complies with the definition of disability under Code Section 409A) prior to the Team Member's termination of Service, the Team Member shall be fully vested in all Shares earned under the Payout Formula.

5.<u>Change in Control</u>. If a Change in Control occurs prior to the Determination Date and the Award is assumed or replaced pursuant to Section 11(b)(1) of the Plan, the Award will continue to be subject to the Continuous Service Requirement provided in Section 4, but the total number of Shares earned under the Payout Formula shall be deemed to be equal to the Goal Payout.  Notwithstanding the foregoing if within two years after a Change in Control and prior to the end of the Performance Period the Team Member's Service terminates voluntarily by the Team Member for Good Reason or involuntarily without Cause, provided that the Company has received a valid unrevoked Release Agreement from the Team Member, the total number of Shares earned under the Payout Formula shall be deemed to be equal to the Goal Payout.

6.<u>Cause</u>. Notwithstanding any other provisions of this Agreement to the contrary, if the Committee concludes, in its sole discretion, that the Team Member's Service was terminated in whole or in part for Cause, all of the PSUs subject to the Award shall terminate immediately and the Team Member shall have no rights hereunder.

7.<u>Other Termination; Changes of Service</u>. If the Team Member's termination of Service occurs at any time prior to the end of the Performance Period for any reason not meeting the conditions specified in Sections 4 or 5, all of the PSUs subject to the Award shall terminate effective as of the date of termination of Service and the Team Member shall have no rights hereunder. Service shall not be deemed terminated in the case of (a) any approved leave of absence, or (b) transfers among the Company and any Subsidiaries in the same Service Provider capacity; however, a termination of Service shall occur if (i) the relationship the Team Member had with the Company or a Subsidiary at the Grant Date terminates, even if the Team Member continues in another Service Provider capacity with the Company or a Subsidiary, or (ii) the Team Member experiences a "separation from service" within the meaning of Code Section 409A.

8.<u>Restrictive Covenant</u>. By accepting the Award, the Team Member specifically agrees to the restrictive covenant contained in this Section 8 (the "Restrictive Covenant") and the Team Member agrees that the Restrictive Covenant and the remedies described herein are reasonable and necessary to protect the legitimate interests of the Company.

(a)<u>Non-Solicitation</u>. The Team Member agrees that for the period beginning on the Grant Date and ending on the date that is one year following the Team Member's termination of Service, the Team Member will not recruit for employment directly or indirectly, any employee of the Company with whom the Team Member worked, or about whom the Team Member possesses any Company personnel information.

(b)<u>Remedies.</u> The Team Member agrees that immediate irreparable damage will result to Company if the Team Member breaches the Restrictive Covenant set forth in this Agreement. Therefore, in the event the Team Member breaches this Agreement, whether directly or indirectly, the Team Member consents to specific enforcement of this Agreement through an injunction or restraining order. Injunctive relief shall be awarded in addition to any other remedies or damages available at law or in equity.  The Team Member specifically agrees that the Company is entitled to the attorneys' fees and expenses the

3.

Company incurs to enforce this Agreement, and that the Team Member is responsible for paying the Company's costs and attorneys' fees incurred as a result of enforcing any provisions of this Agreement.

(c)Recovery. Notwithstanding any other provisions of this Agreement to the contrary, if the Committee concludes, in its sole discretion, that the Team Member has breached the Restrictive Covenant, the Company may take one or more of the following actions with respect to the Award:

(i)immediately terminate all of the PSUs subject to the Award that have not previously been converted to Shares, and the Team Member shall have no rights hereunder; and

(ii)require repayment of all or any portion of the amounts realized or received by the Team Member resulting from the conversion of PSUs to Shares or the sale of Shares related to the Award.

9.Dividend Equivalents. The Team Member shall have the right to receive additional PSUs with a value equal to the regular cash dividend paid on one Share for each PSU earned pursuant to this Agreement prior to the conversion of PSUs and issuance of Shares pursuant to Section 10. The dividend equivalents will be based on the actual number of PSUs earned pursuant to this Agreement. The number of additional PSUs to be received as dividend equivalents for each PSU held shall be determined by dividing the cash dividend per share by the Fair Market Value of one Share on the dividend payment date; provided, however, that for purposes of avoiding the issuance of fractional PSUs, on each dividend payment date the additional PSUs issued as dividend equivalents shall be rounded up to the nearest whole number. All such additional PSUs received as dividend equivalents shall be subject to forfeiture in the same manner and to the same extent as the original PSUs granted hereby, and shall be converted into Shares on the basis and at the time set forth in Section 10 hereof.

