## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RAFAEL E. PEREZ, individually and on behalf of all others similarly situated,

        *Plaintiff*,

v.

TARGET CORPORATION, BRIAN C. CORNELL, MICHAEL J. FIDDELKE, A. CHRISTINA HENNINGTON, AND JOHN J. MULLIGAN,

        *Defendants*.

Case No. 0:23-cv-00769-JMB-TNL

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page(s)**

I. PRELIMINARY STATEMENT ............................................................................. 1

II. STATEMENT OF FACTS ................................................................................... 4

    A. Defendant Target ....................................................................................... 4

    B. Defendants Abandon Target's Inventory Purchasing Business Model and Pre-Order Large Quantities of Inventory Without Regard to Consumer Demand .................................................................................................... 5

    C. Defendants' Over-Ordering of "Bulky" Items Necessitated Steep Discounts to Sell ........................................................................................ 11

    D. The Truth is Revealed .............................................................................. 11

III. ARGUMENT ................................................................................................... 12

    A. Legal Standards ....................................................................................... 12

    B. Defendants Made Materially False and Misleading Statements ................ 13

        1. Material Misstatements Concerning Target's Business Model ......... 14

        2. Material Misstatements Concerning Target's Inventory Levels ....... 21

        3. Material Misstatements Concerning Markdowns .............................. 23

        4. Defendants' Statements Are Not Inactionable Opinions .................. 26

        5. The PSLRA Safe Harbor Does Not Protect Defendants .................... 28

            a) Defendants' False Statements Were Not Forward-Looking. 28

            b) The Purported Cautionary Language Was Not "Meaningful" ........................................................................ 30

        6. Defendants' Misstatements Were Material ........................................ 35

    C. The Complaint Adequately Alleges Scienter ............................................. 39

        1. Defendants' Admissions Support Scienter ......................................... 40

2.    Defendants Knew from Target's Customer Data, Greenfeld Inventory Management and Apollo Systems that HHF Inventory Was Skyrocketing Because Customers Were Not Purchasing It ......44

3.    Defendants' Site Visits ............................................................................51

4.    Core Operations.....................................................................................54

5.    Insider Trading ......................................................................................56

6.    Holistic Analysis ...................................................................................59

D.    The Complaint Adequately Alleges a Claim under Section 20(a).............. 62

IV. CONCLUSION............................................................................................................ 62

# TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*3226701 Canada, Inc. v. Qualcomm*,
  2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) .................................................. 25

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ........................................................................... 21

*In re Ancor Commc'ns, Inc.*,
  22 F. Supp. 2d 999 (D. Minn. 1998) .............................................................. 54

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ............................................... 52

*In re AppHarvest Sec. Litig.*,
  2023 WL 4866233 (S.D.N.Y. July 31, 2023) ................................................. 54

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*,
  28 F.4th 343 (2d Cir. 2022) ........................................................................... 28

*Baron v. Hyrecar Inc.*,
  2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) ............................................... 18

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015) ....................................... 12, 13, 35, 38

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ......................................................................... 17

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  No. 3:20-CV-06719-WHO, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ...... 19

*Bondali v. YumA Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) .................................................................. 32

*Boykin v. K12 Inc.*,
  54 F.4th 175 (4th Cir. 2022) .......................................................................... 30

*In re Cardinal Health Inc. Sec. Litigs.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .......................................................... 58

iii

*In re CarLotz Inc. Sec. Litig.*,
   2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) .............................................................. 48

*In re CenturyLink Sales Practices & Sec. Litig.*,
   403 F. Supp. 3d 712 (D. Minn. 2019) ..................................................................... *passim*

*In re Champion Enterprises, Inc., Securities Litigation*,
   144 F. Supp. 2d 848 (E.D. Mich. 2001) .................................................................. 29, 30

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
   701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) .................................................................... 49

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair
   Holdings PLC*,
   2020 WL 2834857 (S.D.N.Y. June 1, 2020) .................................................................. 43

*City of Pontiac Gen. Emples.' Ret. Sys. v. Dell Inc.*,
   2016 WL 6075540 (W.D. Tex. Sept. 16, 2016) ............................................................. 41

*City of Providence v. Aeropostale, Inc.*,
   *2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)* ........................................... 15, 25, 32, 36

*City of Sunrise Gen. Employees' Ret. Plan v. Fleetcor Techs., Inc.*,
   No. 1:17-CV-2207-LMM, 2018 WL 4293143 (N.D. Ga. May 15, 2018) ..................... 18

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...................................................................... 26, 48

*Dougherty v. Esperion Therapeutics, Inc.*,
   905 F.3d 971 (6th Cir. 2018) ...................................................................................... 29

*Dutton v. D&K Healthcare Res.*,
   2006 WL 1778884 (E.D. Mo. June 23, 2006) .......................................................... 57, 59

*In re Eastman Kodak Co. Sec. Litig.*,
   632 F. Supp. 3d 169 (W.D.N.Y. 2022) .......................................................................... 28

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008)................................................................................... 50, 55

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) .......................................................................... 58

iv

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ........................................................... 33

*Ferreira v. Funko Inc.*,
  2021 WL 880400 (C.D. Cal. Feb. 25, 2021) ............................... 15, 34

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ...................................................... 39, 40

*Freedman v. St. Jude Med., Inc.*,
  4 F. Supp. 3d 1101 (D. Minn. 2014) ................................. 13, 26, 61

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ..................................... 59

*Galestan v. Onemain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ............................................ 48

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012) .................................... 19, 35

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  2023 WL 2532061 (9th Cir. Mar. 16, 2023) ................................... 19

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) .............................................. 23, 35, 36

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) ........................................................ 51

*In re Hutchinson Tech., Inc. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) .................................................. 18, 37

*IBEW Local 595 Pension and Money Purchase Pension Plan v. ADT Corp.*,
  660 F. App'x 850 (11th Cir. 2016) ................................................ 38

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  958 F. Supp. 2d 1065 (D. Minn. 2013) ........................................ 49

*Indiana Public Retirement System v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) .................................................... 16

*In re Inotiv, Inc. Sec. Litig.*,

2024 WL 1344784 (N.D. Ind. Mar. 29, 2024) ............................................................ 40

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ................................................................ 25

*In re iRobotCorp. Sec. Litig.*,
527 F. Supp. 3d 124 (D. Mass. 2021) ........................................................ 46

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ................................................ 27, 28

*Karth v. Keryx Biopharmaceuticals, Inc.*,
6 F.4th 123 (1st Cir. 2021) ................................................................ 32

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................ 4

*In re K-tel Intern., Inc., Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ................................................................ 13

*Kushner v. Beverly Enters.*,
317 F.3d 820 (8th Cir. 2003) ............................................................ 4, 40

*Lefkoe v. Jos. A. Bank Clothiers*,
No. WMN-06-1892,
2007 WL 6890353 (D. Md. Sept. 10, 2007) ............................................ 26, 49

*Little Gem Life Scis. LLC v. Orphan Med., Inc.*,
2007 WL 541677 (D. Minn. Feb. 16, 2007) ................................................ 29

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103, (S.D.N.Y. Jan. 27, 2014) ................................................ 52

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
No. 22-1165, 2024 WL 1588706 (U.S. Apr. 12, 2024) ................................ 43

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
144 S. Ct. 885, 890 (2024) ................................................................ 23

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788, 816 (D. Minn. 2022) ............................................ 18, 35, 58

*Matrixx Initiatives, Inc. v. Siracusano*,

563 U.S. 27 (2011) ......................................................................................... 12, 13

*In re Medtronic Inc., Sec. Litig.*,
618 F. Supp. 2d 1016, 1030 (D. Minn. 2009) ............................................ 37, 46, 49, 50

*Miller v. Champion Enterprises Inc.*,
346 F.3d 660 (6th Cir. 2003) ........................................................................................ 29

*Minneapolis Firefighters' Relief Association v. Medtronic, Inc.*,
2010 WL 11469576 (D. Minn. Feb. 3, 2010) ................................................................ 55

*In re Nash Finch Co. Sec. Litig.*,
502 F. Supp. 2d 861 (D. Minn. 2007) ....................................................................*passim*

*In re Neustar Sec. Litig.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ............................................................................. 17

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir.2000) ........................................................................ 25, 39, 41, 42

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) ................. 36

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ..................................................................................................... 27

*Ortiz v. Canopy Growth Corp.*,
537 F. Supp. 3d 621, 647 (D.N.J. 2021) ...................................................................... 30

*In re Pemstar, Inc. Sec. Litig.*,
No. CIV. 02-1821 DWFSRN, 2003 WL 21975563 (D. Minn. Aug. 15, 2003) ............ 32

*In re Piedmont Lithium Inc. Sec. Litig.*,
No. 21CV4161OEMPK, 2024 WL 197751 (E.D.N.Y. Jan. 18, 2024) ......................... 55

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ............................................................... 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...................................................................................... 38

*Pound v. Stereotaxis, Inc.*,
8 F. Supp. 3d 1157 (E.D. Mo. 2014) ............................................................................ 18

*Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*,
370 F. Supp. 3d 60 (D.D.C. 2019) ...................................................... 33

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) .............................................. 19

*In re Resideo Techs., Inc., Sec. Litig.*,
No. 19-CV-2863 (WMW/KMM),
2021 WL 1195740 (D. Minn. Mar. 30, 2021)..................................... 4, 13, 31

*Rochester Laborers Pension Fund v. Monsanto Co.*,
883 F. Supp. 2d 835 (E.D. Mo. 2012)............................................... 28, 29, 31

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...................................... 48, 50

*Sanchez v. Centene Corp.*,
407 F. Supp. 3d 831 (E.D. Mo. 2019)................................................ 26

*Schoenfeld v. U.S. Resort Mgmt., Inc.*,
No. 05-CV-04368-CVC-NKL, 2007 WL 2363500 (W.D. Mo. Aug. 16, 2007)........... 20

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016)............................................................ 22

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009)........................................................... 15, 34

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ........................................ 55

*Steamfitters Local 449 Pension Plan v. Skechers USA, Inc.*,
412 F. Supp 3d 353 (S.D.N.Y. 2019),
*aff'd*, 826 F. App'x 111 (2d Cir. 2020) ............................................. 28, 33, 38

*In re St. Jude Medical, Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ................................................ 35

*In re Stellent, Inc. Sec. Litig.*,
326 F. Supp. 2d 970, 985 (D. Minn. 2004) ........................................ 23

*In re Stratasys Ltd. S'holder Sec. Litig.*,

864 F.3d 879 (8th Cir. 2017) ........................................................................ 36

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ........................................................................ 43

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) .......................................................... 13, 37, 39

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008) ........................................................................ 50

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................... *passim*

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
325 F. Supp. 3d 728 (N.D. Tex. 2018) ....................................................... 33

*Turocy v. El Pollo Loco Holdings, Inc.*,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ............................................. 48

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022) ....................................................... 54

*In re Tyson Foods, Inc. Sec. Litig.*,
275 F. Supp. 3d  970 (W.D. Ark. 2017) ............................................... 58, 59

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) ....................................... 38, 39

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ........................................................................ 29

*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ................................................ 39

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023) ....................................................... 55

*Waswick v. Torrid Holdings, Inc.*,
2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ......................................... 36, 38

*W. Wash. Laborers-Employers Pension Tr. v. Panera Bread Co.*,
697 F. Supp. 2d 1081 (E.D. Mo. 2010) ...................................................... 31

*Williams v. Globus Medical, Inc.*,
869 F.3d 235 (3d Cir. 2017) .......................................................................... 33

*In re XM Satellite Radio Holdings Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007) .............................................................. 38

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ......................................................................... 19

## **STATUTES & RULES**

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a, *et seq.*,
§ 78n(b) ("Section 10(b)") .............................................................. 13, 32, 62
§ 78t(a) ("Section 20(a)") ....................................................................... 62

Federal Rules of Civil Procedure
Rule 12(b)(6) ......................................................................................... 12

Private Securities Litigation Reform Act of 1995 ("PSLRA"),
15 U.S.C. § 78u-4(a), *et seq.* ................................................................... 28

Lead plaintiff Terry and Diane Van Der Tuuk Living Trust and plaintiffs Chester Zoll and John Zlatic (collectively, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants' motion ("Motion") to dismiss Plaintiffs' Amended Class Action Complaint ("Complaint").[1]

## I. PRELIMINARY STATEMENT

Target sells a wide range of consumer products, from groceries to electronics and furniture. Target regularly touts to investors its unique insights into its customers' purchasing patterns through "real-time" data collected from multiple sources, including rewards programs, smart phone apps and internet searches. Target purportedly analyzes and uses that data to "stay [] three steps ahead with [its] guests in … rapidly changing times" and purchase the merchandise that consumers want.

After experiencing inventory shortages during COVID, in early 2021, Defendants began *indiscriminately* pre-ordering large quantities of inventory, *irrespective* of consumer preferences or demand, to ensure Target had sufficient products to sell during the holiday season. This included large purchases of "bulky" products in the Hardlines and Home Furnishings and Décor ("HHF") categories that consumers no longer wanted after COVID restrictions were lifted and they were no longer restricted to their homes.

---

[1] "Defendants" are: Target Corporation ("Target" or the "Company"); Brian C. Cornell ("Cornell"), Chief Executive Officer ("CEO") and Board Chairman; Michael J. Fiddelke ("Fiddelke"), Executive Vice President ("EVP") and Chief Financial Officer ("CFO"); A. Christina Hennington ("Hennington"), EVP and Chief Growth Officer ("CGO"); and John J. Mulligan ("Mulligan"), EVP and Chief Operating Officer ("COO"). Cornell, Fiddelke, Hennington, and Mulligan are "Individual Defendants."

As a result, Target warehouses and distribution centers across the country overflowed with unwanted HHF goods. Indeed, confidential witnesses ("CWs") who worked at distribution centers and stores throughout the country, confirmed that by mid-2021, bulkier products like furniture, sofas and TVs in Target's HHF categories began to accumulate and clog the aisles at Target distribution centers and stores due to waning consumer demand for such products. CWs uniformly describe inventory levels that were "unprecedented" and "spiked" and aisles stuffed with HHF inventory, which was "piling up in every nook and cranny that we could put stuff into." Target facilities were "absolutely slammed," "extremely overwhelmed," "packed so solid," and "full of stuff no one's buying."

