## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Rafael E. Perez, *individually and on*
*behalf of all others similarly situated*, and
Terry and Diane Van Der Tuuk Living Trust,

Plaintiffs,

v.

Target Corporation, Brian C. Cornell,
Michael J. Fiddelke, A. Christina
Hennington, and John J. Mulligan,

Defendants.

Case No. 23-CV-00769 (JMB/TNL)

**ORDER**

---

Garrett D. Blanchfield, Jr., and Roberta A. Yard, Reinhardt Wendorf & Blanchfield, Minneapolis, MN; Carl Malmstrom (*pro hac vice*), Wolf Haldenstein Adler Freeman & Herz LLC, Chicago, IL; Shannon L. Hopkins (*pro hac vice*), Levi & Korsinsky, LLP, New York, NY; and Gregory M. Potrepka (*pro hac vice*), Levi & Korsinsky, LLP, Stamford, CT, for Lead Plaintiff Terry and Diane Van Der Tuuk Living Trust.

Garrett D. Blanchfield, Jr., and Roberta A. Yard, Reinhardt Wendorf & Blanchfield, Minneapolis, MN, for Plaintiff Rafael E. Perez.

Jeffrey P. Justman, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; Sandra Grannum (*pro hac vice*), Faegre Drinker Biddle & Reath LLP, Florham Park, NJ; and Alexander J. Rodney (*pro hac vice*), Sandra Goldstein (*pro hac vice*), and Stefan H. Atkinson (*pro hac vice*), Kirkland & Ellis LLP, New York, NY, for Defendants Target Corporation, Brian C. Cornell, Michael J. Fiddelke, A. Christina Hennington, and John J. Mulligan.

---

This matter is before the Court on Defendants Target Corporation's (Target), Brian C. Cornell's, Michael J. Fiddelke's, A. Christina Hennington's, and John J. Mulligan's (together, Defendants) motion to dismiss (Doc. No. 81) Lead Plaintiff Terry and Diane Van Der Tuuk Living Trust's (the Trust) Amended Complaint, which alleges violations of

sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §§ 78j(b) and 78t(a), and the Securities and Exchange Commission's (SEC) implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of itself and all persons who purchased or otherwise acquired Target common stock between November 17, 2021 and May 17, 2022 (the Class Period).  For the reasons explained below, the Court grants Defendants' motion in its entirety.

## BACKGROUND[1]

### I.    THE PARTIES

Target is a national retailer.  (Doc. No. 70 [hereinafter, "Am. Compl."] ¶ 29.)  Its common stock trades on the New York Stock Exchange.  (*Id.* ¶ 17.)  Defendants Cornell, Fiddelke, Hennington, and Mulligan (together, Individual Defendants) were executive officers of Target during the Class Period.[2]  (*Id.* ¶¶ 18–21.)

Plaintiffs purchased Target common stock during the Class Period.  (*Id.* ¶¶ 14, 163.)  As described more fully below, Plaintiffs allege that the Defendants made materially false and misleading statements to investors during the Class Period while in possession of material, non-public adverse information about Target that they purposefully concealed

---

[1] The following facts are drawn from the Amended Complaint, as well as "documents incorporated into the complaint by reference, and matters" subject to judicial notice, such as public SEC filings, stock price history, and industry trends. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[2] Cornell was Target's Chief Executive Officer and Board Chairman.  (*Id.* ¶ 18.)  Fiddelke was Target's Executive Vice President (EVP) and Chief Financial Officer.  (*Id.* ¶ 19.)  Hennington was Target's EVP and Chief Growth Officer.  (*Id.* ¶ 20.)  Mulligan was Target's EVP and Chief Operating Officer.  (*Id.* ¶ 21.)

from investors. (*Id.* ¶ 24.) Plaintiffs further allege that Fiddelke, Cornell, and Hennington had a motive to mislead investors because they executed suspicious stock sales during the Class Period while in possession of material, non-public information about Target's inventory overstock that was not disclosed to investors and while Target's common stock price was artificially inflated due to Defendants' materially false and misleading statements. (*Id.* ¶¶ 144–49.)

## II.    ALLEGATIONS OF DECLINING DEMAND

In 2020, when some businesses were forced to close due to the COVID-19 pandemic, Target was permitted to remain open as an essential business. (*Id.* ¶ 2.) During that year, Target reported record sales growth across each of its five "core" product categories: (1) apparel and accessories; (2) beauty and household essentials; (3) food and beverage; (4) hardlines; and (5) home furnishings and décor. (*Id.* ¶¶ 29–30.) As consumers spent more time at home due to lockdowns, Target's sales in the hardlines and home goods (HHG)[3] categories particularly grew, each constituting roughly one fifth of Target's sales going into fiscal year 2021. (*Id.* ¶¶ 2, 29.) Despite this growth, in late 2020, supply chain issues prevented Target from keeping its shelves fully stocked, which negatively impacted its revenue. (*Id.* ¶ 3.)

By early- to mid-2021, when COVID restrictions were lifting and non-essential businesses reopening, Plaintiffs allege that consumers' shopping habits shifted away from

---

[3] The hardlines category includes electronics, toys, entertainment, sporting goods, and luggage. (*Id.* ¶ 29.) The home goods category includes furniture, lighting, storage, kitchenware, small appliances, home décor, bed and bath, home improvement, school and office supplies, greeting cards, party supplies, and seasonal merchandise. (*Id.*)

HHGs, causing the availability of those products to increase. (*Id.*) Despite this shift in consumer preferences, Plaintiffs allege that by at least June 2021, Target had begun preordering large quantities of HHGs to ensure its shelves were stocked going into the 2021 holiday season. (*Id.* ¶¶ 4–5.) Plaintiffs allege that Target procured this inventory without regard for consumer preferences, which resulted in Target's warehouses, distribution centers, and stores becoming overstocked with HHGs by September of 2021. (*Id.* ¶ 6.)