10.Time of Payout. Vested PSUs shall be converted to Shares in accordance with the Payout Formula and shall be issued as soon as practicable following the end of the Performance Period and after the Committee has determined on the Determination Date that they have been earned, but not later than 90 days following the Determination Date. Notwithstanding the foregoing, PSUs meeting the conditions specified in Section 5 involving termination of the Team Member's Service voluntarily for Good Reason or involuntarily without Cause, shall be converted to Shares that shall be issued within 90 days following such termination. The Committee in its sole discretion may accelerate or delay the distribution of any payment under this Agreement to the extent allowed or required under Code Section 409A. Payment of amounts under this Agreement are intended to comply with the requirements of Code Section 409A and this Agreement shall in all respects be administered and construed to give effect to such intent.

11.Taxes. The Team Member acknowledges that (a) the ultimate liability for any and all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items") legally due by him or her is and remains the Team

4.

Member's responsibility and may exceed the amount actually withheld by the Company and/or a Subsidiary to which the Team Member is providing Service (the "Service Recipient") and (b) the Company and/or the Service Recipient or a former Service Recipient, as applicable, (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the PSUs, including, but not limited to, the grant, vesting and/or conversion of the PSUs and issuance of Shares; (ii) do not commit and are under no obligation to structure the terms of the grant or any aspect of the PSUs to reduce or eliminate the Team Member's liability for Tax-Related Items; (iii) may be required to withhold or account for Tax-Related Items in more than one jurisdiction if the Team Member has become subject to tax in more than one jurisdiction between the Grant Date and the date of any relevant taxable event; and (iv) may refuse to deliver the Shares to the Team Member if he or she fails to comply with his or her obligations in connection with the Tax-Related Items as provided in this Section.

The Team Member authorizes and consents to the Company and/or the Service Recipient, or their respective agents, satisfying all applicable Tax-Related Items which the Company reasonably determines are legally payable by him or her by withholding from the Shares that would otherwise be delivered to the Team Member the highest number of whole Shares that the Company determines has a value less than or equal to the aggregate applicable Tax-Related Items. In lieu thereof, the Team Member may elect at the time of conversion of the PSUs such other then-permitted method or combination of methods established by the Company and/or the Service Recipient to satisfy the Team Member's Tax-Related Items.

12. <u>Limitations on Transfer</u>. The Award shall not be sold, assigned, transferred, exchanged or encumbered by the Team Member other than pursuant to the terms of the Plan.

13. <u>Recoupment Provision</u>. In the event of intentional misconduct of the Team Member that causes the Company material financial or material reputational harm, or contributes to a restatement of the Company's consolidated financial statements, the Company may take one or more of the following actions with respect to the Award, as determined by the Human Resources & Compensation Committee of the Board in its sole discretion, and the Team Member shall be bound by such determination:

(a) cancel all or a portion of the PSUs, whether earned or unearned, including any dividend equivalents related to the Award; and

(b) require repayment of all or any portion of the amounts realized or received by the Team Member resulting from the conversion of PSUs to Shares or the sale of Shares related to the Award.

The term "restatement" shall mean the result of revising financial statements previously filed with the Securities and Exchange Commission to reflect the correction of an error. The term "intentional misconduct" shall be limited to conduct that the Human Resources & Compensation Committee or its delegate determines indicates an intentional violation of law, an intentional violation of the Company's Code of Ethics (or any successor or replacement

5.

code of conduct for employees), or an intentional violation of a significant ethics or compliance policy of the Company, but shall not include good faith errors in judgment made by the Team Member.

The Team Member agrees that the Company may setoff any amounts it is entitled to recover under this Section against any amounts owed by the Company to the Team Member under any of the Company's deferred compensation plans to the extent permitted under Code Section 409A. This Section 13 shall not apply, and no amounts may be recovered hereunder, following a Change in Control.