Contrary to these facts, Defendants told investors throughout the Class Period that Target was adhering to its inventory purchasing policy of using customer insights to inform inventory purchasing decisions, stating that "because of [Target's] durable, flexible business model, [Defendants] have ***proven*** [Target] can adapt to any environment" by "listening to the ever-changing wants and needs of our guests," and that the Company was purportedly entering the 2021 Holiday Season "with a very healthy inventory position overall" that would, thus, minimize inventory markdowns.

Defendants were aware of the massive inventory buildup through their access to, and reports generated from, Target's internal Greenfield and Appollo inventory management systems, site visits to Target's distribution centers where large quantities of HHF inventory left in "stash isles" and trailers of inventory left in the parking lot were inescapable, and the fact inventory decisions came from the top down.

On May 18, 2022, Defendants belatedly revealed that Target's quarterly results were adversely impacted by the Company's practice of over-ordering HHF inventory on a massive scale, without regard to customer insights or demand, resulting in overstocked, unsellable inventory wasting valuable shelf space and leaving Target unable to pivot to meet changing consumer preferences, as falsely represented. Defendants admitted that sustained over-ordering, resulted in inventory increasing dramatically, with "too much inventory" in "bigger, bulkier" HHF products that customers did not want "like furniture [and] TVs." Thus, Target finally took across-the-board HHF inventory markdowns to "make room for fast-growing categories." Upon the news, Target's stock price declined $53.67 per share, or nearly 25%. Meanwhile, Defendants unloaded significant stock holdings before Target announced its massive inventory markdowns.

Defendants recast Plaintiffs' allegations as a mere "failure to make accurate predictions" about customer demand. But this is ***not*** a case about Target's failure to ***predict*** anything. Rather, Defendants fraudulently concealed that, prior to the Class Period, Target abandoned its purported pre-Covid inventory management techniques in favor of indiscriminately purchasing inventory and, consequently, Target amassed unprecedented inventory oversupply that assuredly would—and did—far outstrip any potential demand. To credit Defendants' argument, one would have to believe that, between "late March 2022" and April 30, 2022 (approximately one months' time), Defendants purportedly observed a sudden, drastic reduction in demand for bulkier HHF products, determined it warranted huge, Companywide and immediate markdowns on the specified HHF items to

"clear them" and then implemented the markdowns. This narrative is simply not believable.[2] Defendants' Motion should be denied.

## II. STATEMENT OF FACTS[3]

### A.     Defendant Target

Target is a U.S.-based retail corporation that operates a chain of department stores across the United States. ¶¶1, 17, 29.[4] Target breaks its product sales down into five "core" categories: (i) "Apparel and accessories"; (ii) "Beauty and Household Essentials"; (iii) "Food and Beverage"; (iv) "Hardlines," which includes "electronics… toys, entertainment, sporting goods, and luggage"; and (v) "Home Furnishings, which includes "furniture, lighting, storage, kitchenware, small appliances, home décor, bed and bath, home

---

[2] Defendants' argument that "would be plaintiffs (or counsel) may not designate themselves without court approval" is irrelevant. The only Court-appointed lead plaintiff and lead counsel identified in the Complaint are those appointed by the Court. DB1, n.2. "DB_" refers to pages of Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint (ECF 83).

[3] Defendants seek to introduce more than 1,000 pages of extrinsic documents outside the pleadings to create an entirely new factual narrative that they then seek to dismiss. Defendants' Motion is procedurally improper as they did not file a motion requesting judicial notice, nor do they request notice in their Motion. *See In re Resideo Techs., Inc., Sec. Litig.,* 2021 WL 1195740, at *2–3 (D. Minn. Mar. 30, 2021). Moreover, the Court cannot accept Defendants' exhibits for the truth of the matters asserted, as most, if not all of the documents are in dispute: Exhibits: 1) K, U, V, W, and X are not Target's "SEC filings" and are information amalgamated by Defendants; 2) R, S, and T, are documents concerning Walmart, a single competitor not relied on or cited in the Complaint and are irrelevant to this case; and 3) C, D, E, F, G, H, I, J, P, Q, AA, BB, CC, DD, EE, and FF, are from outside the relevant Class Period and not referenced in the Complaint. *Kushner v. Beverly Enter., Inc*., 317 F.3d 820, 824 (8th Cir. 2003). The Ninth Circuit recently squarely addressed and rejected this practice. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

[4] References to "¶__" are to the operative Complaint.

improvement, school/office supplies, greeting cards and party supplies, and other seasonal merchandise." ¶29. Entering Fiscal 2021, Hardlines and Home Furnishings constituted 18% and 20%, respectively, of Target's annual sales. *Id.*

According to Target's touted business model, it uses customer insight data obtained through multiple sources such as rewards programs, smartphone application data, surveys, search insights, and more to gain real-time insight into consumer buying preferences and demand. ¶¶33–37. Target then purportedly uses this information to "stay [] three steps ahead with [its] guests in … rapidly changing times," and "curate" and purchase merchandise that consumers want at a quantity that would satisfy demand, but which would not result in bloated inventory that would eventually become obsolete. ¶¶31–32. Indeed, Defendant Hennington explained that "guests' mindset … serves as a North Star for all our strategies and decisions," including inventory procurement. ¶81.

### B. Defendants Abandon Target's Inventory Purchasing Business Model and Pre-Order Large Quantities of Inventory Without Regard to Consumer Demand

In 2020, Target reported record growth as the Company was buoyed by shopping trends during the COVID-19 pandemic. ¶30. Despite Target's success in 2020, the Company's revenue in late 2020 was constrained by supply chain issues which prevented Target from keeping its shelves fully stocked. ¶3. However, in early to mid-2021, product availability increased as COVID restrictions were lifted, resulting in consumers shifting their shopping habits away from certain "*bulkier"* goods to services, experiences and smaller items. ¶¶3, 6, 8.

CWs confirm that, to avoid the catastrophe of having empty shelves during the holiday season, starting no later than June 2021, Defendants began indiscriminately pre-ordering any inventory they could get their hands on, rather than according to current customer insights or demand. ¶¶4, 42. In particular, Defendants stocked up on "discretionary" products such as sofas, furniture, electronics, televisions and other "bulkier" goods from the HHF categories that consumers no longer wanted, causing Target's distribution centers and stores to become "alarmingly" overstocked by July or August 2021 as demand for such products was steadily declining. ¶¶48, 65–67, 69–70. As such, Target was unable to move it off the store shelves to make room for incoming inventory, or to adapt to changes in customer preferences. ¶43.

Indeed, CW-1, a Warehouse Associate at Target's RDC warehouse in Albany, Oregon (the "Albany RDC") from October 2018 to September 2023 (¶46) in charge of replenishing inventory for stores across a wide swath of Target's stores in multiple states, including Alaska, Washington, Oregon, western Idaho, and parts of northern California, witnessed first-hand that inventory levels at the Albany RDC grew to "alarming" levels as early as July or August 2021, and continued growing through the end of the Class Period, with overstock consisting of bulkier items in the HHF categories that customers were not buying. ¶¶48-50. CW-1 recalled that inventory levels leading up to and through the 2021 Holiday Season were "unprecedented" compared to prior years, even during the height of the COVID-19 pandemic; "everybody was talking about it, like 'this is crazy.'" ¶48.

According to CW-1, it was Target's policy to keep inventory levels at its warehouse facilities at 80% capacity at all times. ¶49. By early November 2021, however, the Albany

RDC reached *95 or 96%* inventory capacity, and by early 2022 manifestly *exceeded 100%* capacity. ¶¶49-50, 54.

CW-2, an Operations Manager from June 2021 through January 2023 at Target's Flow Center warehouse in Logan Township, New Jersey (the "Flow Center"), a massive facility that serviced stores and online orders for a large bulk of the East Coast including New Jersey, New York, Pennsylvania, and the Carolinas (¶56), personally witnessed the growth of Target's inventory overstock in 2021 and recalled that it was the direct result of the Defendants over-ordering inventory without regard to customer preferences—that came in far faster than the warehouses could contain it. ¶¶56, 60. Like the Albany RDC, CW-2 explained Target's goal was to operate the Flow Center at peak (holiday) season at 80% inventory capacity. ¶58. According to CW-2, the Flow Center reached 80% capacity well before Thanksgiving, reaching "the mid-90s" by "mid-November" 2021. ¶58. CW-2 confirmed that Target headquarters had control over inventory at the Flow Center through Target's custom-built warehouse management system, "Apollo," which provided inventory data, and thus Target headquarters personnel would be aware product was being overordered. ¶¶61–62. CW-2 also confirmed that Target management at headquarters used inventory data from Apollo when directing CW-2's facility on what to do with inventory, such as where to move it to. *Id.*

CW-3, an Executive Team Lead (*i.e.,* assistant store manager) at a major Target store in New York from 2019 until March 2022, similarly described a "huge spike" in inventory as far back as May 2021 at CW-3's store, which worsened over 2021. ¶¶64–65. "Everything" was stacking up, CW-3 said, but apparel and "bulky" furniture, in particular,

were moving extremely slowly because customers were not buying them at anywhere near COVID levels ¶¶65-66. The inventory overordering caused capacity issues through the end of CW-3's tenure in March 2022, and massive quantities of inventory that were not selling were pushed into CW-3's store from June 2021 onward. ¶67.

Indeed, the Amsterdam, Pennsylvania distribution center ("DC") that serviced CW-3's store ran out of storage capacity by April 2021, which led management headquarters to override automatic ordering quantities in Target's Greenfield inventory software, thus forcing the store to take excess inventory divorced from actual sales trends; CW-3's store, for example, was forced to take twenty weeks' worth of bulky furniture inventory that was not selling. ¶67. CW-3 also learned through communications and work with Executive Team Leads at other Target stores in the region, as well as with the region's District Store Manager, that the inventory overstock as a result of overordering was a widespread issue, affecting the entire region of stores starting in June 2021. ¶70. CW-3 recalled that by mid-2021, every store was dealing with the same inventory overstock issues. *Id*.

CW-3 explained that inventory purchasing for stores was decided "top down" by procurement teams in Target's headquarters and that, by 2021 and going into 2022, Target procurement continued to purchase items based on 2020 demand levels. ¶66. CW-3 observed through communications from Target headquarters and through access to Greenfield, Target's inventory management system which headquarters also had access to, that many of Target's bulky products, particularly those in the Home Furnishings category, were not selling and clogging Target's facilities. ¶¶67-68.

Out West, as inventory continued to amass at the Albany RDC during September through November 2021, the RDC reached a state where there was no space on warehouse racks or in bulk storage, and thus CW-1 and colleagues began having to make "stash aisles," placing inventory into aisles and travel lanes. ¶52. CW-1 observed throughout the 2021 Holiday Season that large quantities of televisions (*i.e.,* Hardlines), furniture, toys, and "bulky" items in the Home Furnishings category were not flowing out of the RDC because Target customers were not buying them. ¶53. Thus, by November 2021, the RDC exceeded 100% capacity, and employees were forced to start "stuffing trailers and leaving them in the yard." ¶54. CW-1 estimated that by November 2021, the Albany RDC had 50 to 100 tractor trailers of excess, unsold inventory "just sitting there" in the lot.

CW-2 similarly observed that, by mid-November 2021, employees at the Flow Center began having to put inventory on the floors as the storage racks became full—like the stash aisles CW-1 described at the Albany RDC. *Id*. CW-2 recalled that the Flow Center hit 100% inventory capacity, and exceeded it around February or March 2022, with some of the inventory overflow ending up in trailers outside as had occurred at the Albany RDC. *Id.* According to CW-2, the Flow Center had "probably 1,000 televisions that sat … collecting dust" because customers were not buying them. ¶59. CW-2 knew from personal observations and fulfillment demands from stores that the inventory piling up consisted of larger products in the HHF categories like "televisions and patio furniture." *Id.*

CW-1, CW-2 and CW-3's accounts are corroborated by, *inter alia*, posts and comments on internet forums where Target employees discuss their work. For example, on October 10, 2021, a Target employee posted on the Target "subreddit" called /r/target, an

internet forum with over 185,000 members, a photo of the back storage room of a Target store captioned "please stop sending us TVs" and depicting Hardlines crowding storage racks, indicating that this store was so overstocked with Hardlines that they were forced to cannibalize storage space intended for other products. ¶¶74-75. The post was "upvoted" by hundreds of users, indicating that the post received a high level of engagement from Target employees. ¶76. Several Target employees commented on the October 10, 2021 post, stating "[n]o. I'm drowning I'm [*sic*] TVs here." *Id.*

On The Break Room, an Internet forum described as "by team members, for team members" (*i.e.,* Target employees), a user identifying as a DC employee posted on February 2, 2022 that their DC had to make stash aisles for excess bulky inventory: "[t]hey even made up bulk locations in the shipping wing and we still can't store it all." ¶77. In another discussion thread on the Target subreddit on February 16, 2022, a user posted a photo of an overstocked store back room with the caption "[i]s anyone overwhelmed with the amount of shipments coming through this week? … Space is tight!!" *Id.* This prompted dozens of comments within 48 hours confirming the issue was ***widespread*** at other stores and warehouses, describing their facilities as "absolutely slammed," "extremely overwhelmed," "packed so solid," and "full of stuff no one's buying." *Id.*

Despite the overstocked facilities Company-wide, Defendants told investors that "because of [Target's] durable, flexible business model, we have proven we can adapt to any environment" (¶98) and touted Target's purported "favorable category mix" of inventory was resulting in Target experiencing "lower markdowns." ¶¶96, 100.