Plaintiffs also allege that during the Class Period, Defendants misled investors by making a series of twenty statements. (*Id.* ¶¶ 80–115.) Plaintiffs allege that the twenty statements were materially false and misleading for essentially the same reason: Defendants were concealing the fact that Target had "abandoned its customer-focused purchasing strategy" in favor of "indiscriminately buying large quantities of inventory" that consumers did not want, particularly HHGs. (*Id.* ¶ 39.) Plaintiffs base this allegation on statements imputed to three confidential witnesses (CWs)—former Target employees who claim to have observed HHG inventory becoming overstocked in the months leading up to and through the Class Period.[4] (*Id.* ¶¶ 80–115.)

CW-1 was a warehouse associate at Target's regional distribution center (RDC) in Albany, Oregon, which services five states in the Pacific Northwest, during the Class Period. (*Id.* ¶ 26.) In that role, CW-1 was responsible for unloading and sorting inventory

---

[4] Plaintiffs also ask the Court to consider "anonymous employee posts on multiple Internet forums for Target employees from across the country" that they argue "corroborate the CW accounts." (Doc. No. 91 at 29; Am. Compl. ¶¶ 74–78.) Defendants contend that the Court should not consider these posts because "anonymous and unsubstantiated user comments badly flunk pleading fraud." (Doc. No. 83 at 23 n.10.) The Court declines to consider these posts, but even if it did, they would not have a determinative effect on the outcome.

received from vendors, selecting inventory to ship to stores, and attending daily shift meetings to discuss the state of inventory and how it exceeded the RDC's intended capacity.[5] (*Id.* ¶¶ 46–47, 49–50.) CW-1 observed inventory levels at the RDC, including "stash aisles" of excess inventory and 50 to 100 trailers of inventory in the RDC parking lot, and learned through daily meetings with the Senior Director of Distribution (and headquarters liaison) of the RDC's decreasing capacity for inventory. (*Id.* ¶¶ 49–54.)

CW-2 was an operations manager at Target's flow center warehouse in Logan Township, New Jersey, during the Class Period, and was responsible for replenishing inventories and fulfilling e-commerce orders for much of the East Coast, including direct-to-consumer online sales and stores in five states. (*Id.* ¶ 56.) CW-2 observed inventory accumulating at the warehouse. (*Id.* ¶¶ 58–60.) CW-2 was also given inventory reports from Target headquarters generated from a custom-built warehouse management system. (*Id.* ¶ 61.)

CW-3 was an executive team lead (ETL) at a major Target store in New York during the Class Period, and was responsible for receiving and unloading incoming inventory, managing the back stockroom, getting inventory onto the sales floor, and fulfilling customer orders. (*Id.* ¶ 64.) CW-3 had access to Target's inventory management data system and received directives from headquarters based on data from that system. (*Id.* ¶¶ 67–69.) CW-3 also communicated directly with ETLs who oversaw other stores in the

---

[5] "According to CW-1, the overwhelming majority of inventory sold in Target stores flows from vendors through Target's RDCs, save for 'very few' products that go straight to stores." (Am. Compl. ¶ 47.)

same region, as well as the district store director, who visited stores weekly or bi-weekly and observed and discussed overstock on the sales floor and in the stockroom with ETLs. (*Id.* ¶ 70.)

## III.    ALLEGATIONS OF FALSE AND MISLEADING STATEMENTS

Based on information provided by the CWs, Plaintiffs allege that the following twenty statements, made by Defendants across five separate dates during the Class Period, were materially false and misleading.

### A.    November 17, 2021 Statements

On November 17, 2021, Target held a Q3 2021 earnings call in which it announced its third quarter financial results.  (*Id.* ¶ 80.)  During that call, Hennington claimed that Target was using consumer insights to inform its inventory purchasing decisions:

> ***We continuously evaluate our guests' mindset, which serves as a North Star for all our strategies and decisions.***  We remain laser-focused on their experiences with us  and expectations of us.  And we strive to build flexibility and agility into our plans to ensure we show up at our best for them during the holidays and all year round.
>
> ***
>
> As [Mulligan] will outline in more detail, ***our teams are working diligently to get the right inventory to the right place at the right time***.  Doing so has driven some near-term gross margin pressure, appropriate long-term investment in the relationship with our guests.  ***Bottom line, based on the incredible efforts of our team, we feel good about our inventory levels heading into the holiday season***.

(*Id.* ¶ 81 (Statements 1, 2, and 3) (emphasis in original).)[6]  On that same call, Mulligan told investors that Target was focused on moving appropriate levels of inventory, particularly during the prime holiday shopping season, and stated: "On our supply chain team, ***the focus is on moving the right amount of inventory to the right place at the right time***.  (*Id.* ¶ 82 (Statement 4) (emphasis in original).)  Later during that call, Mulligan reiterated that, "while we continue to see some periodic outages across different items and categories, ***we're entering the holidays with a very healthy inventory position overall***.  (*Id.* ¶ 84 (Statement 5) (emphasis in original).)

Following Defendants' prepared statements, the earnings call turned to a question-and-answer session with securities analysts.  (*Id.* ¶ 86.)  In response to a question posed about how inventory levels were affecting Target's gross margin, Fiddelke emphasized that Target purchased and positioned its inventory with reference to guests' expectations:

> As you know, we don't guide margins specifically out into future quarters.  But I will say and reiterate what I said in my remarks.  ***I think you're seeing in the third quarter, the result of some very specific investments we made.  And the biggest of those investments is an investment to make sure we've got a great inventory position heading into the fourth quarter.  And pulling all the levers within the system to ensure we're there for the guest has been our priority***.  And some of those levers, think of expediting product to come at a cost, and you saw some of that in the third quarter.
>
> But I feel really good about the payoff from an investment decision like that.  ***We've got inventory of $2 billion north of last year, up almost 20% on a year-over-year basis.  And that's fueling the continued top line growth that we see.  So, I feel really good about the set of investments that we're***

---

[6] All italicized and bolded text are statements that Plaintiffs allege are false and misleading. (Am. Compl. at 28 n.8.)  Additional statements are provided for necessary context.  (*Id.*)

> ***making and how they have us positioned for the back part of
> the year***.