14. No Employment Rights. Nothing in this Agreement, the Plan or the Award Letter shall confer upon the Team Member any right to continued Service with the Company or any Subsidiary, as applicable, nor shall it interfere with or limit in any way any right of the Company or any Subsidiary, as applicable, to terminate the Team Member's Service at any time with or without Cause or change the Team Member's compensation, other benefits, job responsibilities or title provided in compliance with applicable local laws and permitted under the terms of the Team Member's Service contract, if any.

(a) The Team Member's rights to vest in the PSUs or receive Shares after termination of Service shall be determined pursuant to Sections 3 through 10. Those rights and the Team Member's date of termination of Service will not be extended by any notice period mandated under local law (e.g., active service would not include a period of "garden leave" or similar notice period pursuant to local law).

(b) This Agreement, the Plan and the Award Letter are separate from, and shall not form, any part of the contract of Service of the Team Member, or affect any of the rights and obligations arising from the Service relationship between the Team Member and the Company and/or the Service Recipient.

(c) No Service Provider has a right to participate in the Plan. All decisions with respect to future grants, if any, shall be at the sole discretion of the Company and/or the Service Recipient.

(d) The Team Member will have no claim or right of action in respect of any decision, omission or discretion which may operate to the disadvantage of the Team Member.

15. Nature of Grant. In accepting the grant, the Team Member acknowledges, understands, and agrees that:

(a) the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement, and any such modification, amendment, suspension or termination will not constitute a constructive or wrongful dismissal;

(b) the PSUs are extraordinary items and are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any

6.

severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or welfare or retirement benefits or similar payments;

(c)in no event should the PSUs be considered as compensation for, or relating in any way to, past services for the Company or the Service Recipient, nor are the PSUs or the underlying Shares intended to replace any pension rights or compensation;

(d)the future value of the underlying Shares is unknown and cannot be predicted with certainty;

(e)the Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Team Member's participation in the Plan or the PSUs;

(f)no claim or entitlement to compensation or damages shall arise from forfeiture of the PSUs resulting from termination of the Team Member's Service (for any reason whatsoever and whether or not in breach of local labor laws), and in consideration of the grant of the PSUs to which the Team Member is otherwise not entitled, the Team Member irrevocably (i) agrees never to institute any such claim against the Company or the Service Recipient, (ii) waives the Team Member's ability, if any, to bring any such claim, and (iii) releases the Company and the Service Recipient from any such claim. If, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, the Team Member shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claims;

(g)this Agreement is not a condition of the Team Member's employment or continued employment; and

(h)the Team Member is hereby advised to consult with personal tax, legal and financial advisors regarding participation in the Plan before taking any action related to the PSUs or the Plan.

16.<u>Governing Law; Venue; Jurisdiction; Severability</u>. To the extent that federal laws do not otherwise control, this Agreement, the Award Letter, the Plan and all determinations made and actions taken pursuant to the Plan shall be governed by the laws of the State of Minnesota without regard to its conflicts-of-law principles and shall be construed accordingly. The exclusive forum and venue for any legal action arising out of or related to this Agreement shall be the United States District Court for the District of Minnesota, and the parties submit to the personal jurisdiction of that court. If neither subject matter nor diversity jurisdiction exists in the United States District Court for the District of Minnesota, then the exclusive forum and venue for any such action shall be the courts of the State of Minnesota located in Hennepin County, and the Team Member, as a condition of this Agreement, consents to the personal jurisdiction of that court. If any provision of this Agreement, the Award Letter or the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, the Award Letter or the Plan, and the Agreement, the Award Letter and

7.

the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

17. <u>Currencies and Dates</u>. Unless otherwise stated, all dollars specified in this Agreement and the Award Letter shall be in U.S. dollars and all dates specified in this Agreement shall be U.S. dates.

18. <u>Survival</u>. The Team Member agrees that the terms of Sections 8 and 13 shall survive the Team Member's termination of Service, the end of the Performance Period, and any conversion of the Award into Shares.