**C.      Defendants' Over-Ordering of "Bulky" Items Necessitated Steep Discounts to Sell**

Beginning in Winter 2021 and continuing through Spring 2022, Target began heavily discounting the prices of its overstocked "bulkier" HHF inventory to make room for products consumers actually wanted.  ¶¶45, 72, 116–23. CW-3 confirmed that inventory overstock led management at headquarters, who could see the buildup in the Greenfield system, to mandate the stores' discounts and markdowns starting in June 2021 and through the end of CW-3's tenure in March 2022. The number of price changes at CW-3's store ballooned from an average 700-900 items per week in 2019 and 2020 to a peak of 5,000-6,000 items per in just one week during 2021 and early 2022, as Target had begun working through the unwanted overstock. ¶72. According to CW-3, Target headquarters knew which products were overstocked at stores because the Greenfield system provided detailed inventory data for any Target facility, and headquarters began directing markdowns, discounts and liquidations starting in June 2021, continuing into 2022. ¶¶71–72.

**D.      The Truth is Revealed**

On May 18, 2022, Target issued a press release containing the Company's financial results for the first quarter ended April 30, 2022 (the "Q1 2022 Earnings Release") (¶116), revealing net profits were down 52%, operating margin was "well below expectations, driven primarily by gross margin pressure reflecting actions to reduce *excess inventory*" and gross margin dropped to 25.7% compared to 30.0% in the same quarter 2021, which "reflected higher markdown rates."   *Id.* (emphasis added). According to Defendant Hennington, "as supply grew and demand shifted away from ***bigger, bulkier products like***

*furniture, TVs and more*, we needed to make difficult trade-off decisions... To preserve the quality of on-shelf presentations and support the guest experience, we chose [to take]… incremental markdowns that reduced our gross margin." ¶120. Defendant Cornell stated that much of the excess inventory was in "***bulky***" categories such as "kitchen appliances, TVs and outdoor furniture"—products *within* Target's HHF categories the CWs and Target employees spoke about. ¶118 (emphasis added).

On this news, Target's stock price declined $53.67 per share, or nearly 25%, from a closing price of $215.28 per share on May 17, 2022, to close at $161.61 per share on May 18, 2022. ¶124.

## III. ARGUMENT

### A.    Legal Standards

To withstand a Rule 12(b)(6) motion to dismiss, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he question is not whether Plaintiff can be successful on its securities fraud claims, but rather, whether Plaintiff has pled its allegations and supporting facts with particularity such that the Complaint should remain for discovery." *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877 (D. Minn. 2007). In deciding a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). "Any ambiguities concerning the

sufficiency of the claims must be resolved in favor of the nonmoving party." *Beaver Cnty.*
*Emps.' Ret. Fund v. Tile Shop Holdings, Inc*., 94 F. Supp. 3d 1035, 1045 (D. Minn. 2015).

To state a claim under Section 10(b) of the Exchange Act, a complaint must allege
"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a
connection between the misrepresentation or omission and the purchase or sale of a
security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)
loss causation." *In re Target Corp. Sec. Litig*., 955 F.3d 738, 742 (8th Cir. 2020) (*quoting
Matrixx*, 563 U.S. at 37). Defendants argue only that the Complaint fails to satisfy falsity
and scienter. As discussed below, Defendants' arguments lack merit.

### B.     Defendants Made Materially False and Misleading Statements

Misrepresentations are adequately pled where the complaint "specif[ies] each
materially false statement or misleading omission and explain[s] why it is misleading."
*Resideo*, 2021 WL 1195740, at *4. A "party who discloses material facts in connection
with securities transactions assume[s] a duty to speak fully and truthfully on those
subjects." *In re K-tel Intern., Inc., Sec. Litig*., 300 F.3d 881, 898 (8th Cir. 2002) (citation
omitted). A statement is "actionably misleading" if it "create[s] an impression of a state of
affairs" that "materially differed from the one that actually existed." *Freedman v. St. Jude
Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014). Throughout the Class Period,
Defendants misrepresented: (1) Target's adherence to its business model to monitor and
consider customer preferences when ordering inventory; (2) the appropriateness of
Target's inventory; and (3) need for inventory markdowns.

### 1.    Material Misstatements concerning Target's Business Model

Throughout the Class Period, Defendants falsely claimed that "because of [Target's] durable, flexible business model, [Defendants] have ***proven*** [Target] can adapt to any environment" by "listening to the ever-changing wants and needs of our guests" through data obtained from loyalty programs, internet searches, smartphone apps and other guest insights. ¶¶33, 98; *see also* ¶81 (Target's business model allowed Defendants to "continually evaluate our guests' mindset, which serves as a North Star for all our strategies and decisions."). Thus, Defendants claimed, Target's inventory levels throughout the Class Period "reflect[ed] efforts to align inventory with sales trends" (¶¶92, 112) in order "to get the right inventory to the right place at the right time" (¶¶81-82), which gave Target a "favorable category mix" of inventory throughout the Class Period. ¶¶96, 110.

These, and other similar misstatements (*e.g.*, ¶88), were false when made because, according to the CWs, by at least June 2021, Defendants had abandoned Target's business model and were buying inventory without regard to customer's buying habits and sales trends. ¶¶50, 59–60, 65–68. CW-3 observed that by May 2021 and continuing through at least March 2022, CW-3's store in New York and the Amsterdam, PA DC that supplied it became extremely overstocked with discretionary, bulkier items in the HHF categories such as sofas, patio furniture and TVs that were not selling due to change in customer mindsets. ¶67. CW-1 corroborated CW-3's account stating that by July or August 2021, the Albany RDC was "alarming[ly] overstocked," particularly with respect to bulky, HHF products that customers were not buying and, by October 2021, was at 95% capacity—well above the Company's internal 80% policy. By November 2021, CW-1 and colleagues had

14

to store excess inventory in "stash aisles" and on 50 to 100 trailers located in the parking lot. ¶¶50, 54. CW-2 corroborated CW-1 and 3's accounts, recounting that by mid-November 2021, the Flow Center in New Jersey was in the mid-90s percent capacity comprised of furniture, electronics and other bulky goods that were not selling. CW-2's warehouse also had to store the excess inventory in aisles and trailers. Online comments from numerous Target employees further corroborated CW1, 2 and 3's accounts,

Courts have held similar misstatements that Defendants were adhering to a company's customer-data-centric business model as actionable. *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *13 (S.D.N.Y. Mar. 25, 2013) (statement defendant had "taken the necessary steps to give the customers what they want," referring to product inventory, was actionable).

Defendants also purported to warn investors that if Target's fails to "respond quickly to changing consumer preferences" or did not "quickly respond to changing consumer tastes, preferences, spending patterns" that it "could adversely affect our results of operations." ¶¶94, 114. These statements were misleading when made because the risks being warned of had already materialized, as Defendants had abandoned Target's business model of using customer insights to inform inventory purchases, resulting in increased levels of unwanted inventory that Target was unable to sell, and inevitably necessitating large discounts and corresponding write-downs. When risks have already materialized, merely disclosing them "in the abstract" whilst omitting they have "already come to fruition" is misleading. *Siracusano v. Matrixx Initiatives, Inc.,* 585 F.3d 1167, 1181 (9th Cir. 2009); *see also Ferreira v. Funko Inc.,* 2021 WL 880400, at *16–19 and 24–25 (C.D.

Cal. Feb. 25, 2021) (risk disclosures as to effective inventory management misleading where defendants omitted that "millions of dollars of obsolete inventory being stored in multiple warehouses").[5]

Defendants contend that the CW allegations lack merit because the CWs were too low-level, had no exposure to data concerning customer demand, and can only speak to one facility each, rather than conditions at Target Company-wide. DB13-19. As an initial matter, Defendants' attempt to recast Plaintiffs' case as one about Defendants' ability to predict customer demand should be rejected, as that is not Plaintiffs' case. Rather, Plaintiffs allege that Defendants purchased inventory without regard to customer preferences, while telling investors otherwise, leaving Target with inventory of unwanted goods that would inevitably have to be marked down.

The witnesses are not too low-level to have knowledge about the topics about which they speak and, in fact, represent three separate levels of employment within Target, including managerial, and each is described "with sufficient particularity to support the probability that a person in their position occupied by the source would possess the information alleged." *Nash Finch*, 502 F. Supp. 2d at 877. The Complaint alleges:

- CW-1 was a Warehouse Associate in Target's RDC[6] in Albany, Oregon servicing five states in the Pacific Northwest from October 2018 until September 2023, responsible for unloading and sorting inventory received from vendors, selecting inventory to ship to stores, and attending daily shift

---

[5] Unlike *Indiana Public Retirement System v. Pluralsight, Inc.*, 45 F.4th 1236 (10th Cir. 2022), where the company "could hire more sales representatives" to meet its sales ramp capacity plan, Target already had a massive glut of bulkier HHF products and could only work through it by instituting widespread markdowns.

[6] CW-1 confirmed that most inventory flows through Target's RDCs. ¶47.

meetings discussing the state of inventory and how it exceeded the RDC's intended capacity. ¶¶46–47, 49–50. CW-1 physically observed inventory levels at the RDC, including "stash aisles" of excess inventory and 50 to 100 trailers of inventory in the RDC parking lot, and learned through the daily meetings with the Senior Director of Distribution (and headquarters liaison) of the RDC's decreasing capacity for inventory. ¶49.[7]

- CW-2 was an Operations Manager in Target's Logan Flow Center, responsible for replenishing store inventories and fulfilling Target.com orders for much of the East Coast—including direct-to-consumer online sales and stores in New Jersey, New York, Pennsylvania, and the Carolinas—from June 2021 through January 2023. ¶56. CW-2 was given inventory reports from Target headquarters generated from the Center's Apollo software. ¶61.

- CW-3 was an executive team lead ("ETL") at a major New York store from 2019 until March 2022 responsible for receiving and unloading incoming inventory, managing the back stockroom, getting inventory onto the sales floor, and fulfilling customer orders. CW-3 had access to Target's Greenfield inventory software, and received directives from headquarters based on Greenfield data. CW-3 communicated directly with ETLs overseeing other stores in the same region, as well as the District Store Director. ¶70.

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (crediting CWs in a position to "know" or "reasonably deduce" the information attributed to them).

Furthermore, the CWs speak to more than one facility each (DB13-14): CW-1 had personal knowledge of the inventory in the ***five states in CW-1's Pacific Northwest region*** (Alaska, Washington, Oregon, western Idaho, and parts of northern California) supplied by the RDC where CW-1 worked; CW-2's warehouse supplied most of the East Coast region (including New Jersey, New York, Pennsylvania, and the Carolinas); and CW-3 not only attended regional meetings with ETLs and the District Store Director where CW-3

---

[7] *In re Neustar Sec. Litig.*, is inapposite: it did not address CWs at all, much less their positions to know facts. 83 F. Supp. 3d 671, 686 (E.D. Va. 2015).

was informed that the same inventory issues existed at stores throughout CW-3's New York state region, ¶70, but also was informed by Target headquarters and through Greenfield on the state of the store's DC in Amsterdam, PA. ¶67. Thus, the CWs cover ten states as well as online orders. Moreover, numerous anonymous employee posts on multiple Internet forums for Target employees from across the country corroborate the CW accounts. ¶¶74–78. Thus, Plaintiffs have adequately alleged a Company-wide inventory problem and need not, as Defendants suggest, allege the issues existed at every single store or DC. *City of Sunrise Gen. Employees' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018) (plaintiff plausibly pled that an alleged fee-related fraud was widespread). *Mart v. Tactile Sys. Tech., Inc*., 595 F. Supp. 3d 788, 812 (D. Minn. 2022) (kickback scheme suggested a widespread, company-wide strategy); *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *14 (C.D. Cal. Dec. 5, 2022) (CW accounts "bolstered by Better Business Bureau ('BBB') reviews from customers").[8]

That the CW allegations "corroborate one another" further supports a Company-wide inventory problem and indicia of reliability. *Nash Finch*, 502 F. Supp. 2d at 875. These employee posts do not "merely discuss increasing inventory" (DB13 n.10); they describe HHFs backing up in warehouses, RDCs, and stores, exactly as the CWs described,

---

[8] Defendants' cases are inapposite. *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 958 (8th Cir. 2008) ("[n]othing in the complaint put[] the returns spoken of by [the] CW[] in perspective or suggest[ed] that they were something other than normal business fluctuations."); *Pound v. Stereotaxis, Inc.,* 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014) (CW allegations that "certain customers expressed dissatisfaction" with a medical product did not support the broad conclusion that the product was not being clinically adopted). Here, multiple CWs particularized facts establishing HHF inventory increase were far outside "normal business fluctuations."

presenting "overlapping and corroborative information" that must be credited. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022).

Defendants' attacks on CWs allegations as inadmissible hearsay should also be rejected because the pleading stage is not the time for "a mini-trial on the admissibility of the evidence." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *11 n.8 (N.D. Cal. Jan. 6, 2022). Defendants' own authority holds that hearsay may be credited. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009) (hearsay may be "consider[ed]"); *see also Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012) ("hearsay does not automatically render confidential witness statements unreliable"). Moreover, the CW accounts are not unreliable hearsay. DB18. For instance, CW-3 personally communicated with the District Store Director and other Executive Team Leads in the New York region to balance inventory across stores, and thus learned beginning in mid-2021 about the scope and severity of overstock issues. Thus, CW-3 "described conversations that they themsel[f] heard." *Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.,* 63 F.4th 747 (9th Cir. 2023) (CWs do not need explicit knowledge of corporate-level activities for their statements to "combine to tell a plausible story"). The same goes for CW-2's report of learning about the Logan Flow Center's ordinary inventory levels from Blake Helmke, Senior Operations Director.[9]

Defendants also baselessly contend that the CW reports about inventory cannot shed light on what Target purchased and sold. DB19. But CW-3 had access to Greenfield, which

---

[9] Defendants resort to the implausible suggestion that Mr. Helmke was not in a position to have basic operational knowledge such as ordinary inventory levels. DB19 n.12.

showed inventory levels that adjusted in real-time as items were sold at the registers and received into the store by freight, while CW-2's facility used Apollo, Target's warehouse management system. That "store management had no say in purchasing or stocking decisions" (DB20) is irrelevant; the CWs directly observed inventory movement.