(*Id.* ¶ 86 (Statement 6) (emphasis in original).)

Plaintiffs allege that the November 17, 2021 statements were materially false and misleading because by at least June 2021, Target was not taking customers' shifting buying habits into account but, instead, preordered excess quantities of HHG inventory, which resulted in a massive overstock that was not "well-positioned" or "healthy" but that would need to be marked down and discounted in order to sell.  (*Id.* ¶¶ 83, 85, 87.)

**B.    November 24, 2021 Statements**

On November 24, 2021, Target filed a Q3 2021 Form 10-Q, which reported its financial and operating results for that quarter.  (*Id.* ¶ 88.)  The Form 10-Q indicated that its inventory management aimed to offset supply chain pressures:

> Since the onset of the COVID-19 pandemic, we have experienced strong comparable sales growth and significant volatility in our sales category and channel mix, including same-day fulfillment options.   Note 4 presents sales by category.   ***We have taken various actions, including accelerating purchases of certain merchandise in our core categories*** and, early in the pandemic, slowing or canceling purchase orders, primarily for Apparel and Accessories.  As a result, during the quarter ended May 2, 2020, we recorded $216 million of purchase order cancellation fees in Cost of Sales.

(*Id.* (Statement 7) (emphasis in original).)  It also stated that Target's inventory position was a positive driver of the gross margin rate in contrast to negative drivers (e.g., supply chain issues), as follows:

> For the three months ended October 30, 2021, our gross margin rate was 28.0 percent compared with 30.6 percent in the

comparable prior-year period.  This decrease reflected the net impact of[:]

• pressure from higher merchandise and freight costs and higher inventory shrink, *partially offset by the benefit of historically low promotional and clearance markdown rates*;

• supply chain pressure related to increased compensation and headcount in our distribution centers; and

• favorable mix in the relative growth rates of higher and lower margin categories.

(*Id.* ¶ 90 (Statement 8) (emphasis in original).)

The Form 10-Q also informed investors that Target had factored customer sales trends in its inventory position, as follows:

Inventory was $15.0 billion as of October 30, 2021, compared with $10.7 billion and $12.7 billion at January 30, 2021, and October 31, 2020, respectively.  *The increase over the balance as of October 31, 2020, reflects efforts to align inventory with sales trends*.

(*Id.* ¶ 92 (Statement 9) (emphasis in original).)  Finally, the Form 10-Q incorporated by reference statements in Target's Form 10-K, which it filed with the SEC on March 10, 2021, that were purportedly made to warn investors of certain risk factors, as follows:

*If we do not anticipate and respond quickly to changing consumer preferences, our sales and profitability could suffer.  A large part of our business is dependent on our ability to make trend-right decisions and effectively manage our inventory in a broad range of merchandise categories, including apparel, accessories, home décor, electronics, toys, seasonal offerings, food, and others.  If we do not obtain accurate and relevant data on guest preferences, predict and quickly respond to changing consumer tastes, preferences, spending patterns and other lifestyle decisions, emphasize the correct categories, implement competitive and effective pricing and promotion strategies, or personalize our offerings to our guests, we may experience lost sales,*

9

> *spoilage, and increased inventory markdowns, which could*
> *adversely affect our results of operations*.

(*Id.* ¶ 94 (Statement 10) (emphasis in original).)

Plaintiffs allege that the November 24, 2021 statements were materially false and misleading because the purported risk being warned of had already materialized and because Defendants failed to disclose that, in preordering massive quantities of hardline and home good inventory, Target had abandoned the use of customer data and insights, which was creating an immense overstock of those items, which would eventually need to be marked down and discounted. (*Id.* ¶¶ 89, 91, 93, 95.)

## C.    March 1, 2022 Statements

On March 1, 2022, Target announced its 2021 Q4 earnings. (*Id.* ¶ 96.) A press release stated that Target's "[f]ull-year gross margin rate was 28.3 percent, in line with 28.4 percent in 2020, reflecting pressure from increased supply chain, merchandise, and freight costs *largely offset by favorable category mix and lower markdowns*." (*Id.* (Statement 11) (emphasis in original).)

On a Q4 earnings call, Hennington emphasized that Target's business model, which factored in customer preferences, gave the company a unique competitive edge, as follows:

> We have created momentum through unique and innovative
> strategies, many of which began long before the onset of the
> pandemic. And *because of our durable, flexible business*
> *model, we have proven we can adapt to any environment*.
> *We'll continue to play offense and accelerate these strategies*
> *while listening to the ever-changing wants and needs of our*
> *guests* to ensure our playbook is a direct reflection of what they
> have come to expect from Target.

(*Id.* ¶ 98 (Statement 12) (emphasis in original).)  On that same call, Fiddelke discussed Target's plans for markdowns in the coming year, stating, "***[W]e're planning for a small increase in markdown rates in 2022*** as we move past the dramatically low rates we've seen over the last couple of years."  (*Id.* ¶ 100 (Statement 13) (emphasis in original).)

Following Defendants' prepared statements, the call opened up to a question-and-answer format with securities analysts.  (*Id.* ¶ 101.)  In response to an analyst question about Target's efficiency in markdowns, Fiddelke said the following:

> The shape of profit for the year will be like we described, where you could expect it to build over the course of the year. ***When it comes to markdowns specifically, there's some markdowns that we've been rooting for returning.  To be better in stock with stronger inventory levels means a few more clearance markdowns, and we're planning for that outcome in the upcoming year***.