19. <u>Imposition of Other Requirements</u>. The Company reserves the right to impose other requirements on the Team Member's participation in the Plan, on the PSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan, and to require the Team Member to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

20. <u>Plan and Award Letter Incorporated by Reference; Electronic Delivery</u>. The Plan, as hereafter amended from time to time, and the Award Letter shall be deemed to be incorporated into this Agreement and are integral parts hereof. In the event there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern. This Agreement, the Plan and the Award Letter embody the entire agreement and understanding between the Company and the Team Member pertaining to this grant of PSUs and supersede all prior agreements and understandings (oral or written) between them relating to the subject matter hereof. The Company or a third party designated by the Company may deliver to the Team Member by electronic means any documents related to his or her participation in the Plan. The Team Member acknowledges receipt of a copy of the Plan and the Award Letter.

[End of Agreement]

8.



Target Corporation 2020 Long-Term Incentive Plan

NON-EMPLOYEE DIRECTOR
RESTRICTED STOCK UNIT AGREEMENT

THIS RESTRICTED STOCK UNIT AGREEMENT (the "Agreement") is made in Minneapolis, Minnesota as of the date of grant (the "Grant Date") set forth in the award letter (the "Award Letter") by and between the Company and the person (the "Director") identified in the Award Letter. This award (the "Award") of Restricted Stock Units ("RSUs"), provided to you as a member of the Board, is being issued under the Target Corporation 2020 Long-Term Incentive Plan (the "Plan"), subject to the following terms and conditions.

1.Definitions. Except as otherwise provided in this Agreement, the defined terms used in this Agreement shall have the same meaning as in the Plan. The term "Committee" shall also include those persons to whom authority has been delegated under the Plan.

2.Grant of RSUs. Subject to the relevant terms of the Plan and this Agreement, as of the Grant Date, the Company has granted the Director the number of RSUs set forth in the Award Letter.

3.Vesting Schedule. Beginning with the fiscal quarter in which the Grant Date occurs, 25% of the RSUs shall vest on the last day of each quarter of the fiscal year in which the Grant Date occurs (i.e., at the end of April, July, October and January) and any remaining RSUs shall become fully vested on the last day of the fiscal year in which the Grant Date occurs (the "Final Vesting Date").

4.Circumstances that Accelerate the Vesting Date. All unvested RSUs subject to this Agreement shall become immediately vested if the Director ceases to be a member of the Board due to (a) death, (b) Disability, (c) reaching the mandatory retirement age for members of the Board, or (d) reaching the maximum term limit for members of the Board.

In the event a Change in Control occurs prior to the Final Vesting Date, the outstanding unvested RSUs shall immediately become fully vested.

5.Effect of Ceasing to be a Member of the Board. In the event that the Director ceases to be a member of the Board for any reason prior to the Final Vesting Date, except as specifically provided in this Agreement, the unvested portion of the Award shall be forfeited.

6.<u>Dividend Equivalents</u>. The Director shall have the right to receive additional RSUs with a value equal to the regular cash dividend paid on one Share for each RSU held pursuant to this Agreement prior to the conversion of RSUs and issuance of Shares pursuant to Section 7. The number of additional RSUs to be received as dividend equivalents for each RSU held shall be determined by dividing the cash dividend per share by the Fair Market Value of one Share on the dividend payment date; provided, however, that for purposes of avoiding the issuance of fractional RSUs, on each dividend payment date the additional RSUs issued as dividend equivalents shall be rounded up to the nearest whole number. All such additional RSUs received as dividend equivalents shall be subject to forfeiture in the same manner and to the same extent as the original RSUs granted hereby, and shall be converted into Shares on the basis and at the time set forth in Section 7 hereof.

7.<u>Conversion of RSUs and Issuance of Shares</u>. The Director shall receive one Share for each vested RSU on the date that is as soon as administratively feasible, but not more than 90 days, following a Change in Control (provided such acceleration is permissible under Code Section 409A), the Director's death or other termination of service as a member of the Board and cessation of all contractual relationships as an independent contractor with the Company (or any other entity which would be treated as a single employer with the Company under Code Section 414(b) or 414(c)) which causes the Director to experience a "separation from service" within the meaning of Code Section 409A; provided, however, that in the event the Company determines that the Director is a "specified employee" under Code Section 409A (or successor provision) and that such distribution is subject to Code Section 409A(a)(2)(B), the issuance of the Director's Shares will be suspended until six months after the Director's separation from service, or if earlier, the Director's death. Until such time as the Director's RSUs have been converted into Shares pursuant to this Section 7, the RSUs will not carry any of the rights of share ownership and will not be entitled to vote or receive dividends (other than the right to receive dividend equivalents).