Moreover, Defendants' claim that the CW accounts are directly contradicted by Target's sales figures, which purportedly showed demand for the challenged products was increasing (DB15, 25, 31, 34), is demonstrably wrong. First, Defendants improperly rely on quarterly sales figures for broad product categories comprised of hundreds of products not at issue in this case. For example, Target's SEC filings define Hardlines as "electronics (including video game hardware and software), toys, entertainment, sporting goods, and luggage," yet Plaintiffs do not allege sporting goods or luggage were overstocked. The Home Furnishings category includes numerous products well beyond the bulky, discretionary items like furniture (¶53) at issue here.

Second, Defendants' own Motion shows sales in the Hardlines category *declined* quarter after quarter in 2021. DB17 (stating sales for Q1 2021 of $3.95b, Q2 2021 of $3.87b and Q3 of $3.84b). Sales growth likewise plummeted in 2021: while Hardlines sales grew 44%, 37% and 27% in Q2, Q3, and Q4 2020, respectively, as compared to 2019, they only increased 7%, 14% and 4% for Q2, Q3 and Q4, respectively in 2021 as compared to 2020. Likewise, Home Furnishing sales in Q2, Q3 and Q4 2021 increased only 3%, 11% and 5%, as compared to growth of 44%, 37% and 27% respectively, for the same quarters in 2020. DB17. At best, Defendants' argument raises inappropriate "factual disputes." *Schoenfeld v. U.S. Resort Mgmt., Inc*., 2007 WL 2363500, at *2 (W.D. Mo. Aug. 16, 2007).

Even if Defendants *had* provided sales figures for the particular products at issue, their statements are misleading in light of their admissions in May 2022 that markdowns had to be taken on such products, "even if [they] do not … have an immediate financial impact on the company." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021). Thus, Defendants' factual issue should be rejected at this stage.[10]

Defendants' other arguments fare no better, as the fact Target ordered unwanted inventory (DB31) contradicts statements that Target was "attempting" to get the right inventory in its stores at the right time because they do not disclose Defendants did not consider customer preferences and thus, was not even trying to get the right inventory.[11]

## 2. Material Misstatements Concerning Target's Inventory Levels

Defendants falsely represented throughout the Class Period that, as a result of Target's purported "durable, flexible business model," Defendants "feel good about our inventory levels heading into the holding season" (¶81), that Target had been "accelerating purchases of certain merchandise in our core categories," to purportedly meet holiday demand (¶88), that Target was, thus, "entering the holidays with a very healthy inventory

---

[10] Defendants concede the CWs are accurate as to facts Defendants publicly admitted and cannot now disavow, while ignoring the CW information contradicting Defendants' misstatements. This renders Defendants' authorities irrelevant. *See* DB §I.B.1.b (citing *Cal. Pub. Emp.s' Ret. Sys. v. Chubb*, 394 F.3d at 126, 157 (3d Cir. 2004); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 42 (1st Cir. 2017); and *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014)).

[11] Defendants argue that Plaintiffs "fail to demonstrate … Target's future performance outlook was less optimistic than its past" (DB34 n.14), *i.e.* following "2 years of … federal stimulus payments," yet Defendant Cornell later *admitted* "we knew that wasn't going to last forever." ¶¶120, 125.

position overall" (¶84) and that Target's "inventory of $2 billion north of last year" favorably "positioned [Target] for the back part of the year." ¶86. *See also* ¶105. Defendants also falsely assured investors that Target's inventory was "constantly moving through" such that there was "a lot of headroom for growth from that perspective." ¶103.

The above statements were materially false and misleading when made because Target had abandoned its business model in favor of pre-ordering large quantities of inventory, without regard to customer preferences, resulting in a massive influx of HHF inventory that Target couldn't sell. Accordingly, Target was not "constantly moving inventory through"; rather, according to CWs 1, 2 and 3, Target's capacity had far exceeded the Company's 80% capacity policy such that Defendants had to store it in "stash isles" and trailers in the parking lot and offer massive discounts to sell it. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) ("by failing to disclose [the] increase in inventory, Defendants rendered their partial disclosures about their "well-defined strategy" false or misleading."); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *6 (S.D.N.Y. May 1, 2024) (reassurances about "adequate" inventory levels misleading when undermined by undisclosed issues).

Moreover, by discussing the adequacy of Target's inventory levels, Defendants had a duty to speak truthfully and completely about Target's core inventory categories, including HHFs that collectively represented approximately 40% of sales. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't

mislead investors") (alterations in original). Thus, by discussing Target's inventory levels, Defendants had a duty to disclose that markdowns were needed to clear unwanted inventory—especially given they also discussed markdowns. *See* §III(B)(3), *infra. See, e.g., Macquarie Infrastructure Corp. v. Moab Partners, L. P.,* 144 S. Ct. 885, 890 (2024) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004) ("if one speaks, he must speak the whole truth.").

That Target disclosed in August 2021 that it was increasing inventory for the holiday season (DB15, 34; ¶88) does not remedy their omission that Target abandoned its business model and was not considering customer preferences in pre-ordering such inventory, which would result in inevitable markdowns to sell it. *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 104 (D.C. Cir. 2015) (finding statements misleading because "references to amassed inventory did not convey that inventory was obsolete"). Similarly, Defendants' accusation that the Complaint contains contextomy (DB27–28) is misplaced. Not only do Plaintiffs *include* context for the misleading statement at ¶84 ("we continue to see … outages across … items"), but said context further contributes to the misleading nature of the statements—that investors being told of "healthy inventory" relative to past supply chain issues only further paints the misleading picture that Target was not overstocking in unwanted goods.

### 3. Material Misstatements Concerning Markdowns

Defendants misled investors throughout the Class Period by acclaiming across multiple quarters that markdowns were *lower* in 2021, stating the Company's gross

margins were "partially offset by the benefit of historically low promotional and clearance markdown rates" (¶¶90, 110), and later stating Target's gross margin for its entire fiscal year 2021 was "largely offset by favorable category mix and lower markdowns" (¶96). Defendants also claimed during the Class Period that they were "planning for a *small* increase in markdown rates in 2022," which would mean "*a few* more clearance markdowns … in the upcoming year," and falsely touted that "[w]e achieve effective inventory management by … carefully planning inventory levels for seasonal and apparel items to *minimize markdowns*." ¶¶100-01, 108.

Defendants' statements were false and misleading when made because, by discussing Target's low markdown rates and accelerated inventory purchasing, Defendants had a duty to disclose the full truth—that significant markdowns were needed to dispose of multitudes of unwanted inventory in the HHF categories. CWs witnessed firsthand that customers were not purchasing bulky items in the HHF categories prior to and throughout the Class Period which would inevitably necessitate significant markdowns to rid Target of overstocked inventory in these categories, including: i) the Apollo inventory software, which CW-2 explained showed Target was continuing to purchase bulky HHF products that were not selling and thus inventory increased, such that the Flow Center exceeded its 80% "intended capacity" well before Thanksgiving 2021 (¶¶61–62); and ii) the Greenfield inventory management system used by stores, per CW-3, which showed bulky furniture clogging Target's facilities by April 2021. ¶¶65, 67-68. CW-1 confirmed that inventory levels of "bulky" items like televisions and furniture at the Albany RDC grew to "alarming" levels by August 2021, ultimately resulting in the RDC making "stash aisles"

and stuffing 50 to 100 external trailers as it exceeded 100% capacity by November 2021. ¶¶48, 52-54. CW-2's Flow Center also made stash aisles by November 2021 for HHF products like "televisions and patio furniture," ¶¶54, 59. The CWs' accounts of Target's massive overstock are corroborated by Internet posts by various Target employees. ¶¶74–76.[12]

Courts have found similar statements misleading where, as here, "defendants knew the projections could not be achieved because of unusual pricing discounts." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 249, 264-67 (3d Cir. 2009); *see also Novak v. Kasaks*, 216 F.3d 300, 304, 315 (2d Cir. 2000) (sustaining statements that "no major or unusual markdowns were anticipated," and that the inventory situation was "in good shape" or "under control," while defendants knew that the contrary was true); *Aeropostale*, 2013 WL 1197755, at *11 ("appropriately attacking the inventory problem" misleading where in reality Aeropostale had to engage in markdowns to clear unwanted products).

Moreover, it is axiomatic that investors who are repeatedly told about low markdown rates over Target's entire fiscal year 2021 would reasonably conclude that Target wasn't marking down product because it didn't need to. However, Target's low markdown rates in 2021 were merely dilatory, as evidenced by the markdowns being executed in Target's first fiscal quarter 2022. Thus, Defendants' statements are actionable

---

[12] While Defendants dispute the numerous Internet posts of Target employees as unsubstantiated, DB13 n.10, these posts provide "corroborating detail" with the CWs' accounts to support falsity. *See 3226701 Canada, Inc. v. Qualcomm*, 2017 WL 4759021, at *19 (S.D. Cal. Oct. 20, 2017) (online complaints and CW testimony corroborated each other).

because they created "an impression of a state of affairs that materially differed from the one that actually existed." *St. Jude*, 4 F. Supp. 3d at 1114; *Sanchez v. Centene Corp.,* 407 F. Supp. 3d 831, 842 (E.D. Mo. 2019). *Lefkoe v. Jos. A. Bank Clothiers,* 2007 WL 6890353 at *5 (D. Md. Sep. 10, 2007) is instructive: there, the court sustained "statements regarding [d]efendants comfort with the [c]ompany's inventory and promotional activity" where, as here, defendants knew that "aggressive pricing strategies" were needed to "alleviate the excessive … inventories" and plaintiffs alleged a "specific failure to disclose the excessive inventory build-up and the resultant need to engage in steep discounting." *Id.; see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (statements that "revenues benefited" were misleading where revenues were driven by "inflated … inventory.")[13]

#### 4.    **Defendants' Statements Are Not Inactionable Opinions**

Defendants contend that their statements at ¶¶81, 84, 86, 105, and 108 are inactionable opinions, yet do not identify which portions they claim are opinions. DB28–29. Their arguments should be rejected as a waiver on that basis alone. Moreover, two of these statements describe then-existing *facts* and, thus, are not opinions: 1) Target "***achieve[s]*** effective inventory management" (a "key" to its "success") by "carefully planning inventory levels for seasonal and apparel items to minimize markdowns" (¶108);

---

[13] Defendants point to competitor Walmart's announcement of COVID-related shortfalls to argue Target's inventory issues were an industrywide problem. DB9 n.7; DB 36 n.16. These allegations aren't alleged in the Complaint,are irrelevant, and thus should be disregarded. Moreover, Walmart's press release (Def. Ex. R; DB9 n.7) ***does not contain*** any mention of markdowns as Defendants (mis)cite; rather, the release attributes Walmart's headwinds to inflation.

and 2) despite "periodic outages across different items and categories, **we're entering** the holidays with a very healthy inventory position overall." ¶84.

As to the three remaining challenged statements, even statements that appear on their face to be opinions can mislead investors. Indeed, "those magic words ['we believe' or 'we think'] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors." *Omnicare,* 575 U.S. at 193. Even if Defendants' statements at ¶¶81, 86, and 105 are analyzed as opinions, they are actionable.

First, in response to an analyst, Defendant Fiddelke emphasized that Target was "pulling all the levers … to ensure we're there for the guest," referred to "some very specific investments we made," and assured investors that he "fe[lt] really good about the set of investments that we're making and how they have positioned us for the back part of the year." Only one portion of Fiddelke's response is "expressly framed as [a] feeling[]" (DB28), but even if the entirety of his response is analyzed as an opinion, it remains actionable because he failed to disclose that Target had abandoned its prior strategy of buying inventory based on customers preferences, and that inventory was egregiously backed up throughout Target's warehouses and stores. These omitted facts directly conflict with Defendants' statements that, *inter alia*, Target had "effective inventory management" (¶108) and was "entering the holidays with a very healthy inventory position overall." ¶84. *Omnicare*, 575 U.S. at 189 (facts that "conflict with what a reasonable investor would take from the statement itself" are actionable). Moreover, Plaintiffs have "alleged additional context that makes these statements misleading." *Karinski v. Stamps.com, Inc.*, 2020 WL

281716, at *11–13 (C.D. Cal. Jan. 17, 2020) (holding "very happy" statement actionably misleading in light of undisclosed facts).·[14]

Nonetheless, the Complaint alleges particularized facts creating a strong inference that Defendants did not subjectively believe any statements of opinion at the time. *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 729 (D. Minn. 2019) (plaintiffs "repeatedly alleged facts that show Defendants knew that their statements were … false."). *See also* §III(C), *infra*.

### 5. The PSLRA Safe Harbor Does Not Protect Defendants

#### a) Defendants' False Statements Were Not Forward-Looking

Defendants claim that nearly all of their misstatements were "forward-looking" and protected by the PSLRA's statutory safe harbor. DB26-27, 30-33. But Defendants' misstatements were "statements of present fact or past fact, to which the safe harbor does not apply." *CenturyLink*, 403 F. Supp. 3d at 729; *see also Rochester Laborers Pension*

---

[14]Defendants' cases are inapt. DB29. *Steamfitters Local 449 Pension Plan v. Skechers USA, Inc.* provides little support where the statement about inventory growth was an inactionable opinion because the plaintiff did not "explain how the statement was false." 412 F. Supp 3d 353 (S.D.N.Y. 2019), *aff'd*, 826 F. App'x 111 (2d Cir. 2020). *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 185 (W.D.N.Y. 2022) and *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343, 354-55 (2d Cir. 2022), are also inapplicable. *Eastman* held that "we feel very comfortable" was inactionable when followed by "there was still some work to do," because it was purposely vague in order to convey a lack of certainty. 632 F. Supp. 3d at 185. Here, Fiddelke's "feel good about our inventory," was followed by *certainty* ("up 30%" and "that's a testament to us working through…supply chain challenges…"). ¶105. Likewise, *Bristol-Myers* held that the opinion statements could support a claim if they "contained one or more embedded factual statements that can be proven false." *Id.* at 355. Here, "up 30%" and "we've got inventory of $2billion north of last year, up almost 20%" are embedded facts that form the basis of the opinion. ¶¶86, 105.

*Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 846 (E.D. Mo. 2012); *see, e.g.*, ¶81 ("We **continuously evaluate** our guests' mindset" and "**feel good** about our inventory levels"); ¶98 ("our durable, flexible business model"); ¶82 ("focus is on moving the right amount of inventory to the right place at the right time"); ¶84 ("a very healthy inventory position"); ¶86 ("you're seeing in the third quarter, the **result** of some very specific investments we **made**"); ¶105 ("our inventory position **today**"); ¶94 ("our business **is** dependent on our ability to make trend-right decisions and effectively manage our inventory"); ¶108 ("we achieve effective inventory management by … carefully planning inventory levels…"). To the extent any of these are "mixed statements" containing both forward-looking and non-forward-looking elements, the safe harbor does not protect the latter.  "Combining false or misleading statements about past or present facts with forward-looking statements does not invoke the safe harbor." *CenturyLink*, 403 F. Supp. 3d at 729. [15]

Defendants concede that the "Flow Statements" "partially refer to Target's present efforts," and do not identify any forward-looking portion of these statements. DB32-33.

---

[15] Defendants' reliance on two out-of-circuit cases is misplaced. *Little Gem Life Scis. LLC v. Orphan Med., Inc.*, 2007 WL 541677, at *6 (D. Minn. Feb. 16, 2007)—which addressed a DCF analysis of *anticipated future* cash flows—cites a single S.D.N.Y. case, but the Second Circuit subsequently held that "[a] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016). Likewise, the Sixth Circuit rejected the "overly broad" approach of *In re Champion Enterprises, Inc., Securities Litigation*, 144 F. Supp. 2d 848 (E.D. Mich. 2001) (DB30). *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 680 (6th Cir. 2003); *see also Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 984 (6th Cir. 2018) ("The *Miller* court held that when a defendant makes mixed statements, and a statement of present or historical fact is specifically challenged as fraudulent, it can be separated from surrounding forward-looking statements that remain within the safe harbor.").

Nor can they. Those statements falsely assured investors about Target's then-current inventory posture. *See* ¶81 ("our teams *are* working diligently to get the right inventory to the right place at the right time," which "*has* driven … gross margin pressure," and related to *then-existing* "inventory levels heading into the holiday season"); ¶82 ("*the focus is* on moving the right amount of inventory to the right place at the right time"); ¶103 (inventory is "*constantly moving* through*. It shows up* at night*. It's out the store the next day.*"). Thus, the safe harbor does not apply.[16]

### b) The Purported Cautionary Language Was Not "Meaningful"

Defendants do not specify any purported cautionary language that relates to their misstatements, instead relying on generic language added to the end of earnings call *transcripts* (i.e., not spoken during the calls) *by the call vendor*, and whose verbiage does not even mention Target. *See* DB27 (citing N.32), 33 (citing M.17 and N.32), and 37 (citing N.32); *see also* M.17 and N.32 (both stating: "In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking

---

[16] Defendants' cited cases for their argument that the "Investment Statements" are forward-looking are inapposite. *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 647 (D.N.J. 2021) held the statement that defendant "fe[lt] very happy with [its] inventory level today" was forward-looking because the statement was made about future projections, not present inventory as here. *In re Champion Enters., Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 865 (E.D. Mich. 2001) held that "watching and managing inventory to *improve turn*," was mixed because "improving turn is a future objective of the management and is necessarily forward-looking," where as "I feel really good about our inventory position today," is a present circumstance. ¶105. *Boykin v. K12 Inc.*, 54 F.4th 175, 184 (4th Cir. 2022) found statement "positions us well" was a projection of "future economic performance," and agrees that "the safe harbor does not cover assertions of present fact." Here, the inventory statements describe present situations.

statements regarding a variety of items...”). Further, one boilerplate reference to the Company’s 2021 10-K at the outset of a single earnings call (*see* DB27 (citing M.2)) does not satisfy Defendants’ burden to establish that the safe harbor applies, as the risk factors in the 2021 10-K were themselves misleading (*see* §III(B)(1), *supra;* ¶114).

Moreover, cautionary language must be “more than mere boilerplate.” *Monsanto*, 883 F. Supp. 2d at 846–47 (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) that “[t]he requirement for ‘meaningful’ cautions calls for ‘substantive’ company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely … generally applicable risk factors.”). “To determine whether cautionary language is adequate, courts should evaluate it in light of the allegedly undisclosed risk and determine if a reasonable investor would have concluded that the risk that eventually materialized never existed.” *W. Wash. Laborers-Employers Pension Tr. v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1090 (E.D. Mo. 2010). Here, the purported risks Defendants identify are too general to be meaningful. For example, warnings that if Target fails to “make trend-right decision” or “predict changing consumer tastes [and] preferences” it could “experience inventory markdowns” (DB27) does nothing to warn that Target might purposefully abandon its touted inventory-purchasing model and disregard customer preferences and demand in purchasing inventory.

Moreover, Defendants’ cautionary language is insufficient because the risk warned of had already occurred. *Nash Finch*, 502 F.Supp.2d at 873 (“cautionary language cannot [sic] be ‘meaningful’ when defendants know that the potential risks they have identified

have in fact already occurred, and that the positive statements they are making are false.");

*see also Resideo*, 2021 WL 1195740, at *5 (same); *In re Pemstar, Inc. Sec. Litig.*, 2003

WL 21975563, at *8 (D. Minn. Aug. 15, 2003) ("[cautionary] language is insufficient to

render immaterial presently known facts about the problems at the company.");

*Aeropostale*, 2013 WL 1197755, at *12–14 (finding that even "specific risk disclosures",

*e.g.* as to the "effectiveness of our inventory management" "do not shelter defendants from

liability" because defendants failed to disclose facts "critical to appreciating the magnitude

of the risks described," specifically that defendants' inventory was already "'infected' with

unpopular" products). Here, the purported risk being warned of—that "if we do not obtain

accurate and relevant data on guest preferences, predict and quickly respond to changing

consumer tastes, preference… we may experience lost sales, spoilage, and increased

inventory markdowns"—was materializing as of at least June 2021, when Defendants

abandoned efforts to purchase inventory based on consumer preferences and demand.

¶¶94-95, 114-115.[17]

Moreover, Defendants' presentation that such failures were purely hypothetical

when those circumstances had already developed was materially misleading "even if the

---

[17] Defendants' cases (DB21) are distinguishable. In *Karth v. Keryx Biopharmaceuticals, Inc.*, "the facts alleged d[id] not indicate that" the risk at issue "was happening or was even close to a 'near certainty.'" 6 F.4th 123, 138 (1st Cir. 2021). Similarly, in *Olo* (which Defendants misquote), the plaintiffs "failed to adequately allege that the disclosed risk had already materialized when the disclosure was made." 2023 WL 8287681, at *3. In *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015), an unpublished decision, the Court acknowledges that there are circumstances under which a risk disclosure might support Section 10(b) liability, such as here, where plaintiffs have alleged facts suggesting issues "were so severe that they would have resulted in financial loss."

magnitude of the ensuing harm was still unknown." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949–50 (9th Cir. 2023) ("Our case law does not require harm to have materialized for a statement to be materially misleading."). At the time of the "Demand Warning[]" statements (DB9) on November 24, 2021 (¶94) and January 29, 2022 (¶114), Target was already experiencing lost sales and increased markdowns as a result of its glut of particular HHF products, and it was a virtual certainty that it would experience more.[18]

*Williams v. Globus Medical, Inc.*, 869 F.3d 235 (3d Cir. 2017) (DB22) is inapposite: when the *Williams* defendants warned about the sales from the loss of distributors, the sole distributor at issue "was still distributing the company's products" (risk yet to materialize) and the plaintiffs failed to adequately plead that the company's executives 'should have expected' the negative financial impact that ultimately occurred." *Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 93 (D.D.C. 2019) (discussing *Williams*).[19]

---

[18] In *Sleep Number*, because the "plaintiffs d[id] not plead that … manufacturers in fact shut down their operations," there was an insufficient basis to establish a significant disruption of the company's supply chain. *Steamfitters Loc. 449 Pension & Ret. Sec. Funds v. Sleep No. Corp.*, 2023 WL 4421688, at *9 (D. Minn. July 10, 2023). Similarly, in *Pier 1*, the allegations provided "no basis to conclude that Pier 1 knew it had troubled or obsolete inventory materially above normal levels." *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 747 (N.D. Tex. 2018). Here, unlike *Sleep Number* and *Pier 1*, Plaintiffs allege particularized facts establishing Target knew it had a glut of unwanted inventory far above "normal levels."

[19] Defendants also claim that they "warned that consumer preferences could change quickly," but they do not point to any language disclosing this risk, let alone the reality that Target had purchased a glut of HHFs in the face of known, slowing demand for such goods. Defendants quote a purported warning "that the Pandemic and market conditions caused 'significant volatility' in demand" (*see* DB24) (citing Ex. A.8-9), but they mischaracterize their own statements. The cited exhibit merely refers to "significant volatility in our sales mix, including both category and channel sales mix and same-day fulfillment options," and represents that "we have experienced unusually strong sales, as guests rely on Target for

Further, Defendants' argument that the "Demand Warnings" did not concern the risk of "fail[ing] to align Target's purchasing behavior and inventory selection with demand," and only warned of the risk that such failure could cause "material harm to Target's results of operations," is irrelevant hair-splitting. DB22. Defendants' statement that if they "d[id] not anticipate and respond quickly to changing consumer preferences, our sales and profitability could suffer" was materially misleading because Target had already ordered massive amounts of HHF inventory that was misaligned with consumer preferences. Thus, the risk that Target may not "anticipat[e] and respond quickly to changing consumer preferences," was already occurring. And the sustained excess inventory is evidence that sales of bulky HHFs were suffering during the Class Period. *See Funko*, 2021 WL 880400, at *18–19 (C.D. Cal. Feb. 25, 2021) (finding risk disclosure "not meaningful" where it merely set forth "hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized") (citing *Siracusano*, 585 F.3d at 1181). Further, Target was already experiencing "elevated cost to store" excess inventory, in particularity because many HHF products "are bulkier than average and require higher-than-average amounts of storage capacity" (¶119), and the necessity of markdowns to "work through this excess inventory" was already clear. Thus, not only do the "Demand Warnings" not insulate any other misstatements from liability, they were themselves materially false and misleading.

---

[*inter alia*] merchandise associated with guests spending more time at home." This representation concerning strong sales in HHFs *bolsters* Plaintiffs' claims.

### 6. Defendants' Misstatements Were Material

Defendants contend that cherry-picked snippets from eight of the alleged misstatements are immaterial "puffery." *See* DB25-26 (¶¶81, 98), DB29–30 (¶84, 86—87, 108), DB32 (¶81–82, 103).  When evaluating puffery, however, the alleged misstatements must be read in context. *Hewlett-Packard*, 905 F. Supp. 2d at 1069 ("Although these statements, standing alone, might constitute puffery…"); *Mart*, 595 F. Supp. 3d at 809 n.17 (rejecting defense where purported puffery language failed to disclose contrary facts"); *In re St. Jude Medical, Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) ("statements by [d]efendants must be evaluated … in context."). Moreover, "[m]ateriality is normally a 'question of fact for the jury.'" *Tile Shop*, 94 F. Supp. 3d at 1046.

Here, each of Defendants' statements, when read contextually, are objectively verifiable, and therefore not puffery. For instance, each of the allege misstatements regarding Target's inventory position (DB27), when read in context, refers to a verifiable, numeric inventory value as the basis for Defendants' statement that Target had sufficient inventory to meet customer preferences and demand.  *See* ¶86 ("We've got inventory of $2 billion north of last year, up almost 20% on a year-over-year basis…So I feel really good about the set of investments that we're making…."); ¶105 ("I feel really good about our inventory position today, up 30% to last year). Indeed, either the enumerated inventory *was* sufficiently tied to customer preferences to satisfy demand or it *wasn't. See Nash Finch*, 502 F. Supp. 2d at 879 ("specific predictions about growth" not immaterial puffery); *Harman*, 791 F.3d at 108–10 (a statement claiming an aspect of a business was "very

strong" was "not too vague" because it was tied to product that was "the focus of recent public statements" and "tied … to a time period").

Likewise, Defendants' statements that they adhered to Target's inventory business model of considering customer insights, read contextually, assured investors that Target complied with its business model and, thus, would have the inventory customers wanted. *See* ¶81 (Target was "working diligently to get the right inventory to the right place at the right times. Doing so has driven…appropriate long-term investment in the relation with our guests…[s]o we feel good about our inventory levels heading into the holiday season");[20] *Id.* ("[w]e continuously evaluate our guests' mindset, which serves as a North Star for all our strategies and decisions");[21] ¶84 ("we're entering the holiday with a very healthy inventory position overall"); ¶98 (Target has a "durable, flexible business model" that "can adapt to any environment"). Courts have found similar misstatements actionable. *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *4 (C.D. Cal. Dec. 1, 2023) (finding statement that company used a "data-driven approach" ***not*** puffery); *CenturyLink* (not puffery where "[d]efendants purposefully encouraged investors to rely on CenturyLink's statements about its focus of "customer needs"); *Aeropostale,* 2013 WL

---

[20] Defendants are wrong that these statements are vague because they "refer to unspecified inventory, places and times" (DB32), because they specify (although not required) Target had sufficient inventory for "the holiday season," (¶81) and inventory is "constantly moving," "[i]t shows up at night. It's out the store the next day," (¶103) which explicitly refers to the ability to sell inventory within a day.