(*Id.* (Statement 14) (emphasis in original).)  When analysts on the call continued to inquire about Target stores' capacity to store inventory, Mulligan said the following:

> I think the other thing I'd add on is as inventory turns increase with scale, you just push things through faster.  ***Speed and flow of inventory is the key to the whole game***, like we were just talking about with Robby.  ***And as that happens, we see it in our largest stores, they just move inventory.  It's constantly moving through***.  It shows up at night.  It's out the store the next day.  That's capacity.  ***You're just moving inventory.  So a lot of headroom for growth from that perspective***.

(*Id.* ¶ 103 (Statement 15) (emphasis in original).)

That same day, Fiddelke also took part in an interview with Bloomberg's "Bloomberg Surveillance" television program.  (*Id.* ¶ 105.)  When asked about how Target handled supply chain disruptions and inflation, Fiddelke responded as follows:

> Well, as you might expect, it's a situation we monitor really closely and I'll start by just saying our hearts go out to everyone impacted by the situation in Ukraine. I know it weighs heavily on my mind, our Target team and our guests. We're fortunate. We've got the benefit of a really sophisticated supply chain that's navigated a lot of challenges over the last two years. Incredibly well. ***I feel really good about our inventory position today, up 30% to last year. That's a testament to us working through some of those supply chain challenges. So, we should be well positioned to start the year.***

(*Id.* ¶ 105 (Statement 16) (emphasis in original).)

Plaintiffs allege that the March 1, 2022 statements were materially false and misleading because they failed to disclose that Target had abandoned its "durable, flexible business model" as it related to inventory management, "gave the false impression that Target was not overstocked in inventory such that the Company would not need to take major markdowns and thereby have a higher gross margin," "gave the misleading impression that at that time inventory was constantly moving and not building up and that Target stores had plenty of inventory capacity," and because "Defendants had no basis to view Target's inventory increase as positive or its inventory status as 'well positioned.'" (*Id.* ¶¶ 97, 99, 102, 104, 106.) Rather, by June 2021, Defendants had begun preordering large quantities of hardline and furniture inventory without regard for customer trends. (*Id.* ¶ 106.) That inventory piled up in Target's distribution centers and stores because consumers were not buying it and, in turn, Target would be compelled to mark that inventory down and write it off the following quarter. (*Id.*)

**D.    March 9, 2022 Statements**

On March 9, 2022, Target filed a Form 10-K with the SEC, which reported its results for Q4 of 2021.  (*Id.* ¶ 107.)  It told investors the following:

> Effective inventory management is key to our ongoing success, and we use various techniques including demand forecasting and planning and various forms of replenishment management. ***We achieve effective inventory management by*** staying in-stock in core product offerings, maintaining positive vendor relationships, ***and carefully planning inventory levels for seasonal and apparel items to minimize markdowns.***

(*Id.* ¶ 108 (Statement 17) (emphasis in original).)  It also described Target's gross margin rate as "a boon," as follows:

> Our gross margin rate was 28.3 percent in 2021 and 28.4 percent in 2020.  This decrease reflected the net impact of[:]
>
> • supply chain pressure related to increased compensation and headcount in our distribution centers, partially offset by the small net benefit of a higher percentage of digital sales fulfilled through our lower-cost same-day fulfillment options;
>
> • higher merchandise and freight costs partially ***offset by historically low promotional and clearance markdown rates***; and
>
> • ***favorable mix in the relative growth rates of higher and lower margin categories***.

(*Id.* ¶ 110 (Statement 18) (emphasis in original).)

The Form 10-K also represented that Target's year-end 2021 inventory was up by $3 billion from 2020 because "***[t]he increase in inventory levels reflect our efforts to align inventory with sales trends***, and elevated in-transit inventory related to import supply chain delays."  (*Id.* ¶ 112 (Statement 19) (emphasis in original).)  Finally, the Form 10-K

purported to warn investors of the risk that Target's business could be negatively impacted

if Target failed to adapt to changing consumer buying behaviors:

> ***If we do not anticipate and respond quickly to changing consumer preferences, our sales and profitability could suffer***.  A large part of our business is dependent on our ability to make trend-right decisions and effectively manage our inventory in a broad range of merchandise categories, including apparel, accessories, home décor, electronics, toys, seasonal offerings, food and beverage, and others.  ***If we do not obtain accurate and relevant data on guest preferences, predict and quickly respond to changing consumer preferences, spending patterns, and other lifestyle decisions, emphasize the correct categories, implement competitive and effective pricing and promotion strategies***, or personalize our offerings to our guests, ***we may experience lost sales, spoilage, and increased inventory markdowns, which could adversely affect our results of operations***.  During the COVID-19 pandemic, many guests significantly reduced their spending on dining, travel, lodging, and other leisure activities outside their homes, which may have contributed to our increased sales, particularly for essential items and merchandise associated with guests spending more time at home.  ***If we are unable to effectively adapt if or when guests increase spending on other categories, it could lead to lower sales and adversely affect our results of operations***.

(*Id.* ¶ 114 (Statement 20) (emphasis in original).)