8.<u>Limitations on Transfer</u>. The Award shall not be sold, assigned, transferred, exchanged or encumbered by the Director other than pursuant to the terms of the Plan.

9.<u>Service as a Member of the Board</u>. Nothing in this Agreement, the Plan or the Award Letter shall give the Director any claim or right to continue as a member of the Board.

2.

10. Governing Law; Venue; Jurisdiction. To the extent that federal laws do not otherwise control, this Agreement, the Award Letter, the Plan and all determinations made and actions taken pursuant to the Plan shall be governed by the laws of the State of Minnesota without regard to its conflicts-of-law principles and shall be construed accordingly. The exclusive forum and venue for any legal action arising out of or related to this Agreement shall be the United States District Court for the District of Minnesota, and the parties submit to the personal jurisdiction of that court. If neither subject matter nor diversity jurisdiction exists in the United States District Court for the District of Minnesota, then the exclusive forum and venue for any such action shall be the courts of the State of Minnesota located in Hennepin County, and the Director, as a condition of this Agreement, consents to the personal jurisdiction of that court. If any provision of this Agreement, the Award Letter or the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, the Award Letter or the Plan, and the Agreement, the Award Letter and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

11. Currencies and Dates. Unless otherwise stated, all dollars specified in this Agreement and the Award Letter shall be in U.S. dollars and all dates specified in this Agreement shall be U.S. dates.

12. Plan and Award Letter Incorporated by Reference; Electronic Delivery. The Plan, as hereafter amended from time to time, and the Award Letter shall be deemed to be incorporated into this Agreement and are integral parts hereof. In the event there is any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan shall govern. This Agreement, the Plan and the Award Letter embody the entire agreement and understanding between the Company and the Director pertaining to this grant of RSUs and supersede all prior agreements and understandings (oral or written) between them relating to the subject matter hereof. The Company or a third party designated by the Company may deliver to the Director by electronic means any documents related to his or her participation in the Plan. The Director acknowledges receipt of a copy of the Plan and the Award Letter.

[End of Agreement]

3.

**Exhibit (31)A**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**
Certifications

I, Brian C. Cornell, certify that:

1.I have reviewed this Quarterly Report on Form 10-Q of Target Corporation;

2.Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date: August 28, 2020

/s/ Brian C. Cornell

Brian C. Cornell

Chairman and Chief Executive Officer

**Exhibit (31)B**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

Certifications

I, Michael J. Fiddelke, certify that:

1.I have reviewed this Quarterly Report on Form 10-Q of Target Corporation;

2.Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Date: August 28, 2020

/s/ Michael J. Fiddelke

Michael J. Fiddelke

Executive Vice President and Chief Financial Officer

**Exhibit (32)A**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**AS ADOPTED PURSUANT TO 18 U.S.C. SECTION 1350**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Target Corporation, a Minnesota corporation ("the Company"), for the quarter ended August 1, 2020, as filed with the Securities and Exchange Commission on the date hereof ("the Report"), the undersigned officer of the Company certifies pursuant to 18 U.S.C. Section 1350, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the officer's knowledge:

1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Date: August 28, 2020

/s/ Brian C. Cornell

Brian C. Cornell

Chairman and Chief Executive Officer

**Exhibit (32)B**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**
**AS ADOPTED PURSUANT TO 18 U.S.C. SECTION 1350**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Target Corporation, a Minnesota corporation ("the Company"), for the quarter ended August 1, 2020, as filed with the Securities and Exchange Commission on the date hereof ("the Report"), the undersigned officer of the Company certifies pursuant to 18 U.S.C. Section 1350, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the officer's knowledge:

1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Date: August 28, 2020

/s/ Michael J. Fiddelke

Michael J. Fiddelke

Executive Vice President and Chief Financial Officer