[21] Stating that Target's inventory *strategy* followed a specific "North Star" is unlike describing a product as a "Holy Grail" (DB26), because it goes to Target's *tactics,* not product quality. *Cf. In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881 (D. Minn. 2007); *cf. also In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 883 (8th Cir. 2017) (also hyperbolizing product quality).

1197755, at *15 (finding statement that "[w]e fill very good about the product going forward" not puffery where they are "rendered problematic" by "material omissions"). Moreover, Defendants' statements of feeling 'very confident' or "very good,' were connected to factual assertions regarding … inventory" and "[a] reasonable investor could have relied on those statements" as communicating that Target was adhering to its business model and would be able to meet demand.[22]

*CenturyLink* is instructive. There, the court rejected a puffery defense where, as here, statements "that its strategies were based on meeting customer needs" could "reasonably be interpreted as material and false or misleading" because the Company knowingly encouraged services that customers did not need or want in order to materially boost its revenue. *CenturyLink,* 403 F. Supp. 3d at 727-28. Here, like *CenturyLink*, given the importance of Target's inventory strategy to meet demand, statements representing that it was purchasing inventory based on consumer preferences, and how pursuing that strategy positioned the company for the holiday season, is material as a matter of law.[23]

---

[22] In *Target*, the court's puffery discussion was a one-sentence footnote without contextual analysis, stating, "[i]n addition to insufficiently alleging the required mental state…'we feel really good about where we are today,' is "inactionable puffery." *Id.* at 743 n.2. The rest of Defendants' cited cases are inapposite. *Target,* 955 F.3d at 745. In *In re Hutchinson Tech., Inc. Sec. Litig.* the Court found, "[w]e believe we are well-positioned *on a number* of [] programs that will be transitioning into volume production *in the coming months*" not based in time and did not identify specific programs. Thus, it was "too vague and too much like puffing to be material." 536 F.3d 952, 960 (8th Cir. 2008)(emphasis added).

[23] Here, the statements "healthy position" and "we've got a great inventory position," are grounded in substantive information such as "we've got inventory of $2 billion north of last year, up almost 20% on a year-over-year basis," rendering each of the Defendants cases (DB29) inapt because they were "promotional phrases devoid of substantive information." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1030 (D. Minn. 2009) ("well

Moreover, Defendants' statement regarding "carefully plann[ed] inventory levels" when read in full context, states "[w]e achieve effective inventory management by… carefully planning inventory levels for season apparel items to minimize markdowns" (¶108) and was objectively verifiable because it can be disproved with evidence that, for example, the inventory increase was the result of Target abandoning its customer-focused buying strategy in favor of a volume approach that was not "carefully plan[ed] … to minimize markdowns" and that markdowns were increasing. *Torrid*, 2023 WL 9197563, at \*4 (statement that company used a "data-driven approach to minimize inventory risk" was ***not*** puffery); *Tile Shop*., 94 F. Supp. 3d at 1049 (statements where shop repeatedly attributed its success to its direct sourcing model not immaterial puffery)

That certain of Defendants' statements were made "in response to . . . an analyst's specific inquiry," further supports materiality. *St. Jude*, 836 F. Supp. 2d at 888; *see, e.g.,* ¶86 (analyst asking about how inventory levels affected Company's gross margin); ¶103 (analyst asking about inventory capacity). Moreover, Defendants addressed Target's purchasing strategy, inventory position, and markdown practices in each of Target's quarterly reports and earnings calls and specifically highlighted the importance of these matters. *E.g.*, ¶¶35, 94. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*12 (E.D.N.Y.

---

positioned" was promotional); *Steamfitters Loc. 449 Pension Plan v. Skechers USA, Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) ("well positioned to maintain this growth" too vague); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) ("pretty good position" is vague and lacks substance); *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179 (D.D.C. 2007) ("sound" cannot be quantified*); IBEW Local 595 Pension and Money Purchase Pension Plan v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) ("thoughtful" plan was inactionable).

May 20, 2020) (when statements are "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.").

Finally, while Defendants claim their statement that Target would get the "right inventory to the right place at the right time" (¶¶81-82) was "inherently subjective" (DB32), their own authority confirms these statements are actionable because "qualitative statements can be misrepresentations of existing facts if those statements are belied by conditions known to the defendants." *See U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *6 (S.D.N.Y. Mar. 5, 2013) (collecting cases*); see also Novak,* 216 F.3d at 315 (statements that inventory situation was "in good shape" or "under control" when defendants knew contrary was true were false and misleading). Here, Target had a "huge spike" in inventory (¶¶64–65), causing "unprecedented" capacity exceeding their policies (¶¶48-49), which piled up in "every nook and cranny," (¶58), and created facilities that were "packed" "full of stuff no one's buying," (¶77), rendering their "right place at the right time" and similar statements misleading.  ¶¶81-82.

## C.    The Complaint Adequately Alleges Scienter

A "strong inference" of scienter "can be established through "(1) 'facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud'[;] (2) 'conduct which rises to the level of severe recklessness'[;] or (3) 'allegations of motive and opportunity.'" *Target*, 955 F.3d at 742.  A showing of severe recklessness is sufficient to establish scienter. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653-54 (8th Cir. 2001). Recklessness is sufficiently alleged where "defendants' knowledge of

facts or access to information contradict[ed] their public statements," or where "alleged facts demonstrate that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Kushner*, 317 F.3d at 828.

The scienter inference "need not be irrefutable" (*i.e.*, of the "'smoking-gun' genre") nor "even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. The relevant inquiry is "whether all of the facts alleged, taken collectively," give rise to "an inference of scienter at least as likely as any plausible opposing inference." *Id*. at 322-23, 328. Under this analysis, a tie goes to the Plaintiffs. *Id.*; *see also In re Inotiv, Inc. Sec. Litig.*, 2024 WL 1344784, at *29 (N.D. Ind. Mar. 29, 2024). When analyzed holistically, the Complaint pleads a "'classic' fact pattern" of scienter, *i.e.*, "that defendants published statements when they knew or had access to information suggesting that their public statements were materially inaccurate." *Green Tree*, 299 F.3d at 665.

### 1. Defendants' Admissions Support Scienter

During Target's Q1 2022 Earnings Call, Defendants acknowledged Target's earnings shortfall was driven by a 4.3% decline in gross margin rates, most (about three-quarters) of which was due to "impairments, markdowns" and other "merchandising actions" taken "to reduce excess inventory"—mostly in "bulky" categories, such as "kitchen appliances, furniture and outdoor living," which "are bulkier than average and require higher-than-average amounts of storage capacity," and that Mulligan and Harrington's team had "collaborated" to "work through this excess inventory," which included securing "temporary storage capacity" beyond Target's warehouses. ¶¶116-19.

Contrary to Defendants' unsupported suggestion (DB7) that they were surprised by a lightning shift in consumer spending patterns "in late March 2022" (between their March 2022 misleading statements and their May 18, 2022 earnings announcement), and thus had no scienter, impairments and markdowns are typically taken on inventory that has sat unsold for a significant period of time, for which there is little remaining hope of recouping full retail value.[24] Thus, the bulk of Target's gross margin decline (and thus its earnings shortfall) would have been from impairments and markdowns taken on inventory that had amassed and sat unsold for many months. As the Complaint alleges, Defendants therefore had to be aware of this issue well in advance, particularly given their admitted focus on inventory. *See Novak*, 216 F.2d at 309 (scienter where company allegedly delayed markdowns of aged inventory); *City of Pontiac Gen. Emples.' Ret. Sys. v. Dell Inc.*, 2016 WL 6075540, at *4 (W.D. Tex. Sept. 16, 2016) (scienter where defendants allegedly knew or recklessly disregarded "stockpiling inventories" given shift in demand away from high-margin products; defendants' arguments were fact-based). Moreover, Defendants' repeated focus during earnings calls about purported lower markdowns further supports they closely monitored inventory levels. ¶¶90, 96, 101-03.

Further, Defendants acknowledged that these "bulky" excess inventory items required "higher-than-average amounts of storage capacity" and that Target "faced

---

[24] This is especially true here, where the inventory consisted of furniture and appliances, not perishable items. Further, most of the inventory described by Defendants (indoor and outdoor furniture, appliances) is not the type one would expect to sell during Christmas sales (*e.g.*, sofas and refrigerators are not typical surprise gifts, and outdoor furniture is not gifted in December), indicating much of it sat from mid-2021—clearly indicating shifted consumer trends throughout the Class Period and well before late March 2022.

elevated costs to store" them. ¶119. Thus, such items presented glaring challenges by their physical size, and extra storage costs, that were literally impossible to miss, including by Defendants, who had to arrange to store, and pay for them. *Id.* Indeed, Defendant Mulligan acknowledged he and Hennington had "collaborated" to "work through this excess inventory," which included securing "temporary storage capacity" outside Target's warehouses. *Id.* Identifying, "working through" and implementing such issues and paying substantial costs to store Target's largest items on such a massive scale would not take a matter of days or weeks, and as Mulligan stated, it required "collaboration" among Defendants themselves. *See Novak*, 216 F.3d at 309 (scienter where company approved storing aged excess inventory at warehouses). At a minimum, the inference that such inventory had sat for months and Defendants Mulligan and Hennington were aware of this well before March 2022, is far more plausible than Defendants' unsupported narrative that demand suddenly vanished, all in late March 2022. *See Tellabs*, 551 U.S. at 322-23.

Additionally, in discussing the inventory issues, Defendant Cornell admitted that Target had abandoned the customer-data driven inventory procurement procedures it touted throughout the Class Period, and instead "had several years where we were just chasing demand." Worse, Cornell admitted Target knew well ahead of time that sales of the HHF items that spiked during Covid and which Target had recklessly overordered ("chasing demand") would dissipate, saying "we knew that wasn't going to go on forever."

¶125.[25]   Continuing to tout the purported competitive advantage of Target's inventory ordering system, while failing to disclose the Company was "just chasing demand," and "knew" the Covid-inspired spike in HHF sales would end, even as Covid restrictions lifted in early-to-mid 2021 (before much of the excess inventory here would have been ordered) shows Defendants' statements were made with scienter. *See St. Jude*, 836 F. Supp. 2d at 899 (allegations that undisclosed internal facts including data from internal software program contradicted what defendants told the market "plainly support the 'strong inference of scienter'"); *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*, 2020 WL 2834857, at *3-4 (S.D.N.Y. June 1, 2020) (the "admission is direct evidence of Defendants' knowledge of the true likelihood of [the adverse event] at the time they made the [misleading] statements").

---

[25] Defendants wrongly suggest (DB39-40) Cornell was speaking about a later time period because the article quoting him was from November 2023, but its context is clear that he was speaking about "'chasing demand' *at the time*" "during the COVID-19 pandemic" and in connection with the "wrong inventory" glut disclosed "last year" (2022), *while knowing* it "wasn't going to go on forever." https://bestlifeonline.com/shoppers-abandoning-target-11-2-2023-news/. Thus, Defendants' citation to *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015), for the proposition that Plaintiffs fail to allege that Cornell knew *when* demand would decrease, is misplaced. Further, while Defendants suggest *Stratte-McClure* stands for the proposition that Plaintiffs need to allege specifically when a Defendant who admitted monitoring pertinent data realized the significance of adverse facts, it instead turned on the fact that there, a trading position was cut "*regardless* of the likelihood that the pessimistic assumptions of the stress test would come to pass" rather than when employees came to certain realizations. *Id.* (abrogated by *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 2024 WL 1588706 (U.S. Apr. 12, 2024)).

**Defendants Knew from Target's Customer Data, Greenfeld Inventory Management and Apollo Systems that HHF Inventory Was Skyrocketing Because Customers Were Not Purchasing It**

Defendants Hennington and Cornell admit that they were continuously assessing "incredible data and guest insights" from multiple sophisticated points of customer data collection, real-time, to evaluate shopping trends and demand. ¶¶33-38, 127-28, 131-33 ("we continuously evaluate our guests' mindset;" Target was "constantly revaluating" shifting consumer demand "week by week"). Defendants touted such "incredible data" as the basis for Target's ordering inventory. ¶¶32, 35, 37, 73, 81, 92, 133. With Covid and budding inflation, Defendants doubled-down on assuring investors that they used the "massive influx of insights" to tailor to real-time demand trends, could "adapt to any environment," and "stay[] three steps ahead with our guests in these rapidly changing times." ¶¶31-32, 38, 44.

Assuming Defendants' representations were true, Defendants knew that consumer preferences were changing away from HHF inventory starting in early 2021,[26] yet recklessly continued to "just chase demand" and pre-order large quantities of inventory in a scattershot manner throughout the Class Period without regard to consumer preferences or demand, including large quantities of HHF products that were not selling by early 2021. Contrary to Defendants' argument, HHF category sales were slowing, not picking up.

---

[26] If Defendants' representations of knowing customer demand trends in real-time were *not* true, then they were clearly made with knowledge or at least reckless disregard of their untruth. Defendants try threading the needle with the facially-implausible and unsupported narrative that demand shifted overnight in late March 2022 (which the numerous accounts of overrun warehouses and outside storage facilities belie).

Likewise, CWs confirm that, throughout the Class Period, Defendants knew how much inventory they had stored in their warehouses, in real-time, through access to Target's Companywide inventory management software, Greenfield, and warehouse management system, Apollo. ¶¶61-62, 67-71, 73, 127-130, 142. According to CW3, Target's Greenfeld system provided real-time inventory and capacity data for all of Target's DCs and stores that tracked the location of each piece of inventory individually, by product type, and in total amounts. ¶¶68-69, 71, 129, 142; *see also* ¶55 (CW-1 corroboration). CW-3 saw this data (accessible for any Target store, by store number), and so could management at Target headquarters. ¶¶67-68, 71.[27] CW-3 stated that Greenfield showed by the April-June 2021 time frame, that HHF inventory was not selling but massively increasing, Companywide. ¶145. By April 2021, management at Target headquarters began instructing CW-3's and neighboring stores to accept excess inventory regardless of what was selling because the DCs "were out of space," and soon began manually overriding figures in Greenfield to force excess inventory onto stores. ¶67. Through Greenfield, and first-hand store operations, CW-3 saw that many of the products that sold well in 2020 were accumulating, and clogging CW-3's own store by May 2021. ¶69.[28] Through its awareness of inventory levels via Greenfield, CW-3 stated Target's

---

[27] Defendants are wrong in suggesting (DB39, 42-43) that Plaintiffs don't allege the systems were Company-wide. The Complaint clearly alleges they were, and that inventory was searchable by store number, based on the CWs' and Defendants' own statements (*e.g.*, ¶¶67-68, 128-29); nor would it make sense to provide management with inventory systems that were not Company-wide.