Plaintiffs allege that the March 9, 2022 statements were materially false and

misleading because the purported risk being warned of had already materialized,

Defendants were not "carefully planning inventory levels," "achiev[ing] effective

inventory management," or "align[ing] inventory with sales trends" and did not have a

"favorable mix."  (*Id.* ¶¶ 109, 111, 113, 115.)  Rather, by at least June 2021, Defendants

purposefully preordered large quantities of hardline and furniture inventory without regard

for customer trends.  (*Id.*)  That inventory piled up in Target's distribution centers and

stores because consumers were not buying it and, in turn, Target had been and would be compelled to mark that inventory down and write it off. (*Id.*)

## IV.    TARGET ANNOUNCEMENT OF DEMAND DECLINE

On May 18, 2022, Target announced its Q1 results. (*Id.* ¶ 116.) According to Plaintiffs, that announcement revealed that Target's net profits were down 52%, its operating margin was "well below expectations, driven primarily by gross margin pressure reflecting actions to reduce excess inventory," and that gross margin had dropped to 25.7% compared to 30.0% in the same quarter 2021, which "reflected higher markdown rates." (*Id.*) Hennington stated that,

> as supply grew and demand shifted away from bigger, bulkier products like furniture, TVs and more, we needed to make difficult trade-off decisions . . . . To preserve the quality of on-shelf presentations and support the guest experience, we chose [to make room for fast-growing categories], leading to incremental markdowns that reduced our gross margin.

(*Id.* ¶ 120 (emphasis omitted).) Cornell stated that much of the excess inventory was in "bulky" categories such as "kitchen appliances, TVs and outdoor furniture"—products within Target's HHGs categories, which the CWs and Target employees had spoken about. (*Id.* ¶ 118.) On this news, Target's stock price declined $53.67 per share, or nearly 25%, from a closing price of $215.28 per share on May 17, 2022, to close at $161.61 per share on May 18, 2022. (*Id.* ¶ 124.)

## V.    THIS ACTION

Plaintiffs commenced this action in March 2023. (Doc. No. 1.) In their Amended Complaint, Plaintiffs assert two claims. (*See* Am. Compl.) Count I is a claim for securities

fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the SEC's implementing Regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants.  (*Id.* ¶¶ 170–80.)  Count II is a claim of controlling-person liability under Section 20(a) of the Exchange Act against the Individual Defendants.  (*Id.* ¶¶ 181–85.)

## DISCUSSION

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  A complaint must present "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).  To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A pleading has facial plausibility when its allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In this analysis, the Court construes the allegations and draws inferences from them in the light most favorable to the plaintiff.  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018).

Defendants argue that Plaintiffs' allegations do not satisfy the heightened pleading standards set forth in the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b, which applies to their claims.  (Doc. No. 81.)  As discussed below, the Court agrees.

## I.    FAILURE TO ADEQUATELY ALLEGE FALSITY IN COUNT I

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 also makes it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Together, Section 10(b) and Rule 10b-5 create a private cause of action for fraud. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). A claim for securities fraud under Section 10(b) and Rule 10b-5 has the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (quotation omitted).

In addition to the *Iqbal/Twombly* pleading standard, when a plaintiff has alleged securities fraud claims, the complaint is also subject to the heightened pleading requirements of the PSLRA, which incorporates the standards of and supersedes reliance on Federal Rule of Civil Procedure 9(b). *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002); *see* Fed. R. Civ. P. 9(b) (setting forth that a party alleging fraud must "state with particularity the circumstances constituting fraud" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). The

PSLRA is distinct from Rule 9(b) because it requires that falsity and scienter be pleaded with particularity. *Navarre*, 299 F.3d at 742.

Defendants argue that Plaintiffs' allegations do not satisfy the heightened PSLRA standard in any of the elements of their claim. The Court begins and ends its analysis of Count I with the falsity element.[7]  (Doc. No. 83 at 12–37.)  Under the PSLRA, the complaint must "specify each false statement or misleading omission and explain why the omission was misleading."  15 U.S.C. § 78u-4(b)(1).  The complaint must set forth the "who, what, when, where and how of the misleading statements or omissions," *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009) (quotation omitted), and "indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made." *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 958–59 (8th Cir. 2008) (quotation omitted).  Defendants argue that there are "universal defects" with Plaintiffs' falsity allegations, namely that Plaintiffs have failed to allege the basis for the CWs' knowledge and that some of the CWs' statements are consistent with Target's statements, while others are contradicted by Target's public disclosures.  (Doc. No. 83 at 23–30.)  In addition, Defendants argue that the alleged misstatements are nonactionable for independent reasons, which vary based on the category of statement at issue.  (*Id.* at 13, 30.)

---

[7] In light of the Court's decision that Plaintiffs have failed to plead falsity, the Court need not reach the question of whether Plaintiffs have adequately pleaded scienter.

### A.    Universal Defects

Allegations based on confidential witness accounts in securities-fraud actions are distinct from other factual allegations contained in a complaint (which courts must accept as true on a motion to dismiss), and courts view them with skepticism. *See Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) (disregarding plaintiff's reliance on allegations of confidential sources and affirming dismissal for failure to state a securities-fraud claim); *see also Trs. of Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*, No. 22-CV-2197 (KMM/JFD), 2024 WL 1332262, at *30 (D. Minn. Mar. 28, 2024) (granting motion to dismiss for failure to state a securities fraud claim and noting that courts "treat allegations in a complaint based on the accounts of confidential witnesses with skepticism"); *Shoemaker v. Cardiovascular Sys. Inc.*, 300 F. Supp. 3d 1046, 1055 (D. Minn. 2018) (granting motion to dismiss for failure to state a securities fraud claim and noting that "courts are not required to wholly accept as true statements from a confidential witness"). When determining whether a plaintiff's allegations satisfy the PLSRA's heightened pleading standard, courts consider, among other things, whether the complaint contains allegations that support a confidential witness's basis of knowledge. *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008).

Dismissal is proper where the plaintiff fails to adequately allege the confidential witness's basis of knowledge and the confidential witness's statement is the only allegation supporting the alleged misrepresentation. *See, e.g.*, *In re Hutchinson Tech.*, 536 F.3d at 959–60 (affirming dismissal for failure to state a securities fraud claim because the

complaint lacked "any allegations showing the basis of" the confidential witness's knowledge, and the confidential witness "provided the only basis for" the alleged misrepresentation); *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014) (noting same).