[28] Defendants' suggestion (DB43) that CW-3 did not specify how and when they learned this is wrong, as Plaintiffs allege CW-3 observed this through the Greenfield system which

management at headquarters began mandating drastic markdowns in response to the inventory build-ups in June 2021 *into* 2022, with the rate of markdowns increasing approximately ***seven-fold*** in 2021 from 2020. ¶72.

CWs-1, 2 and 3 all confirmed the Individual Defendants each had access to Greenfield. ¶130. This is corroborated by Defendant Mulligan's acknowledgement that he and Defendant Hennington had collaborated on working through the excess inventory including obtaining temporary storage outside Target's warehouses (which the CWs observed throughout the Class Period), something they could not have done without using inventory data through Greenfield and Apollo. ¶119. *See also* ¶128 (Mulligan otherwise "emphasizing the ongoing collaboration" and *focus on "incorporation of real-time data on inventory availability and location* within our holiday plans"). Thus, Defendants' questioning whether Hennington (or Mulligan) used Greenfield and Apollo to track inventory levels (DB39-40) is simply not credible.[29] *See Dell*, 2016 WL 6075540, at *4 (rejecting defendants' denials as fact-based).

CW-2 further confirmed that the Individual Defendants and others at Target's corporate headquarters had access to and used Target's Apollo system to manage inventory. ¶¶61, 130. According to CW-2, Target headquarters sent the Flow Center where

---

showed individual or categorical product data, by Target facility and in the aggregate, and through store operations, in May 2021. ¶69. Defendants' citations to *Medtronic*, 618 F. Supp. 2d at 1034, and *In re iRobotCorp. Sec. Litig.*, 527 F. Supp. 3d 124 (D. Mass. 2021), are therefore inapplicable.

[29] Defendant Fiddelke, who made several of the alleged misleading statements, also made clear he was monitoring inventory issues and markdowns closely. *See, e.g.*, ¶¶88, 100-01, 105, 117, 123.

CW-2 was Operations Manager daily reports on the inventory items that were not moving, and directing the Flow Center where to move those products. ¶62.[30]

The Complaint cites three separate CWs—from locations across the United States covering expansive territories—who corroborate one another's accounts that Defendants had access to Greenfeld and Apollo; and it is clear from Mulligan's statements that at least he and Hennington availed themselves of such access, at a minimum in working through the excess inventory issues during the Class Period.[31] Moreover, contrary to Defendants' contention that Plaintiffs fail to allege the reports' contents (DB42), these accounts also demonstrate those systems showed granular and aggregate inventory data (*e.g.*, "the location of each piece of inventory in real-time, including individually, by product type, and in total amount," ¶129), which made clear that from spring 2021 onward, HHF inventory was not selling and continuing to pile up.

---

[30] Defendants' suggestion (DB42) that CW-2 "admits" he did not have access to the Apollo data and, thus, could not know what it said mischaracterizes the Complaint. CW-2 stated that "the Flow Center *used* … Apollo," however, only Target headquarters could "*generate reports*" from it. ¶61. This does not mean CW-2 could not access and view the Apollo data itself.

[31] Accordingly, Defendants' argument that Plaintiffs make no allegations indicating "who" used those systems, or that Defendants used them (DB41-42), is incorrect, and the cases they cite inapposite. *See also* ¶129 (beyond Defendants Mulligan, Hennington and Fiddelke, and those at headquarters communicating with the CWs, C-Suite executives Cara Sylvester and Arthur Valdez are identified as having access to and using Target's real-time inventory systems). Similarly, because Plaintiffs have alleged the scienter of Cornell, Hennington, Mulligan and Fiddelke as shown herein, they have pled corporate scienter under Defendants' own authority (DB40 n.10, 42). *See St. Jude*, 836 F. Supp. 2d at 896 ("The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity.").

The Complaint's detailed allegations naming the precise internal systems (Greenfield, Apollo), Defendants' admitted reliance on such systems (*e.g.*, Mulligan emphasizing "the incorporation of real-time data on inventory availability and location within our holiday plans"), what information they contained (description and location of each inventory item separately and aggregate reporting), and how it contradicted Defendants' public statements (showing continually increasing HHF inventory that was not selling), sufficiently alleges Defendants' scienter. *See, e.g., In re CarLotz Inc. Sec. Litig.*, 2024 WL 1348749, at *15-16 (S.D.N.Y. Mar. 29, 2024) (ability to access regularly updated reports concerning information that, like here, defendants admittedly "paid close attention to," and where defendants (like Mulligan here), admitted the existence of such reports, supported scienter inference); *Dentsply*, 665 F. Supp. 3d at 291 (monthly reports supported scienter that statements about inventory were misleading); *CenturyLink*, 403 F. Supp. 3d at 730-31 (defendants' "access to real time data" and "access to comprehensive data on sales" supported scienter); *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018) (CW accounts of access to regular reports supported scienter); *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *16-*17 (C.D. Cal. Aug. 4, 2017) (scienter pled where defendants had access to dashboards and real-time data regarding the relevant operations); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (allegations that the process of discerning Salix's true inventory levels was straightforward, including, as here, availability of reports showing "precisely how much of each product … is in the channel and in detail;" along with defendants' statements that they had accurate knowledge of inventory levels, like Mulligan's

statements here that Target used "real-time data on inventory availability and location"); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1077 (D. Minn. 2013) (scienter pled where defendants' statements misleading due to alleged knowledge of declining sales trends and rising inventories); *St. Jude*, 836 F. Supp. 2d at 899 (scienter pled where "[a]lthough Plaintiffs do not elaborate on the 'internal forecasts' that they allege contemporaneously contradicted what Defendants were telling the markets and investors, the Complaint elsewhere makes frequent reference to the new software program STJ had begun using … to track its sales"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter supported where defendants (similar to Mulligan's statements about inventory here) "told the investing public that they monitored the value of their portfolio on a nearly real-time basis"); *Lefkoe,* 2007 WL 6890353, at *6 ("[p]laintiffs cite numerous internal reports used for forecasting, purchasing, transferring, and managing inventory, to which Defendants each had access.… Defendants do not challenge that they had access to reports which would have reflected the inventory build-up and resultant need for massive promotional activity.").

Defendants' remaining arguments about the sufficiency of Plaintiffs' monitoring allegations, and their concomitant authority, are inapposite. The *Medtronic* court found the data monitoring allegation insufficient because the data defendants reviewed would not reveal to them why their public statements were misleading, finding: "Plaintiffs fail to explain why the simple review of sales and performance data would convey to the reader" that one of its products might have a latent defect, at a rate the court determined was "statistically insignificant." *Medtronic,* 618 F. Supp. at 1026, 1034. Here, unlike

*Medtronic*, Plaintiffs allege that the inventory data Defendants monitored plainly revealed precisely the facts at issue – that HHF inventory had soared and was not selling, exactly how much excess inventory there was and where, that it exceeded the capacity at Target's warehouses and regional DCs, such that it had to be moved to outside storage (at substantial cost), and Defendants Mulligan and Hennington collaborated to obtain temporary storage capacity outside Target's warehouses. Thus, rather than having to divine obscurities buried in raw data (with no indication it even existed), here the data on its face (in sheer numbers) told the story of massive excess inventory. *See Salix*, 2016 WL 1629341, at *14 (scienter where inventory levels easily discernable from available reports).[32]

Defendants' other cases likewise involve adverse facts or trends that would not be immediately apparent from the data, as it would be from the detailed inventory data here (by individual product, product type, location, and total amounts). *See, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.,* 531 F.3d 190, 195-96 (2d Cir. 2008) (no scienter found where mere access to raw "collection data" reflecting loan delinquencies would not reveal the reason for the delinquencies which was the subject of suit); *Elam v. Neidorff,* 544 F.3d 921, 929 (8th Cir. 2008) (allegations that government-program-focused healthcare company should have predicted increased costs not yet billed

---

[32] As stated, Defendants such as Mulligan and Hennington had access to and used this data since they made inventory purchasing decisions based at least in part on current inventory levels. ¶¶79, 128-29. To the extent Defendants suggest they did not review how much inventory they had before ordering more, this would also satisfy the "recklessness" prong of scienter, just as ordering without regard to shifted consumer demand.

50

to it simply because it had a complex cost-estimating program did not indicate defendants would know of increased costs).[33]

Finally, the CW allegations were *not* inaccurate because, as shown above, HHF sales were slowing, not accelerating.

### 3. Defendants' Site Visits

Defendants, including Cornell, were also aware of increasing inventory and, in particular, bulky HHF inventory levels from their physical site visits to warehouses—corroborated by both CW-1 and CW-2—where they would have seen firsthand the overcrowded "stash aisles" and trailers of excess inventory. ¶¶7, 52, 55, 63, 135.

While Defendants seek to sow doubt about when visits occurred, the Complaint alleges based on CW accounts that the site visits took place *during the Class Period* while "stash aisles" and trailers were actively used, and that Cornell and EVP/Chief Supply

---

[33] *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.,* 580 F.3d 755, 762 (8th Cir. 2009), is also inapposite, as it did not involve reports to which Defendants had access, as here. There, a confidential witness said a VP once told him there were often challenges reconciling certain tax items for accounting purposes; the Court stated this did not mean the VP told this to the CEO, and provided "weak support" for the CEO's scienter. Whether an employee chose to tell the CEO in an ephemeral conversation about one discrete issue in an accounting department is vastly different from always-accessible reports on custom-built systems designed for management to track inventory, a key issue for a company like Target and an area of especial focus during the post-Covid era, and something the Defendants here referenced and used (*see, e.g.*, ¶¶119, 128). Similarly inapplicable is *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553 (8th Cir. 2021) (where 137 of 138 statements about a disappointing merger were immaterial, a CW's statement that he heard the two merged companies' employees used different legacy finance software systems until a few months after CEO said the combined company had integrated its various departments, was insufficient to indicate the CEO knew anything about the systems specific departments were using or that this posed significant problems).

Chain and Logistics Officer Valdez attended. . ¶¶55, 63, 135.[34]  It is difficult to imagine a data point more granular or striking than the CEO and EVP in charge of inventory walking into a overstuffed warehouse where the aisles are unwalkable due to excess inventory. *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("tout[ing] the company's 'real time' electronic inventory monitoring" and site visits pled scienter). Moreover, since the very purpose of visiting a "Flow Center" or warehouse (as opposed to a store) is to check on inventory and inventory management, there is a strong presumption that Cornell and Valdez personally saw those stash aisles. *See In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (site visits would have informed executives whether LATAM assets were operational).[35]

Contrary to Defendants' suggestion (DB44), Defendants did not need to visit all Target facilities to know the inventory glut was Companywide.  Rather, Cornell and Valdez's site visits confirmed what the Companywide inventory management data previously showed, that Target's scattershot overordering of early-pandemic favorites, specifically bulky HHFs, had caused a massive spike in inventory that was not selling

---

[34] Defendants' citation to *Sleep Number*, 2023 WL 4421668, at *7 (DB44), is wholly inapplicable since there, the question was when the company first had reason to know of the adverse event at issue (that its suppliers could not supply raw materials due to a major storm), while here Plaintiffs allege the shift in demand and inventory pile-up occurred well before Defendants' warehouse visits as reflected in Target's inventory management system, and that Defendants would have seen the inventory pile-up with their own eyes during their visits.

[35] Defendants' quibbling that allegations Cornell and others "would have seen" the inventory in the aisles (DB43) do not mean they "did see it" is nonsensical, as it defies logic that any person who walked by aisles full of inventory would *not* have seen it.

because customer demand had markedly shifted as the pandemic approached its first anniversary in early 2021 (and what Cornell said he had anticipated all along came to pass, ¶125).[36]

Defendants' remaining arguments about the site visits (DB44-45) are inapposite or without merit. Defendants' argument that the CWs could not have a basis for opining that inventory was "excessive" because they had no "understanding of future demand" is puzzling. First, it has nothing to do with Defendants' site visits. Second, the CWs attested to massive amounts of inventory overwhelming their warehouses and those of other colleagues, as a result of management's *past* disregard of the shifts in customer demand. The CWs also knew Companywide inventory was excessive because they had received emails from headquarters concerning Companywide excessive inventory, and resulting storage problems. ¶¶48-49, 58, 77. Defendants' argument that seeing overflowing inventory in two warehouses would not inform Cornell and Valdez that the piled-up inventory was "excessive relative to future demand" is similarly inapt. Defendants again ignore that the site visits to the overwhelmed DCs confirmed the *Companywide* inventory management data which showed Defendants the massive spike in inventory, and

---

[36] Similarly, as discussed above, the CWs accounts cannot be dismissed as a "small sample size" (DB45) since, *inter alia*, they covered large (at least ten states) and dense areas of the U.S., stated that their colleagues in other areas had the same experience with overflowing warehouses and DCs, or could not send their excess inventory elsewhere because the other facilities were also overloaded; received directives from Target headquarters dealing with *Company-wide* excess inventory management; and internet posts of Target employees across the country corroborated the inventory problems were overwhelming and widespread. Moreover, they provide physical corroboration of the excess inventory shown in Target's Greenfield and Apollo systems, and the excess inventory they had experienced since mid-2021 was later admitted by the Company.

demonstrated that they had disregarded the marked shift in *past* and *present* customer demand, as the HHF inventory had already amassed unsold.[37]

### 4. Core Operations

As Defendants repeatedly recognized, Target's entire business depended on proper inventory management. For example, Mulligan stated that "[s]peed and flow of inventory is the key to the whole game" and Target's "focus is on moving the right amount of inventory to the right place, at the right time." Defendants also stated, *inter alia*, that "[a] large part of our business is dependent on our ability to make trend-right decisions and effectively manage our inventory in a broad range of merchandise categories," emphasized the importance of "the incorporation of real-time data on inventory availability and location within our holiday plans," and the importance of proper inventory levels was reiterated during every quarterly investor conference call. ¶¶82, 94, 103, 114, 128, 138-39.