The allegations in the Amended Complaint do not satisfy the PSLRA's heightened pleading requirement because they fail to adequately set forth any of the three CWs' basis for knowing facts that support the heart of the alleged omission: that Target had "abandoned its customer-focused purchasing strategy" in favor of "indiscriminately buying large quantities of inventory" that consumers did not want, particularly HHGs. (Am. Compl. ¶ 39.) Plaintiffs fail to allege facts to support the notion that the CWs had personal knowledge of Target's inventory procurement processes (e.g., what Target's consumer data showed, how the data factored into Target's inventory procurement, or how the data was inconsistent with Targets actions). Plaintiffs have also failed to allege how any of the CWs knew that Defendants had abandoned Target's inventory procurement policy in favor of intentionally ordering inventory without regard to consumer demand. For instance, there are no allegations that any of the CWs were involved at the merchandise-procurement stage or spoke with anybody involved at that stage who shared knowledge of an intentional shift in the inventory-procurement policy. Additionally, there are no allegations to suggest any of the CWs analyzed Target's companywide sales or demand, knew customer-purchasing patterns across Target's business, let alone what merchandise Target was purchasing and when. Rather, Plaintiffs allege that the CWs had knowledge of Target's inventory after it was procured, namely that they observed inventory levels increasing after the fact, which

is not enough to survive a motion to dismiss.  *See In re Hutchinson Tech. Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 895 (D. Minn. 2007) (concluding that CW's observation that returns had decreased did not support allegation that the company's return allowances were inadequate), *aff'd*, 536 F.3d 952.  Moreover, the CWs' observations were consistent with Target's public statements that it was preordering merchandise and investing in increased inventory.  (*See* Doc. No. 84, Ex. L at 31.)  Target's audited financial statements show that consumer demand for HHGs was consistently increasing throughout 2021, on top of record increases in 2020.  (*Id.*, Ex. K.)

Thus, drawing all reasonable inferences in Plaintiffs' favor, the allegations contained in the Amended Complaint fail to adequately allege falsity, in part, because they do not set forth facts demonstrating the CWs' basis for knowing the alleged omission.

## B.    Independent Grounds

Defendants group the twenty alleged misstatements into six categories: (1) demand warnings; (2) insight statements; (3) investment statements; (4) flow statements; (5) historic statements; and (6) markdown projections.  Defendants then contend that the six categories of statements constitute forward-looking statements, statements of corporate optimism, and opinion statements, which are nonactionable under the PSLRA.  (Doc. No. 83 at 35–47.)  The Court agrees.

Under the PSLRA's "safe-harbor" provisions, a defendant's forward-looking statements are nonactionable if they are accompanied by "meaningful cautionary statements," are "immaterial," or made without actual knowledge of falsity.  15 U.S.C. § 78u-5(c); *see also Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920–21 (8th Cir. 2015).

Forward-looking statements include the following types of statements: "(1) projections of revenues or other financial items, (2) statements of plans and objectives for future operations, and (3) statements of the assumptions underlying the previous two categories." *K-V Pharm*, 791 F.3d at 921 (citing 15 U.S.C. § 78u-5(i)(1)). "In determining whether a statement is truly forward-looking, the determinative factor is not the tense of the statement; instead, the key is whether its truth or falsity is discernible only after it is made." *Id.* (quotation omitted). In addition, a statement that accurately reports past events or historic performance cannot support a securities fraud action. *In re Marion Merrell Dow Inc., Sec. Litig. II*, No. 93-0251-CV-W-6, 1994 WL 396187, at *3–4 (W.D. Mo. July 18, 1994); *see also In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009) (concluding that company's public statements were nonactionable because they reported accurate historical financial information).

The Court considers each of the twenty statements, by category, to determine whether they are actionable under the PSLRA.

### i.    Demand Warnings

The first category of allegedly misleading statements concerns Statements 10 and 20, warnings about demand that Target included in its Form 10-K and Form 10-Q filings with the SEC. (Am. Compl. ¶¶ 94, 114.) These filings disclosed the following three risks that could occur if Target did not obtain accurate and relevant data on and anticipate and respond quickly to changing consumer preferences: (1) lost sales, (2) spoilage, and (3) increased inventory markdowns that could adversely affect Target's results of operation. (*Id.*) According to Plaintiffs, these statements were materially false and

misleading because Defendants had stopped procuring inventory based on consumer data and insights, resulting in unwanted inventory that Target could not sell, and that necessitated large discounts and corresponding write-offs. The Court disagrees and finds that the statements are nonactionable for the following two reasons.

First, Plaintiffs have failed to plausibly allege that the statements were made "with actual knowledge . . . that the statement[s] w[ere] false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). The Amended Complaint contains no allegation that when Defendants made these statements on November 24, 2021, and March 9, 2022, they *knew* that lost sales, spoilage, and increased inventory markdowns had already occurred. *Trs. of Welfare*, 2024 WL 1332262, at *15 (finding forward-looking statements nonactionable under the PSLRA's safe-harbor provisions where plaintiffs did not plausibly allege that at the times defendants made the forward-looking statements, they knew that the potential risk about which they cautioned had already been realized).

Second, the allegations do not support an inference that the statements were materially false. 15 U.S.C. § 78u-5(c)(1)(A) (stating the persons "shall not be liable with respect to any forward-looking statement . . . to the extent that . . . the forward-looking statement is . . . immaterial"). The most support Plaintiffs seem to offer for such an allegation comes from CW-3's statement that by June 2021, Target corporate headquarters had directed increasing markdowns of certain overstocked products. (Am. Compl. ¶ 72.) However, these statements say nothing of magnitude or degree; without more, they cannot support an inference that the unqualified markdowns would materially harm Target's operations. Moreover, audited financial statements show that sales of HHGs increased

throughout 2021.  (*See* Doc. No. 84, Ex. K.)  Specifically, hardline sales in 2021 increased

48% from 2019 and 12% from 2020, and home goods increased 40% from 2019 and 11%

from 2020.  (*Id.*)  Given this increase, the Court cannot draw any inference that the demand

statements were materially false and misleading.