Courts have widely recognized that "facts critical to a business's core operations … generally are so apparent that their knowledge may be attributed to the company and its key officers." *In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998). While the Eighth Circuit has not yet formally adopted this concept, it also has explicitly

---

[37] Defendants' remaining cases (DB44-45) are inapposite. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 237-38 (S.D.N.Y. 2022) ("the allegations relate to an underground development project being built at a slower rate than scheduled and being overbudget—facts that would not necessarily have been plainly visible to someone vising the Mine"); *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *21 (S.D.N.Y. July 31, 2023) (executive's site visits did not indicate product waste he likely saw was "anything other than routine," while here CW-1 stated these visits occurred while obvious "stash aisles" were being used. ¶¶55, 135).

declined to reject it. *See Elam*, 544 F.3d at 929 (stating it "need not determine" the issue). Nonetheless, courts in this Circuit have applied the doctrine. *See, e.g., CenturyLink*, 403 F. Supp. 3d at 731 ("at the motion to dismiss stage, it is reasonable to assume that top management were 'aware of matters central to that business's operation.'"); *St. Jude*, 836 F. Supp. 2d at 903; *Minneapolis Firefighters' Relief Association v. Medtronic, Inc.*, 2010 WL 11469576, at *7 (D. Minn. Feb. 3, 2010); *Ancor*, 22 F. Supp. 2d at 1005.

Tellingly, while Defendants claim "several other circuits have found it insufficient," they cite only one case from the Eastern District of New York (DB46), although courts within that circuit apply the "core operations" doctrine routinely. *See, e.g., Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024); *Wang v. Cloopen Grp. Holding Ltd.,* 661 F. Supp. 3d 208, 237 (S.D.N.Y. 2023). Nonetheless, even courts that have not expressly adopted the doctrine, such as *In re Piedmont Lithium Inc. Sec. Litig.*, 2024 WL 197751, at *14 (E.D.N.Y. Jan. 18, 2024), cited by Defendants, recognize it may support scienter, even if not alone.

Here, Defendants frequently recognized that inventory management was key to Target's operations, therefore the core operations doctrine applies and knowledge of the massive inventory glut should be imputed to Defendants. *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 731.

Moreover, Defendants recognize that while *Elam* declined to determine whether the core operations doctrine should be formally adopted, it stated that to attribute knowledge to company officers, a plaintiff must at least show that the relevant information "was known within the company at that time." *Id.* at 929. That is plainly satisfied here by the

CW accounts of inventory overwhelming DCs and HHF product sales in ten different states across the country, as well as Target employee internet posts. Defendants try to reframe the issue by suggesting that Plaintiffs are simply alleging that Defendants bought more inventory than before, and that this is consistent with Defendants' disclosures. DB46. But the point of Plaintiffs' allegations is not simply that Target bought "more" inventory than before, but that it bought *massive* amounts of inventory that customers did not want and were no longer buying, in quantities guaranteed to far outstrip demand for such products. Sure enough, that unwanted inventory began clogging Target's DCs by spring 2021, and did so until the "late March" 2022 markdowns. Defendants' excuse that they had a good-faith belief the products they bought in scattershot fashion would sell someday is belied by Cornell's admission the Covid HHF demand spike was about to end, and regardless, simply disputes the facts. *See Dell Inc.*, 2016 WL 6075540, at *4 (rejecting defendants' arguments regarding ballooning inventory as "fact-based").

In any event, as shown herein, Plaintiffs allege multiple factors that support a finding of scienter.

### 5.    Insider Trading

"[I]nsider sales are probative of motive, which may provide circumstantial evidence of scienter" and can become suspicious "when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Nash Finch,* 502 F. Supp. 2d at 882. Defendants stock sales here support scienter, particularly when considered holistically with Plaintiffs' other scienter allegations. *Id.* (scienter where some but not all defendants sold).

During the Class Period, Defendant Hennington sold 4,173 shares, or 17.5%, of her Target common stock on November 19, 2021—the largest portion of holdings she'd ever sold until then—only *two days* after Target's November 17, 2021 earnings call in which Defendants made false statements about Target's inventory position and low markdowns. ¶¶38, 81-82, 84. Similarly, Defendant Cornell sold 30,000 shares of common stock—then 13.6% of his holdings—on December 2, 2021, some three trading days after Target's Q3 2021 Form 10-Q containing false statements, and shortly after the November 17 earnings call. ¶¶88, 90, 92, 94. *See Dutton v. D&K Healthcare Res.*, 2006 WL 1778884, at *10 (E.D. Mo. June 23, 2006) (stock sales "on the heels of false positive financial statements" or just before disclosures of adverse facts deemed "unusual and suspicious").

On March 16, 2022, shortly after Target's last alleged false statements on March 1 and 9, 2022  and shortly before the truth was revealed, Cornell sold another 30,000 shares of common stock, or another 14.3% of his then-holdings, for a total of nearly 30% of his personal holdings during the Class Period.[38] *See Nash Finch*, 502 F. Supp. 2d at 882 (sales "suspicious" where defendants were "alleged[ly] aware of all of the undisclosed problems, and their sales 'were just two or three months before the Company's … disclosure"). Finally, on April 4, 2022, just over a month before the truth was revealed to investors, Defendant Fiddelke sold 5,000 shares of his own Target common stock, or 13.8% of his holdings (ostensibly pursuant to a 10b5-1 plan suspiciously entered into just a month

---

[38] Defendants' argument that Cornell sold 41.7% of his holdings in March 2021 is misleading because thereafter he acquired large volumes of shares at no cost, making the percentages of later sales appear smaller.

before on March 3, 2022). *See id.* All three Individual Defendants engaged in these sales while they possessed material non-public information about Target's over-ordering and resultant inventory problems. ¶¶146-149.

While Defendants claim that insider stock sales were made pursuant to 10b5-1 plans (DB47), no such plans have been provided.[39] Moreover, it does not appear from their trading patterns that any defendant sold pursuant to a regular plan. Such incomplete, fact-based arguments are why courts have found that "the fact that the insider traded under such a plan, by itself, is not a cognizable defense to scienter allegations" at the pleading stage. *Mart*, 595 F. Supp. 3d at 817; *see also Evanston Police Pension Fund v. McKesson Corp.,* 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019) ("the Court will not accept [10b5-1 trading plans]" at the pleading stage "as proof of the disputable conclusion that they rule out the possibility of trading based on nonpublic material information"); *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) (declining to consider 10b5-1 trading plan because it is "typically premature ... in a motion to dismiss.").

Defendants argue that the selling Defendants acquired stock during the Class Period negates scienter. DB47. But this argument appears to be illusory, since the Form 4s Defendants submit indicate the shares were acquired through performance awards and other benefits, or as gifts from Defendants' own trusts, for no monetary payment. Def. Exs. V, W, X (Codes "A" and "G"). "That Defendants acquired much (and perhaps all) of their retained shares through performance awards and other employment benefits, rather than

---

[39] Defendants have only submitted their own constructed chart showing the insider trades, along with various Form 4s filed with the SEC, and not the actual plans themselves.

on the open market, reduces ... the significance of those holdings." *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1002 (W.D. Ark. 2017); *see also Dutton*, 2006 WL 1778884, at *11 (whether consideration of stock sales should include exercised or unexercised options is a merits question "not for the Court to consider at this time"). Because Defendants "acquired shares at no cost to [them]," and with no risk, their shareholdings do "not demonstrate lack of scienter." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).

Indeed, Defendants' argument that Target's executives receive most of their pay in stock (DB48 n.20) only served as an added motivation for them to ***inflate*** it—particularly at a time when large markdowns had begun and the market was unaware of the then-existing inventory crisis.

Further, simply selling stock often, as Cornell did, does not make Defendants' sales any less suspicious, as they knew of a long-running issue bound to cause the stock to drop at some point. *See* ¶125 ("we knew that wasn't going to go on forever").

### 6. Holistic Analysis

Allegations relevant to scienter must be viewed not in isolation, but holistically. *Tellabs*, 551 U.S. at 326. Courts should deny a motion to dismiss when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Here, Plaintiffs' scienter inference is at least compelling, if not more, than Defendants' competing inference. Plaintiffs' allege that, in order to avoid the disaster of not having sufficient inventory on the shelves for the holiday season due to supply chain

issues, as happened in the prior year, Defendants abandoned Target's inventory purchasing business model that required Defendants to base purchasing decisions on customer preferences and demand, and in April 2021, were pre-ordering large quantities of inventory of anything they could get their hands on, without regard to shifting customer demand.

Defendants consistently assured investors throughout the Class Period that they ordered inventory based on real-time customer data showing current customer demand preferences, and that they closely monitored customer demand using insights and data.

Behind the scenes, however, Defendants' reckless inventory-buying spree caused a pile-up of unwanted bulkier products within the HHF category that overwhelmed Target's facilities. Defendants knew this inventory was not moving by mid-2021 and by the third quarter 2021 when capacity at the DCs Companywide became near-to-over 100%, well above Target's policy of 80%, forcing Target's facilities to create stash isles and store inventory in trailers. In another reckless gamble, Defendants concealed these facts from the market, hoping that the excess inventory would sell during the holiday season, even though many of the bulky HHF products such as furniture and appliances were not the kind to sell at Christmas. *St. Jude*, 836 F. Supp. 2d at 907 (at best question of fact whether reckless gamble justified). When they did not sell, Target was forced to bear the consequences of heavy discounts in the first quarter of 2022 to rid the Company of the unwanted product and make room for products customers did want.

Defendants' competing inference (DB49-50), that demand for HHF vanished suddenly in "late March" 2022, necessitating massive markdowns shortly thereafter to sell them, is simply implausible. Indeed, Defendants would have the Court believe that,

between "late March 2022" and April 30, 2022, Defendants: (i) observed a purportedly sudden and drastic reduction in demand; (ii) found temporary offsite storage for the excess inventory; (iii) determined it warranted huge, immediate Companywide markdowns on the specified HHF items to "clear them"; (iv) implemented the markdowns; and (v) realized a massive reduction in gross margin rate due to those same "merchandising actions," all within little more than one month. ¶¶117, 121, 122, 143. Defendants would also have the Court believe the CWs did not actually experience the inventory chaos in their DCs and regions; or if they did, they were the only ones, and their colleagues and a swarm of Internet posters were not credible. This narrative is simply implausible. The more compelling inference is that Defendants were at least reckless in repeatedly touting their customer demand-focused inventory ordering management prowess while contemporaneously "just chasing demand" and disregarding the massively growing inventory that far outpaced any demand for those products and overwhelmed Target's DCs by mid-2021, as attested to by the CWs.

Defendants' argument about plausibility attempts to shift blame from Defendants' statements to operating in the COVID environment, but the problem is not that Defendants may not have desired to keep their shelves full, or sell the product when they ordered it, but rather that Defendants made repeated assurances that were not true, and were aware of the massive inventory pile-ups by mid-2021 yet chose to conceal them whilst making continued assurances to the contrary. The Complaint adequately alleges scienter as a consequence. *See Freedman*, 4 F. Supp. 3d 1101 (finding scienter despite proffered nonculpable innocent explanations).

At bottom, the facts alleged present a more cogent and compelling inference of scienter than Defendants' unsupported proposed theory. *Id.* at 1122.

### D.     The Complaint Adequately Alleges a Claim under Section 20(a)

Defendants do not challenge Plaintiffs' Section 20(a) control person liability claims except insofar as they argue Plaintiffs have not stated an underlying primary claim. Because, as shown above, Plaintiffs have stated primary claims under Section 10(b), the Section 20(a) claims should be sustained as well. *CenturyLink*, 403 F. Supp. 3d at 737.

## IV. CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be denied.[40]


DATED: May 3, 2024          By:  */s/ Carl V. Malmstrom*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
Carl V. Malmstrom (#0391908)
111 West Jackson
Suite 1700
Chicago, IL 60604
Tel.: (312) 984-0000
malmstrom@whafh.com

*Local Counsel*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
(State of Connecticut Juris No. 435545)
Gregory M. Potrepka (admitted *pro hac vice*)
(State of Connecticut Juris No. 437326)
1111 Summer Street, Suite 403

---

[40] Should the Court dismiss the Complaint in its entirety, Plaintiffs intend to file a motion seeking leave to amend pursuant to LR 15.1(b). *See, e.g., Shoemaker v. Cardiovascular Sys.*, 2017 WL 1180444, at *11 (D. Minn. Mar. 29, 2017).

Stamford, CT 06905
Tel.: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

*Attorneys for Lead Plaintiff Terry and Diane Van Der Tuuk Living Trust and Lead Counsel for the Proposed Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (pro hac vice forthcoming)
(State of New York Registration No. 4161352)
Jonathan D. Park (pro hac vice forthcoming)
(State of New York Registration No. 5371059)
600 Third Avenue
New York, New York 10016
Tel: (212) 661-1100
jlieberman@pomlaw.com
jpark@pomlaw.com

*Counsel for Additional Plaintiffs Chester Zoll and John W. Zlatic and the Proposed Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
(State of New York Registration No. 4832903)
1800 Century Park East, Suite 600
Los Angeles, California 90067
Tel: (310) 692-8883
lesley@portnoylaw.com

*Counsel for Additional Plaintiffs Chester Zoll and John W. Zlatic*