### ii.    *Insight Statements*

The second category of allegedly misleading statements concerns Statements 1 and

12, two statements made during Target's Q3 and Q4 2021 earnings calls.  (Am. Compl.

¶¶ 81, 98.)  According to Plaintiffs, these insight statements were materially false and

misleading because as of June 2021, Target was not procuring inventory based on

consumer demand.  The Court disagrees and finds that the statements are nonactionable

optimistic rhetoric.

A statement is nonactionable, under Section 10(b), if "a reasonable investor could

not have been swayed by the statement."  *City of Plantation Police Officers Pension Fund*

*v. Meredith Corp.*, 16 F.4th 553, 556 (8th Cir. 2021) (quotation omitted).  "Vague or

optimistic rhetoric—sometimes called corporate 'puffery'—falls into this category."  *Id.*

(quotation omitted).  The insight statements at issue here reference Target's continuous

evaluation of its guests' mindset, "which serves as a North Star for all [its] strategies and

decisions," as well as the fact that Target listens "to the everchanging wants and needs of

[its] guests."  (Am. Compl. ¶¶ 81, 98.)  Such statements constitute quintessential examples

of nonactionable corporate puffery.  *Meredith*, 16 F.4th at 557 (deeming references to

"proven strategies" inactionable corporate puffery); *see also Kusnier v. Virgin Galactic*

*Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y. 2022) (concluding that defendant's

statement of "uncompromising commitment to . . . customer satisfaction" was "pure puffery"); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 727 (D. Minn. 2019) (noting that "in many instances, statements about meeting customer needs could be puffery" but not where it is alleged that defendant's financial performance stemmed, in material part, from fraud on customers); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y 2019) (interpreting statements that defendant "understands what its customers want and has a connectivity with its consumer" as "plainly puffery" (quotations omitted)).  Thus, no reasonable investor could have been swayed by Defendants' vague, optimistic insight statements.

### iii.    *Investment Statements*

The third category of allegedly misleading statements concerns Statements 3, 5, 6, 16, and 17, which comprise five statements made during the Q3 2021 earnings call, the question-and-answer session that immediately followed, the Bloomberg interview, and in the Form 10-K.  (Am. Compl. ¶¶ 81, 84, 86, 105, 108.)  The Defendants' statements express generic optimism about Target's inventory investments, describing its inventory as "healthy" and "well-positioned," and stating that they felt good about it.  (*Id.* ¶¶ 81, 84, 86, 105.)  The Form 10-K also described how Target carefully plans seasonal inventory levels to minimize markdowns and achieve effective inventory management.  (*Id.* ¶ 108.) According to Plaintiffs, these statements were materially false and misleading because Target had no basis to view its inventory positively after experiencing overstocked inventory as a result—Plaintiffs allege—of no longer considering consumer demand when

procuring inventory.  Again, the Court disagrees, concluding that these statements are also nonactionable corporate puffery.

Previous courts have reached the same conclusion concerning nearly identical positive inventory characterizations.  *See, e.g.*, *Trs. of Welfare*, 2024 WL 1332262, at *30 (finding defendant's statement that they "felt really good about the pipeline" for products was an inactionable statement of optimism and opinion (quotation omitted)); *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 n.2 (8th Cir. 2020) (finding defendant's statement that they "feel really good about where we are today" was nonactionable puffery); *In re Hutchinson Tech.*, 536 F.3d at 960 (affirming district court's determination that defendant's statement that it was "well-positioned" was too vague); *see also Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, No. 21-CV-9582 (ALC)(OTW), 2024 WL 4362747, at *12 (S.D.N.Y. Sept. 30, 2024) (concluding that defendant's forward-looking statement about its "healthy" inventory heading into a busy time of year was "precisely the type of vague expressions of optimism" that courts dismiss).  Moreover, the context of the investment statements at issue here would have made clear to a reasonable investor that the health of Target's inventory was relative to the persistent inventory shortages resulting from the unprecedented COVID-19 pandemic and its effect on the global economy.  *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) ("[I]f no reasonable investor could conclude public statements, taken together and in context were misleading, then the issue is appropriately resolved as a matter of law.")  Thus, the investment statements cannot support an actionable securities fraud claim.

### iv.    *Flow Statements*

The next category of allegedly misleading statements concerns Statements 2, 4, and 15, three statements made during Target's Q3 and Q4 2021 earnings calls concerning the flow of inventory.  (Am. Compl. ¶¶ 81, 82, 103.)  The Defendants' statements describe Target's efforts to move the right inventory "to the right place at the right time" (*id.* ¶¶ 81, 82), as well as how "[s]peed and flow of inventory is the key to the whole game" and "there was a lot of headroom for growth" because inventory was constantly moving through Target's "largest stores."  (*Id.* ¶ 103.)  Again, Plaintiffs argue these statements were materially false and misleading because Target had no basis to view its inventory positively.  The Court disagrees and finds the flow statements are nonactionable for the following two reasons.

First, the mere allegation that Target procured inventory without regard for consumer demand does not necessary establish the falsity of Target's statement that it was trying to get the right inventory to the right place at the right time.  *See Foot Locker*, 412 F. Supp. 3d at 224 (noting that confidential witnesses' statements that retailer bought "large quantities of undesirable merchandise in order to obtain desirable merchandise" did not undercut the retailer's statements that it was "try[ing] to get what it thought was the appropriate amount for its stores" or "working to improve allocation to get the right product to the right place, right time" (quotation omitted)).  Nor does it necessarily mean that Target's other flow statements were false.

Second, as with the insight and investment statements discussed above, the flow statements are also examples of vague, optimistic rhetoric that constitutes nonactionable

puffery. *See U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No 12-CV-6811 (CM)(JCF), 2013 WL 791462, at *6 (S.D.N.Y. Mar. 5, 2013) ("Where a representation is subject to varying interpretations depending upon varying standards different persons use, classic puffery is involved." (quotation omitted)); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052 (C.D. Cal. 2012) (concluding that alleged misstatements that corporation would "draw on its deep executive bench to position the right leaders in the right roles to accelerate the long-term growth" was nonactionable puffery).    Therefore, the flow statements are nonactionable.

### v.    Historic Statements

The next category of allegedly misleading statements concerns Statements 7, 8, 9, 11, 18, and 19, which comprise six statements made in Target's Form 10-Q, press release, Q4 2021 earnings call, and Form 10-K.  (Am. Compl. ¶¶ 88, 90, 92, 96, 110, 112.)  These statements report on Target's past financial and operating results, gross margin rate, inventory position, and certain company actions.  (*See id.*)  According to Plaintiffs, these statements were materially false and misleading because they misled investors as to the likelihood of future markdowns.  (*Id.* ¶¶ 91, 97, 111.)  The Court disagrees and finds these statements are nonactionable because they are reports of past performance or events and the Amended Complaint contains no allegations that the historic statements are false or inaccurate.  *See In re Marion Merrell Dow*, 1994 WL 396187, at *3–4 (listing cases and noting that "statements pertaining to past performance not alleged to be inaccurate are clearly not materially misleading"); *see also In re Medtronic*, 618 F. Supp. 2d at 1031 (dismissing for failure to state a securities fraud claim because the complaint made no

allegations that the statements at issue, which concerned past sales and economic success, were inaccurate).

### vi.    *Markdown Projections*

The final category of allegedly misleading statements concerns Statements 13 and 14, which comprise two statements made during the Q4 2021 earnings call and the question-and-answer session immediately following that call.  (Am. Compl. ¶¶ 100, 101.) The Defendants' statements relate to their projections for a "small increase in markdown rates."  (*Id.* ¶ 100.)  According to Plaintiffs, these statements were materially false and misleading because Defendants knew that HHG inventory would need "significant markdowns and write-offs the immediately following quarter," yet understated their extent. (*Id.* ¶ 102.)  The Court disagrees.

The markdown statements are nonactionable because Plaintiffs have failed to plausibly allege that at the time the statements were made Defendants had "actual knowledge . . . that the statement[s] w[ere] false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(ii)(II).  Specifically, Plaintiffs have failed to allege facts showing that Defendants knew—at the time these statements were made—that demand would rapidly change later that month, necessitating additional markdowns beyond those contemplated at that time. *See In re Target Sec. Litig.*, 275 F. Supp. 3d 1063, 1071 (D. Minn. 2017) ("[M]erely pleading that the prediction must have been false mid-year because it conflicts with year-end facts [is] an unsatisfactory explanation for 'why' the mid-year statement was false when made."); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal.

2016) (finding that just because inventory did not move as quickly as defendants projected it would did not mean projections were false when made).

In sum, drawing all reasonable inferences in Plaintiffs' favor, the Court also concludes that the allegations contained in the Amended Complaint fail to adequately allege falsity because the statements identified by Plaintiffs are protected by the PSLRA's safe-harbor provisions, namely, that they are material and that the Defendants had actual knowledge that the statements were false at the time they were made. Additionally, many of the statements are nonactionable statements of corporate optimism, opinion statements, or uncontested statements of past performance.

For these reasons, the Court will dismiss Count I.

## II.    COUNT II

Because Plaintiffs have failed to adequately allege their Section 10(b) and Rule 10b-5 claim, the claim under Section 20(a) also fails as a matter of law. *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010) ("The plain language of the control-person statute dictates that, absent a primary violation, a claim for control-person liability must fail."). Therefore, the Court will also dismiss Count II.

## III.    FORM OF DISMISSAL

"[C]ourts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal." *Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1080 (D. Minn. 2021). Dismissal with prejudice is appropriate "when a plaintiff has shown persistent pleading failures despite one or more opportunities to amend." *Id.* (quotation omitted). However, "when a plaintiff's claims might conceivably be repleaded with

success, . . . dismissal without prejudice may be justified." *Id.* (quotations omitted). Plaintiffs state that they intend to file a motion for leave to amend, pursuant to D. Minn. Local Rule 15.1(b), if the Court dismisses their complaint in its entirety. (Doc. No. 91 at 73 n.40.)

Before the present motion was filed, Plaintiffs requested, and were granted, an extension to file their amended complaint. (Doc. Nos. 60, 65, 70.) Plaintiffs also could have filed a motion for leave to amend, pursuant to Rule 15.1(b), upon reviewing the arguments Defendants raised in their motion to dismiss, but they chose to stand by the Amended Complaint in its present form. Moreover, the Court concludes that the factual deficiencies here cannot conceivably be cured. Therefore, the Court will not entertain a motion brought pursuant to Rule 15.1(b), and this action will be dismissed with prejudice.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Defendants Target Corporation's, Brian C. Cornell's, Michael J. Fiddelke's, A. Christina Hennington's, and John J. Mulligan's Motion to Dismiss (Doc. No. 81) is GRANTED; and

2.    The Amended Complaint (Doc. No. 70) is DISMISSED WITH PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 15, 2024                     /s/ *Jeffrey M. Bryan*
                                              Judge Jeffrey M. Bryan
                                              United States District Court